**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ALEON METALS, LLC *et al.*,[1] | ) | Case No. 25-90305 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF ROY GALLAGHER IN SUPPORT OF THE DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Roy Gallagher, declare as follows under penalty of perjury:

1.     I am over the age of 18 and I am authorized to submit this declaration (the "Declaration") on behalf of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). If called to testify, I could and would testify competently to the facts and opinions set forth in this Declaration.

2.     On August 17, 2025 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court"). I submit this Declaration in support of the Debtors' chapter 11 petitions and first day motions (collectively, the "First Day Motions"), filed with the Court contemporaneously herewith.

3.     Unless otherwise indicated, the statements set forth in this Declaration are based upon (a) my personal knowledge of the Debtors' business, (b) information learned from my review of relevant documents, (c) information I received from my team at Ankura Consulting Group, LLC

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aleon Metals, LLC (1610) ("Aleon Metals"); Aleon Renewable Metals, LLC (9215) ("ARM"); and Gladieux Metals Recycling, LLC (6057) ("GMR"). The location of the Debtors' service address is: P.O. Box 2290, 302 Midway Road, Freeport, TX 77542.

("Ankura") working under my supervision, (d) information I received from the Debtors' management team or other professional advisors, or (e) my experience as a restructuring professional, which is described in greater detail below.  I am not being specifically compensated for this testimony other than through payments that are proposed to be received by Ankura as an estate professional, the retention and compensation of which remain subject to this Court's approval.

## **Professional Background**

4.      I am the Chief Restructuring Officer ("CRO") of the Debtors.  I was appointed to that role on April 28, 2025.

5.      I am also a Senior Managing Director and the co-leader of Ankura's Turnaround and Restructuring Practice.  Ankura is an independent global expert services and advisory firm and the proposed financial advisor to the Debtors, with its principal office located at 485 Lexington Avenue, New York, New York 10017, and other locations worldwide.  Ankura, together with its advisor affiliates, has approximately 1,700 professionals serving over 3,000 clients across 55 countries.

6.      Ankura's Turnaround and Restructuring Practice helps distressed companies, governments, and creditors in a variety of reorganization proceedings and complex financial restructurings, both in and out of court.  Ankura is known for its ability to work alongside company management and key constituents during chapter 11 restructurings to develop a feasible and executable plan of reorganization.

7.      Since the Debtors engaged Ankura in April 2025, Ankura has worked closely with the Debtors' management and other professionals with respect to the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projections, budgets, and other financial

MOFO-359310141.5

information.  In addition to serving as the Debtors' chief restructuring officer, I am also the senior leader of the Ankura team advising the Debtors.

8.     I have more than 26 years of experience in providing strategic financial restructuring advice as both an advisor and as an investor.  Prior to joining Ankura, I had over a decade of experience as an investor in the leveraged loan and distressed debt markets with a focus on debt for equity transactions.  Since joining Ankura, I now focus on advising both companies and lender groups as they navigate through complex restructurings across various industries.

9.     I earned a Bachelor's Degree in Accounting from the University of Notre Dame and I am a Certified Public Accountant (inactive).

10.     After briefly introducing the Debtors and what they hope to achieve through these chapter 11 cases, my Declaration proceeds in four parts:

- **Part I** provides background on the Debtors' origins and business operations;

- **Part II** describes the capital and corporate organizational structure of the Debtors;

- **Part III** details the events leading to the chapter 11 filings and the goals of the restructuring; and

- **Part IV** describes the First Day Motions filed by the Debtors and sets forth the factual bases for the relief sought therein.

## Introduction

11.     The Debtors are a leading recycler of spent catalysts used in petroleum refining, from which they extract vanadium, molybdenum, and other valuable metals with a variety of chemical and industrial applications.  They own and operate the largest petroleum catalyst recycling facility of its kind in North America (the "GMR Facility" and, along with the property and assets held by ARM in Freeport, Texas, referred to herein as the "ARM Facility," the

3

"Facilities"), which can process up to 55,000 tons of material per year (based on current permitted capacity). The Debtors have also been developing an innovative process for the recycling of lithium-ion batteries and further refinement of aluminum waste generated by the Debtors' catalyst recycling processes, converting each into materials used to produce cathodes in new lithium-ion batteries.

12. The Facilities are located in Freeport, Texas, in close proximity to some of the largest oil refineries on the continent. Because of their location, the critical importance of vanadium and molybdenum to domestic supply chains (as recognized in, among other things, the 2025 omnibus spending bill signed into law by the President of the United States earlier this year),[2] and favorable developing market dynamics, the Debtors are poised to play a leading role in and derive substantial benefit from the ongoing global energy transition.

13. Despite the significant strategic and macroeconomic tailwinds for the business and its high growth potential, historical operational issues at the GMR Facility had by late 2024 led to an acute liquidity crisis. When it became apparent that the Debtors' equity holders (who had previously supported the Debtors through subordinated debt and equity investments) were no longer willing to financially support the company, a group of the Debtors' bondholders stepped in to provide funding.

14. Beginning in May 2025 (and again in July), those bondholders—which include some of the largest institutional asset managers in the world—provided bridge financing to stabilize the Debtors' operations and allow the Debtors to begin marketing their assets to potential third-party purchasers or capital providers, with an eye towards consummating a sale,

---

[2] See H.R. 1, 119th Congr. (2025), § 20004(a)(40) (appropriating $2 billion to improve U.S. stockpile of "critical minerals"); see also 86 Fed. Reg. 62199 (Nov. 9, 2021) (U.S. Geological Survey list of "critical minerals" which includes vanadium, nickel, and cobalt).

recapitalization, or other transaction (which marketing process remains ongoing).  Once it became clear that any transaction would likely require an in-court process, certain of the Debtors' bondholders (the "DIP Lenders") subsequently agreed to fund these cases with $187.5 million of debtor-in-possession financing (the "DIP Facility") and to serve as stalking horse in a sale of substantially all the Debtors' assets (the "Sale").

