**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALEON METALS, LLC *et al.*,[1] | ) Case No. 25-90305 (CML) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DEBTORS' <u>EMERGENCY</u>**
**MOTION FOR ENTRY OF (I) AN ORDER**
**(A) APPROVING BIDDING PROCEDURES**
**FOR THE SALE OF SUBSTANTIALLY ALL OF THE**
**DEBTORS' ASSETS, (B) AUTHORIZING ENTRY INTO THE**
**STALKING HORSE AGREEMENT, (C) APPROVING PROCEDURES**
**FOR THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) SCHEDULING**
**AN AUCTION AND SALE HEARING, (E) APPROVING THE FORM AND**
**MANNER OF NOTICE THEREOF, AND (F) GRANTING RELATED RELIEF,**
**AND (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS**
**FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES,**
**(B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY**
<u>**CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**</u>

---

**Emergency relief has been requested. Relief is requested not later than 3:30 p.m. (prevailing Central Time) on August 19, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on August 19, 2025, at 3:30 p.m. (prevailing Central Time) in Courtroom 401, 515 Rusk St., Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aleon Metals, LLC (1610); Aleon Renewable Metals, LLC (9215); and Gladieux Metals Recycling, LLC (6057). The location of the Debtors' service address is: P.O. Box 2290, 302 Midway Road, Freeport, TX 77542.

> **Lopez's homepage. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company"), hereby submit this emergency motion (this "Motion").  In support of the Motion, the Debtors submit the *Declaration of Roy Gallagher in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") and the *Declaration of Richard W. Morgner in Support of Debtors' Emergency Motion for Entry of (I) an Order (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing Entry into the Stalking Horse Agreement, (C) Approving Procedures for the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling an Auction and Sale Hearing, (E) Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief, and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "Morgner Declaration"), filed contemporaneously herewith and incorporated by reference.[2]  In further support of this Motion, the Debtors state as follows:

## Preliminary Statement

1.      As described in further detail in the First Day Declaration and the Morgner Declaration, in the months leading up to commencement of these chapter 11 cases, the Debtors, with the assistance of their advisors, launched a competitive marketing process for a potential

---

[2] Capitalized terms used but not defined in this Motion have the meanings ascribed to them in the First Day Declaration.

going-concern transaction of the Debtors' business and, in parallel, engaged with certain prepetition bondholders regarding the terms of a section 363 sale of the Debtors' assets. These chapter 11 cases are a continuation of the Debtors' prepetition marketing process and efforts to effectuate a sale or other transaction that will preserve the Debtors' operations for the benefit of the Debtors' estates.

2.     In June 2025, Jefferies LLC ("Jefferies"), the Debtors' proposed investment banker, commenced the prepetition marketing process and engaged approximately 93 potentially interested parties to solicit interest in acquiring some or all of the Debtors' Assets (as defined below) or in effectuating an alternative value-maximizing transaction. The Debtors' marketing efforts have already yielded third party interest in the Assets and the Debtors are in active discussions with potential bidders. To continue the momentum of the prepetition marketing process and ensure preservation of the Debtors' estates, the Debtors have developed bidding procedures to govern the sale of all or substantially all of their Assets.

3.     As set forth herein, the Bidding Procedures (as defined below) are designed to continue to promote a competitive and robust bidding process, while allowing the Debtors to implement a sale transaction on an expedited basis. At the same time, the Bidding Procedures are uniform and provide clarity to the bidding and auction process by establishing dates for submitting bids, conducting an auction, if necessary, and approving one or more transactions (each, a "Sale Transaction"). By entering into the Stalking Horse Agreement (as defined below), the Debtors have effectively set the bidding floor for a value-maximizing sale process.

4.     The Debtors are confident that the postpetition marketing process and Bidding Procedures will facilitate the sale of the Assets for the highest or otherwise best bid, preserve jobs for the Debtors' employees and vendor relationships, and maximize value for the Debtors' estates

3

on the most efficient timeline available under the circumstances. The Debtors therefore respectfully request that the Court approve the Debtors' proposed Bidding Procedures, authorize entry into the Stalking Horse Agreement and approve the terms thereof, schedule the Sale Hearing (as defined below), and approve the form and manner of notices and procedures in connection with the Sale Process (as defined below), among other requested relief, as set forth herein.

## **Relief Requested**

5.      By this Motion, the Debtors seek entry of:

(a)      an order, substantially in the form attached hereto (the "<u>Bidding Procedures Order</u>"):

(i)      authorizing and approving the proposed bidding procedures (the "<u>Bidding Procedures</u>") substantially in the form attached as <u>Exhibit 1</u> to the Bidding Procedures Order, by which the Debtors will solicit and may select the highest or otherwise best offer for the sale of substantially all or any portion of the Debtors' assets (the "<u>Assets</u>") through one or more Sale Transactions, free and clear of all liens, claims, interests, and encumbrances;

(ii)      authorizing the Debtors to select AM BidCo Holdings, LLC as a stalking horse bidder (the "<u>Stalking Horse Bidder</u>") for the Debtors' Assets, approving the terms of and the Debtors' entry into the stalking horse agreement (the "<u>Stalking Horse Agreement</u>"), substantially in the form attached hereto as **Exhibit A**, and approving the Expense Reimbursement (as defined below) in favor of the Stalking Horse Bidder;

(iii)      scheduling (A) a date for an auction in connection with a Sale Transaction (the "<u>Auction</u>"), (B) a hearing date for the approval of one or more Sale Transactions (the "<u>Sale Hearing</u>"), and (C) the objection deadline for approval of one or more Sale Transactions (the "<u>Sale Objection Deadline</u>");

(iv)      approving the form and manner of the notice of the Auction and Sale Transaction, substantially in the form attached as <u>Exhibit 2</u> to the Bidding Procedures Order (the "<u>Sale Notice</u>") and the notice of successful bidder (the "<u>Notice of Successful Bidder</u>"), substantially in the form attached as <u>Exhibit 4</u> to the Bidding Procedures Order;

(v)      approving procedures (the "<u>Assumption and Assignment Procedures</u>") for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale Transaction (all such contracts and leases capable of being assumed or assumed and assigned under section 365 of the Bankruptcy Code, the "<u>Assigned Contracts</u>"), and approving the form and

manner of notice thereof, substantially in the form attached as <u>Exhibit 3</u> to the Bidding Procedures Order (the "<u>Cure Notice</u>"); and

    (vi)    granting related relief; and

(b)    an order (the "<u>Sale Order</u>"), the form of which will be filed by the Debtors prior to the Sale Hearing:

    (i)    approving the sale to the Stalking Horse Bidder or other Successful Bidder(s) (as defined in the Bidding Procedures) pursuant to section 363 of the Bankruptcy Code, free and clear of all liens, claims, interests, and encumbrances;

    (ii)    authorizing the assumption and assignment of the Assigned Contracts; and

    (iii)    granting related relief.

## <u>Jurisdiction and Venue</u>

6.    The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.    The bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Bankruptcy Rules 2002, 6003, 6004, and 6006, rule 9013-1 of the Bankruptcy Local Rules of the Court (the "<u>Local Rules</u>"), and the Procedures for Complex Cases in the Southern District of Texas (the "<u>Complex Case Procedures</u>").

**Background**

### I.    General Background

9.    On August 17, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated as of the date hereof.  A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the First Day Declaration.

10.    The Debtors are a leading recycler of spent catalysts used in petroleum refining, from which they extract vanadium, molybdenum, and other valuable metals with a variety of chemical and industrial applications.  The Debtors' Assets consist primarily of (i) the recycling catalyst facility operated by Debtor Gladieux Metals Recycling, LLC, and related assets, and (ii) the property and assets held by Debtor Aleon Renewable Metals, LLC, including the electric arc furnace.

### II.    Prepetition Marketing Process

11.    The Debtors retained Jefferies in June 2025 to, among other things, facilitate outreach on behalf of the Debtors in connection with an evaluation of the Debtors' immediate financing needs and potential strategic transactions, including financing and asset sales.  Following its engagement by the Debtors, Jefferies launched a marketing process on behalf of the Debtors to evaluate any and all potential acquisitions, investments, financings, restructurings or other

negotiated transactions.  During this time, Jefferies has also been integrally involved in the negotiations with certain prepetition bondholders, other creditors, stakeholders, and third parties.

12.     Since Jefferies' engagement, Jefferies has contacted a total of 93 parties including 43 potential strategic buyers and 50 potential financial sponsors with respect to a potential financing transaction or sale of some or all of Debtors' Assets.  Morgner Decl. ¶ 12.  Of these parties, 37 parties have held or scheduled discussion calls with Jefferies, and approximately 40 have executed or are in the process of executing non-disclosure agreements with the Debtors in order to gain access to the virtual data room, which contains more than 179 files.  *Id.*  The Debtors' management and Jefferies have also scheduled and hosted site visits for interested parties to provide prospective purchasers with an opportunity to further evaluate the Debtors' Assets and to discuss potential sale and/or restructuring opportunities with the Debtors' management.  *Id.*

## The Bidding Procedures

**A.     Bidding Procedures**

1.     The Debtors believe that the proposed Bidding Procedures, attached to the Bidding Procedures Order as <u>Exhibit 1</u>, are fair and appropriate under the circumstances and consistent with the Debtors' goals in the marketing and sale process (the "<u>Sale Process</u>").  The Bidding Procedures are typical of bidding procedures ordered by this Court and are designed to promote a competitive and expedient sale process.  The Bidding Procedures describe, among other things, procedures for parties to access due diligence, the submission of bids, the manner in which bidders and bids become "qualified," the conduct of an Auction if one is required, the criteria by which the Successful Bidder will be selected by the Debtors, and the deadlines with respect to the foregoing.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids

from Potential Bidders (as defined in the Bidding Procedures) that constitute the highest or best offers for any of the Assets on a schedule consistent with the Debtors' chapter 11 strategy.

