```
                        UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                          .
IN RE:                                    .   Case No. 25-90305
                                          .   Chapter 11
ALEON METALS, LLC, et al.,                .
                                          .   515 Rusk Street
                                          .   Houston, TX 77002
                    Debtor.               .
                                          .   Tuesday, August 19, 2025
. . . . . . . . . . . . . . . .           .   3:31 p.m.

                    TRANSCRIPT OF FIRST-DAY MOTIONS HEARING
                   BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                     UNITED STATES BANKRUPTCY COURT JUDGE
```

TELEPHONIC APPEARANCES:

For the Debtor:          Norton Rose Fulbright US LLP
                         By:  JASON L. BOLAND, ESQ.
                              JULIE G. HARRISON, ESQ.
                              MARIA B. MOKRZYCKA, ESQ.
                         1550 Lamar, Ste. 2000
                         Houston, TX 77010
                         (713) 651-3769

                         Morrison & Foerster LLP
                         By:  JENNIFER L. MARINES, ESQ.
                              BENJAMIN BUTTERFIELD, ESQ.
                              ANDREW KISSNER, ESQ.
                              JOSEPH K. MURPHY, ESQ.
                              ILAYNA GUEVREKIAN, ESQ.
                              YAN, DONGHAO, ESQ.
                         250 W 55th Street
                         New York, NY 10019
                         (212) 468-8000

APPEARANCES CONTINUED.

Audio Operator:          Yesenia Lila, ERO

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1

APPEARANCES (Continued):

| | |
|---|---|
| For UMB Bank, National Association, in its separate capacities as 2019 Trustee, Subordinate Trustee, Aleon Trustee, Prepetition Superpriority Agent, and DIP Agent: | Arnold & Porter LLP<br>By:  MIKE MESSERSMITH, ESQ.<br>      MARJORIE CARTER, ESQ.<br>      SARAH GRYLL, ESQ.<br>      OWEN HANEY, ESQ.<br>70 W Madison St. #4200<br>Chicago, IL 60602<br>(312) 583-2300 |
| For Field Service Specialists: | The Law Office of Paul M. Sullivan, PLLC<br>By:  PAUL M. SULLIVAN, ESQ.<br>6602 Westview Drive<br>Houston, TX 77055<br>(281) 768-7214 |
| For Texas Commission on Environmental Quality: | Office of the Attorney General of Texas<br>By:  LAYLA MILLIGAN, ESQ.<br>PO Box 12548<br>Austin, TX 78711<br>(512) 475-4933 |
| For Mason Metals, LLC: | Haynes and Boone LLP<br>By:  DAVID L. STAAB, ESQ.<br>301 Commerce Street, Suite 2600<br>Fort Worth, TX 76102<br>(817) 347-6645<br><br>Haynes and Boone LLP<br>By:  KENRIC KATTNER, ESQ.<br>1221 McKinney St. #4000<br>Houston, TX 77010<br>(713) 547-2000 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By: HA M. NGUYEN, ESQ.<br>      JANA S. WHITWORTH, ESQ.<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>(202) 590-7962 |

1        (Proceedings commence at 3:31 p.m.)

2            THE COURT:  Good afternoon, everyone.  This is Judge

3   Lopez.  Today is August 19th.  I'm going to turn my camera on

4   and we will get started with Case Number 25-90305, I hope I'm

5   pronouncing this correctly, and someone will correct me if I'm

6   wrong, Aleon Metals, Inc.

7            I'll take a virtual hearing today, so I would take

8   appearances from folks on the line.  I would also ask you to

9   please make an appearance virtually and remotely.  Just log on

10  to the Southern District of Texas webpage, and you'll find a

11  link to make appearances.  In complex cases, you'll find my

12  homepage and you can make one there as well.

13           Let me unmute a few lines here.  Let's see.  If you

14  wish to make an appearance, why don't you hit "five star" and I

15  will unmute your lines.  I'll start with a 713 number.

16           MR. BOLAND:  Good afternoon, Judge Lopez.  It's great

17  to be back before you.  Jason Boland and Julie Harrison of

18  Norton Rose Fulbright, as proposed co-counsel for debtors.

19  We're joined this afternoon with our co-counsel and colleagues

20  from the Morrison Foerster firm.  We have a few folks to

21  introduce who'll be handling various motions today:  Jennifer

22  Marines, Benjamin Butterfield, Andrew Kissner, Joseph Murphy,

23  Donghao Yan, and Ilayna Guevrekian.  Good afternoon.

24           THE COURT:  Alrighty.  Good afternoon to all of you

25  and welcome.  Here's a 312 number.

1          MR. MESSERSMITH:  Good afternoon, Your Honor.  Mike

2   Messersmith with Arnold & Porter on behalf of UMB, National

3   Association, as the trustee and DIP agent.

4          THE COURT:  Alrighty.  Good afternoon.  Good to see

5   you.

6          MR. MESSERSMITH:  Good to see you too.

7          THE COURT:  A 917 number.

8          MS. MARINES:  This is Jennifer Marines of Morrison &

9   Foerster on behalf of the debtors.

10          THE COURT:  Good afternoon.  A 281 number.

11          MS. MARINES:  Thank you.

12          MR. SULLIVAN:  Good afternoon, Your Honor.  This is

13   Paul Sullivan.  I'm here on behalf of Field Services

14   Specialists, which is an unsecured creditor.

15          THE COURT:  Good afternoon and welcome.

16          Okay.  Let's see, a 512 number.

17          MS. MILLIGAN:  Good afternoon, Your Honor.  Layla

18   Milligan with the Texas Attorney General's Office, appearing on

19   behalf of the Texas Commission on Environmental Quality.

20          THE COURT:  Good afternoon.  Good to see you,

21   Ms. Milligan.

22          Another 512 number.

23          MS. MILLIGAN:  Thank you.

24          MS. HARRISON:  Good afternoon, Your Honor.  Julie

25   Harrison with the Norton Rose Fulbright, proposed counsel for

1   the debtors.

2           THE COURT:  Good afternoon.

3           An 817 number.

4           MR. STAAB:  Good afternoon, Your Honor.  David Staab

5   with Haynes and Boone on behalf of Mason Metals, LLC.

6           THE COURT:  Good afternoon.

7           And Mr. Nguyen, this must be you.

8           MR. NGUYEN:  Good afternoon, Your Honor.  Your Honor,

9   Ha Nguyen from the U.S. Trustee.

10          THE COURT:  Alrighty.  Anyone else wish to make an

11  appearance, please hit "five star".  Let's see, all right.  I'm

12  going to turn this over to the -- oh, one more, a 212 number.

13          MR. BUTTERFIELD:  Hey, (indiscernible).

14          THE COURT:  Good afternoon, Mr. Butterfield.

15          MR. BUTTERFIELD:  Good afternoon, Your Honor.  Ben

16  Butterfield, yeah, with Morrison & Foerster.  I wasn't sure

17  exactly if I was supposed to make an appearance --

18          THE COURT:  Yeah.

19          MR. BUTTERFIELD:  -- but here for the debtors, Aleon

20  Metals.

21          THE COURT:  Alrighty.  Good afternoon.

22          All right.  For all the lines that I've unmuted, I'm

23  going to keep you unmuted.  I'd ask that you just please

24  monitor yourselves, keep your phone on mute, unless you're

25  speaking.

1          At this point, I will turn it over to the debtors.

2    Good afternoon.  All right.  Who do I turn this over to?

3          MR. BOLAND:  Ms. Marines might be muted.  There you

4    go.

5          THE COURT:  Oh.

6          MS. MARINES:  Yep.  I'm off.  Thank you.  Thanks for

7    bearing with me.

8          Good afternoon, Your Honor.  Just for the record,

9    again, my name is Jennifer Marines, and I'm a partner at

10   Morrison & Foerster, appearing on behalf of the debtors.

11         I just want to start by thanking Your Honor, your

12   chambers, all the Court staff for accommodating this hearing

13   and reviewing a massive amount of documents in a short

14   timeframe.  I also want to introduce a few key people who are

15   with us today on the debtor's side and on camera now.