15.     The Debtors today commence these chapter 11 cases to clean up their balance sheet and effectuate an orderly sale of the Facilities as a going concern.  To that end, the Debtors have, with the assistance of their proposed investment banker, Jefferies LLC ("Jefferies"), engaged in a months'-long marketing process for their assets, and will continue to do so in chapter 11.

16.     I believe that the DIP Facility and a Sale—whether to the stalking horse or a third party that provides a higher or better offer for the Debtors' assets—provide the Debtors with a sound path forward in these chapter 11 cases.  The relief requested in the First Day Motions is essential to allowing the Debtors to accomplish the proposed Sale and maximize value for all stakeholders.  Accordingly, and for the reasons set forth in the First Day Motions and accompanying declarations filed contemporaneously herewith, the requested relief is warranted and should be approved.

**Overview of Business and Company History**

17.     The Debtors own and operate an industrial recycling facility that specializes in the extraction of valuable metals from waste generated by oil refineries.  The GMR Facility is the largest of its kind in North America.  It is also unique in its ability to process both hydrodesulfurization ("HDS") and residue desulfurization ("RDS") catalysts—and is in fact the only North American recycler capable of accepting RDS catalyst.[3]

---

[3] The Debtors predominantly extract molybdenum from HDS catalyst and vanadium from RDS catalyst.

18.     The Facilities are located in Freeport, Texas, which is strategically situated in the U.S. Gulf Coast refining center:



19.     The Debtors purchased the GMR Facility in 2017, after its prior owner, Gulf Chemical & Metallurgical Corporation ("Gulf"), filed for protection under chapter 11 of the Bankruptcy Code.  The Gulf bankruptcy was precipitated in part by enforcement actions brought by, among others, the Texas Commission on Environmental Quality ("TCEQ"), the Texas state Attorney General, and the county district attorney's office for what authorities alleged to have been persistent and widespread violations of various environmental laws and regulations.  As part of the purchase of assets, the Debtors entered into agreements with the TCEQ to undertake various environmental and remediation projects related to the GMR Facility.

20.     Since the 2017 acquisition, the Debtors and their capital partners have invested hundreds of millions of dollars into the Facilities.  Those investments were used to, among other things, refurbish and repair existing infrastructure, install additional equipment and machinery to mitigate air and water pollution, amend and renew environmental permits to reflect current operations, address violations noticed by the TCEQ and federal Environmental Protection Agency, and fund potential future remediation obligations associated with the Facilities and surrounding area.

21.     The GMR Facility hosts a number of pieces of advanced processing equipment, including multiple hearth furnaces, hydrometallurgical circuits, and an electric arc furnace (the "EAF") owned by ARM.  The Debtors' operations are supported by an experienced management team and technical staff, with decades of operational and engineering expertise in metals recycling, hazardous waste management, and chemical processing.  The Debtors maintain strong relationships with their suppliers and customers and are recognized as an important link in the domestic supply chain for critical minerals and sustainable infrastructure.  That importance will only grow in coming years due to not only the looming energy transition, but also strong bipartisan support for the onshoring of key aspects of the energy value chain.

22.     While the Debtors' primary focus is the processing of spent catalyst, ARM was established to develop a process for converting end-of-life lithium-ion batteries and alumina tailings (a byproduct of the Debtors' catalyst processing at GMR) into battery-grade nickel and cobalt.  The ARM Facility, which is strategically located adjacent to the GMR Facility on a largely unoccupied parcel of real estate with substantial room for growth, owns an EAF purchased from GMR in 2022:



*Aerial view of existing ARM / GMR facilities and additional room for growth*

23.     Although additional capital investment in the EAF and related equipment and processes is required for ARM to achieve commercial viability, once fully operational the Debtors will provide a one-stop-shop for the recycling and extraction of molybdenum, vanadium, nickel, cobalt, and other valuable metals.

24.     Until then, the Debtors' core business consists of providing environmentally beneficial recycling solutions to oil refiners and other industrial customers.   The principal alternatives to recycling spent catalyst are either to landfill it or to ship it abroad for further processing.  Because under applicable environmental regulations spent catalyst is considered a hazardous waste, refiners are generally considered responsible—*i.e.*, financially liable—from "cradle to grave": that is, even after sending their spent catalyst for disposal in a landfill, they remain potentially liable under applicable law for any discharge or other environmental contamination caused by such catalyst.  The Debtors' recycling process thus offers refiners a more

MOFO-359310141.5

sustainable, and often less expensive, solution for managing spent catalyst as compared to other available alternatives.

25.     Under the Debtors' model, refiners pay the Debtors to offtake spent catalyst for a fixed recycling fee.  The Debtors then extract high-purity vanadium and molybdenum from the catalyst and sell them into specialty markets including battery manufacturing, steelmaking, and even the synthesis of new hydrocarbon refinement catalyst (completing the "circle of life").[4]  In turn, the Debtors credit a portion of the proceeds from the sale of the extracted metals back to the original refiners.