13.     As the Bidding Procedures are attached to the Bidding Procedures Order, they are not restated in their entirety herein.  Importantly, however, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize value and, as such, do not impair the Debtors' ability to consider all Bid proposals, whether for the purchase of some or all of the Assets, and provide the Debtors with sufficient flexibility to modify the Bidding Procedures as may be necessary, subject to paragraph I of the Bidding Procedures, to maximize value for their estates.  Moreover, the Bidding Procedures promote communication with the Debtors' key stakeholders—the Debtors will provide information about the ongoing sale process and consult with the Consultation Parties,[3] as applicable, to ensure that the Debtors' stakeholders are apprised of the status and determinations related to a Sale Transaction.

14.     To ensure that the Sale Process maximizes value for the benefit of the Debtors' estates, the Debtors seek approval of the following proposed schedule, certain portions of which may be subject to extension and other modifications in accordance with the Bidding Procedures.

### The Proposed Schedule:

15.     The Debtors seek approval of the Bidding Procedures and sale schedule set forth below in order to establish a transparent and orderly process for the solicitation, receipt, and

---

[3] The term "Consultation Parties" shall mean the Committee, the DIP Secured Parties, and the Prepetition Secured Parties (each as defined in the Bidding Procedures).  Notwithstanding the foregoing, for so long as the Stalking Horse Bidder remains a bidder, the DIP Secured Parties shall not be Consultation Parties, and the Debtors shall establish reasonable procedures to prevent such parties or their representatives from being privy to confidential information concerning the bids of other bidders for the Assets; *provided*, *however*, that if the Stalking Horse Bidder later withdraws such bid, the DIP Secured Parties may immediately be treated as Consultation Parties for purposes of the Bidding Procedures.  If a member of the Committee submits an Indication of Interest and/or a Qualified Bid (each as defined in the Bidding Procedures), the Committee will continue to be a Consultation Party; *provided*, that the Committee shall exclude such member from any discussions or deliberations regarding the sale of the applicable Assets and shall not provide any confidential information regarding the sale of the applicable Assets to such member.

evaluation of bids on an efficient timeline that allows the Debtors to consummate one or more Sale Transactions and emerge from these chapter 11 cases expeditiously.  The following schedule also complies with the milestones provided in the DIP Credit Agreement (as defined in the DIP Motion[4]) and contemplates the consummation of a Sale Transaction no later than October 2025.[5] Accordingly, subject to Court availability, the Debtors respectfully request that the Court approve the proposed sale timeline:[6]

| **Event or Deadline** | **Date and Time** |
|---|---|
| **Contract Objection Deadline** | By 4:00 p.m. (prevailing Central Time) on the day that is 14 days after service of the Cure Notice (as defined below) or seven days after service of a Supplemental Cure Notice (as defined below), as applicable |
| **Stalking Horse Bid: Sale Objection and Adequate Assurance Objection Deadline** | Tuesday, September 16, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Bid Deadline** | Monday, September 22, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Auction (if needed)** | Monday, September 29, 2025, at 10:00 a.m. (prevailing Central Time) |
| **Deadline to File Notice of Successful Bidder** | As soon as reasonably practicable after the close of the Auction with respect to the applicable Sale Transaction.  In the event there is no Auction with respect to a Sale Transaction, the Debtors shall file the Notice of Successful Bidder identifying the Successful Bidder on Wednesday, September 24, 2025. |
| **Successful Bid (other than the Stalking Horse Bid):** | Tuesday, September 30, 2025, at 4:00 p.m. (prevailing Central Time) |

[4] "DIP Motion" means the *Debtors' Emergency Motion for the Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims, and (B) Adequate Protection to the Prepetition Secured Parties; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief*, filed substantially contemporaneously herewith.

[5] The Debtors reserve the right to modify the Bidding Procedures and the sale timeline in consultation with the Consultation Parties and consistent with the terms of the DIP Facility, subject to paragraph I of the Bidding Procedures.

[6] In the case of any inconsistencies between this chart and the Bidding Procedures attached to the Bidding Procedures Order as **Exhibit 1**, the Bidding Procedures will control.

| | |
|---|---|
| **Sale Objection and Adequate Assurance Objection Deadline** | |
| **Sale Hearing** | Wednesday, October 1, 2025, at 10:00 a.m. (prevailing Central Time) |
| **Deadline to Close Sale Transaction** | Friday, October 10, 2025, subject to regulatory approval |

16.     The sale timeline is reasonable and essential for the Debtors' swift emergence from chapter 11 and for preserving the value of the Debtors' estates.  The proposed timeline provides adequate notice to parties in interest by permitting the Sale Process to continue for an additional 45 days postpetition.  This schedule complements the robust two-month prepetition sale process and provides the Debtors with sufficient time to finalize their marketing efforts, and for potential purchasers to conduct ample due diligence and formulate a value-maximizing bid for the Assets.  Accordingly, the Debtors believe the relief requested herein is in the best interest of the Debtors' estates, will provide interested parties with sufficient opportunity to participate, and should therefore be approved.

### Stalking Horse Bidder and Expense Reimbursement

17.     Following arm's-length and good faith negotiations, the Debtors and the Stalking Horse Bidder[7] have agreed on the terms of the Stalking Horse Agreement whereby the Stalking Horse Bidder will purchase the Debtors' Assets.  Morgner Decl. ¶ 16.  The Stalking Horse Agreement also provides for expense reimbursement (the "Expense Reimbursement") in the event that the Stalking Horse Agreement is terminated in certain circumstances, including, but not limited, to, (i) the Debtors' breach of or failure to perform any representations, warranties,

---

[7] The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder and the Debtors.

covenants, or other agreements contained in the Stalking Horse Agreement, (ii) the Debtors' failure to consummate the closing within three business days following notice by the Stalking Horse Bidder of the satisfaction of all closing conditions and readiness to consummate the sale, (iii) the Debtors' filing of a motion to dismiss or convert these chapter 11 cases, (iv) the failure to meet certain of the sale-related milestones, or (iv) the Debtors' consummation of an Alternative Transaction (as defined in the Stalking Horse Agreement). *Id.* at ¶ 18.

18.    The following chart summarizes the terms and conditions of the Stalking Horse Agreement, attached hereto as **Exhibit A**:[8]

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| Stalking Horse Agreement Parties | <u>Sellers</u>: Gladieux Metals Recycling, LLC; Aleon Renewable Metals, LLC; Aleon Metals, LLC<br><br><u>Purchaser</u>: AM BidCo Holdings, LLC<br><br>*See* Preamble. |
| Purchase Price | The aggregate purchase price for the purchase, sale, assignment and conveyance of Sellers' respective right, title and interest in, to and under the Purchased Assets will consist of the following (collectively, the "<u>Purchase Price</u>"):<br><br>(i)  the credit bid in the amount of the Credit Bid Amount;<br><br>(ii)  an amount in cash equal to the Cash Consideration; and<br><br>(iii)  the assumption of the Assumed Liabilities, including payment of the Assumed Cure Costs payable pursuant to Section 2.7(a).<br><br>*See* Stalking Horse Agreement § 2.5(a). |
| Purchased Assets | Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in the Stalking Horse Agreement (including entry of the Sale Order), at the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Sellers, all of Sellers' right, good title, and interest in and to all of the assets of Sellers, other than the Excluded Assets, to the extent such assets exist as of the Closing Date, wherever located, including, without limitation, the following assets (the "<u>Purchased Assets</u>"), in each case free and clear of all Liens to the extent provided in the Sale Order (other than Permitted Post-Closing Encumbrances): |

---

[8] This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse Agreement, the Stalking Horse Agreement shall govern in all respects. All references to schedules or sections in the following summary shall refer to schedules or sections of the Stalking Horse Agreement. Terms used but not defined in this summary chart have the meaning ascribed to such terms as in the Stalking Horse Agreement.

a) all Cash and Cash Equivalents, security entitlements, securities accounts, commodity contracts and commodity account and including any cash collateral that is collateralizing any letters of credit or Insurance Policies, excluding (i) the Carve-Out Account, but including any funds remaining in the Carve-Out Account after all Allowed Professional Fees have been irrevocably paid in full, and (ii) the Cash Consideration;

b) Accounts Receivables;

c) Inventory;

d) Transferred Owned Real Property;

e) Fixtures and Equipment, including Transferred IT Equipment;

f) Transferred Intellectual Property;

g) each Contract listed on Schedule 2.1(g), including the Acquired Real Property Leases (such Contracts, collectively, the "Closing Assumed Contracts"), and each Additional Assumed Contract, together with all outstanding purchase orders related thereto, it being understood that the Closing Assumed Contracts will not include any of the Rejected Identified Contracts;

h) each non-executory Contract Related to the Business listed on Schedule 2.1(h);

i) all leasehold rights in personal property leased by Sellers and used or held for use primarily in connection with the Business;

j) all of Sellers' rights under confidentiality or non-disclosure agreements with respect to confidential treatment of information Related to the Business or the Purchased Assets and with respect to solicitation and hiring of Scheduled Employees;

k) for each Seller, the books and records, and the corporate charter, seal, minute books, stock record books and other similar documents, including all personnel records (including all human resources and other records) relating to the Transferred Employees;

l) all Claims and Actions owned by or available to any Seller, including any Avoidance Action, (i) Related to the Business or related to the Purchased Assets, the Assumed Liabilities, or the acquisition, ownership, management, operation, use, function, or value of the Business or any Purchased Asset; (ii) against any counterparty to a Assumed Contract, or any Affiliate of such counterparty; or (iii) against any current or former director, officer, manager, Employee, contractor, consultant or advisor employed by or providing services to any Seller to the extent Related to the Business (such actions, the "Assigned Actions");