16         The first is Mr. Tarun Bhatt, who is Aleon's CEO, and

17   you did get that right, Your Honor, Aleon.

18         THE COURT:  Yeah.

19         MS. MARINES:  Mr. Roy Gallagher of Ankura, Aleon's

20   chief restructuring officer and also our First-Day declarant.

21   Mr. Richard Morgner and also Mr. Paul Shin, who are both from

22   Jefferies, Aleon's investment banker and also declarants in

23   support of the proposed bidding procedures and DIP financing,

24   respectively.

25         And finally, and I'm not sure that they're all on

1   camera here, they may be, several members of the Morrison &

2   Foerster team who really worked around the clock alongside, of

3   course, Norton Rose and the Arnold & Porter team, counsel to

4   the trustee, to get these cases filed over the weekend.  And I

5   just want to say, like, I can't thank them enough for their

6   hard work and their endless positivity in the face of many,

7   many sleepless nights.

8              THE COURT:  Okay.

9              MS. MARINES:  So our goal, Your Honor, is to make

10  this hearing as efficient as possible, and I'm just going to

11  start with a very brief overview of who the debtors are, why

12  we're here, and where these cases are headed.  And then after

13  that, Norton Rose and my colleagues will just take the Court

14  through the agenda and the First-Day motions.

15             And the good news is that we have what I think will

16  be a largely consensual agenda today, with maybe a few tweaks

17  here and there that came in last minute.  And we also want to

18  thank Mr. Nguyen for working through the weekend and also on

19  several calls with us to get to that outcome.

20             THE COURT:  All right.  I --

21             MS. MARINES:  So --

22             THE COURT:  -- I have a -- I don't want to spill the

23  bean, but I have a couple of thoughts on some of the motions,

24  and I -- we'll have to kind of go through them.  It has to do

25  with the bid procedures timing of the motion, which I think

```
 1   goes into the milestones on the DIP.

 2           MS. MARINES:  Okay.

 3           THE COURT:  But let's take those up one by one.  The

 4   other ones, I think, will be easy.

 5           MS. MARINES:  Sure.  That's fine.  And I think we may

 6   also be able to address that proactively.  We've been in

 7   conversations with the United States Trustee over the weekend

 8   and think we have a tweak --

 9           THE COURT:  Okay.

10           MS. MARINES:  -- to the timing.

11           THE COURT:  Okay.

12           MS. MARINES:  So we'll see if that addresses the

13   Court's concern.  If not, we'll take that up, certainly.

14           THE COURT:  Is your tweak what was proposed in the

15   agenda?

16           MS. MARINES:  Yes.

17           THE COURT:  Well, I'm still --

18           MS. MARINES:  I believe so.

19           THE COURT:  I don't -- I'm not sure the tweak is

20   going to work, but let's talk about it.

21           MS. MARINES:  Okay.

22           THE COURT:  I'll give you all an opportunity to talk

23   to me about it.

24           MS. MARINES:  Great.  Okay.  I appreciate that.  So

25   if it's okay, I will just start with a brief overview.
```

1          THE COURT:  Mm-hmm.

2          MS. MARINES:  So as I'm sure everyone already knows,

3    there are just three entities that filed for bankruptcy.  The

4    first is Aleon Metals, Inc., which is the parent company and

5    holds really no assets other than the equity in its two

6    operating subs.

7          Gladieux Metals Recycling, which we all refer to as

8    GMR, is really the main operating entity here.  It's located in

9    Freeport, Texas, and the majority of the debtor's operations

10   and assets reside at that entity.  And I'll talk about those

11   operations in just a second.

12         And then there's the third entity, which is Aleon

13   Renewables Metal.  We all refer to that as ARM.  That entity

14   was really established to develop a complementary plant to

15   recycle the leased product remaining from GMR's recycling

16   process.  And at present, ARM is largely non-operational and

17   has -- its assets are limited.

18         So that's the simple corporate structure.  And I'll

19   just briefly touch upon the operations because it took me a

20   while to kind of get my own head around it.  But at the core of

21   this group's operations is a plant that recycles what we call

22   spent petroleum catalysts into metal that then is resold into

23   specialty markets for things like battery manufacturing and

24   steel making.

25         The Aleon facility is the largest of its kind in

1  North America that undertakes this specific process.  And it

2  has a very strategic location among the Gulf Coast oil

3  refineries who comprise the debtor's customer base.

4         And just to break it down for anyone who's not

5  knowledgeable about spent catalysts, and again this is where it

6  took me a few times to wrap my head around the process, oil

7  refineries use large vessels with pedals -- excuse me, pellets

8  called catalysts to clean up the fuel that they produce.  And

9  over time, those catalysts wear out.  They can get clogged,

10 coated with sulphur, other materials, and they can't be used

11 anymore.  And these are what are called spent catalysts.

12        And they're classified as hazardous waste if they're

13 just thrown away.  So oil refineries really can't legally dump

14 them into landfills.

15        And the debtor's plant offers a solution to this

16 problem, which is specialized equipment that can safely heat

17 and then break down and chemically process these spent

18 catalysts.  And as an added benefit, through that kind of

19 breakdown process, the Aleon plant can then also extract

20 valuable metals that are locked inside those spent catalysts,

21 like vanadium, molybdenum, nickel, cobalt.  And then those

22 metals can get sold and reused in things like, I think I

23 mentioned, batteries and specialty steel, but even also to make

24 new catalysts pellets that can then go back to the oil

25 refineries.  So the debtor's operations really do have multiple

1  benefits for numerous different constituents.

2        So, Your Honor, given all that, why are we here?  And

3  to explain that, I will just briefly touch upon the debtor's

4  revenue model.  When a refinery contracts with Aleon, it pays

5  Aleon what we call a recycling fee for Aleon to accept those

6  spent catalysts that we were talking about.

7        And then Aleon processes the material, extracts the

8  metal, and then sells them into the open market.  And a portion

9  of those raw proceeds, which is contractually agreed to and

10  known as what we call a metal credit, is then returned to the

11  refinery.  And Aleon's net revenue is equal to the recycling

12  fee plus Aleon's share of proceeds from selling the materials

13  into the open market, less any metal credits that get returned

14  to the refinery.

15        So with this model, the economics really do shift

16  with the metal markets.  And when prices are low, the credit

17  back to the refinery is less than fixed fee.  So the refinery

18  is really just essentially paying Aleon to take the hazardous

19  waste and process it.

20        When prices are high, though, the refinery's share of

21  proceeds, their metal credits, can exceed the recycling fee, so

22  both the refinery and Aleon profit from the transaction.  And

23  it's really the second part of the model that's the goal.

24  Unfortunately, it's not always the reality.

25        And while the model offers a partial hedge against

1    low metal prices, the volatility really does cause big swings

2    in the debtor's revenue.  And of course, the recent prolonged

3    softness in metal pricing has directly contributed to what I'll

4    call Aleon's revenue instability and some of the liquidity

5    challenges.

6              That is not the only reason we're here, though, Your

7    Honor.  The company has also faced some operational and supply

8    chain setbacks.  Last year and into early this year, the

9    Freeport facility was taken offline a few times for some

10   equipment problems, the most significant being a failure of

11   Aleon's SO2 scrubber.

12             And the SO2 scrubber is the system that removes

13   sulfur dioxide from the plant's exhaust in compliance with

14   environmental regulations.  So, of course, when that piece of

15   the plant is down, the plant is not able to operate due to all

16   sorts of environmental regulations.  And the plant was down for

17   about five months, which really impacted production and

18   revenue.

19             The good news, Your Honor, is that the scrubber is

20   now fixed.  The plant is running.  But that five-month downtime

21   and some kind of related downtimes really did take a toll on

22   the plant and the operations and revenues contributed --

23   contributing to why we're here today.