26.     The net economic outcome of this cycle depends on the prevailing commodities price environment.  When metals prices are low, refiners pay the Debtors to recycle their spent catalyst on a net basis (*i.e.*, the fixed recycling fee is greater than the credit the refiners receive upon sale of the extracted metals); by contrast, when metals prices are sufficiently high (*i.e.*, the refiner's share of the sold metal proceeds exceeds the recycling fee), both the Debtors and their recycling customers stand to profit.  The Debtors' model thus acts as a partial hedge against low metal prices (although the Debtors' services are, of course, more attractive to refiners in a high-price environment).

---

[4] For example, molybdenum trioxide sold by the Debtors is used by catalyst manufacturers to create new catalyst, then sold to and used by refiners.



*(1) Prices are illustrative; "MSV" refers to value of sold metal.*

27.     As alluded to previously, the Debtors' business is subject to significant regulatory oversight and requires that the Debtors obtain or maintain permits under the Resource Conservation and Recovery Act, Clean Air Act, Clean Water Act, and other environmental statutes.   The Debtors have invested substantially in environmental controls and compliance systems in the years since the Gulf bankruptcy.   As a result, I understand them to have a positive working relationship with their regulators—including their principal regulator, the TCEQ.

28.     I anticipate that the Debtors will work closely with their regulators in connection with the proposed Sale to address any concerns they may have and ensure a smooth transition of ownership of the Facilities.

## Corporate and Capital Structure

29.     Debtor Aleon Metals is the parent company of Debtors GMR and ARM.   GMR is the main operating entity that owns the substantial majority of the Debtors' property, plant, and

equipment assets (with the notable exception of an EAF owned by ARM); employs the Debtors'
staff; and holds the permits associated with the Debtors' operation of the Facilities (including
permits associated with the EAF, which as stated above is owned by ARM).

30.     Aleon Metals is a wholly owned subsidiary of non-Debtor GM-FTAI HoldCo LLC,
a joint venture between non-Debtors FTAI Infrastructure Inc. ("FTAI") and Gladieux Metals, LLC
("Gladieux Metals," an entity associated with Jefferson Enterprise Management, a major developer
of large-scale industrial recycling projects).

31.     A copy of the Debtors' organizational structure chart is attached as **Exhibit A**
hereto.

32.     The Debtors' material outstanding indebtedness is described in greater detail
below, and the following table summarizes the key components of the Debtors' capital structure
as of the Petition Date:

| Debt Facility | Outstanding Principal Amount (appx.; $ millions) | Interest Rate | Maturity |
|---|---|---|---|
| May 2025 Bridge Financing | $15.0 | 15.00% | May '26 |
| July 2025 Bridge Financing | 2.8 | 15.00% | May '26 |
| Series 2022 Revenue Bonds | 70.3 | 10.00% | Jun. '42 |
| Series 2023 Revenue Bonds | 93.7 | 12.00% | Jun. '43 |
| EAF Note | 21.5 | 6.00% | Jun. '25 |
| *Total ARM Debt* | *$203.3* | | |
| May 2025 Bridge Financing | $15.0 | 15.00% | May '26 |
| July 2025 Bridge Financing | 2.8 | 15.00% | May '26 |
| Series 2019 Revenue Bonds | 23.0 | 9.00% | Mar. '39 |
| Series 2019A Revenue Bonds | 23.0 | 9.00% | Mar. '39 |
| Series 2019B Revenue Bonds | 48.2 | 7.00% | Mar. '39 |
| Series 2020 Subordinated Revenue Bonds | 35.4 | 8.50% | Mar. '39 |
| Gladieux Metals Note Payable | 7.5 | 10.00% | Dec. '25 |
| Gladieux Metals Subordinated Loan | 9.8 | 8.00% | Dec. '26 |
| Mason Metals Repo Loan | 10.9 | 15.00% | -- |
| *Total GMR Debt[5]* | *$157.8* | | |
| May 2025 Bridge Financing | $15.0 | 15.00% | May '26 |
| July 2025 Bridge Financing | 2.8 | 15.0% | May '26 |
| FTAI Loan | 42.1 | 8.00% | Jan. '26 |
| *Total Aleon Metals Debt[6]* | *$42.1* | | |
| **Total Funded Debt** | **$403.2** | | |

---

[5] To avoid double-counting, the GMR subtotal does not include amounts owed on the Bridge Financings included in ARM subtotal.

[6] Aleon Metals also guaranteed the Bridge Financing. To avoid double-counting, the Aleon Metals subtotal does not include amounts owed on the Bridge Financings included in the ARM subtotal.

MOFO-359310141.5

A.      **Municipal Bond Debt**

33.      Both GMR and ARM have from time to time issued tax-exempt revenue bonds to municipal bond markets to fund capital expenditures and finance operations.  Each series of revenue bonds was issued by the Brazoria County Industrial Development Corporation (the "Municipal Issuer"), which lent the bond proceeds to GMR or ARM, as applicable.  The bonds are in turn backed by the Municipal Issuers' rights under the respective loan agreements with GMR or ARM, as well as a direct pledge of assets by GMR or ARM, as described in further detail below. UMB Bank, National Association ("UMB") serves as indenture trustee for each series of revenue bonds.

   *i.      GMR Senior Revenue Bonds*

34.      On March 1, 2019, the Municipal Issuer issued those certain 9.000% Series 2019 Bonds due March 1, 2039, in the aggregate principal amount of $25,000,000 (the "GMR Series 2019 Bonds").  As of the Petition Date, approximately $23 million in principal amount, plus all accrued and unpaid interest thereon and any additional fees, expenses (including, without limitation, any attorneys', advisors', accountants', appraisers', financial advisors', and other consultants' fees and expenses, in each case that are chargeable or reimbursable under the applicable bond documents), disbursements, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owed, or chargeable, now or hereafter due under the applicable bond documents, remains outstanding on account of the GMR Series 2019 Bonds.