m) all Permits (including Environmental Permits), and all pending applications therefor, in each case, to the extent Related to the Business and necessary for the current operation and conduct of the Business and Purchased Assets (the "Transferred Permits");

n) any interests, shares, securities, or other investments set forth on Schedule 2.1(n);

o) the Benefit Plans set forth on Schedule 2.1(o), together with any additional Benefit Plans, if any, designated by Purchaser by providing written notice to Sellers not later than ten (10) Business Days prior to the expected Closing Date, and all rights and interests of any Seller thereunder, and any trusts, funding vehicles, insurance policies, administrative services agreements, files and records, and other assets related thereto to the extent Related to the Business or Transferred Employees (collectively, the "Transferred Seller Plans");

p) all credits, prepaid expenses, prepayments, deferred charges, advance payments, refunds, customer deposits and security deposits, prepaid items and duties, customer or vendor rebates, credits or other refunds, earnest deposits, bid, performance, lease, utility and other deposits, and all other forms of deposit or security placed by Sellers for the performance of an Assumed Contract, in each case, to the extent Related to the Business or related to a Purchased Asset;

q) any claim, interest, right, award, recovery, indemnity, warranty, right to insurance proceeds, rebate, right of set off, refund, reimbursement, audit right, duty, obligation, liability or other intangible right in favor of or owed to any Seller (other than rights arising under or relating to the Stalking Horse Agreement and the other Transaction Documents), to the extent (i) related to any Assigned Action or Transferred Seller Plan, (ii) related to any other Purchased Asset, any Assumed Liability, or the Business, or (iii) related to any insurance proceeds as set forth in Section 5.12;

r) all of Sellers' rights under invention, intellectual property assignment, non-competition, non-solicitation of customers and Employees, and non-disparagement agreements, with current and former Employees and agents of any Seller or third party to the extent related to the Purchased Assets (or any portion thereof) or with the Transferred Employees;

s) all customer and supplier lists Related to the Business and all telephone and telephone facsimile numbers and other directory listings of the Business;

t) all goodwill, customer and referral relationships, other intangible property, and all privileges and rights of set-off, in each case, Related to the Business or to the extent attributable to the Purchased Assets or the Assumed Liabilities;

u) all rights of any Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, and contractors to any Seller to the extent related to the Purchased Assets;

v) all bank accounts Related to the Business, other than those set forth on Schedule 2.2(f);

w) any refund of any Taxes paid by or allocable to any Seller other than any refund of Taxes that are Excluded Liabilities;

x) all current and historical primary, excess and umbrella policies, self-insurance and captive insurance company arrangements, casualty, workers' compensation, general liability and auto liability insurance policies, including the policies set forth on Schedule 3.17, and all rights of any nature with respect to any such insurance policy, including any recoveries thereunder and any claims, rights to assert claims, or causes of action thereunder or proceeds thereof;

13

| | |
|---|---|
| | y) prepaid expenses of Sellers and any of their respective Affiliates to the extent attributable to a Purchased Asset or otherwise Related to the Business; |
| | z) the rights under the trust funds established under the trust agreements identified on Schedule 3.13(f) with respect to Environmental Liabilities; |
| | aa) other than any Excluded Asset, all right, title, and interest of Sellers in, for or under the Business and other assets, properties or rights of every kind and description, wherever located, whether real, personal, or mixed, tangible or intangible, Related to the Business, whether owned, leased, licensed, used, occupied, or held for use by Sellers; and |
| | bb) all proceeds and products of any and all of the foregoing Purchased Assets. |
| | *See* Stalking Horse Agreement § 2.1. |
| Assumed Liabilities | On the terms and conditions contained in the Stalking Horse Agreement, Purchaser shall, after the Closing, assume and be liable and responsible for paying and satisfying, solely and only the following Liabilities, all items not set forth below in Section 2.3 being excluded (all Liabilities so assumed, the "Assumed Liabilities"): |
| | a) all Liabilities exclusively arising in connection with or from the use of the Purchased Assets or operation of the Business after the Closing; |
| | b) all Liabilities arising after the Closing of any Seller to deliver products or services pursuant to Assumed Customer Orders; |
| | c) all Liabilities under the Assumed Contracts, in each case to the extent arising out of any event, fact, act, omission, or condition occurring after the Closing and excluding any Liabilities arising from or relating to any breaches under such Assumed Contracts prior to the Closing; |
| | d) all Liabilities under the Transferred Seller Plans, to the extent arising from Purchaser's employment of Transferred Employees and all Liabilities assumed by Purchaser pursuant to Section 5.5, in each case to the extent arising out of any event, fact, act, omission, or condition occurring after the Closing; |
| | e) all Liabilities related to the Assigned Actions to the extent arising out of any event, fact, act, omission, or condition occurring after the Closing; |
| | f) all Assumed Cure Costs payable pursuant to Section 2.7(a) and all Liabilities described in Section 2.7(i); |
| | g) the Take-Back Indebtedness; |
| | h) Liabilities for accrued and unpaid vacation, holidays, sick pay and other paid time-off for the Transferred Employees (the "Assumed PTO"); |
| | i) all Liabilities under any Transferred Permit to the extent arising out of any event, fact, act, omission, or condition occurring after the Closing; |
| | j) all Liabilities with respect to any product liability or warranty claims relating to the Business and arising out of facts, events, or conditions first existing or first occurring after the Closing; |

<table>
<tr>
<td></td>
<td>

k)    all Liabilities for Taxes imposed on or with respect to the Purchased Assets or the Business that are attributable to any period or portion thereof beginning after the Closing; and

l)    without duplication of any other item described in Section 2.3, all financing or capital leases secured by any of the Purchased Assets set forth on Schedule 2.3(k).

*See* Stalking Horse Agreement § 2.3.

</td>
</tr>
<tr>
<td>Excluded Assets</td>
<td>

Notwithstanding anything to the contrary contained in Section 2.1 or any other provision of the Stalking Horse Agreement or any Transaction Document, the following assets are not being sold, assigned, transferred, or conveyed to Purchaser by Sellers thereunder (collectively, the "<u>Excluded Assets</u>"):

a)    the Cash Consideration;

b)    data files, archive files, systems documentation, and other data processing information and records relating solely to any of the Excluded Assets;

c)    all Contracts (other than Closing Assumed Contracts or Additional Assumed Contracts), including the Contracts set forth on the Rejected Contracts Schedule (the "<u>Excluded Contracts</u>");

d)    all current and prior directors' and officers' liability insurance policies maintained by Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

e)    the Carve-Out Account, excluding any funds remaining in the Carve-Out Account after all Allowed Professional Fees have been irrevocably paid in full;

f)    the bank accounts set forth on Schedule 2.2(f) (including any cash held therein);

g)    the rights which accrue or will accrue to Sellers under the Stalking Horse Agreement and the Transaction Documents;

h)    any rights, claims, or causes of action to the extent related to (i) Excluded Assets described herein, and (ii) intercompany obligations between Sellers or any of their respective Affiliates;

i)    any tangible or intangible asset held by Sellers pursuant to a lease, license, contract, or other agreement where such lease, license, contract, or other agreement is an Excluded Contract;

j)    all securities, whether capital stock or debt, of Sellers, other than those set forth on Schedule 2.1(n);

k)    all Personal Information that Sellers are prohibited by Applicable Law, including applicable Privacy Laws, or by any of Seller's public-facing policies, notices or other disclosures from delivering or transferring to Purchaser;

l)    all personnel records (including all human resources and other records) of Employees who are not Transferred Employees;

</td>
</tr>
</table>

| | |
|---|---|
| | m) all open purchase orders for goods and services with customers of the Business outstanding as of the Closing, other than the Assumed Customer Orders; |
| | n) all open orders for goods and services with suppliers of the Business that remain unfulfilled as of the Closing, other than the Assumed Supplier Orders; |
| | o) any Benefit Plan other than the Transferred Seller Plans and any trusts, funding vehicles, insurance policies, administrative services agreements, files and records, and other assets, related thereto (other than with respect to the Transferred Seller Plans); |
| | p) documents that (i) Sellers are required by Applicable Law to retain, (ii) if transferred would violate any Applicable Laws (including with respect to privacy), or (iii) are subject to any attorney-client, work product or similar privilege with respect to work performed in anticipation of or in connection with the preparation or administration of the Chapter 11 Cases, the Stalking Horse Agreement or the transactions contemplated by the Stalking Horse Agreement; and |
| | q) any assets, properties and rights described or set forth on Schedule 2.2(q). |
| | *See* Stalking Horse Agreement § 2.2. |
| Excluded Liabilities | Anything in the Stalking Horse Agreement or in any other Transaction Document to the contrary notwithstanding, except for the Assumed Liabilities set forth in Section 2.3, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or otherwise become responsible for Sellers' or any of their respective Affiliates' Liabilities that are not Assumed Liabilities (such excluded Liabilities are collectively referred to herein as the "Excluded Liabilities"), and Sellers and their Affiliates shall remain fully and solely responsible for all Excluded Liabilities. For the avoidance of doubt, any and all of the following shall constitute Excluded Liabilities: |
| | a) any Liability under the DIP Credit Agreement, except the Take-Back Indebtedness, the Prepetition Obligations, and any other Indebtedness of Sellers; |
| | b) any Liability to the extent arising out of any Excluded Asset, including the Excluded Contracts; |
| | c) all Claims or Actions pending on or before the Closing against Sellers and all Claims or Actions against or giving rise to liabilities or obligations of the Business or the Purchased Assets based on acts or omissions by Sellers (or any of them) prior to the Closing even if instituted after the Closing; |
| | d) all Liabilities to any current or former holder or owner of capital stock or other Equity Interests of Sellers or any security convertible into, exchangeable or exercisable for shares of capital stock or other Equity Interests of Sellers or any current or former holder of Indebtedness of Sellers; |
| | e) all drafts or checks outstanding at the Closing under which Sellers are obligated; |
| | f) indemnification or advancement of expenses for any current or former officer or director of any Seller or any of the Subsidiaries of Sellers; |
| | g) all Liabilities for trade or accounts payable and other obligations of payment to any Person to the extent arising prior to the Closing; |