24             And finally, Your Honor, the company's fixed costs,

25   especially the cost of carrying all of the funded debt, has

1  just become unsustainable, especially given some of the

2  operational issues that I've just discussed.  As of the

3  petition date, the debtors have about $382 million in principal

4  of funded debt outstanding.  A significant portion of that

5  comes from the municipal revenue bonds on which UMB is the

6  trustee.  Those have been issued since 2019 in various

7  different tranches to build and operate the Freeport facility.

8         At the outset of this year, 2025, while the plant was

9  offline and not generating revenue, one of Aleon's sponsors,

10  Fortress, had stepped in to fund the operations and debt

11  service at a time -- for a time, but by about mid-April, a

12  little bit after we were involved, Fortress made it clear that

13  no additional capital was forthcoming, at which point the

14  company and its advisors reached out to the bondholders.

15         And in May of this year, a group holding a majority

16  of the debtors' prepetition notes provided a rescue loan.  That

17  rescue loan was later upsized in July of this year, and it gave

18  the company enough runway to, first and foremost, repair the

19  SO2 scrubber, but also evaluate other operating and other

20  capital needs to explore restructuring alternatives, start a

21  marketing process, and then ultimately prepare for and file

22  these least Chapter 11 cases.

23         That same group of bondholders has now agreed to fund

24  $187.5 million in senior secured superpriority DIP financing,

25  which you're going to hear about in just a moment, from my

1  colleague Ben Butterfield.  And the DIP lenders have also

2  committed to the competitive court process and to act as a

3  stalking horse bidder.

4          And Jefferies has already been involved, spent

5  several months marketing the debtors' assets, and will continue

6  outreach, and I'm sure that we will continue to hear from Your

7  Honor about tweaks to that proposed sale process.

8          So I promised I'd be brief.  That brings me to the

9  end.  Hopefully I was brief.  That brings me to the end of my

10  presentation.  I can pause here if the Court has any questions

11  on that presentation or any of the facts or any information

12  about the debtor, or otherwise I can turn the virtual podium

13  over.

14          THE COURT:  No, no questions.  I just wanted to thank

15  whoever put together the First-Day declaration and related

16  materials.  They were incredibly helpful to me, and they gave

17  me some time to Google some stuff and learn a little bit more

18  about the industry and the process.  So I very much appreciate

19  it.  No questions.  Thank you.

20          MS. MARINES:  Okay.  Well, then I apologize for being

21  redundant.

22          THE COURT:  No, not at all.

23          MS. MARINES:  But it was hard for me to wrap my head

24  around as well, so I thought I would just put it out there for

25  the rest of the universe.

1           THE COURT:  Thank you.

2           MS. MARINES:  Okay.  So I will turn the podium over

3  to Ms. Harrison to, I think, address a couple of housekeeping

4  points and then to pick up with the first item on the agenda.

5           THE COURT:  Okay.  Thank you.

6           MS. HARRISON:  Thank you, Judge.  And for the record,

7  Julie Harrison, Martin Rose Fulbright, proposed counsel for the

8  debtors.  It's great to be back in front of you.  I'm

9  presenting the first couple of items on the agenda.  That was

10 on file at Docket Number 37 yesterday evening.

11          And I also just wanted to thank the Court for your

12 attention to the Items 1 through 3 on the agenda.  We saw the

13 orders come across for --

14          THE COURT:  Yeah.

15          MS. HARRISON:  -- the joint administration complex

16 case and the (indiscernible) for us.  So we appreciate you

17 taking care of those for us.

18          Before I get into the agenda, I did want to note that

19 we filed a witness and exhibit list at Docket Number 20.  That

20 contains debtors' exhibits Docket Number 20-1 through 20-18,

21 and was applied to the various motions in the agenda.  And I

22 don't think that there are any objections to any of the

23 exhibits, so I would move for admission of Exhibits 20-1

24 through 20-18.

25          THE COURT:  Any objection to 20-1 through 20-18 for

1    purposes of today's hearing?  Okay.  They're admitted.

2         (ECF Numbers 20-1 through 20-18 admitted into evidence)

3         MS. HARRISON:  Thank you, Your Honor.  And so on to

4    the agenda, the creditor matrix motion was filed at Docket

5    Number 6.  And with this motion, the debtors are seeking

6    authority to file a consolidated creditor matrix across the

7    three debtors and to redact any personally identifiable

8    information from natural persons from that matrix and any

9    documents that would be filed in this case.  And the debtors

10   are also seeking approval of the form for notifying creditors

11   of the commencement of these cases.

12        And so with respect to the redaction specifically, we

13   think that request is appropriate and necessary in light of

14   many of the privacy laws that the debtors are subject to.  And

15   the primary information will be redacted with home addresses

16   and email addresses of individual persons.  We've conferred

17   with the U.S. Trustee and incorporated their comments into that

18   proposed order, which is filed at Docket Number 6-1.

19        And so unless you have any questions, we request

20   entry of that order.

21        THE COURT:  Anyone wish to be heard with respect to

22   the creditor matrix motion?

23        Okay.  I got a chance to review the creditor matrix

24   motion.  It looked good to me.  I did see -- I can tell where

25   the U.S. Trustee's fingerprints are in some of the comments to

1   the order.  And so I can see it there.  It's incorporated.  It
2   looks good to me.  The motion is granted.  I'll get it signed
3   and on the docket shortly.

4        MS. HARRISON:  Thank you, Your Honor.  The next item
5   on the agenda is Docket Number 7, which is the debtors' motion
6   to extend time to file schedules and statements.  We're seeking
7   an extension of 31 days for a total of 35 days after the
8   petition date to file schedules and statements.  That would put
9   us at October 1st, which we think is a fairly standard release
10  requested.

11       The debtors have voluminous books and records, and
12  the collection and processing of all the information that goes
13  into the schedules and statements will require a significant
14  amount of time for the debtors, their employees, and their
15  advisors.  And so while we are working diligently to prepare
16  the schedules and statements, that additional time will help
17  ensure accuracy and completeness.

18       We've also incorporated comments from the U.S.
19  Trustee into this proposed order at Docket Number 7.  I'm
20  sorry, Docket 7-1.  And we're also aware that the 31-day
21  extension for the total of 35 days will put the U.S. Trustee
22  outside of the normal period where they hold 341 meetings.  So
23  we understand that the U.S. Trustee has the ability to call the
24  initial meeting within that timeframe and then continue it to
25  have a more fulsome 341 meeting with the benefit of the

1  complete schedules.

2          And so unless you have questions on this motion or

3  the proposed order, we would request entry of the order at

4  Docket 7-1.

5          THE COURT:  Nope.  Schedules have to be done right.

6  And if you're telling me this is the amount of time that you

7  need, I'll give you the time.  Motion granted.

8          MS. HARRISON:  Thank you, Your Honor.  And that is

9  all from me, so I will turn the virtual podium over to

10  Mr. Butterfield for the DIP motion.

11          THE COURT:  Alrighty.  Mr. Butterfield, good

12  afternoon, sir.

13          MR. BUTTERFIELD:  Good afternoon, Your Honor.  Can

14  you hear me okay?

15          THE COURT:  Just fine.  Thank you.

16          MR. BUTTERFIELD:  Great.  Ben Butterfield of Morrison

17  & Foerster on behalf of Aleon Metals LLC and its affiliated

18  debtors and debtors in possession.

19          First off, I'll just echo my partner's comments about

20  the Zoom hearing.  Thank you for accommodating us.  We love

21  Houston, but I'll be honest, I personally appreciate any

22  opportunity to appear remotely in August.  So thank you for

23  that.