35.      On July 1, 2019, the Municipal Issuer issued those certain 9.000% Additional Series 2019A Bonds due March 1, 2039, in the aggregate principal amount of $25,000,000 (the "GMR Series 2019A Bonds").  As of the Petition Date, approximately $23 million in principal amount,

13

plus all accrued and unpaid interest thereon and any additional fees, expenses (including, without limitation, any attorneys', advisors', accountants', appraisers', financial advisors', and other consultants' fees and expenses, in each case that are chargeable or reimbursable under the applicable bond documents), disbursements, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owed, or chargeable, now or hereafter due under the applicable bond documents, remains outstanding on account of the GMR Series 2019A Bonds.

36.     On November 1, 2019, the Municipal Issuer issued those certain 7.000% Additional Series 2019B Bonds due March 1, 2039, in the aggregate principal amount of $50,000,000 (the "GMR Series 2019B Bonds" and, together with the GMR Series 2019 Bonds and the GMR Series 2019A Bonds, the "GMR Senior Revenue Bonds").  As of the Petition Date, approximately $48.2 million in principal amount, plus all accrued and unpaid interest thereon and any additional fees, expenses (including, without limitation, any attorneys', advisors', accountants', appraisers', financial advisors', and other consultants' fees and expenses, in each case that are chargeable or reimbursable under the applicable bond documents), disbursements, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owed, or chargeable, now or hereafter due under the applicable bond documents, remains outstanding on account of the GMR Series 2019B Bonds.

37.     The GMR Senior Revenue Bonds are limited recourse obligations of the Municipal Issuer and are secured by (a) the Municipal Issuer's rights and interests under the respective loan agreements with GMR pursuant to which the Municipal Issuer lent the GMR Senior Revenue Bond proceeds to GMR, (b) amounts held by UMB as indenture trustee in certain funds and accounts, (c) the GMR Facility real estate and any associated leases, rents, fixtures, and improvements as

14

further described in the relevant security documents, and (d) certain revenues generated by the GMR Facility.  The Municipal Issuer's obligations under the GMR Senior Revenue Bonds are senior to its obligations with respect to the GMR Subordinated Revenue Bonds (as defined herein).  GMR's obligations under the associated loan agreements are senior to its obligations with respect to the GMR Subordinated Revenue Bonds and its guarantee of the ARM Revenue Bonds (as defined herein).

### ii.    GMR Subordinated Revenue Bonds

38.    On May 1, 2020, the Municipal Issuer issued those certain 8.500% Series 2020 Term Bonds due March 1, 2039, in the aggregate principal amount of $38,500,000 (the "GMR Subordinated Revenue Bonds").  As of the Petition Date, approximately $35.4 million in principal amount, plus all accrued and unpaid interest thereon and any additional fees, expenses (including, without limitation, any attorneys', advisors', accountants', appraisers', financial advisors', and other consultants' fees and expenses, in each case that are chargeable or reimbursable under the applicable bond documents), disbursements, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owed, or chargeable, now or hereafter due under the applicable bond documents, remains outstanding on account of the GMR Subordinated Revenue Bonds.

39.    The GMR Subordinated Revenue Bonds are limited recourse obligations of the Municipal Issuer and are secured by (a) the Municipal Issuer's rights and interests under its loan agreement with GMR pursuant to which the Municipal Issuer lent the GMR Subordinated Revenue Bond proceeds to GMR, (b) amounts held by UMB as indenture trustee in certain funds and accounts, (c) the GMR Facility real estate and any associated leases, rents, fixtures, and improvements, as further described in the relevant security documents, and (d) certain revenues

generated by the GMR Facility.  The Municipal Issuer's obligations under the GMR Subordinated Revenue Bonds are subordinate to its obligations with respect to the GMR Senior Revenue Bonds. GMR's obligations under the corresponding loan agreement are subordinate to its obligations with respect to the GMR Senior Revenue Bonds and senior to its guarantee of the ARM Revenue Bonds.

### iii.    *ARM Revenue Bonds*

40.    On June 1, 2022, the Municipal Issuer issued those certain 10.000% Series 2022 Bonds due June 1, 2042, in the aggregate principal amount of $75,000,000 (the "ARM Series 2022 Bonds").  As of the Petition Date, approximately $70.3 million in principal amount, plus all accrued and unpaid interest thereon and any additional fees, expenses (including, without limitation, any attorneys', advisors', accountants', appraisers', financial advisors', and other consultants' fees and expenses, in each case that are chargeable or reimbursable under the applicable bond documents), disbursements, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owed, or chargeable, now or hereafter due under the applicable bond documents, remains outstanding on account of the ARM Series 2022 Bonds.

41.    On June 1, 2023, the Municipal Issuer issued those certain 12.000% Series 2023 Bonds due June 1, 2043, in the aggregate principal amount of $100,000,000 (the "ARM Series 2023 Bonds" and, together with the ARM Series 2022 Bonds, the "ARM Revenue Bonds").  As of the Petition Date, approximately $93.7 million in principal amount, plus all accrued and unpaid interest thereon and any additional fees, expenses (including, without limitation, any attorneys', advisors', accountants', appraisers', financial advisors', and other consultants' fees and expenses, in each case that are chargeable or reimbursable under the applicable bond documents), disbursements, indemnification obligations, and other charges, amounts, and costs of whatever

nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owed, or chargeable, now or hereafter due under the applicable bond documents, remains outstanding on account of the ARM Series 2023 Bonds.