h)  any Liability with respect to any of the current or former Employees arising prior to the Closing, other than (i) the Assumed PTO and (ii) Liabilities arising under a Transferred Seller Plan (prior to or on Closing);

i)  all Liabilities under any futures contracts, options on futures, swap agreements, or forward sale agreements;

j)  any and all (i) Taxes allocated to, of or imposed on Sellers (or any member or Affiliate of a Seller), (ii) Taxes imposed on or with respect to the Business or the Purchased Assets that are attributable to any period or portion thereof ending on or prior to the Closing, (iii) Taxes that arise from the consummation of the transactions contemplated by the Stalking Horse Agreement, (iv) Transfer Taxes that are the responsibility of Sellers pursuant to Section 5.8(a), and (iv) any Taxes payable to the extent arising out of or related to the Excluded Assets or with respect to the activities of any Seller or any of their respective Affiliates (including divested or discontinued business of any Seller or their respective Affiliates);

k)  any Environmental Liability arising out of or relating to (i) the Excluded Assets, (ii) the conduct of the Business or the ownership or operation of the Business and the Purchased Assets, in each case, on or prior to the Closing; (iii) the presence, Release or threat of Release of or exposure to any Hazardous Materials at, on, or under or migrating from any Owned Real Property, Leased Real Property or otherwise with respect to the Purchased Assets, or otherwise arising out of the ownership or operation of, the Business, in each case, arising on or prior to the Closing; (iv) the transportation, storage, treatment, disposal, generation, manufacturing, recycling, reclamation, use or other handling of any Hazardous Materials with respect to the Purchased Assets, or relating in any manner to the ownership or operation of, the Business on or prior to the Closing; (v) the presence, existence or human exposure to asbestos in any form at, on, under or within any Purchased Asset, Owned Real Property, or Leased Real Property occurring, arising or existing on or prior to the Closing; (vi) Liabilities that Sellers have assumed by Contract from a third party prior to the Closing that are not a Closing Assumed Contract; (vii) any Contract that is not an Assumed Contract; (viii) any violations of Environmental Law to the extent such violations occurred prior to the Closing regardless of whether those violations continue on or past the Closing; or (ix) the matters set forth on Schedule 2.4(k);

l)  all Liabilities relating to (i) the collection, storage, transmission, use or disposal of any Personal Information of any third party, in each case, on or before the Closing, and (ii) the transfer of any such Personal Information to Purchaser to the extent permitted under the Stalking Horse Agreement;

m)  all Liabilities, including any Claims or Actions, with respect to current or former Employees (or their representatives or beneficiaries) or employees of any ERISA Affiliate, or any officers, directors, retirees, independent contractors, consultants or job applicants of any Seller or any ERISA Affiliate, for any action or inaction of any Seller (or any predecessor of any Seller) occurring on or prior to the Closing, including with respect to any Benefit Plan, severance, vacation, payroll, sick leave, unemployment benefits, retirement benefits, pension benefits, Employee stock options, equity compensation, Employee stock purchases, or profit sharing plans, health care and other welfare plans or benefits, or any other Employee plans or arrangements or benefits or other compensation of any kind to any Employee, officer, director, retiree, independent contractor, consultant or job applicant, including under any benefit

17

<table>
<tr><td></td><td>plans, programs and arrangements of an ERISA Affiliate and Liabilities of Sellers and their predecessors for severance and Liabilities pursuant to the WARN Act;

n) all Liabilities of Sellers or any of their respective ERISA Affiliates relating to, arising out of, or with respect to any Multiemployer Plan;

o) any payment obligation or liability, contingent or otherwise, for brokerage or finders' fees or similar payment in connection with the Stalking Horse Agreement (including all Allowed Professional Fees and all amounts necessary to wind-down the Sellers' estates);

p) all Liabilities relating to, arising from or with respect to the failure to comply with any bulk sales laws;

q) all Liabilities relating to, arising from or with respect to any worker's compensation claims and any other occurrence-based claim to the extent arising out of any event, fact, act, omission, or condition occurring prior to the Closing, irrespective of when such Liabilities arise;

r) all Liabilities of Sellers under or arising out of the Transaction Documents and all Liabilities for which Sellers or any of their respective Affiliates are expressly made responsible pursuant to the Stalking Horse Agreement or any other Transaction Document;

s) all Cure Costs, other than Assumed Cure Costs;

t) all Liabilities for all costs and expenses incurred or owed by Sellers in connection with (i) the administration of the Chapter 11 Cases, or (ii) the negotiation, execution and consummation of the transactions contemplated under the Stalking Horse Agreement or any other Transaction Document or the DIP Credit Agreement;

u) subject to Section 2.4(h), all Liabilities relating to, arising from or with respect to, the conduct of the Business or to the Purchased Assets (and the use thereof) arising or accruing at any time at or prior to the Closing;

v) all Liabilities that existed, arose, or were incurred (i) prior to the Petition Date unless assumed in Section 2.3, or (ii) subsequent to the Petition Date and prior to the Closing Date, unless expressly assumed herein, including in each case of (i) and (ii) Liabilities that are dischargeable in the Chapter 11 Cases; and

w) any other Liability of any kind, whether known or unknown, contingent or noncontingent, matured or otherwise, whether currently existing or hereinafter created, other than an Assumed Liability.

*See* Stalking Horse Agreement § 2.4.</td></tr>
<tr><td>Conditions Precedent to Obligations of Purchaser</td><td>The obligations of Purchaser at Closing under the Stalking Horse Agreement are subject to the satisfaction (or waiver by Purchaser) of the following conditions precedent on or before the Closing Date:

1.  **Accuracy of Representations**. (a) The representation and warranty of Sellers made in the second sentence of Section 3.7 shall be true and correct in all respects on and as of the Closing; (b) the Fundamental Representations shall be true and correct in all respects (other than in *de minimis* respects) on and as of</td></tr>
</table>

| | |
|---|---|
| | the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all respects (other than in *de minimis* respects) as of such earlier date; and (c) all other representations of Sellers contained in the Stalking Horse Agreement (without giving effect to any materiality limitations, such as "material," "in all material respects," and "Material Adverse Effect" set forth therein) shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except for any failure of any such representation and warranty to be so true and correct that has not had and would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect.<br><br>2. **Compliance with Agreements and Covenants**. Sellers shall have performed and complied in all material respects with all of the covenants, obligations and agreements contained in the Stalking Horse Agreement to be performed and complied with by it on or prior to the Closing Date including delivery of the documents referred to in Section 2.8(b).<br><br>3. **No Prohibition**. No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit or proceeding shall be pending which would be reasonably expected to prohibit, the consummation of the transactions contemplated by the Stalking Horse Agreement.<br><br>4. **Waiting Periods; Required Consents**. The waiting period (and any extension thereof) applicable to the consummation of the transactions contemplated by the Stalking Horse Agreement under the HSR Act shall have expired or been earlier terminated, and the Required Consents shall have been received.<br><br>5. **Entry of Sale Order.** The Sale Order shall have been entered by the Court, shall be in full force and effect, shall not have been vacated, reversed, stayed, modified or amended as of the Closing Date, and shall have become final and no longer be subject to (or subject to a pending) appeal, vacatur, reversal or motion for reconsideration.<br><br>6. **No Material Adverse Effect**. Since the date of the Stalking Horse Agreement, no Material Adverse Effect shall have occurred.<br><br>*See* Stalking Horse Agreement Art. VI. |
| Conditions Precedent to Obligations of Sellers | The obligations of Sellers at Closing under the Stalking Horse Agreement are subject to the satisfaction (or waiver in writing by Sellers) of the following conditions precedent on or before the Closing Date:<br><br>1. **Accuracy of Representations**. The representations and warranties of Purchaser contained in the Stalking Agreement shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except for any failure of any such representation and warranty to be so true and correct as would not, individually or in the aggregate, reasonably be expected to adversely affect, materially delay or prevent the ability of Purchaser to (a) perform its obligations under the Stalking Horse Agreement or any other Transaction Document, or (b) consummate the transactions contemplated by the Stalking Horse Agreement or any other Transaction Document. |

<table>
<tr><td></td><td>

2. **Compliance with Agreements and Covenants**. Purchaser shall have performed and complied in all material respects with all of its covenants, obligations and agreements contained in the Stalking Horse Agreement to be performed and complied with by it on or prior to the Closing Date, including delivery of the documents referred to in Section 2.8(c).

3. **No Prohibition**. No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit or proceeding shall be pending which would be reasonably expected to prohibit, the consummation of the transactions contemplated by the Stalking Horse Agreement.

4. **Entry of Sale Order.** The Sale Order shall have been entered by the Court, shall be in full force and effect, shall not have been vacated, reversed, stayed, modified or amended as of the Closing Date, and shall have become final and no longer be subject to (or subject to a pending) appeal, vacatur, reversal or motion for reconsideration.

5. **Waiting Periods; Required Consents**. The waiting period (and any extension thereof) applicable to the consummation of the transactions contemplated by the Stalking Horse Agreement under the HSR Act shall have expired or been earlier terminated, and the Required Consents shall have been received.

*See* Stalking Horse Agreement Art. VII.