24          THE COURT:  Well, it helps drive settlements if I

25  keep you in this room out here.  So don't --

1          MR. BUTTERFIELD:  Yeah.

2          THE COURT:  -- it's really hot, so.

3          MR. BUTTERFIELD:  Yeah, I'm going to park.

4          THE COURT:  The First-Day hearing, though, it'll --

5   it's good.  I know.  I'm glad we're doing it all virtual.  It

6   is -- I can't even tell you how hot it is outside.  You missed

7   a good one today, so it's just fine.  Good afternoon, though.

8          MR. BUTTERFIELD:  Thank you.  All right.  The next

9   item on today's agenda is the DIP motion.  That's Item 6.  We

10  filed it at Docket Number 9.

11          In support of the DIP motion, we are relying on the

12  declaration of Mr. Paul Shin from Jefferies, that's Exhibit 3;

13  Mr. Roy Gallagher of the Ankura firm, and that is Exhibit

14  Number 1.

15          Your Honor, the debtors are requesting approval of a

16  superpriority senior secured financing facility provided by an

17  ad hoc group of their prepetition bondholders.  The facility is

18  critical -- the liquidity this facility provides is absolutely

19  critical for the company to continue to operate and also to

20  give the company time to run a sales process that we are

21  hopeful will maximize value for all creditors and all

22  stakeholders.

23          The headline facility amount, Your Honor, is 187.5

24  million.  And of that amount, 62,502,000 represents new money.

25  The DIP's being provided, like I said, but it is funded by an

1  ad hoc group of bondholders, and their counsel is at Arnold &

2  Porter, the Arnold & Porter firm.  And we've been in

3  discussions with that group and with Arnold & Porter, you know,

4  since April of this year and have been working closely with

5  them on a weekly and even daily basis.

6         And I just want to say that we are very appreciative

7  of the constructive and collaborative approach the ad hoc group

8  has taken during this process.  We know it's painful, but we

9  got into bankruptcy and we had a sale underway, and we're

10 confident that this is the right path for the company.

11        So turning back to the DIP facility, the facility is

12 structured to be available in three draws.  17.5 million in new

13 money will be available upon entry of the interim order today,

14 hopefully.  And then following entry of the final order, we can

15 draw 33.5 million.  And then subject to the satisfactions of

16 additional conditions, at some point in September we're hoping

17 to draw another 11.5 million.  So collectively, those three

18 tranches, that's where you get the 63.5.

19        And I'll get -- I'll highlight a few economic

20 features that aren't jumping -- may not jump off the page in

21 the order, and then I think I'll walk through the order and

22 talk about some of the key points that I'm sure you'll want to

23 know about.

24        Okay.  Economic terms, interest rate is SOFR plus 10,

25 or base rate, defined in the credit agreement, plus 9.  That's

1   the greatest option with a 2 percent default rate.  Interest on

2   the new money is paid in cash monthly, and interest on the

3   roll-up portion is paid in kind.  The roll-up is two-for-one

4   based on the new money advanced.

5          The maturity date is 60 days following the petition

6   date, subject to acceleration if certain events occur.  The

7   events of default are standard for a facility of this nature.

8   To secure the facility, there's a superpriority lien on all

9   unencumbered assets, and then a superpriority lien subject only

10  to permitted liens on everything else.  Clinically, the DIP

11  primes all of the prepetition-funded debt.  Going to -- also

12  getting the customary superpriority admin claims, with respect

13  to avoidance actions, they're not taking liens on the claims

14  themselves, but they're taking liens subject to final order on

15  divorcee, as you would expect.

16         I'll now just -- I started to get into the order

17  there, so I apologize.  I'll just now walk you through the

18  order.  I won't read every provision, but I'll hit the stuff

19  that committees usually care about and you may care about, and

20  you can just make sure it meets your criteria for an interim

21  order.

22         So we have the debtor stipulations.  That's

23  Paragraph F.  They're typical, I think, for a DIP facility.

24  They admit to the validity of the debt.  There's a release of

25  claims against the lenders, and they're all subject to

1  challenge, and we'll get to the challenge provisions in a

2  second.  That's Paragraph F.

3          The DIP liens I just described, if you want to look

4  at them for yourself, they're in Paragraph 8 of the order.

5  Again, I think they're pretty standard, and that's what you'd

6  expect for something like this.

7          THE COURT:  The only mile --

8          MR. BUTTERFIELD:  We wish --

9          THE COURT:  -- the only issue I've got is the timing,

10 is the milestone.  I think everything works for me except for

11 the one milestone, that I've got to enter an order approving a

12 bid procedure with a stalking horse protection today or

13 tomorrow, even on a preliminary basis.  I don't know how I can

14 do that.  And so that's -- it's it.  It's the thing that will

15 make -- -I'm happy to give folks a hearing on Friday, but I've

16 got to make sure that there's some notice about a bid

17 procedure.

18          MR. BUTTERFIELD:  (Indiscernible).  Yeah.

19          THE COURT:  So if you can talk to me about that and

20 get me comfortable --

21          MR. BUTTERFIELD:  Yeah.

22          THE COURT:  -- I think everything gets a lot easier.

23          MR. BUTTERFIELD:  Okay, great.  So look, we

24 absolutely did not want to change it.  We understood that it

25 might be appropriate to have another hearing before the bid

```
 1    procedures become final.  I defer to the lenders that we spent

 2    time marketing the business prior to bankruptcy.  We're going

 3    to spend a decent amount of time in bankruptcy marketing it.

 4    We're not trying to jam anyone or defy people's rights.

 5              THE COURT:  I can't give bid protections to someone

 6    today on Day 1 --

 7              MR. BUTTERFIELD:  Okay.

 8              THE COURT:  -- on 24-hour days.

 9              MR. BUTTERFIELD:  In light --

10              THE COURT:  I can't even do it on a preliminary

11    basis.  I can --

12              MR. BUTTERFIELD:  Yeah.

13              THE COURT:  -- approve an auction.

14              MR. BUTTERFIELD:  Well, (indiscernible) --

15              THE COURT:  I'm just telling everyone, I can approve

16    an auction, and I'm not going to jam anyone on the dates.  The

17    dates work for me.  The dates work for me, and I just want to

18    hold a hearing on Friday and do it all at one time, but without

19    moving the dates.  The dates are important.

20              Let me hear from the DIP lender.

21              MR. MESSERSMITH:  Good afternoon, Your Honor.

22              THE COURT:  Oh.

23              MR. MESSERSMITH:  Mike Messersmith, again, Arnold &

24    Porter on behalf of UNB.  At UNB we agree that the dates are

25    extremely important.  You know, we are -- you know, part of the
```

1  rationale we have for this is really that there is certainly a

2  certain amount of money that's available.  This has been a real

3  troubling situation for our bond holders.  We've asked them to

4  support the company from an operational standpoint, but then to

5  support the company from a repair traffic standpoint, you know,

6  when the company has gone -- has become, you know, broken for a

7  variety of reasons.

8         They said they maybe -- our clients have basically

9  said to us, and then we've said to debtor's counsel, listen, we

10  have a pot of money, and that amount of money has to last long

11  enough in order to get to, you know, a seller.  You know, what

12  we'd like to do is conserve as much money as we can to do some

13  of those repairs that are necessary now to get this company off

14  of that and running off.  And so that is part of the reason why

15  we're trying to do this quickly as possible, because it saves

16  us money to address and fix it.  With the company making money,

17  the more offers we have.

18         So we are absolutely on board with your view of

19  keeping the dates.  Let's have a hearing on Friday.  We can

20  walk you through the rationale.  Mr. Morgner from Jefferies can

21  talk through the bidding process with you and why he believes

22  this is (indiscernible).  He's been doing this now for, I

23  think, like it might have been a couple of weeks.

24         Really, what we want to do is, like, you might

25  imagine, there isn't any given day that my bondholders will end

1  up wanting to own a petrochemical plants, and that's a great

2  one.  That's how they make the money.  But we want to make sure

3  that we're marketing the assets in a fair and open way, and

4  we're also (indiscernible).  You know, we believe if we're not

5  getting a strong enough date that we're only kicking ourselves,

6  because we think it's a good path and we can make money with

7  it.