42.     The ARM Revenue Bonds are limited recourse obligations of the Municipal Issuer and are secured by, among other things, (a) the Municipal Issuer's rights and interests under the respective loan agreements with ARM pursuant to which the Municipal Issuer lent the ARM Revenue Bond proceeds to ARM, (b) amounts held by UMB as indenture trustee in certain funds and accounts, (c) the ARM Facility real estate and any associated leases, rents, fixtures, and improvements, (d) certain revenues generated by the ARM Facility, (e) the EAF (purchased by ARM from GMR with certain of the ARM Revenue Bond proceeds), and (f) substantially all other assets of ARM, each as further described in the relevant security documents.  The ARM Revenue Bonds are guaranteed on a subordinate basis by GMR.  Aleon Metals also issued a limited recourse guarantee of the ARM Revenue Bonds that is secured by and payable solely from distributions made by ARM and GMR to Aleon Metals that are deposited into a pledged account.

### B.     Bridge Financing

43.     On May 7, 2025, GMR and ARM as borrowers, Aleon Metals as guarantor, UMB as agent, and certain of the Debtors' bondholders as lenders (the "Bridge Lenders"), entered into that certain Superpriority Credit Agreement (the "Bridge Financing"), pursuant to which the Bridge Lenders agreed to make term loans to GMR and ARM in the aggregate amount of $15,000,000 (the "Initial Bridge Loan").

44.     On July 25, 2025, the parties to the Bridge Financing entered into that certain First Amendment to Superpriority Secured Credit Agreement, pursuant to which the Bridge Lenders

agreed to make additional term loans to GMR and ARM in the aggregate amount of $2,812,500 (together with the "Initial Bridge Loan," the "Bridge Loans").

45.     The Bridge Loans bear interest at 15% per year, mature on May 8, 2026, and are secured by first priority liens on substantially all of the Debtors' assets.  As of the Petition Date, approximately $17.8 million in principal, plus all accrued and unpaid interest thereon and any additional fees, expenses (including, without limitation, any attorneys', advisors', accountants', appraisers', financial advisors', and other consultants' fees and expenses, in each case that are chargeable or reimbursable under the applicable loan documents), disbursements, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owed, or chargeable, now or hereafter due under the applicable loan documents, remains outstanding on account of the Bridge Financing.

### C.     Mason Metals Repo Agreement

46.     GMR and Mason Metals, LLC ("Mason Metals") are party to that certain Master Sale and Repurchase Agreement dated as of April 19, 2023 (the "Mason Metals Repo Agreement").  Pursuant to the Mason Metals Repo Agreement, Mason Metals provides GMR with short-term financing that is secured by calcine, an intermediate metal product generated at the GMR Facility that is rich in nickel, cobalt, molybdenum, and vanadium.  The loans under the Mason Metals Repo Agreement are structured as sales by GMR to Mason Metals of calcine in exchange for cash, which calcine GMR is required to repurchase at a later date at a higher price. The spread between the two prices represents the interest earned by Mason Metals on the loan.

47.     In May 2025, Mason Metals terminated the Mason Metals Repo Agreement, as discussed in greater detail herein.  As of the Petition Date, the aggregate amount outstanding under

the Mason Metals Repo Agreement was approximately $12.8 million, including accrued and unpaid interest.

### D.    Equity Holder Loans

48.    From time to time prior to the Petition Date, the Debtors received loans from or on behalf of their indirect equity holders FTAI and Gladieux Metals (an entity associated with Jefferson Enterprise Management).

49.    Pursuant to that certain Credit Agreement dated as of June 15, 2022 (as amended from time to time, the "FTAI Credit Agreement"), an affiliate of FTAI agreed to make up to $20 million of term loans available to Aleon Metals, which amount has been increased from time to time.  The term loans bear interest at 8.00% per year and mature on January 15, 2026.  As of the Petition Date, the aggregate amount outstanding under the FTAI Credit Agreement was approximately $42.7 million, including accrued and unpaid interest.

50.    In May 2018, GMR issued a note payable to Gladieux Metals in the amount of $7.5 million (the "Gladieux Metals Note Payable").  The Gladieux Metals Note Payable bears interest at 10.00% per year and had an original maturity date of May 15, 2020.  In 2021, the Gladieux Metals Note Payable was amended to extend the maturity date to December 31, 2025.  As of the Petition Date, the aggregate amount outstanding under the Gladieux Metals Note Payable was approximately $12.9 million, including accrued and unpaid interest.

51.    Pursuant to that certain Loan Agreement dated as of February 1, 2021 (as amended from time to time, the "Gladieux Metals Loan Agreement"), Gladieux Metals agreed to make up to $100 million of loans available to GMR.  The loans bear interest at 8.00% per year and mature on December 31, 2026.  As of the Petition Date, the aggregate amount outstanding under the

Gladieux Metals Loan Agreement was approximately $14 million, including accrued and unpaid interest.

### E.    Intercompany Loans

52.    As described in greater detail in the Cash Management Motion (defined below), the Debtors have from time to time entered into various intercompany loans with one another.  Among other things, in connection with the issuance of the ARM Revenue Bonds, ARM lent approximately $94.2 million of the bond proceeds ($34 million of ARM Series 2022 Bond proceeds and $60.2 million of ARM Series 2023 Bond proceeds) to Aleon Metals, which in turn loaned the proceeds to GMR.  The loans are evidenced by promissory notes, and GMR and Aleon Metals each reflect "back-to-back" intercompany loan payables on their books that accrue interest at 10% (with respect to the ARM Series 2022 Bond proceeds) and 12% (with respect to the ARM Series 2023 Bond proceeds), respectively.