</td></tr>
<tr><td>

Termination Rights

</td><td>

The Stalking Horse Agreement may be terminated at any time prior to the Closing Date:

a) With the mutual written consent of Purchaser and Sellers;

b) By either Purchaser or Sellers if the Closing shall not have occurred on or before sixty (60) days after the Petition Date (as may be extended pursuant to Section 8.1(j)) (the "Termination Date"); *provided*, that the right to terminate the Stalking Horse Agreement for this reason shall not be available to any Party whose failure to fulfill any obligation under the Stalking Horse Agreement has been the primary cause of, or materially contributed to, the failure of the Closing to occur on or before the Termination Date;

c) By Sellers, if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants, or other agreements contained in the Stalking Horse Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 7.1 or 7.2, and (ii) has not been or is incapable of being cured by Purchaser within ten (10) Business Days after its receipt of written notice thereof from Sellers;

d) By Purchaser, if Sellers shall have breached or failed to perform any of their representations, warranties, covenants, or other agreements contained in the Stalking Horse Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 6.1 or Section 6.2, and (ii) has not been or is incapable of being cured by Sellers within ten (10) Business Days after their receipt of written notice thereof from Purchaser;

e) By Sellers, if (i) all of the conditions set forth in Article VI have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing), and (ii) Purchaser fails to proceed with and consummate the Closing within three (3) Business Days after receipt of written notice from

</td></tr>
</table>

20

Sellers that Sellers are ready, willing, and able to proceed with and consummate the Closing;

f)   By Purchaser, if (i) all of the conditions set forth in Article VII have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing), and (ii) Sellers fail to proceed with and consummate the Closing within three (3) Business Days after receipt of written notice from Purchaser that Purchaser is ready, willing, and able to proceed with and consummate the Closing;

g)   By Purchaser, if (i) Sellers file a motion to have the Court enter an Order (1) dismissing the Chapter 11 Cases, or (2) converting the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code or appointing a trustee in the Chapter 11 Cases or appointing an examiner with enlarged powers related to the operation of the Business (beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code, (ii) an Order is entered (1) dismissing the Chapter 11 Cases, or (2) converting the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code or appointing a trustee or examiner in the Chapter 11 Cases, and, in each case, such Order is not reversed or vacated within fourteen (14) days after entry thereof, (iii) the Sale Order (1) shall not have been entered by the Court by fifty-two (52) days after the Petition Date (unless, prior to termination of the Stalking Horse Agreement by Purchaser, the Court shall have entered the Sale Order), (2) shall have been entered in a form not acceptable to Purchaser, or (3) shall have been stayed, vacated, modified, or supplemented without Purchaser's prior written consent, (iv) Sellers publicly announce, file, or otherwise takes material steps in furtherance of any chapter 11 plan(s) of reorganization or plan(s) of liquidation with respect to the Chapter 11 Cases that fail to provide for or otherwise contemplate the Closing pursuant to the terms hereof, or (v) any of the conditions set forth in ARTICLE VII has become incapable of fulfillment and such condition is not waived by Purchaser;

h)   By either Purchaser or Sellers if any Governmental Authority shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the transactions contemplated by the Stalking Horse Agreement, and such order, decree, ruling, or other action shall have become final and nonappealable;

i)   Automatically if Sellers consummate any Alternative Transaction with someone other than Purchaser involving the Purchased Assets; or

j)   By Purchaser if: (i) the Auction shall not have been held, conducted, or concluded on or before forty-five (45) days after the Petition Date; (ii) Purchaser is not selected and designated as the Successful Bidder or Back-Up Bidder in the Notice of Successful Bidder to be filed by Sellers on or before two (2) days after the Auction; (iii) the Sale Hearing shall not have been held and concluded on or before fifty (50) days after the Petition Date; (iv) the Sale Order shall not have been entered on or before fifty-two (52) days after the Petition Date; (v) the Closing of the transactions contemplated by the Stalking Horse Agreement shall not have occurred on or before the Termination Date; *provided*, that Sellers and Purchaser may mutually agree in writing to extend such milestones in the foregoing clauses (i) through (v), in accordance with the DIP Credit Agreement; (vi) after the conclusion of the Auction, if Purchaser is the Successful Bidder, Sellers or any of their respective Affiliates take steps in further of any Alternative Transaction; or (vii) after the conclusion of the Auction if Purchaser

| | |
|---|---|
| | is the Back-Up Bidder, Sellers or any of their respective Affiliates take steps in furtherance of any Alternative Transaction other than that of the Successful Bidder. |
| | Notwithstanding anything else contained in the Stalking Horse Agreement, the right to terminate the Stalking Horse Agreement under Section 8.1 shall not be available to any Party (a) that is in material breach of its obligations under the Stalking Horse Agreement, or (b) whose failure to fulfill its obligations or to comply with its covenants under the Stalking Horse Agreement has been the primary cause of, or materially contributed to, the failure to satisfy any condition to the obligations of either party thereunder. |
| | *See* Stalking Horse Agreement § 8.1 |
| Milestones | The milestones include the following: |
| |    a)  On or before forty-five (45) days after the Petition Date, the Auction, if any, shall have been held and concluded. |
| |    b)  On or before fifty (50) days after the Petition Date, the Sale Hearing shall have been held and concluded. |
| |    c)  On or before fifty-two (52) days after the Petition Date, the Sale Order shall have been entered. |
| |    d)  On or before sixty (60) days after the Petition Date, the Closing of the sale transactions shall have occurred. |
| | *See* Stalking Horse Agreement § 8.1(j). |
| Expense Reimbursement | Subject to approval by the Court pursuant to the Bidding Procedures Order, the Stalking Horse shall, upon termination of the Stalking Horse Agreement in accordance with certain provisions therein, be entitled to reimbursement of amount equal to the reasonable and documented out-of-pocket fees and expenses of the Stalking Horse Bidder incurred in connection with the Stalking Horse Agreement and the transactions contemplated thereby, including all such fees and expenses related to negotiating the Stalking Horse Agreement, or any of the other Transaction Documents, preparing to implement the transactions contemplated thereby, and investigating and evaluating the Purchased Assets, the Excluded Assets, and the Assumed Liabilities, which shall constitute an allowed superpriority administrative expense claim against each Seller under sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of Sellers of the kind specified in section 503(b) of the Bankruptcy Code; *provided*, that the "Expense Reimbursement Amount" shall not exceed $2,500,000. |
| | *See* Stalking Horse Agreement §§ 1.01, 9.3. |

19.     By approving the designation of the Stalking Horse Bidder, the Debtors' entry into the Stalking Horse Agreement, and the Expense Reimbursement set forth therein, the Court will enable the Debtors to set the bidding baseline or "floor" for the Assets, which in turn will help maximize the value of the Assets for the benefit of creditors and other stakeholders and promote

the best possible outcome for the Debtors' sale process.  Morgner Decl. ¶ 15.  Moreover, the

Stalking Horse Agreement was negotiated by the Debtors and the Stalking Horse Bidder in good

faith and at arm's-length.  *Id.* at ¶ 19.  The Debtors have demonstrated compelling and sound

business justifications for authorization to enter into the Stalking Horse Agreement.

20.     The Stalking Horse Agreement represents the highest or otherwise best offer the

Debtors have received to date as a result of their efforts to market the Assets for sale.  Morgner

Decl. ¶¶ 16–17.  The Stalking Horse Bidder is providing a material benefit to the Debtors, their

estates, and their creditors by increasing the likelihood that the best possible price for the Debtors

Assets will be received.  The Debtors therefore believe that designating the Stalking Horse Bidder

to serve as the "stalking horse bidder" under the Stalking Horse Agreement and subjecting the

Stalking Horse Bid to higher or better offers in accordance with the Bidding Procedures represents

a sound exercise of the Debtors' business judgment and is in the best interests of their estates.

21.     In connection with the Stalking Horse Bid, the Debtors also seek approval of the

Expense Reimbursement.  The Expense Reimbursement provided to the Stalking Horse Bidder is

a necessary inducement for the Stalking Horse Bidder's willingness to commit to the Sale

Transactions contemplated by the Stalking Horse Agreement and to invest substantial time, effort,

and resources necessary to negotiate and finalize a binding bid, and to pursue the consummation

of the Sale Transactions.  Morgner Decl. ¶¶ 18–19.  The Debtors believe that the Expense

Reimbursement is appropriate and justified under the circumstances.  This is particularly true

where the Stalking Horse Bidder would not have agreed to provide a Stalking Horse Bid without

the Expense Reimbursement.  Morgner Decl. ¶ 19.  Specifically, the Expense Reimbursement:

constitutes an allowed superpriority administrative expense claim under sections 105(a), 503(b),

and 507(a)(2) of the Bankruptcy Code, subject to and subordinated in all respects to the Carve Out

and DIP Obligations (each as defined in the DIP Motion) and is commensurate with the actual and material benefits provided to the Debtors' estates by the Stalking Horse Bidder.  Additionally, as noted in the Morgner Declaration, the Expense Reimbursement is an integral part of the Stalking Horse Bid and contains terms which are customary and usual in light of the binding commitments made and the value that the Stalking Horse Bid sets as a floor for further bidding.  *Id.* at ¶ 19. Accordingly, approval of the Expense Reimbursement is warranted under the circumstances.

22.    The Stalking Horse Bidder is a Qualified Bidder (as defined in the Bidding Procedures) and the bid reflected in the Stalking Horse Bid is a Qualified Bid (as defined in the Bidding Procedures).  Designating the Stalking Horse Bidder as a Qualified Bidder provides the Debtors with a firm and actionable bid that establishes a meaningful floor for further bidding, which is critical to preserving and maximizing value.