8          So that's -- as long as we keep our dates, we're good

9  for Friday.

10          THE COURT:  I very much appreciate it.  And I can

11  give you all a hearing on, you know, Friday at 10 a.m., and we

12  can just take it up.  And it doesn't need to be a terribly long

13  hearing, frankly.  I think --

14          MR. MESSERSMITH:  (Indiscernible)

15          THE COURT:  -- we can rely on the declarations that

16  are admitted today for purposes of that hearing, and we can get

17  right into it.  I can admit it -- I can admit the declarations

18  today, folks, and give you a short supplement, and we can go

19  there.  I just feel a lot more comfortable doing that, even if

20  we had a short hearing, but certainly subject to anyone's

21  rights to come in.  But I think I'm more than comfortable

22  giving folks a hearing.

23          I know there may be other issues where people may

24  want to comment on the DIP.  But in terms of establishing a

25  procedure for an auction, you know, subject to everyone's

1    rights to come in and people can have them, I'd rather just do

2    it all at one time.

3             Ms. Milligan.

4             MS. MILLIGAN:  Thank you, Your Honor.  And apologies

5    for my technical lack of ability in figuring out how to raise

6    your -- well, my hand.  I will say that on behalf of TCEQ,

7    there are concerns with the dates and issues with the bidding

8    procedures, and we're happy to delay that discussion until

9    Friday and see if we can reach agreement behind the scenes

10   between now and then.

11            But the concern is largely that if there is an

12   auction and there is a successful bid other than the stocking

13   horse, that is not notified on any parties until September 30th

14   at 4 p.m., and the sale hearing is scheduled for October 1st at

15   10 a.m., and so we've communicated with debtor's counsel about

16   that issue.

17            THE COURT:  What's the concern there, Ms. Milligan,

18   from the Texas AG's perspective?

19            MS. MILLIGAN:  From --

20            THE COURT:  From the TCEQ's perspective?

21            MS. MILLIGAN:  So on behalf of the TCEQ, right, Your

22   Honor.  If we don't know who the auction -- who the bidder is,

23   what the terms of the bid are, we don't know how to understand

24   if the person purchasing a very highly environmentally

25   impactful business will be sustainable or feasible.

1          And from our perspective, again, we've communicated

2   with counsel, for debtors.  We're hoping that maybe we can get

3   involved in some way through the process, so we'll resolve our

4   concerns.  But the timing, I'm just saying that we don't want

5   to necessarily extend out that timing, because it's an issue

6   involving for the DIP.  We don't want them holding the thing

7   up.  We just want to make sure we have sufficient notice --

8          THE COURT:  Right.

9          MS. MILLIGAN:  -- so that we can help facilitate the

10  sale and not --

11         THE COURT:  Yeah.

12         MS. MILLIGAN:  -- unnecessarily delay it.

13         THE COURT:  I just wanted to -- this was just more me

14  just trying to understand it as a -- just trying to get a --

15         MS. MILLIGAN:  Yes.

16         THE COURT:  -- an understanding.  I unmuted one other

17  line.

18         MS. MILLIGAN:  Thank you.

19         THE COURT:  Any other issue?  Did someone else wish

20  to be heard?  Mr. Kissner.

21         MR. KISSNER:  This is Andrew Kissner of Morrison &

22  Foerster, proposed to counsel for the debtors.  And we can --

23  it sounds like bid procedures in general will be dealt with

24  later today and then on Friday.  I just wanted to confirm that

25  we have been in touch with Ms. Milligan's office, and we're

```
1    happy to keep the TCEQ abreast of developments in the sale
2    process, and we're going to propose language, preserving
3    rights, and giving consultation rights, and we hope to reach an
4    agreement on that with them.
5           We understand the issues and don't think it's a
6    controversial proposition that the TCEQ is a major stakeholder
7    in here, and we have to keep them up to date.
8           THE COURT:  So yeah, that's perfect.
9           MR. KISSNER:  I also just want --
10          THE COURT:  Go ahead.
11          MR. KISSNER:  -- preview for everything that's seen
12   all in due time.  But when we're talking about bid protections
13   here, just so nobody's surprised, all we're talking about is a
14   limited expense reimbursement.  No break-up fee here.  I
15   understand Your Honor's concern, and like I said, I don't want
16   to continue to upstage Mr. Butterfield, because we are still
17   talking about the DIP, but I just wanted to --
18          THE COURT:  No.
19          MR. KISSNER:  -- be very clear that that's
20   (indiscernible).  Thank you.
21          THE COURT:  I appreciate it.
22          Mr. Butterfield, I think your presentation makes
23   sense to me.  I think it's clear that the debtor needs money.
24   It's clear that the debtor needs money today.  And based upon
25   the declarations, it's clear that this is the best deal, and
```

1  the proposed order includes a roll-up feature, but it's --

2  under the circumstances, I think it's the -- I understand where

3  the estate is, and I understand the reality of where things

4  are, so I get the economics.  I just have to kind of get

5  through the milestone issue.

6         And I don't feel like doing a bunch of surgery to the

7  order or having anyone upload it or upload -- if there's an

8  understanding that if I sign this order, it's not going to, you

9  know, create a triple wire between now and Friday, I'm good

10 with signing the order and avoiding sending multiple drafts to

11 a bunch of people to go do the review and adding to the bill.

12        So, Mr. Butterfield, is there anything else on the

13 order that you wish to highlight for me?

14        MR. BUTTERFIELD:  Yeah, first of all, thank you, Your

15 Honor.  Ben Butterfield from Morrison & Foerster.  We

16 appreciate it, and we agree wholeheartedly.

17        There was one objection that was filed to the order,

18 which we have resolved.

19        THE COURT:  Oh, that's right, yeah.

20        MR. BUTTERFIELD:  And we've resolved -- we've

21 resolved the DIP language to be added to the order.  And what I

22 would propose is I just read it now into the record, and we

23 can -- if people are happy with the representation on the

24 record, we can do it that way, or if we actually do need to

25 amend the order, I deferred it to the stakeholders that that

1    was the plan.

2              THE COURT:  Oh, you're talking about the language

3    about the property that's in the bins.  Yeah, I think --

4              MR. BUTTERFIELD:  Yeah.

5              THE COURT:  -- I think you can get a representation

6    on the record, and it would work.  And if we need to supplement

7    it later, then folks can do it.  But I think if that's what you

8    all want, or if you want to -- I'd rather have an order that's

9    signed now, and then if folks feel like they need the

10   representation, but you're hearing it from me, I will accept

11   and incorporate that representation into the record as if it

12   was signed, so long as the DIP lender is good with it.

13             MR. BUTTERFIELD:  Thank you, Your Honor.  So why

14   don't I read it, and then it's just going to be something

15   that's not very long, and then people can just respond as to

16   whether it's acceptable.

17             Okay.  So the representation is that nothing in this

18   interim DIP order shall be deemed to prejudice the rights of

19   Mason Metals, LLC with respect to any rights, title, interest,

20   and ownership, as of the petition date of the, quote, "Mason

21   Metals product", end quote, as such term is defined and used in

22   the order granting temporary injunction entered by the District

23   Court of Brazoria County, Texas, 149th Judicial District, on

24   June 11th, 2025, in Catalyst and Chemical Containers, LLC v.

25   Gladieux Metals Recycling, LLC, Cause Number 134327-CB.

1              THE COURT:  Mr. Staab, does that reflect your

2   understanding of the deal?

3              MR. MESSERSMITH:  Yes, that's my understanding of the

4   deal, too, counsel to UNB as DIP agent.

5              THE COURT:  Thank you.  Mr. Staab, if I haven't

6   unmuted you, please hit "five star", but I think you may be

7   unmuted, or maybe I haven't.  Why don't you hit "five star"?