53.    In addition, and as discussed herein, in connection with the issuance of the ARM Series 2022 Bonds, ARM purchased the EAF from GMR using a combination of cash and a seller financing note issued in favor of GMR in the principal amount of approximately $21.5 million (the "EAF Note").  The EAF Note bears interest at 6.00% per year, it is secured by a subordinate deed of trust on certain real and personal property of ARM that is subordinate to the liens securing the ARM Revenue Bonds, and it matured on June 30, 2025.

### The Restructuring

### A.    Events Leading to the Chapter 11 Filing

54.    The Debtors' decision to commence these chapter 11 cases was the culmination of a series of operational, financial, and market-driven challenges that emerged over the past several years.  The Debtors' business, while strategically located and technologically advanced, has been

subject to significant volatility in commodity prices, particularly for vanadium and molybdenum, which are the primary metals recovered from spent catalyst. Despite the partial hedge against metals prices inherent to the Debtors' business model, this volatility nonetheless has resulted in unpredictable revenue streams and periods of negative cash flow.

55.     In recent years, the Debtors also have faced persistent operational disruptions. In late 2024 and early 2025, the Facilities experienced significant downtime due to various equipment failures. The most notable of the issues faced by the Debtors was the malfunctioning of their $SO_2$ scrubber, a device used to remove sulfur dioxide—a leading cause of acid rain—from exhaust gases generated at the Facilities. The federal Clean Air Act and analogous local legislation have long required industrial emitters such as the Debtors to implement systems to mitigate sulfur dioxide pollution. As such, a properly functioning $SO_2$ scrubber is critical to maintaining environmental compliance and plant throughput.

56.     The Debtors' issues with their $SO_2$ scrubber led to a material reduction in production volumes, with the Debtors unable to process any material amount of catalyst between February and July 2025. On average, throughput at the GMR Facility dropped to approximately 178 tons per month of processed catalyst (or 2,131 tons in total) over the twelve months preceding the Petition Date, well below the GMR Facility's permitted capacity of 55,000 tons per year. Even during periods of relatively higher production, the GMR Facility struggled to achieve consistent uptime, and annualized production volumes lagged the targets established in the Debtors' business plan.

57.     The Debtors have also faced challenges in securing reliable supply of HDS and RDS catalyst, which are essential feedstocks for their recycling operations. Relationships with key suppliers became strained because of past due payables and market uncertainty, further

complicating efforts to maintain consistent plant utilization.  For example, as part of the Debtors' catalyst-recycling operations, the Debtors lease storage containers (the "Bins") from vendors including Catalyst and Chemical Containers, LLC ("Hoover") and CCKX LLC ("Flo-Bin").  In April and May 2025, Hoover and Flo-Bin filed complaints against GMR seeking, among other relief, the recovery of alleged unpaid storage fees related to certain Bins leased by GMR and the return of such Bins.  Most of the Bins leased by the Debtors from Hoover and Flo-Bin— approximately 1,500 Hoover Bins and 400 Flo-Bin Bins—contain spent catalyst byproducts subject to the Mason Metals Repo Agreement.

58.     In May 2025, Mason Metals terminated the Mason Metals Repo Agreement and demanded that the Debtors return the metal products stored in the Hoover and Flo-Bin Bins.  Due to the operational disruptions at the Facilities described herein, the Debtors had not processed the products in the Bins; moreover, applicable environmental regulations complicate the Debtors' ability to remove the metals from the Bins, impeding the Debtors' ability to both return the Bins to Hoover and Flo-Bin and to return the spent catalyst to Mason Metals.  In August 2025, the Debtors reached a resolution with Hoover whereby they purchased 77 necessary Bins from Hoover for $148,000.  The Debtors are filing contemporaneously herewith a motion seeking to reject the lease with Hoover and abandon any associated Bins (which are not necessary to the Debtors' go-forward operations) to those parties with an interest in the Bins under applicable law (which I understand to be either Mason or Hoover).  As of the Petition Date, both the Hoover and Flo-Bin litigations against the Debtors remain pending.

59.     Beginning in Spring 2025, the Debtors' management and advisors undertook a comprehensive review of strategic alternatives, including a potential recapitalization, refinancing, or asset sale.  However, the complexity of the Debtors' capital structure, the need for substantial

new investment, and the ongoing operational challenges made an out-of-court solution impracticable. Moreover, while the Debtors' equity holders had historically committed substantial capital to the Debtors' operations in the form of equity investments and subordinated loans, the Debtors learned that their equity holders were no longer willing to support the business with additional capital investment.

60. Accordingly, the Debtors and their advisors began negotiating with a group of their prepetition bondholders holding a supermajority of their outstanding municipal bond indebtedness regarding a bridge financing facility to stabilize the Debtors' operations and provide adequate liquidity to allow the Debtors to explore value-maximizing alternatives. As a result of those discussions, such bondholders provided the Debtors with the Initial Bridge Loan in May 2025. This liquidity allowed the Debtors to continue operating while they assessed their long-term capital needs and explored restructuring alternatives. Once the Debtors' ongoing capital needs had been quantified, it became clear that the quantum of new capital required, the Debtors' continuing operational challenges, and deteriorating relationships with their vendors together made it challenging to restructure outside of bankruptcy. The same group of bondholders then agreed to provide an additional $2.8125 million of Bridge Financing to fund a marketing process for the Debtors' assets and prepare for a chapter 11 filing. The Debtors, their advisors, their lenders, and other stakeholders all believe that commencing these chapter 11 cases will provide the best opportunity to stabilize operations, implement a value-maximizing sale process, and address legacy liabilities in an orderly and transparent manner.