**Form and Manner of Sale Notice and Notice of Successful Bidder**

23.    The Debtors also request that the Court approve the form and manner of the Sale Notice, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order, and the Notice of Successful Bidder, substantially in the form attached Exhibit 4 to the Bidding Procedures Order.  The Debtors submit that service of the Sale Notice and Notice of Successful Bidder as set forth below is proper and sufficient to provide notice of the Auction, if any, the deadlines to object to the Sale Transaction, the assumption and assignment of contracts in connection therewith, and the Sale Hearing, as applicable, to all known and unknown parties.

24.    The Debtors propose that within three business days after entry of the Bidding Procedures Order, the Debtors shall file on the docket and serve the Sale Notice, the Bidding Procedures Order, and the Bidding Procedures, by first-class mail, postage prepaid on: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the thirty

largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent (as defined in the DIP Motion); (d) counsel to the Prepetition Superpriority Agent (as defined in the DIP Motion); (e) counsel to each Trustee (as defined in the DIP Motion); (f) ARM Investment LLC; (g) Gladieux Metals, LLC; (h) the state attorneys general for each of the states in which the Debtors operate; (i) the United States Attorney's Office for the Southern District of Texas; (j) all parties reasonably known to the Debtors that assert liens, claims, and encumbrances, and other interests with respect to the Assets; (h) all entities known to have expressed an interest in bidding on the Assets; (i) the Internal Revenue Service; (k) the Texas Commission on Environmental Quality; (l) any other governmental agencies having a regulatory or statutory interest in these cases; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties"); *provided*, that to the extent email addresses are the only available address for the Sale Notice Parties, such parties may be served by email.

25.     The Debtors shall also, within three business days after entry of the Bidding Procedures Order, post the Sale Notice to https://cases.stretto.com/aleonmetals (the "Case Website").  Publication of the Sale Notice on the Case Website will provide notice to all interested parties whose identities are unknown to the Debtors.  The Sale Notice will include (i) the date and time of the Bid Deadline, (ii) the date, time, and place of the Auction (if any) and the Sale Hearing, and (iii) the deadline for filing any objections related to any Sale Transaction(s).

26.     The Debtors submit that the Sale Notice constitutes good and adequate notice of the Auction and Sale Transaction (including the sale of the Assets as set forth under the Stalking Horse Agreement) and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors propose that no other or further notice of the Auction and Sale Transaction shall be required and submit that the notice is

reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including the date, time, and place of the Auction (if any), the Bidding Procedures, a description of the Sale Transaction as being free and clear of liens, claims, encumbrances, and other interests (except as set forth in the Stalking Horse Agreement or applicable asset purchase agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale Transaction proceeds, and the dates and deadlines related thereto. Relatedly, the Sale Notice is reasonably calculated to provide the Debtors' Contract Counterparties (as defined below) with proper notice of the potential assumption and assignment of their contracts and leases, the proposed cure amounts relating thereto, and the related Assumption and Assignment Procedures, and thus no other or further notice need be given; *provided*, that merely listing any contract or lease on the Cure Notice does not require or guarantee that such contract or lease will be assumed and assigned, and all rights of the Debtors and all other parties in interest with respect to such contracts or leases are reserved. Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction and Sale Transaction is required.

27. The Debtors also propose that, as soon as practicable after the conclusion of the Auction, the Debtors shall file on the Court's docket and serve on the Sale Notice Parties, including all Contract Counterparties, the Notice of Successful Bidder, which shall identify any Successful Bidder(s) and Back-up Bidder(s) (as defined in the Bidding Procedures). In the event there is no Auction with respect to a Sale Transaction, the Debtors shall file the Notice of Successful Bidder identifying the Successful Bidder on September 24, 2025.

**Assumption and Assignment Procedures**

28.     The Debtors seek approval of the Assumption and Assignment Procedures to facilitate the fair and orderly assumption and assignment of the Assigned Contracts in connection with any Sale Transaction(s).  Generally, the Assumption and Assignment Procedures are designed to, among other things, (i) outline the process by which the Debtors would serve notice to all counterparties (the "Contract Counterparties") to the Assigned Contracts regarding (a) the potential assumption and assignment of such agreements in connection with the sale of the Assets, and (b) related Cure Costs, (ii) provide information regarding a Successful Bidder's adequate assurance of future performance, and (iii) set forth the objection deadline and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Assigned Contracts, to the extent necessary.

29.     The Debtors propose that the Assumption and Assignment Procedures, as summarized below, govern the assumption and assignment of the executory contracts and unexpired leases in connection with the sale of any of the Assets to one or more Successful Bidder(s):

      a.     **Cure Notice**.  The Debtors will file and serve notice of potential executory contracts and unexpired leases to be assumed and assigned to any Successful Bidder (the "Cure Notice"), substantially in the form attached to the Bidding Procedures as Exhibit 3, on the Contract Counterparties, and post the Cure Notice to the Case Website: https://cases.stretto.com/aleonmetals. The Cure Notice shall notify the applicable Contract Counterparties that the contracts or leases set forth therein may be subject to assumption and assignment in connection with a Sale Transaction, and contain the following information: (i) a list of the Assigned Contracts; (ii) the applicable Contract Counterpart(ies); (iii) the Debtors' good faith estimate of the amounts necessary to cure any monetary defaults under the Assigned Contracts (the "Cure Costs"); and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the potential assumption and assignment of such Assigned Contract (an "Assignment Objection") or to the Cure Costs (a "Cure Objection"); *provided*, that service of a Cure Notice does not

27

constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid. For the avoidance of doubt and notwithstanding the foregoing, nothing contained in the Bidding Procedures Order shall limit the Debtors' or the Successful Bidder's ability to modify the Assigned Contracts list and Cure Notice in accordance with the applicable sale documents.

b.   **Contract Objection Deadline**.   Any Assignment Objection or Cure Objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection, including, if applicable, the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; (iv) be filed with the Court no later than the date that is 14 calendar days after service of the Cure Notice (the "<u>Contract Objection Deadline</u>"); and (v) be served on the Objection Notice Parties (as defined below).

c.   **Supplemental Cure Notice**.   If the Debtors identify any additional contracts or leases to be assumed and assigned to a Successful Bidder or modifications that need to be made to a proposed Cure Cost previously stated in the Cure Notice, the Debtors may, in consultation with Stalking Horse Bidder or other Successful Bidder and in accordance with the Stalking Horse Agreement or applicable Purchase Agreement, at any time prior to forty-five days after the closing of the Sale Transaction, file and serve notice of a supplemental Cure Notice (the "<u>Supplemental Cure Notice</u>").   Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "<u>Supplemental Cure Objection</u>") only if such objection is to the proposed assumption or assumption and assignment of the applicable Assigned Contracts or the proposed Cure Costs included in the Supplemental Cure Notice, if any.   Supplemental Cure Objections must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection, including, if applicable, the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; (iv) be filed with the Court by no later than seven days after service of the Supplemental Cure Objection; and (v) be served on the Objection Notice Parties.

d.   **Resolution of Assignment Objections, Cure Objections, and Supplemental Cure Objections**. Any Assignment Objection, Cure Objection, or Supplemental Cure Objection that remains unresolved after

28

the Sale Hearing shall be heard at such later date as may be agreed upon by the parties or fixed by the Court. To the extent that any Assignment Objection, Cure Objection, or Supplemental Cure Objection cannot otherwise be resolved by the parties, such contract or lease may be conditionally assumed and assigned subject to the consent of the Stalking Horse Bidder or other applicable Successful Bidder and the terms of the Stalking Horse Agreement or other Purchase Agreement, as applicable, pending a resolution of the Assignment Objection, Cure Objection, or Supplemental Cure Objection after notice and a hearing. If an Assignment Objection, Cure Objection, or Supplemental Cure Objection is not satisfactorily resolved, the Stalking Horse Bidder or other applicable Successful Bidder may determine that such contract or lease should be rejected and not assigned.

e.   **No Cure Objections**.  If there are no timely Assignment Objections, Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file and serve an Assignment Objection, Cure Objection or a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Assigned Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Assigned Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Assigned Contract against the Debtors or the Successful Bidder, or the property of any of them.

f.   **Adequate Assurance Objections**. Objections, if any, to the proposed assumption, assignment, or assumption and assignment of Assigned Contracts, the subject of which objection is the Stalking Horse Bidder's or Successful Bidder's (a) ability to provide adequate assurance of future performance or (b) the proposed form of adequate assurance of future performance with respect to such Assigned Contract (each, an "Adequate Assurance Objection"), must: (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and, to the extent applicable, provide proposed language that, if accepted and incorporated by the Debtors and the Successful Bidder, would obviate such objection; (iv) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases; and (v) be filed with the Court by and served on the Objection Notice Parties by the following deadline (the "Adequate Assurance Objection Deadline"):

        i. For the Stalking Horse Bidder, **September 16, 2025, at 4:00 p.m. (Central Time)**.

        ii. For a Successful Bidder (other than the Stalking Horse Bidder), **September 30, 2025, at 4:00 p.m. (Central Time)**.

g.     **Objection Notice Parties**. Each Assignment Objection, Cure Objection, Adequate Assurance Objection, and Supplemental Cure Objection must be filed with the Court and served on the following parties (the "Objection Notice Parties") so as to be received no later than the applicable deadline: (i) proposed counsel to the Debtors, (a) Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Jennifer Marines (jmarines@mofo.com), Benjamin Butterfield (bbutterfield@mofo.com), and Andrew Kissner (akissner@mofo.com), and (b) Norton Rose Fulbright US LLP, 1550 Lamar Street, Suite 2000, Houston, TX 77010, Attn: Jason Boland (jason.boland@nortonrosefulbright.com), Bob Bruner (bob.bruner@nortonrosefulbright.com), and Julie Goodrich Harrison (julie.harrison@nortonrosefulbright.com; (ii) counsel to the DIP Agent, Arnold & Porter Kaye Scholer LLP, 70 West Madison Street, Suite 4200, Chicago, IL 60602-4321, Attn: Michael Messersmith (michael.messersmith@arnoldporter.com) and Sarah Gryll (sarah.gryll@arnoldporter.com); (iii) counsel to the official committee of unsecured creditors (if any) appointed in these chapter 11 cases; and (iv) the Office of The United States Trustee, Southern District of Texas, Region 7, 515 Rusk Street, Suite 3516, Houston, TX 77002, Attn: Ha Nguyen (ha.nguyen@usdoj.gov) and Jana Whitworth (jana.whitworth@usdoj.gov).

h.     **Reservation of Rights**. Service of the Sale Notice, Cure Notice, Notice of Successful Bidder, and/or any Supplemental Cure Notice shall not constitute an admission that any Assigned Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code and shall not require the Debtors to assume and/or assign such Assigned Contract.