8   Let's see.  Counsel, can you hit "five star" one more time?

9   Oh, there's --

10             MR. STAAB:  Can you hear me, Your Honor?

11             THE COURT:  Oh, I can hear you.  Oh, perfect.

12             MR. STAAB:  Perfect.  Your Honor, David Staab with

13   Haynes and Boone on behalf of Mason Metals, LLC.

14   Mr. Butterfield is correct that the language that was read into

15   the record accurately reflects the agreements of the parties.

16   I understood, on Your Honor's preference, to have the record

17   stand, and we will defer to Your Honor and go with that

18   preference.

19             THE COURT:  Yeah.

20             MR. STAAB:  That's completely fine with Mason Metals.

21   And in addition, we can get to it when we get to the bid

22   procedures order, but my understanding is that we will also

23   have the exact same numbers here be incorporated into that

24   order as well.

25             THE COURT:  Okay.  And I will just note for the

1    record that I'm going to -- I've reviewed the proposed order,

2    the interim order here, and a lot of hard work went into it.

3    I'm going to approve interim approval of the financing motion

4    on the terms, and subject again to the agreement between, as

5    read on the record, which will be deemed incorporated into this

6    interim order for all purposes.

7           And I think what I just need -- or let me just find

8    then, just as well, that you look to a couple of different

9    sections for approval of financing.  You look to 364 to

10   authorize the use of -- to allow the debtor to obtain

11   financing.  You look to 363 as well, because there's going to

12   be some use of that cash collateral as well.

13          And so I'm going to find that the debtor has

14   satisfied each applicable section of 364.  It is clear that

15   this is the best term of the financing and that there is no

16   other form of financing available that would satisfy the other

17   sections of 364.  No one is going to lend on an unsecured basis

18   here or subject to a junior lien.  So this is the appropriate

19   provisions on which 364 are met.

20          The debtors are certainly exercising their business

21   judgment and the parties have consented to the use of cash

22   here.  I'm going to approve the milestones with the approved

23   tweak on the record here, as appropriate.  Everyone's rights

24   are preserved in connection with the final, but it is important

25   for the debtor to get this money in today, and I'm going to

1  approve it.  The debtor's reps as well.  Everybody's rights are

2  preserved in connection with a final.

3          Mr. Butterfield, I think I just need to confirm from

4  you a final hearing date.  On my end, I was told September 17th

5  at 2.  Is that what y'all's understanding is as well?  Does

6  that sound right for final hearing?

7          MR. BUTTERFIELD:  Your Honor.  Yes.  I defer to my

8  co-counsel, Ms. Marines --

9          THE COURT:  Okay.

10         MR. BUTTERFIELD:  -- on that.  But it does to

11  (indiscernible).

12         THE COURT:  Ms. Marines, does that work for you?

13         MS. MARINES:  That's correct.

14         THE COURT:  Okay.  So I'll enter September 17 at 2.

15  Are you okay with an objection deadline of September 10 at 5

16  Central?  Does that work for you?  Or what do you want?  What

17  do you think?  What is your hot plan?

18         MS. MARINES:  That's fine, Your Honor.

19         THE COURT:   Okay.  I will then sign this order and

20  get it on the docket.

21         All right.  Where do we go next?

22         MR. KISSNER:  Thank you, Your Honor.  For the record,

23  again, this is Andrew Kissner of Morrison Foerster, proposed

24  counsel for the debtors.

25         The next item on the agenda was Item 7, which was the

1    bid procedures motion.  I just wanted to clarify, do you wish

2    to carry the entire motion to the private hearing, or do you

3    want to have the presentation today and leave appendence?

4              THE COURT:  Let's carry everything until Friday, but

5    I will carry the exhibits that are entered today into the

6    record so you don't need to re-enter.  Those declarations

7    will -- in support.  And if there's anything else you wish to,

8    I'll carry it into Friday's hearing.  So for purposes of that

9    hearing, I don't want another declaration drafted, another

10   date, or any of that stuff.  This will carry.  If it's admitted

11   here, we'll just pick it up, and I'll hear all the arguments

12   for or against it on Friday.

13             And let's do --

14             MR. KISSNER:  Okay.

15             THE COURT:  -- can we do Friday at 10 a.m. Central?

16   Would that work for you all?

17             MR. KISSNER:  That's all right for me, Your Honor.

18             THE COURT:  Okay.  We'll do Friday at 10 a.m.

19   Central, and we'll pick it up from there.  Okay.

20             MR. KISSNER:  Just for clarity of the record, the

21   evidence that's been admitted today that we would rely on would

22   be the declaration of Roy Gallagher, which was admitted as

23   Exhibit 1, and then the declaration of Richard Morgner, which

24   is Exhibit 4, and both will be available on the line on Friday

25   as well.

1            So with that, then, I think that would bring us to

2   Item 8 on the agenda, which is the cash management motion.

3   That was filed to the docket at Docket Number 13.

4            That motion seeks authority for the debtors to

5   continue using their existing cash management system in the

6   ordinary course of business.  And luckily for us here today,

7   this is actually one of the most straightforward cash

8   management systems I've ever seen.  It makes what we're looking

9   for very simple.

10            In brief, there are five bank accounts within the

11   debtors' cash management system, all of which are at JPMorgan

12   Chase, which is a signatory to uniform depository agreements

13   with the United States Trustee's Office.  The debtors are

14   fortunate in that they don't generally pay bank fees for these

15   accounts and that they're actually generally taken care of by

16   the non-debtor parent.  To the extent that that arrangement

17   changes, and out of an abundance of caution, we do seek

18   authority to pay those fees in the ordinary course.

19            In terms of how the system is structured for the

20   funds, the primary operating account is held at the debtor,

21   GMR.  As of the petition date, that account had a little bit

22   south of $780,000 in it.

23            The way the funds generally flow is that revenue from

24   customers or funds made available by the prepetition rescue

25   agent and going forward the DIP agent are deposited into the

1   GMR operating account, and then it makes transfers to the other

2   debtors as necessary.  Historically, it's been about $10,000 a

3   month to ARM to pay some vendors, but most of the money stays

4   with GMR because it has the vast majority of the operations.

5           The other pictures you see are corporate credit

6   cards.  They have an aggregate limit of about $110,000, and

7   they are over-collateralized by letters of credit.  The stock

8   on those cards a little bit south of $2,000.  I think it's

9   1,773 as of the petition date.  And so the debtors seek

10  authority to continue those corporate cards and to the extent

11  of the de minimis prepetition balance, to honor that going

12  forward.

13          In terms of intercompany transfers, the vast majority

14  of those transfers historically have been interdebtor.  And

15  given the fact that their shareholders will not be providing

16  financial assistance going forward, we don't anticipate

17  anything for company transfers that would leave the debtor's

18  ecosystem.  And for those that do happen within the debtor

19  ecosystem, we are seeking permission to continue those in the

20  ordinary course, and for any of those transfers to have

21  administrative priority status subject to and subordinate to

22  the DIP claims.

23          We provided a copy of the motion and the proposed

24  interim order to the United States Trustee's Office prior to

25  filing.  We don't understand them to have any issues or

1  objections on the form of order.  And as we sit here today, we

2  have not received any objections or informal comments from any

3  other parties in interest.

4          So unless the Court has any questions or concerns,

5  then at this time I'd ask that Your Honor enter an order

6  granting the motion on an interim basis.

7          THE COURT:  I'm going to grant the cash management

8  motion on an interim basis.

9          Mr. Nguyen, no 345 extension for you today.  It's all

10 worked out.  This is an easy one to approve.  This provides

11 transparency about the debtor's flow of cash.  But the motion

12 just allows the debtor to keep their existing cash management

13 system here, which -- without creating material disruption

14 caused by a filing of a Chapter 11 case.  So I'll approve this.

15 And we'll set it for -- it looks like it's an interim order.

16 I'll approve it and then set it for the final hearing at the

17 same date and time as we did for the others.