61. The chapter 11 process will allow the Debtors to access new liquidity through the DIP Facility and pursue a competitive sale process anchored by a stalking horse bid by the DIP

Lenders (each described below), as well as providing a forum for addressing claims (to the extent necessary) and distributing value in accordance with the Bankruptcy Code.

### B.      Proposed DIP Financing

62.      In connection with the commencement of these chapter 11 cases, the Debtors have negotiated a senior secured superpriority priming debtor-in-possession credit facility, the terms of which are described in greater detail in (a) the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims, and (B) Adequate Protection to the Prepetition Secured Parties; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "DIP Motion") and (b) declaration of Paul Shin of Jefferies, the Debtors' proposed investment banker, in support thereof, each filed contemporaneously herewith.

63.      The proposed DIP Facility is intended to provide the Debtors with sufficient liquidity to fund the administration of the chapter 11 cases, maintain ongoing operations, and preserve the value of the Debtors' assets while a sale or restructuring process is pursued. The DIP Facility will be provided by the DIP Lenders, who collectively are also serving as the proposed stalking horse purchaser in the contemplated sale process. The DIP Facility is structured as a senior secured superpriority priming facility, with the DIP Lenders receiving liens on substantially all of the Debtors' assets, subject to certain carve-outs and permitted liens. The DIP Facility will be used to fund working capital, operating expenses, professional fees, and other costs associated with the chapter 11 cases, as well as to provide adequate assurance to vendors, employees, and other stakeholders. The DIP Facility is subject to customary conditions precedent, covenants, and

milestones, including deadlines for the filing, approval, and closing of a sale.  I discuss the DIP Facility and the proposed budget in greater detail below.

### C.     Proposed Sale Process and Stalking Horse Bid

64.     The Debtors have determined, after extensive analysis and consultation with their advisors and stakeholders, that a sale of substantially all of their assets under section 363 of the Bankruptcy Code represents the best available path to maximize value for all stakeholders. To facilitate this process, the Debtors have negotiated an asset purchase agreement (the "Stalking Horse APA") with their proposed DIP Lenders, who will serve as the "stalking horse" bidder in the sale process (in such capacity, the "Stalking Horse Purchaser").

65.     The Stalking Horse APA provides for the sale of substantially all the Debtors' assets, free and clear of all interests, claims, liens, and encumbrances, pursuant to section 363 of the Bankruptcy Code.  The Stalking Horse Purchaser will acquire the assets via a credit bid of its claims under the DIP Facility, the assumption of liabilities, and the payment of cash.  The bid reflected in the Stalking Horse APA remains subject to any higher or otherwise better offers that may be received through a Court-approved marketing and auction process.

66.     The Stalking Horse APA is designed to set a floor for value and to encourage competitive bidding, thereby ensuring that the Debtors' estates realize the highest possible value for their assets.  Under the Stalking Horse APA, the Stalking Horse Purchaser will be entitled to certain customary protections, including a limited expense reimbursement (but **_not_** including any "break-up fee"), subject to Court approval, to compensate for the time and resources expended in negotiating and documenting the Stalking Horse APA.

67.     The sale process will be governed by bidding procedures to be approved by the Court (the "Bidding Procedures"), which have been filed contemporaneously herewith.  The

MOFO-359310141.5

Bidding Procedures establish deadlines for the submission of competing bids, requirements for qualified bidders, and the rules for conducting an auction if qualified competing bids are received.

68.     The assets to be sold include substantially all of the Debtors' operating assets, including the Facilities, related equipment, intellectual property, contracts, and other assets necessary for the continued operation of the business.  To the extent a third-party bidder is the successful bidder at auction, the cash proceeds of the sale will be used to repay the DIP Facility and provide recoveries to other stakeholders in accordance with the Bankruptcy Code and the priorities established therein.

69.     I believe that the proposed Sale process, anchored by the Stalking Horse APA, will provide a transparent and competitive mechanism to maximize value for all stakeholders, while preserving jobs, maintaining operations, and ensuring the continued provision of critical recycling services to the Debtors' customers.

### The First Day Motions

### A.     Operational and Administrative First Day Motions

70.     The Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.  The First Day Motions include the following:

- **Bidding Procedures Motion:** *Debtors' Emergency Motion for Entry of (I) An Order (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing Entry into the Stalking Horse Agreement, (C) Approving Procedures for the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling an Auction and Sale Hearing, (E) Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief, and (II) An Order (A) Approving the Sale of the*

26

*Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief*

- **Cash Management Motion:** *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Existing Cash Management System; (B) Maintain Their Existing Bank Accounts; (C) Pay Related Prepetition Obligations; and (D) Continue to Perform Intercompany Transactions; and (II) Granting Related Relief*

- **Creditor Matrix Motion:** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of the 30 Largest Unsecured Creditors; (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information; (III) Approving the Form and Manner of Notice of Commencement; and (IV) Granting Related Relief*

- **Critical Vendors Motion:** *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) Lien Claimants, and (C) Section 503(b)(9) Claimants, (III) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief*

- **DIP Motion:** *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims, and (B) Adequate Protection to the Prepetition Secured Parties; (III) Authorizing the Use of Cash Collateral; (IV) Modifying*

*the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief*

- **Insurance Motion:** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Supplement, and Enter Into New Insurance Policies, (C) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder, and (D) Enter Into New Premium Financing Agreements in the Ordinary Course of Business, and (II) Granting Related Relief*