## BASIS FOR RELIEF

**I.**     **The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Consistent with the Debtors' Reasonable Business Judgment.**

30.     A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling the assets of a debtor's estate. *See, e.g., The Inst'l Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its

30

fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale.").

31.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Adams Res. Expl. Corp.*, No. 17-10866 (KG), 2017 WL 5484017, at *3 (Bankr. D. Del. Sept. 20, 2017) ("The relief requested in the Sale Motion . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (explaining that a debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets").  To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions.  *See In re ASARCO, L.L.C.*, 650 F.3d 593, 603 (5th Cir. 2011) (affirming the bankruptcy court's approval of bid procedures designed to maximize the value of the debtor's estate); *In re Bigler, LP*, 443 B.R. 101, 115 (Bankr. S.D. Tex. 2010) (providing that the two goals for a sale of the debtors' assets are "maximizing value for the estate and preserving the integrity of the judicial process"); *In re Monitor Dynamics, Inc.*, 2010 Bankr. LEXIS 4170, at *3 (Bankr. W.D. Tex. Aug. 3, 2010) (approving bid procedures and finding that they "represent the method for maximizing value for the benefit of the Debtor's estate").

32.     Here, the Bidding Procedures will expand upon the Debtors' significant prepetition efforts and promote active bidding from interested parties to elicit the highest or otherwise best offers available for the Debtors' Assets.  The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized by these estates from any eventual transactions.  In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties—many of whom have been engaged with the Debtors for months—with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

33.     Moreover, a court-approved auction process is among the best ways to obtain the maximum value of a debtor's assets, as a full and fair price is presumed following such market exposure.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999).  This is especially true here, where any Sale Transaction will have been subjected to an extensive marketing process, both prepetition and postpetition, and intensively scrutinized by the Debtors and their advisors.  In addition, entry into the Stalking Horse Agreement will further ensure that the Debtors obtain fair market value by setting a minimum purchase price for the Debtors' Assets that will be tested in the marketplace.  As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

34.     The proposed Bidding Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, consistent with courts in this District evaluating similar orders, the Court should enter the Bidding Procedures Order.  *See e.g.*, *In re LifeScan Global Corp.*, No. 25-90259 (ARP) (Bankr. S.D. Tex. July 16, 2025); *In re Sunnova Energy Int'l Inc.*, No. 25-90160 (ARP) (Bankr. S.D. Tex. July 11, 2025); *In re Treesap Farms, LLC*, No. 25-90017 (ARP)

32

(Bankr. S.D. Tex. Mar. 19, 2025); *In re Steward Health Care Sys.*, No. 24-90213 (CML) (Bankr. S.D. Tex. Jun. 3, 2024); *In re Robertshaw US Holding Corp.*, No. 24-90052 (CML) (Bankr. S.D. Tex. Mar. 21, 2024); *In re Center for Autism and Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. Jun. 16, 2023).[9]

## II.   The Form and Manner of the Sale Notice and Notice of Successful Bidder Should be Approved.

35.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rules 2002(c) and 6004(a), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.  The Debtors submit that the Sale Notice complies with the notice procedures under Bankruptcy Rule 2002 and includes appropriate information regarding the Bidding Procedures necessary to enable interested bidders to participate in the Sale Process.  Additionally, the Debtors seek approval of the Notice of Successful Bidder as proper notice of the Sale Transaction and related objection deadline.  The Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice and Notice of Successful Bidder as provided for herein, constitutes good and adequate notice of the Sale Transaction and satisfies the applicable requirements of Bankruptcy Rules 2002 and 6004.  Accordingly, the Debtors request that the Court approve the form and manner of the Sale Notice and Notice of Successful Bidder.

---

[9] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

III.    **The Expense Reimbursement Has a Sound Business Purpose and Should be Approved.**

36.     The Debtors also seek approval of the Stalking Horse Bid, including the Expense Reimbursement contemplated thereby.   The use of a stalking horse in a public auction is a customary practice in chapter 11 cases and is recognized by courts as a way to maximize value because it "establish[es] a framework for competitive bidding and [] facilitat[es] a realization of that value."   *Off. Comm. of Unsecured Creditors v. Interforum Holding LLC*, No. 11-CV-219, 2011 WL 2671254 at *1 n.1 (E.D. Wis. July 7, 2011).   Stalking horse bidders virtually always require expense reimbursement and, in many cases, other forms of bidding protections such as breakup fees as an inducement for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement."   *Id.* (citation omitted).   Thus, the use of bid protections, including expense reimbursements, has become an established practice in chapter 11 cases.

37.     Indeed, stalking horse expense reimbursements are a normal and, in many cases, necessary, component of significant sales conducted under section 363 of the Bankruptcy Code. For example, courts have found that because a "corporation [has] a duty to encourage bidding, [bid protections] can be *necessary* to discharge [such] duties to maximize value. . . . [Bid protections] may 'be legitimately necessary to convince a "white knight" to enter the bidding by providing some form of compensation for the risks it is undertaking.'"   *In re Integrated Res. Inc.*, 147 B.R. 650, 659–61 (S.D.N.Y. 1992) (noting that bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid") (emphasis in original); *see also In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

38.     Courts routinely approve bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.   *See In*

*re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."). Courts in the Fifth Circuit apply the "business judgment rule" standard and consider whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount of the incentive is unreasonable relative to the proposed purchase price. *See In re ASARCO, L.L.C.*, 650 F.3d 593, 602–03 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible).

39.     Authorizing the Expense Reimbursement is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse Agreement establishes a floor for further bidding that may increase the consideration given in exchange for the Debtors' Assets, which will inure to the benefit of the Debtors' estates and all parties in interest. The Expense Reimbursement provided to the Stalking Horse Bidder is (a) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, and (c) fair, reasonable, and appropriate, including in light of the size and nature of the proposed transactions, the commitments that have been made, and the efforts that have been and will continue to be expended by the Stalking Horse Bidder. Morgner Decl. ¶ 19.

40.     The Expense Reimbursement was necessary to induce the Stalking Horse Bidder to enter into the Stalking Horse Agreement. Morgner Decl. ¶ 19. To adequately protect the Stalking Horse Bidder from the time and expense related to finalizing the Stalking Horse Agreement in an expedited timeframe, the Stalking Horse Bidder requested a reasonable Expense Reimbursement. *Id.* In short, the proposed Expense Reimbursement is fair and reasonable under the circumstances

because it constitutes a "fair and reasonable percentage of the proposed purchase price" and is "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662.

41.     The Expense Reimbursement is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, and all parties in interest.  Accordingly, the Court should approve the Expense Reimbursement, just as similar expense reimbursements have been approved by the Court.  *See, e.g.,  In re Sunnova Energy Int'l Inc.*, No. 25-90160 (Bankr. S.D. Tex. July 11, 2025) (authorizing stalking horse expense reimbursement); *In re Digit. Media Sols., Inc.*, No. 24-90468 (ARP) (Bankr. S.D. Tex. Oct. 16, 2024) (authorizing stalking horse expense reimbursement); *In re Ctr. for Autism and Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. June 16, 2023) (authorizing stalking horse expense reimbursement); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 19, 2023) (authorizing stalking horse expense reimbursement).[10]

**IV.     The Court Should Approve the Debtors' Entry into the Stalking Horse Agreement as a Sound Exercise of Business Judgment.**

42.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy courts routinely authorize the sale of a debtor's assets if such sale is based upon "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."  *In re Cont'l Air Lines, Inc.*, 780 F.2d at 1226; *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996).

---

[10] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

43.     The business judgment rule shields a debtor's management's decisions from judicial second-guessing.  *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (explaining that a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not "entertain objections to the debtor's conduct" after a reasonable basis for its business decisions is set forth).  Once a debtor articulates a valid business justification, the court should review that request under the business judgment rule.  *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 422 (Bankr. S.D. Tex. 2009) (noting that a debtor-in-possession must demonstrate that it satisfied "its fiduciary obligations and established a valid business justification").  The business judgment rule protects certain debtor decisions—such as the Debtors' entry into one or more definitive purchase agreements—from reevaluation by a court with the benefit of hindsight.  *See Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.").  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

### A.  A Sound Business Purpose Exists for the Sale Transaction.

44.     The Debtors have a sound business justification for selling the Assets.  The Debtors believe the Sale Transaction will maximize the value of their Assets after exposing them to a competitive, arm's-length market test.

45.     The Stalking Horse Bid will be subject to competing Bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets.  Consequently, in the Debtors'

reasonable business judgment, the ultimate Successful Bid(s), being the product of an extensive prepetition marketing process and a further robust "market check" in the form of the sale process and Auction (if warranted), will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. Apr. 2, 2001) (while a "[section] 363(b) sale transaction does not require an auction procedure . . . [t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). Accordingly, the Debtors' determination to sell the Assets through an auction process and subsequently to consummate a Sale Transaction in accordance with the Stalking Horse Agreement or other Purchase Agreement (as defined in the Bidding Procedures), as applicable, will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court authorize (i) the proposed Sale Transaction as a proper exercise of the Debtors' business judgment, and (ii) entry into the Stalking Horse Agreement as a proper exercise of the Debtors' business judgment.