18         MR. KISSNER:  Sounds good.  Thank you, Your Honor.

19 And with that, I'm going to pass things over to my colleague,

20 Mr. Joseph Murphy, who will be handling the next few items on

21 the agenda.

22         THE COURT:  All right.

23         MR. KISSNER:  Thank you very much, and I'll see you

24 on Friday.

25         THE COURT:  Mr. Murphy, good afternoon.  All right.

1   Let's see.  Mr. Murphy, if I have not unmuted you, why don't

2   you hit "five star", and I will unmute your line.  You may be

3   on mute, Mr. Murphy.  There you go.

4          MR. MURPHY:  Good afternoon, Your Honor.  Thank you.

5   For the record, Joseph Murphy of Morrison & Foerster, proposed

6   counsel to the debtors.  I'll be taking us through the next two

7   items on the agenda, starting with Item 9, the debtor's

8   insurance motion, filed at Docket Number 14.

9          The debtors currently maintain 19 insurance policies,

10  many of which were financed through two premium financing

11  agreements.  Pursuant to the insurance motion, the debtors seek

12  authority to maintain their prepetition insurance coverage and

13  satisfy any related prepetition obligations, including with

14  respect to the debtors' premium financing agreements and the

15  payment of broker fees, to renew or enter into new insurance

16  agreements in the ordinary course of business post-petition, to

17  continue to honor the terms of the debtors' premium financing

18  agreements, and to enter into new premium financing agreements

19  in the ordinary course of business post-petition.

20         Maintaining adequate insurance coverage is necessary

21  to preserve the values of debtors' estates, as well as to

22  adhere to the requirements of the Bankruptcy Code and the U.S.

23  Trustee guidelines.  We have shared this motion and formal

24  proposed order with the United States Trustee and counsel to

25  the DIP agent, and I have incorporated any comments.

1          Unless Your Honor has any questions, we respectfully

2    request entry of the order as proposed.

3          THE COURT:  Anyone wish to be heard in connection

4    with the insurance motion?  Approved.  Pay your insurance.

5    Where do we go next?

6          MR. MURPHY:  Thank you, Your Honor.  The next item on

7    today's agenda is Item 10, the debtors' taxes motion, which is

8    filed at Docket Number 15.

9          Pursuant to the taxes motion, the debtors are seeking

10   authority to pay any prepetition amounts owed on account of

11   certain taxes and fees, and to continue to pay their tax

12   obligations post-petition in the ordinary course of business.

13   The debtors do not believe that there are any prepetition of

14   taxes and fees that are due in owing as of the petition date,

15   but out of an abundance of caution, we seek the Court's

16   permission to pay any taxes that might be outstanding, and to

17   continue to pay taxes in the ordinary course of business.

18         We have shared this motion and formal proposed order

19   with the United States Trustee and counsel to the DIP agent,

20   and we have incorporated any comments.  Unless Your Honor has

21   any questions, we respectfully request entry of the order as

22   proposed.

23         THE COURT:  Okay.  I did get an opportunity to review

24   the taxes motion.  The relief requested is appropriate.

25   Debtors are exercising their business judgment here, and it

1   makes sense in connection with this motion.  I will grant the

2   relief requested.

3          MR. MURPHY:  Thank you, Your Honor.  With that, I

4   will turn the podium over to my colleague, Helen Yan, for the

5   next item on the agenda.

6          THE COURT:  Alrighty.  Good afternoon.  Ms. Yan, good

7   afternoon.  Helen, I may need to -- there you go.  Sorry.

8          MS. YAN:  Good afternoon, Your Honor.

9          THE COURT:  Good afternoon.

10          MS. YAN:  Can you hear me all right?

11          THE COURT:  Just fine.

12          MS. YAN:  Okay.  Okay.  For the record, Helen Yan,

13   Morrison & Foerster, proposed counsel to the debtors.  I will

14   be covering Item 11 of the agenda, which can be found at Docket

15   16.  It's the wages motion.

16          The debtors' workforce consists of approximately 64

17   employees and 25 independent contractors.  These individuals

18   provide a wide range of services that are essential to the

19   debtors' operations and restructuring efforts.  Authority to

20   continue the debtors' prepetition compensation and benefits

21   program is critical for the debtors to maintain stability of

22   their business and to avoid any potential hardships for the

23   employees and contractors, many of whom depend on their wages

24   and benefits to support themselves and their families.

25          Accordingly, the debtors, through the wages motion,

1  seek to pay outstanding prepetition amounts not to exceed

2  $733,000 and to continue their compensation and benefits

3  practices in the ordinary course of business on a post-petition

4  basis.  Specifically, the debtors are not seeking to pay any

5  individual above the statutory priority cap.

6          The U.S. Trustee has reviewed the motion and the

7  proposed formal order prior to filing and did not have any

8  comments, but we did provide responses to a couple of

9  clarifying questions that the U.S. Trustee had.  We also shared

10  the motion and the proposed formal order with counsel for the

11  DIP agent and have incorporated all of their comments.

12          Unless Your Honor has any questions or concerns, I

13  would respectfully request that the Court enter the proposed

14  order.

15          THE COURT:  Okay.  Anyone wish to be heard in

16  connection with the wages motion?

17          And so let's see, is anyone over the cap, counsel,

18  that I should be aware of?

19          MS. YAN:  No, there will be no employee that will be

20  paid over the statutory cap.

21          THE COURT:  Okay.  Thank you.  I've reviewed the

22  proposed motion and order.  I've said this a few times.  I know

23  the DIP is kind of the highlight of First-Days in a lot of ways

24  for bankruptcy lawyers, but for bankruptcy judges the First-Day

25  wage motion is probably equally important just because we see

1   so many people and a lot of times you see the company and you

2   see the faces behind the people.

3          So I think this is really important and it sends the

4   right message that the company is taking care of kind of folks

5   who may wake up and hear that their company has filed for

6   Chapter 11 and that they know that they can keep their health

7   insurance and make sure that their kids are off to the first

8   day of school with insurance and they're going to get paid

9   their wages and, you know, not have to worry about that kind of

10  stuff.  So I think this is a super important motion.  So I'll

11  approve it.

12         MS. YAN:  Thank you, Your Honor.  With that, I'll

13  pass the virtual podium to my colleague, Ms. Guevrekian, for

14  moving the agenda.

15         THE COURT:  Okay.  Good afternoon.  You may be on

16  mute.  Let's see.  You may have muted yourself too.  I do it

17  all the time.  Hold on.  Let's see.  Why don't you try it one

18  more time.  Let's see if I can hear you.  I think I've -- let's

19  see.  I think I've already unmuted your line.  Why don't you

20  give it a shot or check your line and see if you're muted.  No,

21  I still can't hear you.  Let's see.  I'm sure it's me.  Let's

22  see.  Did that do the trick?  No, I still can't hear you.

23         MR. BUTTERFIELD:  Your Honor, Ms. Guevrekian is going

24  to come to my office and she'll just give the presentation here

25  if that's okay.

```
1              THE COURT:  That's completely fine.  No.  I'm sorry.

2              MR. BUTTERFIELD:  It's okay.  She's here.  One

3    second.

4              MS. GUEVREKIAN:  Good afternoon, Your Honor.  Can you

5    hear me?

6              THE COURT:  Just fine.  I'm sorry.  I'm doing

7    something wrong.  And it's -- we're going to blame me.  I

8    appreciate it.

9              MS. GUEVREKIAN:  Okay.

10             THE COURT:  But thank you for your -- thank you for

11   accommodating.  Thank you.

12             MS. GUEVREKIAN:  No problem.  Thank you.  For the

13   record, Ilayna Guevrekian from Morrison & Foerster, proposed

14   counsel for the debtors.

15             Your Honor, I will be taking us through the last

16   items on the agenda this afternoon.  So up next, we have the

17   utilities motion, which is Item Number 12 on the agenda, filed

18   at Docket Number 17.

19             In connection with their operations, the debtors rely

20   on a variety of utility services, including electric, gas,

21   steam, water, and waste removal.  A list of the debtors'

22   proposed utility providers are on Exhibit A attached to the

23   proposed order.  The debtors believe that the relief requested

24   by this motion is essential, as the debtors' operations would

25   be severely disrupted if any of the providers were to alter or
```

1   discontinue providing services during these cases.