- **Joint Administration Motion:** *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief*

- **Schedules / SOFA Extension Motion:** *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules and Statements and (II) Granting Related Relief*

- **Stretto Retention Application:** *Debtors' Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent*

- **Taxes Motion:** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees, and (II) Granting Related Relief*

- **Utilities Motion:** *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for*

> *Future Utility Services, (II) Approving Adequate Assurance Procedures, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief*
>
> - **Wages Motion:** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, and Employee Benefits and (B) Continue the Postpetition Maintenance of Employee Benefit Programs, Policies, and Procedures in the Ordinary Course of Business, and (II) Granting Related Relief*

71.     The First Day Motions[7] seek authority to, among other things, honor employee wages and benefit obligations; pay claims of certain vendors and suppliers to ensure that the Debtors' business operations are not interrupted by these cases; continue the Debtors' cash management system; and continue paying taxes, utilities, and insurance obligations in the ordinary course of business to minimize disruption to the Debtors' operations.  The First Day Motions also seek certain administrative and procedural relief common in cases of this size and complexity.

72.     I have reviewed each of the First Day Motions, and the factual statements set forth therein are true and correct to the best of my knowledge, information, and belief, and are incorporated herein by reference.  I believe that the relief sought in each First Day Motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtors' successful reorganization, and (c) best serves the Debtors' estates.

73.     I believe the Debtors have tailored their requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm

---

[7] The DIP Motion are Bidding Procedures Motion are discussed separately herein.

to the Debtors and their estates.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief described in the First Day Motions would hinder the Debtors' operations and cause irreparable harm.  It is my view that the failure to receive the requested relief during the first approximately 30 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.

74.     For the reasons set forth above, I believe that the relief requested in the First Day Motions is necessary to avoid immediate and irreparable harm to the Debtors and is in the best interests of the Debtors' estates. Accordingly, on behalf of the Debtors, I respectfully submit that each of the First Day Motions should be approved.

**B.     The DIP Motion**

75.     Pursuant to the DIP Motion, the Debtors seek authority to enter into a $187.5 million senior secured superpriority multi-draw term loan facility and to use Cash Collateral (as defined in the DIP Motion) on the terms set forth in the DIP Motion and attached proposed orders.

76.     I believe it to be critical to the Debtors' business and the success of these chapter 11 cases that the Debtors immediately obtain access to the DIP Facility and the authority to use Cash Collateral throughout the bankruptcy process.  During these cases, the Debtors will need access to liquidity to, among other things, satisfy payroll obligations; honor obligations to their customers, regulators, taxing authorities, insurers, utility providers, and suppliers; and otherwise continue and preserve their operations in the ordinary course of business.  In addition, the proposed DIP budget discussed herein provides for the use of cash to make critical capital investments to ensure the safe and efficient operation of the GMR Facility, which is necessary to maximize value received by the estates in any transaction in these cases.  The Debtors will also need access to sufficient liquidity to fund the administration of these chapter 11 cases.

77.     As of the Petition Date, the Debtors have approximately $1 million of cash on hand, which is inadequate to fund any of the foregoing expenditures.  Accordingly, failure to obtain the DIP Facility and use of Cash Collateral would cause immediate and irreparable harm to the Debtors' estates, to the detriment of all stakeholders.

78.     I, along with my team at Ankura, assisted the Debtors in developing a 13-week cash flow forecast for an initial DIP budget (the "Initial DIP Budget"), a copy of which is attached as an exhibit to the DIP Motion.  The Initial DIP Budget contains line items for cash flows anticipated to be received and disbursed during the forecast period.  Based on my experience and discussions with the Debtors' management team and advisors, I believe the Initial DIP Budget presents a reasonable estimate of the Debtors' cash needs during these chapter 11 cases.  I believe that the DIP Facility (and the use of proceeds as contemplated by the Initial DIP Budget) will provide the Debtors with sufficient liquidity to stabilize their operations and fund the administration of these cases.

79.     The DIP Motion also reflects the Debtors' agreement with their prepetition secured lenders and bondholders regarding the consensual use of Cash Collateral on the terms set forth in the proposed interim DIP order attached to the DIP Motion.  I believe that the use of Cash Collateral is critical to the Debtors' ability to operate and to preserve their going-concern value during these cases and is in the best interests of the Debtors' estates.

80.     As set forth in the DIP Motion and proposed interim order, the Debtors propose to provide their prepetition secured lenders and bondholders with adequate protection of their prepetition liens, consisting of, among other things and as applicable, replacement liens, superpriority administrative expense claims, reporting and information rights, and payment of professional fees and expenses.  I believe that each of foregoing forms of adequate protection is

reasonable and necessary under the circumstances to protect the prepetition secured lenders and bondholders against any diminution in value of their interest in Cash Collateral and the Debtors' other assets.

81.     Absent approval of the DIP Facility, the Debtors would be unable to generate revenue, operate their businesses, or pay the hundreds of individuals who report to work each day. Indeed, without access to sufficient cash, the Debtors would likely have to suspend operations, materially damaging the Debtors' business reputation and relationships with employees, vendors, regulators, and customers.  For these reasons, I believe the relief requested in the DIP Motion is a valid exercise of business judgement and is in the best interests of the Debtors, their creditors, and all other parties in interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Chicago, Illinois
Dated: August 17, 2025

*/s/ Roy Gallagher*
Roy Gallagher
Managing Director
Ankura Consulting Group, LLC

32

# **EXHIBIT A**

# Aleon Metals Organizational Chart