### B. The Sale Transaction Should Be Approved "Free and Clear" under Section 363(f) of the Bankruptcy Code.

46.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

47.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of any and all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon (collectively, the "Interests"), except with respect to any Interests that may be assumed Interests under the definitive purchase agreement of the applicable Successful Bidder.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

48.     The Debtors will demonstrate at the Sale Hearing that any Interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale Transaction, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Assets to the Successful Bidder(s) free and clear of all Interests including liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the applicable Sale Transaction.

### C.  The Bidding Procedures Ensure that the Sale Transaction Will Be Pursued in Good Faith and Without Collusion, and the Stalking Horse Bidder or Successful Bidder are "Good Faith Purchasers.

49.     The Debtors request that the Court find the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale Transaction, and that the Stalking Horse Bidder and/or any other Successful Bidder, is or would be a "good faith

purchaser" within the meaning of section 363(m) of the Bankruptcy Code.[11]   Section 363(m) of

the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or
> (c) of this section of a sale or lease of property does not affect the validity of a sale
> or lease under such authorization to an entity that purchased or leased such property
> in good faith, whether or not such entity knew of the pendency of the appeal, unless
> such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

50.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser

leased or purchased the assets in "good faith."   While the Bankruptcy Code does not define "good

faith," courts have held that a purchaser shows its good faith through the integrity of its conduct

during the course of the sale proceedings, finding that where there is a lack of such integrity, a

good-faith finding may not be made.   *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143,

147 (3d Cir. 1986) ("Typically, the misconduct that would destroy a purchaser's good faith status

at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee,

or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain*

*Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608,

610 (S.D.N.Y. 1988) (same).

51.     The Stalking Horse Bidder, or any other Successful Bidder arising from the Auction

(if any), is or would be a "good faith purchaser" within the meaning of section 363(m) of the

---

[11] A finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any
Successful Bidder arising from the Auction.   Pursuant to the Bidding Procedures, any Successful Bidder will have had
to present a proposal in accordance with the Bidding Procedures.   In addition, the Debtors will not choose as the
Successful Bidder or Back-Up Bidder any entity whose good faith under section 363(m) of the Bankruptcy Code can
reasonably be doubted, and will be prepared to present the Court with sufficient evidence at the Sale Hearing for the
Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

Bankruptcy Code, and the Stalking Horse Agreement or other Purchase Agreement, as applicable, is or would be a good-faith agreement with arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.  ***First***, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the Stalking Horse Agreement is substantial, fair, and reasonable.  ***Second***, the parties entered into the Stalking Horse Agreement in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any Purchase Agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis.  ***Third***, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders," or similar conduct that would cause or permit the Sale Transaction or Stalking Horse Agreement or Purchase Agreement to be avoided under section 363(m) of the Bankruptcy Code.  *In re Abbotts Diaries*, 788 F.2d at 147.  Moreover, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  Finally, the Stalking Horse Bid was evaluated and approved by the Debtors in consultation with their advisors, and any other bids that the Debtors ultimately determine to be a Successful Bid will have been evaluated in a similar fashion. Accordingly, the Debtors believe that the Stalking Horse Bidder (or Successful Bidder arising from the Auction, if any) and Stalking Horse Agreement (or other Purchase Agreement) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### D. Credit Bidding Should be Authorized under Section 363(k) of the Bankruptcy Code.

52.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause

orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 459–60 (3d Cir. 2006) ("It is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under [section] 363(k).").

53.     Accordingly, the Stalking Horse Bidder should be entitled to credit bid some or all of the claims secured by its collateral pursuant to section 363(k) of the Bankruptcy Code.

**V.     The Assumption and Assignment Procedures are Appropriate and Should be Approved.**

**A. The Assumption and Assignment Procedures Reflect the Debtors' Reasonable Business Judgment.**

54.     To facilitate and effectuate the Sale Transaction, the Debtors seek the entry of the Assumption and Assignment Procedures, as well as authority to assign or transfer the Assigned Contracts to a Successful Bidder (including, for the avoidance of doubt, the Stalking Horse Bidder) to the extent required by such bidder. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided, that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Richmond*

*Leasing*, 762 F.2d at 1309 (applying a business judgment standard to debtor's determination to assume unexpired lease).

55.     The Debtors also request that any party that fails to timely object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the Cure Cost identified in the Cure Notice or Supplemental Cure Notice, as applicable.  *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding that by not objecting to sale motion, the creditor deemed to consent).

56.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale Transaction as a sound exercise of the Debtors' business judgment.  ***First***, the Assigned Contracts are essential to the value of the Assets and, as such, they are essential to inducing the highest or otherwise best offer for the Assets.  ***Second***, it is unlikely that any purchaser would want to acquire certain of the Assets unless the Assigned Contracts needed to conduct business and manage day-to-day operations of those Assets were included in the transaction.  ***Third***, the Assigned Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, the Debtors' decisions will be reviewed by the Debtors' stakeholders who will have the opportunity to object.

57.     Accordingly, the assumption and assignment of the Assigned Contracts pursuant to the Assumption and Assignment Procedures should be approved as an exercise of the Debtors' business judgment.

**B. Defaults Under the Assigned Contracts Will Be Cured in Connection with any Sale Transaction and Non-Debtor Parties Will Be Adequately Assured of Future Performance.**

58.     Upon finding that a debtor has exercised its business judgment in deciding to assume an executory contract, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

59.     The statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults.  The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of the Contract Counterparties.

60.     Similarly, the third requirement of section 365(b) of the Bankruptcy Code— adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' was adopted from Uniform Commercial Code section 2-609" and is "to be given a practical, pragmatic construction" based upon the facts and circumstances of each case.  *In re U.L. Radio Corp.*, 19 B.R. 537, 541–42 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the degree of assurance necessary falls considerably short of an absolute guaranty."  *In re Prime Motor Inns,*

*Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has "expressed willingness to devote sufficient funding" to a business "to give it a strong likelihood of succeeding").

61.     At the Sale Hearing, the Debtors will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder or Successful Bidder will be satisfied.  The Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party a Qualified Bidder or Successful Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts).  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed Cure Costs.  The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the Stalking Horse Agreement or the Purchase Agreement of the Successful Bidder.

**Emergency Consideration**

62.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors request emergency consideration of this Motion.  Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the commencement of a chapter 11 case if "relief is needed to avoid immediate and irreparable harm."  FED. R. BANKR. P. 6003.  Given the Debtors' liquidity position and the milestones under the DIP Facility, it is imperative that the Debtors obtain authorization to

pursue the postpetition marketing, auction, and sale process on the terms set forth herein.  Failure

to receive the requested relief would cause immediate and irreparable harm to the Debtors, their

estates, creditors, and all parties in interest in these chapter 11 cases.  Further, this relief will save

costs and avoid undue administrative burden only if granted immediately.  The Debtors therefore

have satisfied the "immediate and irreparable harm" standard and request that the Court approve

the Motion on an emergency basis.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

63.     The Debtors request that the Court enter an order providing that notice of the relief

requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to

exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h) to the extent

applicable.

## Modification of Bankruptcy Rule 2002(a)(2)

64.     The Debtors request that the Court, for cause, modify the services requirements set

forth in Bankruptcy Rule 2002(a)(2) to limit service of this Motion only to the core service list and

affected creditors.  In light of the breadth and complexity of the Debtors' business, serving the

Motion on all creditors, even those that are unaffected by the relief sought herein, would cause

unnecessary confusion and expense to the detriment of all stakeholders.  Accordingly, sufficient

cause exists under Bankruptcy Rule 2002(a)(2) to modify the service requirements for this Motion.

## Reservation of Rights

65.     Nothing contained herein or any actions taken pursuant to such relief requested is

intended or shall be construed as: (a) an admission by the Debtors as to the amount of, basis for,

or validity of any claim against any Debtor under the Bankruptcy Code or other applicable law;

(b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any

grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates (and the rights of all parties in interest are expressly preserved with respect to such liens); or (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## **Notice**

66.     The Debtors have provided notice of this Motion to the Sale Notice Parties or their respective counsel.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order, substantially in the form attached hereto, (ii) enter the Sale Order(s) following the conclusion of the Sale Hearing, and (iii) grant the relief requested in this Motion and such other and further relief as is just and proper.

Houston, Texas
Dated: August 17, 2025

/s/ Jason L. Boland

**NORTON ROSE FULBRIGHT US LLP**
Jason L. Boland (SBT 24040542)
Bob B. Bruner (SBT 08390450)
Julie Harrison (SBT 24092434)
Maria Mokrzycka (SBT 24119994)
1550 Lamar, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
Email: jason.boland@nortonrosefulbright.com
Email: bob.bruner@nortonrosefulbright.com
Email: julie.harrison@nortonrosefulbright.com
Email: maria.mokrzycka@nortonrosefulbright.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**MORRISON & FOERSTER LLP**
Jennifer L. Marines (*pro hac vice forthcoming*)
Benjamin Butterfield (*pro hac vice forthcoming*)
Andrew Kissner (*pro hac vice forthcoming*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jmarines@mofo.com
Email: bbutterfield@mofo.com
Email: akissner@mofo.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

### Certificate of Accuracy

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Jason L. Boland*
Jason L. Boland

### Certificate of Service

I certify that on August 17, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas. Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' proposed claims agent.

*/s/ Jason L. Boland*
Jason L. Boland