2          As adequate assurance for the utility providers, the

3   debtors propose to fund a preexisting segregated account, as

4   highlighted in the cash management motion, with approximately

5   $104,025.  And this number is approximately half of the

6   debtors' average monthly spend on utilities, as calculated over

7   the past 12 months.  Concerning this motion, the debtors also

8   seek approval of certain customary adequate assurance

9   procedures that should streamline the process by which any

10  utility providers may request additional adequate insurance.

11         And we've previewed this motion and formal proposed

12  order with the United States Trustee and counsel to the DIP

13  agent, and we've incorporated any comments that they had.  So

14  unless Your Honor has any additional questions, we respectfully

15  request that the Court enter the order as proposed.

16         THE COURT:  Anyone wish to be heard with respect to

17  the utilities motion?

18         Okay.  I'm going to approve the relief requested.  It

19  provides adequate assurance to utilities and keeps -- makes

20  sure that the lights stay on and the internet continues to

21  work, but still allows parties an opportunity, if they so elect

22  it to ask for something.  So there's process, but there's also

23  adequate assurance here.

24         So I have reviewed the proposed order, and I will get

25  it signed and on the docket.

1          MS. GUEVREKIAN:  Thank you, Your Honor.

2          THE COURT:  All right.  Where do we go next?

3          MS. GUEVREKIAN:  And finally, that brings us to the

4   critical vendors motion, which is Item 13 on the agenda, filed

5   at Docket Number 18.

6          As Your Honor has heard, the debtors operate a

7   sophisticated catalyst recycling plant, which requires, among

8   other things, a reliable supply of feedstock, storage and

9   transportation for this feedstock and other materials, as well

10  as continued availability to equipment maintenance and other

11  services.  And given the nature of the debtor's business, there

12  are limited options when it comes to vendors who can supply

13  these highly specialized goods and services.  So we believe

14  that it's key that the debtors can continue partnering with

15  their existing vendors during the ordinary course.

16         As set forth in the motion, the debtors have worked

17  with their advisors to carefully evaluate the entire population

18  of vendors and come up with a list of vendors whose goods and

19  services are most critical to their operations during these

20  cases.  Due to the debtors' liquidity challenges and inability

21  to pay invoices, many of these vendors have already threatened

22  to stop providing goods and services if they remain unpaid.

23         The debtors have likewise evaluated the amounts

24  outstanding or expected to become due with respect to Section

25  503(b)(9) claimants and lien claimants, and now request

1  authority to enter into agreements with these trade claimants

2  as they deem necessary, and in doing so, pay their respective

3  prepetition claims up to approximately 2.5 million in the

4  aggregate on an interim basis.

5        Your Honor, we recognize that the amount requested on

6  an interim basis is substantially the same as the amount we

7  have requested on a final basis.  Many of the debtors' invoices

8  are already way past due, and most, if not all, of the debtors'

9  trade terms operate on a payment schedule of 30 days or less.

10 So because of this, substantially all of the amounts that are

11 outstanding are either already due or expected to become due

12 during the interim period.

13       THE COURT:  Why should I consider this today,

14 counsel?

15       MS. GUEVREKIAN:  I'm sorry, Your Honor?

16       THE COURT:  Why should I consider this relief

17 requested today?

18       MS. GUEVREKIAN:  Your Honor, the debtors have already

19 received numerous communications from their vendors, and they

20 are not looking to provide continued services during these

21 cases unless they are in somewhat like compensated for their

22 amounts that have been outstanding for months at this point.

23 And --

24       THE COURT:  Do you believe this is a good exercise of

25 the debtors' business judgment?

1          MS. GUEVREKIAN:  I do, Your Honor.  The debtors have

2    been working consistently with their advisors over these past

3    few weeks to both evaluate their vendors and communicate with

4    their vendors as to go forward terms and try to work to a

5    resolution.  And so we think having this relief from the Court

6    will further support the debtors in those efforts and put them

7    in a position to continue operating during these cases.

8          THE COURT:  Do you think that the amount requested is

9    appropriate for the interim period?

10          MS. GUEVREKIAN:  I do, Your Honor.  I -- we've

11    reviewed this debtor's books and records and taken a look at

12    those vendors that are so specialized that the debtors don't

13    have any option to, you know, to try to receive the same goods

14    or services from alternate vendors.  And so this number is

15    really what the debtors need to get through this interim

16    period.

17          THE COURT:  Okay.  Thank you.  Anyone else wish to be

18    heard?  You're a former Beckerman clerk.  I had to make -- I

19    had to give you a little bit of -- make sure.  You can go back

20    and tell her I gave you a hard time.

21          MS. GUEVREKIAN:  Thank you, Your Honor.

22          THE COURT:  Oh yeah.  You can tell her I muted you

23    too by accident, but it'll make the story funnier.  I -- well,

24    I think this motion, kind of, courts look at it carefully,

25    obviously.  But based upon the declarations that are set before

1  me, the relief requested is appropriate.

2          And I do, and I appreciate that you highlighted that

3  the relief requested is kind of the amounts that are requested

4  and why it's necessary and kind of highlighted the state that

5  the company is in.  Every motion is different.  Every critical

6  agenda motion is different.  And the relief requested is

7  different.  And every company has different kinds of

8  contractual relationships with its vendors.

9          In this one, it sounds like you need this money to be

10  able to kind of get folks comfortable and to avoid harm to the

11  estate.  And so as we -- so I think it's in the best interest

12  of the estate.  I think the debtors have satisfied their

13  business judgment, and I will grant the relief requested and

14  enter the order on an interim basis.  And I'll set the time for

15  the final at the same date and time as we have it for the

16  others.  Good job.

17          MS. GUEVREKIAN:  Thank you, Your Honor.

18          THE COURT:  Anything else we need to take care of

19  today?

20          MS. GUEVREKIAN:  With that, I believe we're at the

21  end of our agenda.  So unless Your Honor has any other

22  questions, we thank the Court and the United States Trustee for

23  their time.

24          THE COURT:  I appreciate everyone.  I just wanted to

25  express my appreciation for the hard work that went into this

1  and to affirm for allowing kind of associates to appear at

2  First-Days.  It wasn't always the case that younger lawyers

3  were appearing.  When I was a younger lawyer, everybody wanted

4  to hear from a guy named Harvey Miller.  And so it was really

5  hard to get him to court and to be able to speak.

6          But I'm just tweaked a little bit, and I very much

7  appreciate it.  But I really appreciate that the young lawyers

8  took full advantage of the opportunity and took it as serious

9  as they did today, super prepared.  Everything went really

10 well.  I thank everyone.

11         It really, really helps on my end to get prepared for

12 the hearings when everything is well drafted and lawyers are

13 well prepared.  So I thank everyone who appeared today, and it

14 sounds like we'll see each other on Friday at 10 a.m.

15         Anything else we need to take care of?

16         MS. MARINES:  I think that's it, Your Honor.  Thank

17 you so much.

18         THE COURT:  All right, folks.  Thank you very much.

19 Have a good day.

20         MS. MARINES:  Thank you.

21     (Proceedings concluded at 4:36 p.m.)

22                         *  *  *  *  *

23

24

25

1                    C E R T I F I C A T I O N

2

3              I, Heidi Jolliff, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9    _____

10   HEIDI JOLLIFF, AAERT NO. 2850     DATE: August 21, 2025

11   ACCESS TRANSCRIPTS, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25