**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALEON METALS, LLC *et al.*,[1] | ) Case No. 25-90305 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF SALE CLOSING AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**PLEASE TAKE NOTICE** that on October 8, 2025, the Court entered the *Order (I) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 222] (the "Sale Order").[2]

**PLEASE TAKE FURTHER NOTICE** that the Sale closed on October 21, 2025 (the "Closing Date").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the execution version of the Stalking Horse Agreement and a redline reflecting the changes to the version attached to the Sale Order, attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a list of the Closing Assumed Contracts, assigned or to be assigned to the Purchaser effective as of the Closing Date

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aleon Metals, LLC (1610); Aleon Renewable Metals, LLC (9215); and Gladieux Metals Recycling, LLC (6057). The location of the Debtors' service address is: P.O. Box 2290, 302 Midway Road, Freeport, TX 77542.

[2] Capitalized terms used but not defined herein shall have the meanings as set forth in the Sale Order or Stalking Horse Agreement, as applicable.

(subject to the expiration of the objection deadline for those executory contracts or unexpired leases set forth in the Second Supplemental Cure Notice[3]), which is attached hereto as **<u>Exhibit B</u>**.

[*Remainder of page intentionally left blank.*]

---

[3] The "<u>Second Supplemental Cure Notice</u>" means the *Second Supplemental Notice of (I) Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) the Proposed Cure Costs with Respect Thereto* [Docket No. 257].

Houston, Texas
Dated: October 22, 2025

/s/ Jason L. Boland
_____

**NORTON ROSE FULBRIGHT US LLP**
Jason L. Boland (SBT 24040542)
Bob B. Bruner (SBT 08390450)
Julie Harrison (SBT 24092434)
Maria Mokrzycka (SBT 24119994)
1550 Lamar, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
Email: jason.boland@nortonrosefulbright.com
Email: bob.bruner@nortonrosefulbright.com
Email: julie.harrison@nortonrosefulbright.com
Email: maria.mokrzycka@nortonrosefulbright.com

*Co-Counsel to the Debtors and Debtors in Possession*

**MORRISON & FOERSTER LLP**
Jennifer L. Marines (admitted *pro hac vice*)
Benjamin Butterfield (admitted *pro hac vice*)
Andrew Kissner (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jmarines@mofo.com
Email: bbutterfield@mofo.com
Email: akissner@mofo.com

*Co-Counsel to the Debtors and Debtors in Possession*

## **Certificate of Service**

I certify that on October 22, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.  Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' claims agent.

*/s/ Jason L. Boland*
Jason L. Boland

## <u>Exhibit A</u>

**Stalking Horse Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**DATED AS OF OCTOBER 21, 2025**

**BY AND AMONG**

**GLADIEUX METALS RECYCLING, LLC,**

**ALEON RENEWABLE METALS, LLC,**

**ALEON METALS, LLC**

**AND**

**AM BIDCO OPERATIONS LLC**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS...................................................................................................... 1

    1.1    **Definitions.** ............................................................................................... 1

ARTICLE II PURCHASE AND SALE; CLOSING ............................................................... 16

    2.1    **Purchase and Sale.**............................................................................. 16
    2.2    **Excluded Assets.** ............................................................................... 18
    2.3    **Assumed Liabilities.** ........................................................................ 20
    2.4    **Excluded Liabilities.** ........................................................................ 20
    2.5    **Purchase Price.** ................................................................................ 23
    2.6    **Purchase Price Allocation.** .............................................................. 23
    2.7    **Assumption and Assignment of Contracts.** ................................... 24
    2.8    **Closing.** ............................................................................................. 27
    2.9    **Purchaser Designees.** ...................................................................... 29
    2.10    **Withholding.** ................................................................................... 29

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS ......................... 29

    3.1    **Due Incorporation; Good Standing.** ............................................. 30
    3.2    **Due Authorization.** .......................................................................... 30
    3.3    **Governmental Filings; No Violations.** ........................................... 30
    3.4    **Compliance With Laws; Permits.** ................................................... 31
    3.5    **Litigation.** ......................................................................................... 32
    3.6    **Certain Financial Information.** ...................................................... 32
    3.7    **Absence of Developments.** ............................................................... 33
    3.8    **Real Property.** .................................................................................. 34
    3.9    **Material Contracts.** ......................................................................... 34
    3.10    **Employees and Labor Matters.** ..................................................... 36
    3.11    **Benefit Plans.** .................................................................................. 38
    3.12    **Intellectual Property.** ..................................................................... 39
    3.13    **Environmental Matters.** ................................................................. 41
    3.14    **Title to Assets; Sufficiency of Assets; Condition of Assets.** ........ 42
    3.15    **Taxes.** ............................................................................................... 42
    3.16    **Key Business Relationships.** .......................................................... 44
    3.17    **Insurance.** ........................................................................................ 44
    3.18    **Brokers and Finders.** ...................................................................... 44
    3.19    **Product Quality.** .............................................................................. 44
    3.20    **Intercompany Agreements.** ............................................................ 44
    3.21    **Data Privacy.** ................................................................................... 44
    3.22    **Bank Accounts.** ............................................................................... 45
    3.23    **Affiliate Transactions.** ................................................................... 45
    3.24    **Disclaimer of Additional Representations and Warranties.** ....... 45

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ................... 46

    4.1    **Due Organization.** ........................................................................... 46
    4.2    **Due Authorization.** .......................................................................... 46
    4.3    **Consents and Approvals; No Violations.** ....................................... 46

| 4.4 | **Available Funds.** | 46 |
| 4.5 | **Solvency.** | 47 |
| 4.6 | **Investigation; Limitation on Warranties** | 47 |
| 4.7 | **Brokers and Finders.** | 47 |

**ARTICLE V COVENANTS** .......................................................................................................... 47

| 5.1 | **Access to Information and the Facility.** | 47 |
| 5.2 | **Interim Operations of the Business.** | 48 |
| 5.3 | **Cooperation; Status Updates; Regulatory Filings; Consents.** | 50 |
| 5.4 | **Preservation of Records; Post-Closing Access and Cooperation.** | 52 |
| 5.5 | **Employees and Benefits.** | 52 |
| 5.6 | **Confidentiality** | 54 |
| 5.7 | **Public Announcements.** | 54 |
| 5.8 | **Tax Matters.** | 54 |
| 5.9 | **Use of Names and Marks.** | 55 |
| 5.10 | **No Successor Liability.** | 56 |
| 5.11 | **Purchased Assets held by Affiliates.** | 56 |
| 5.12 | **Insurance Matters.** | 56 |
| 5.13 | **Title Insurance Policies.** | 57 |
| 5.14 | **Refunds and Remittances.** | 57 |

**ARTICLE VI CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER** ........................... 57

| 6.1 | **Accuracy of Representations.** | 57 |
| 6.2 | **Compliance with Agreements and Covenants.** | 57 |
| 6.3 | **No Prohibition.** | 58 |
| 6.4 | **Waiting Periods; Required Consents.** | 58 |
| 6.5 | **Entry of Sale Order.** | 58 |
| 6.6 | **No Material Adverse Effect.** | 58 |

**ARTICLE VII CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS** ................................ 58

| 7.1 | **Accuracy of Representations.** | 58 |
| 7.2 | **Compliance with Agreements and Covenants.** | 58 |
| 7.3 | **No Prohibition.** | 58 |
| 7.4 | **Entry of Sale Order.** | 58 |
| 7.5 | **Waiting Periods; Required Consents.** | 59 |

**ARTICLE VIII TERMINATION** ................................................................................................. 59

| 8.1 | **Termination.** | 59 |
| 8.2 | **Effect of Termination.** | 60 |

**ARTICLE IX BANKRUPTCY COURT MATTERS** ...................................................................... 61

| 9.1 | **Alternative Transactions.** | 61 |
| 9.2 | **Bankruptcy Actions.** | 61 |
| 9.3 | **Bid Protections.** | 62 |
| 9.4 | **Sale Order.** | 63 |

ARTICLE X MISCELLANEOUS ...................................................................................................... 63

   10.1    **Survival.** ................................................................................................................... 63
   10.2    **Notices.** .................................................................................................................... 63
   10.3    **Entire Agreement.** .................................................................................................. 64
   10.4    **Amendments and Waivers.** ..................................................................................... 64
   10.5    **Counterparts.** ......................................................................................................... 64
   10.6    **Interpretation; Construction.** ............................................................................... 65
   10.7    **Binding Agreement; Assignment** ........................................................................... 66
   10.8    **Third Party Beneficiaries.** ..................................................................................... 66
   10.9    **Further Assurances.** ............................................................................................... 66
   10.10  **Governing Law.** ...................................................................................................... 66
   10.11  **EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT.** ..................... 66
   10.12  **WAIVER OF JURY TRIAL.** .................................................................................. 67
   10.13  **Schedules.** ................................................................................................................ 67
   10.14  **Severability.** ............................................................................................................ 67
   10.15  **Expenses.** ................................................................................................................. 67
   10.16  **Attorneys' Fees.** ...................................................................................................... 67
   10.17  **Bulk Transfer Laws.** .............................................................................................. 67
   10.18  **No Vicarious Liability.** ........................................................................................... 68
   10.19  **Specific Performance.** ............................................................................................ 68
   10.20  **Conflicts; Privileges.** ............................................................................................. 68

## EXHIBITS

Exhibit 1.1          Form of Sale Order
Exhibit 2.8(b)(i)    Form of Bill of Sale, Assignment and Assumption Agreement
Exhibit 2.8(b)(ii)   Form of IP Assignment

## SCHEDULES

Schedule 1.1(a)         Knowledge Individuals
Schedule 1.1(b)         Liens
Schedule 2.1(g)         Closing Assumed Contracts
Schedule 2.1(h)         Non-Executory Contracts Related to the Business
Schedule 2.1(m)         Transferred Permits
Schedule 2.1(n)         Interests, Shares, Securities, or Other Investments
Schedule 2.1(o)         Transferred Benefit Plans
Schedule 2.2(f)         Excluded Bank Accounts
Schedule 2.2(q)         Excluded Assets
Schedule 2.3(k)         Capital Leases
Schedule 2.4(k)         Excluded Environmental Liabilities
Schedule 2.7(c)         Rejected Identified Contracts
Schedule 2.7(d)         Additional Assumed Contracts
Schedule 2.8(b)(v)      Additional Documents to Record
Schedule 3.3(a)         Required Consents
Schedule 3.4(a)         Compliance with Laws
Schedule 3.4(b)         Permits
Schedule 3.5            Litigation
Schedule 3.6(a)         Financial Statements
Schedule 3.6(b)         Undisclosed Liabilities
Schedule 3.6(c)         Accounts Receivable
Schedule 3.6(e)         Letters of Credit
Schedule 3.6(f)         Cure Costs and Seller Property Taxes
Schedule 3.8(a)         Owned Real Property
Schedule 3.8(b)         Leased Real Property
Schedule 3.9(a)         Material Contracts
Schedule 3.9(b)         Breaches and Defaults in Material Contracts
Schedule 3.10(a)        Employee Information
Schedule 3.10(g)        Scheduled Employees
Schedule 3.11(a)        Benefit Plans
Schedule 3.12(a)        Registered Intellectual Property
Schedule 3.12(c)        Infringement
Schedule 3.12(g)        Failures in Computer Systems
Schedule 3.13(a)        Environmental Claims
Schedule 3.13(b)        Release of Hazardous Materials
Schedule 3.13(c)        Environmental Indemnities
Schedule 3.13(e)        Environmental Remediation and Consents
Schedule 3.13(f)        Trust Agreements with respect to Environmental Liabilities
Schedule 3.15           Taxes
Schedule 3.16(i)        Key Customers
Schedule 3.16(ii)       Key Vendors
Schedule 3.17           Insurance Policies

| | |
|---|---|
| Schedule 3.18 | Brokers |
| Schedule 3.20 | Intercompany Agreements |
| Schedule 3.23 | Affiliate Transactions |
| Schedule 5.2 | Interim Operations of the Business |
| Schedule 5.2(b)(iii) | Approved Budget |
| Schedule 5.5(a) | Subject Employees and Selected Employees |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "***Agreement***"), dated as of October 21, 2025, is by and among AM BidCo Operations LLC, a Delaware limited liability company ("***Purchaser***"), Gladieux Metals Recycling, LLC, a Texas limited liability company ("***GMR***"), Aleon Renewable Metals, LLC, a Delaware limited liability company ("***Aleon***"), and Aleon Metals, LLC, a Texas limited liability company ("***Parent***" and, collectively with GMR and Aleon, "***Sellers***" and each a "***Seller***," and, collectively with Purchaser, a "***Party***" and, together the "***Parties***"). Certain capitalized terms used herein are defined in Article I.

## RECITALS

WHEREAS, Sellers are engaged in the conduct of the Business;

WHEREAS, on August 17, 2025, the Sellers (collectively, the "***Debtors***") commenced voluntary cases (the "***Bankruptcy Cases***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") by filing petitions for relief in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***");

WHEREAS, Purchaser desires to purchase and assume the Purchased Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell and assign to Purchaser, pursuant to, among other provisions thereof, section 363 of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities, for the consideration and upon the terms and conditions contained in this Agreement;

WHEREAS, on August 22, 2025, the Bankruptcy Court entered the Bid Procedures Order approving the Bidding Procedures and designating Purchaser as a "stalking horse bidder" for the Purchased Assets; and

WHEREAS, Sellers' ability, and Purchaser's willingness, to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained herein, and for their mutual reliance, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

1.1 **Definitions**. The following terms have the following meanings for the purposes of this Agreement:

"***Accounts Receivable***" means any and all accounts, notes, trade, and other receivables owed to Sellers, all in accordance with GAAP, consistently applied in accordance with past practices, together with all security or collateral thereof and any interest or unpaid financing charges accrued thereon, including vendor/supplier, Employee and other receivables, and all Actions pertaining to the collection of amounts that are payable, or that may become payable, to Sellers with respect to products sold or services performed prior to the Closing, net of any applicable reserve for returns, discounts, doubtful accounts or other similar deductions reflected thereon, but does not include (a) rights or claims to proceeds under Insurance Policies held by Sellers or (b) accounts and notes receivable from Affiliates of Sellers.

"***Acquired Inventories***" means all inventories of raw materials, works in process, finished goods, parts, office supplies, packing materials, janitorial supplies and other supplies owned by any Seller and used or held for use in connection with the Business.

"***Acquired Real Property Leases***" means the Real Property Leases included in the Closing Assumed Contracts or Additional Assumed Contracts.

"***Action***" means any action, suit, claim, counterclaim, demand, hearing, summons, litigation, investigation, prosecution, contest, inquest, audit, examination, proceeding (including any civil, criminal, administrative, investigative, appellate, or eminent domain proceeding), condemnation, mediation, arbitration, dispute, or similar matter by or before any Governmental Authority.

"***Additional Assumed Contracts***" means the executory Contracts listed on the Additional Assumed Contracts Schedule, to the extent not included in Excluded Assets.

"***Additional Assumed Contracts Schedule***" means <u>Schedule 2.7(d)</u> as modified by Purchaser from time to time pursuant to <u>Section 2.7(d)</u> between the date hereof and two Business Days prior to the Closing Date.

"***Additional Rejected Contracts***" means the Identified Contracts and any other executory Contracts or unexpired leases that Purchaser designates to reject from time to time as set forth on the Rejected Contracts Schedule pursuant to <u>Section 2.7(k)</u> prior to the Designation Deadline.

"***Affiliate***" means, with respect to any Person, any other Person directly or indirectly, controlling, controlled by, or under common control with, such Person as of the date on which, or any time during the period for which, the determination of affiliation is being made. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means (a) the beneficial owner of more than fifty percent (50%) of the equity or voting securities of another Person, or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"***Agreement***" has the meaning set forth in the preamble and includes the Disclosure Schedule and all other exhibits and schedules hereto, as it and they may be amended from time to time.

"***Allowed Professional Fees***" has the meaning ascribed to such term in the DIP Orders.

"***Alternative Transaction***" means any transaction or series of transactions (whether pursuant to section 363 or 1129 of the Bankruptcy Code or pursuant to any applicable non-bankruptcy law), whereby any Person or group of Persons (other than Purchaser and its Affiliates) acquires (a) all, or a material portion of, the Purchased Assets, (b) beneficial ownership of a majority of the Equity Interests of any Seller, or (c) any other transaction the consummation of which would be substantially inconsistent with the transactions contemplated by this Agreement, in each case, whether by merger, sale of assets or equity, transfer, exchange, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, a liquidation or wind-down of Sellers' estates that does not involve a going concern sale of the Business shall not be an Alternative Transaction.

"***Applicable Laws***" means, with respect to any Person, any Law, Order, or other similar requirement enacted, adopted, promulgated, enforced or applied by any Governmental Authority that is binding upon or applicable to such Person or its assets or properties, as amended unless expressly specified otherwise.

"***Applicable Seller Prepared Returns***" has the meaning set forth in <u>Section 5.8(d)(i)</u>.

"*Approved Budget*" has the meaning set forth in the DIP Credit Agreement.

"*Assigned Actions*" has the meaning set forth in Section 2.1(l).

"*Assignment and Assumption of Ground Lease*" has the meaning set forth in Section 2.8(b)(v).

"*Assumed Contracts*" means, collectively, the Closing Assumed Contracts and the Additional Assumed Contracts.

"*Assumed Cure Costs*" means the Cure Costs with respect to any Assumed Contract as set forth on, and in the amounts included on any Notice of Potential Assignment, net of any rebates or refunds related to such Closing Assumed Contracts or Additional Assumed Contracts, up to an aggregate amount equal to $632,522.18 (the "*Assumed Cure Costs Cap*"), unless otherwise agreed to by Purchaser in its sole discretion.

"*Assumed Customer Orders*" means all open orders for goods and services with customers of the Business outstanding as of the Closing Date and included in the Closing Assumed Contracts or Additional Assumed Contracts.

"*Assumed Liabilities*" has the meaning set forth in Section 2.3.

"*Assumed PTO*" has the meaning set forth in Section 2.3(h).

"*Assumed Supplier Orders*" means the right to receive goods or services from suppliers that remain unfulfilled as of the Closing Date to be provided to any Seller in connection with the Business pursuant to the open orders included in the Closing Assumed Contracts or Additional Assumed Contracts.

"*Auction*" has the meaning set forth in the Bid Procedures Order.

"*Author*" has the meaning set forth in Section 3.12(f).

"*Avoidance Action*" means any avoidance claims, rights, recoveries, subordinations or causes of action or remedies under Chapter 5 of the Bankruptcy Code, including any proceeds thereof, and any analogous state law claims, in each case, of Sellers and their estates that relate to the Purchased Assets, Assumed Liabilities or the Business.

"*Back-Up Bidder*" has the meaning set forth in the Bid Procedures Order.

"*Bankruptcy Cases*" has the meaning ascribed to such term in the recitals of the Agreement.

"*Bankruptcy Code*" has the meaning ascribed to such term in the recitals of the Agreement.

"*Bankruptcy Court*" has the meaning ascribed to such term in the recitals of the Agreement.

"*Benefit Plans*" means (a) any "employee welfare benefit plan" or "employee pension benefit plan" (as those terms are respectively defined in Sections 3(1) and 3(2) of ERISA); and (b) any retirement or deferred compensation plan, incentive compensation, employment, change-in-control, retention, compensation, employee loan, consulting, severance, stock, share appreciation right, unemployment compensation, vacation pay, severance pay, bonus arrangement, health benefit, profit-sharing, death or disability plan, agreement, commitment, program, policy, practice or arrangement or any other welfare or fringe benefit arrangements in each case in which any Employees participate or with respect to which Sellers have or may have any liability.

"***Bid Procedures Order***" means the order of the Bankruptcy Court approving the *Debtors' Emergency Motion for Entry of (I) an Order (A) Approving Bidding Procedures for the Sale Of Substantially All of the Debtors' Assets, (B) Authorizing Entry into the Stalking Horse Agreement, (C) Approving Procedures for the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling an Auction and Sale Hearing, (E) Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief, and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief*, which order shall be reasonably acceptable to Purchaser.

"***Bidding Procedures***" means the process and procedures established with respect to Sellers' proposed sale of the Purchased Assets and the assumption of the Assumed Liabilities to be approved in the Bid Procedures Order, which shall be in form and substance reasonably acceptable to Purchaser.

"***Bill of Sale, Assignment and Assumption Agreement***" has the meaning set forth in <u>Section 2.8(b)(i)</u>.

"***Business***" means the business of recycling spent hydroprocessing catalyst generated by petroleum refineries during the production of gasoline, diesel and jet fuel and recycling batteries to produce battery metals suitable for electric vehicles and electrical storage systems, and certain activities ancillary thereto (including, but not limited to, operation of the Purchased Assets), conducted by Sellers in the Ordinary Course of Business.

"***Business Day***" means any day other than a Saturday, Sunday or other day on which banking institutions in New York City, New York and Freeport, Texas are authorized or required by law or other action of a Governmental Authority to close.

"***Carve-Out Account***" has the meaning ascribed to such term in the DIP Orders.

"***Cash and Cash Equivalents***" means, collectively, all of Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bank deposits, other deposits, bankers' acceptances, commercial paper, government securities, investment accounts and other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held, net of uncleared checks issued by Sellers that are not yet reflected in the applicable bank account of Sellers.

"***Cash Consideration***" means cash in an amount equal to $1,070,760.37 plus the amount of Seller Transaction Expenses and the Wind Down Amount.

"***Claim***" means any claim, cause of action, action, demand, debt, lien, liability, counterclaim, cross-claim, damage, loss, attorneys' or consultants' fees, costs or expenses, lawsuit, investigation, review, grievance, citation, summons, subpoena, inquiry, audit, hearing, arbitration or other similar proceeding of any nature, civil, criminal, regulatory, administrative or otherwise, of any nature whatsoever, whether in law or in equity, in contact, in tort, or otherwise, and attributable to any Person or any Persons or any Party, directly or indirectly arising out of, or incident to or in connection with this Agreement or the performance, defective performance, or non-performance of any obligation under this Agreement.

"***Closing***" means the consummation of the transaction contemplated herein.

"***Closing Assumed Contracts***" has the meaning set forth in <u>Section 2.1(g)</u>.

"***Closing Date***" has the meaning set forth in <u>Section 2.8(a)</u>.

"***Closing Date Payment***" has the meaning set forth in <u>Section 2.5</u>.

"***COBRA***" means and refer to the applicable requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code (and predecessors thereof).

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Commercial Tort Claim***" has the meaning set forth in § 9-102(a)(13) of the Uniform Commercial Code.

"***Computer Systems***" has the meaning set forth in <u>Section 3.12(g)</u>.

"***Consent***" means any approval, consent, ratification, permission, waiver, license, or other authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"***Contamination***" or "***Contaminated***" means the presence of Hazardous Material in, on or under the soil, groundwater, surface water or other environmental media to an extent that any Response Action is legally required by any Governmental Authority under any Environmental Law with respect to such presence of Hazardous Material.

"***Contract***" means any contract, agreement, grant, sub-grant, arrangement, understanding, commitment, ground lease, lease, sublease, license, mortgage, guarantee, bond, note or other instrument (including any instrument evidencing Indebtedness), or other legally binding obligation, and all amendments thereof (whether written or oral).

"***Credit Bid Amount***" means an amount equal to $187,506,000.00.

"***Cure Costs***" means the monetary amounts that must be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Closing Assumed Contract, Additional Assumed Contract, or Permits, as agreed upon by the Parties or determined by the Bankruptcy Court pursuant to procedures in the Bid Procedures Order.

"***Current Representation***" has the meaning set forth in <u>Section 10.20(a)</u>.

"***Data Room***" means that certain virtual data room entitled Project Atom established by Sellers at https://ipreoprism.com/tvdr/#/workspace/2972/documents/3633143.

"***Deal Communications***" has the meaning set forth in <u>Section 10.20(b)</u>.

"***Debtors***" has the meaning ascribed to such term in the recitals of this Agreement.

"***Deed***" has the meaning set forth in <u>Section 2.8(b)(v)</u>.

"***Designated Jurisdiction***" shall mean any country or territory to the extent that such country or territory itself is the subject of any Sanction, including Cuba, Iran, North Korea and the Crimea region of Ukraine.

"***Designated Person***" has the meaning set forth in <u>Section 10.20(a)</u>.

"***Designation Deadline***" has the meaning set forth in <u>Section 2.7(d)</u>.

5

"***DIP Credit Agreement***" means that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of August 21, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), among the Debtors, each of the lenders party thereto from time to time (the "***DIP Lenders***"), and UMB Bank, National Association, solely in its capacity as the administrative agent.

"***DIP Lenders***" has the meaning set forth in the definition of "DIP Credit Agreement."

"***DIP Orders***" has the meaning ascribed to such term in the DIP Credit Agreement.

"***Disclosure Schedule***" means the Disclosure Schedule delivered by Sellers to Purchaser on the date of this Agreement, as amended, modified, or supplemented in accordance with this Agreement.

"***Employees***" means all full-time and part-time employees employed by Sellers immediately prior to the Closing Date in connection with the Business.

"***Enforceability Exceptions***" has the meaning set forth in <u>Section 3.2</u>.

"***Environment***" means any surface or subsurface physical medium or natural resource, including air, land, soil, surface waters, ground waters, stream and river sediments, biota and any indoor area, surface or physical medium.

"***Environmental Claim***" means any claim, notice, demand, order, action, suit, proceeding, or other communication alleging or asserting liability or obligations under or relating to any Environmental Law, including liability or obligation for investigation, assessment, remediation, removal, cleanup, response, corrective action, monitoring, post-remedial or post-closure studies, investigations, operations and maintenance, injury, damage, destruction or loss to natural resources, personal injury, wrongful death, property damage, fines, penalties or other costs resulting from, related to or arising out of (a) the presence, Release or threatened Release of Hazardous Material in, on, into or from the Environment at any location; or (b) any violation of or non-compliance with Environmental Law, and shall include any claim, notice, demand, order, action, suit or proceeding seeking damages (including the costs of remediation), contribution, indemnification, cost recovery, penalties, fines, indemnities, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to human health, safety or the Environment resulting from said violation or non-compliance with Environmental Law.

"***Environmental Law***" means any and all federal, state, local and foreign statutes, laws, including applicable common law, regulations, ordinances, rules, judgments, orders, decrees or governmental restrictions relating to pollution, the protection of the environment, the release of Hazardous Materials into the environment or human exposure to Hazardous Materials, including those related to the treatment, transport, storage and disposal of Hazardous Materials, air emissions and discharges to public wastewater treatment systems.

"***Environmental Liabilities***" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, monitoring or oversight by a Governmental Authority, fines, or penalties), of any Seller directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law; (b) the generation, use, handling, transportation, storage, treatment, or disposal of any Hazardous Materials; (c) human exposure to any Hazardous Materials; (d) the release or threatened release of any Hazardous Materials into the environment; or (e) any contract, agreement, or other binding consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"***Environmental Permit***" means any Permit, approval, identification number, license or other authorization required under any Environmental Law.

"***Equity Interests***" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, and the rules and regulations thereunder, each as amended or modified from time to time.

"***ERISA Affiliate***" means, with respect to any Person, any entity, trade or business that is, or at any applicable time was, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes such Person.

"***Excluded Assets***" has the meaning set forth in Section 2.2.

"***Excluded Contracts***" has the meaning set forth in Section 2.2(c).

"***Excluded Liabilities***" has the meaning set forth in Section 2.4.

"***Expense Reimbursement Amount***" means an amount equal to the reasonable and documented out-of-pocket fees and expenses of Purchaser incurred in connection with this Agreement and the transactions contemplated hereby, including all such fees and expenses related to negotiating this Agreement, or any of the other Transaction Documents, preparing to implement the transaction contemplated hereby and thereby, and investigating and evaluating the Purchased Assets, the Excluded Assets, and the Assumed Liabilities, which shall constitute an allowed superpriority administrative expense claim against each Seller under sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of Sellers of the kind specified in section 503(b) of the Bankruptcy Code, which amount shall be subject to approval by the Bankruptcy Court pursuant to the Bid Procedures Order; *provided*, that the "Expense Reimbursement Amount" shall not exceed $2,500,000.

"***Expenses***" means the out-of-pocket fees and expenses of a Party's independent advisor, counsel and accountants, incurred or paid by such party or on its behalf in connection with this Agreement and the transactions contemplated hereby.

"***Export/Import Laws***" shall mean, collectively, any Laws, regulations, Orders, and authorizations issued by a Governmental Authority applicable to the export or import of goods, technology or software, including the U.S. Export Administration Regulations (EAR) (15 C.F.R. 768-799); the U.S. Arms Export Control Act (22 U.S.C. 2751-2779); the International Traffic in Arms Regulations (ITAR) (22 C.F.R. 120-130); the Regulations of the Bureau of Alcohol, Tobacco, and Firearms (ATF) (27 C.F.R. 447-555); the Homeland Security Act of 2002; and the U.S. Customs Regulations (19 C.F.R. 1-199).

"***Facility***" means the solid waste disposal facilities of Sellers located in Brazoria County, Texas, including any and all real and personal property thereon, which is subject to the Prepetition Liens and the DIP Liens (each as defined in the DIP Credit Agreement).

"***FCPA***" has the meaning set forth in Section 3.4(c).

"***Financial Statements***" has the meaning set forth in Section 3.6(a).

"***Fixtures and Equipment***" means all furniture, furnishings, vehicles, equipment, machinery, tools, fixtures, Transferred IT Equipment and other personal and mixed property, operation and nonoperational, that are Related to the Business, wherever located, including any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person, except to the extent included in Excluded Assets. "Fixtures and Equipment" shall include all rights under any leases relating to, arising from, or with respect to such Fixtures and Equipment, to the extent such leases constitute Assumed Contracts.

"***Fundamental Representations***" means the representations and warranties of Sellers set forth in Section 3.1 (Due Incorporation; Good Standing), Section 3.2 (Due Authorization), Section 3.3(b)(ii)(2) (Governmental Filings; No Violations), Section 3.14(a) (Title to Assets; Sufficiency of Assets; Condition of Assets), and Section 3.18 (Brokers and Finders).

"***Further Assignment Notice***" has the meaning set forth in Section 2.7(e).

"***GAAP***" means generally accepted accounting principles in the United States, as in effect from time to time.

"***Governmental Authority***" means any U.S., state, local or foreign governmental, regulatory or administrative body, agency or authority, any court or judicial authority or arbitration tribunal, whether national, Federal, state or local or otherwise, or any Person lawfully empowered by any of the foregoing to enforce or seek compliance with any applicable law, statute, regulation, order, or decree.

"***Hazardous Material***" means any chemicals, materials, or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "hazardous constituents," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants," "pollutants," "toxic pollutants," under any Environmental Law or for which liability or standards of conduct may be imposed pursuant to Environmental Law, including petroleum and petroleum products, by-products, derivatives or wastes, radioactive materials, asbestos or asbestos-containing materials or products, per- and polyfluoroalkyl substances, polychlorinated biphenyls (PCBs) or materials containing same, lead or lead-based paints or materials, radon, fungus, mold in quantities or concentrations that may adversely affect human health or materially affect the value or utility of the building(s) in which it is present, or other substances that may have an adverse effect on human health or the environment.

"***HMT***" has the meaning set forth in the definition of "Sanction."

"***HSR Act***" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"***Identified Contracts***" has the meaning set forth in Section 2.7(c).

"***Income Tax***" means any United States or foreign, federal, state, provincial, municipal, or county Tax that, in whole or in part, is based on, measured by or calculated by reference to net income, profits or gains, including any state or local franchise Tax, and including any interest, penalty or addition thereto, whether disputed or not.

"***Income Tax Returns***" means any Tax Return with respect to Income Taxes.

"***Indebtedness***" means, with respect to any Person, without duplication, the outstanding principal amount of, accrued and unpaid interest on, and other payment obligations (including any prepayment premiums or penalties payable as a result of the repayment thereof) arising under, any obligations consisting of (a) indebtedness for borrowed money or indebtedness issued in substitution or exchange for borrowed

money for the deferred purchase price of property or services, (b) indebtedness evidenced by any note, bond, debenture or other debt security, (c) all obligations under financing or capital leases, including obligations created or arising under any conditional sale or other title retention agreement, or incurred as financing, (d) all deferred obligations to reimburse any bank or other Person in respect of amounts paid or advanced under a letter of credit, surety bond, performance bond or other instrument, (e) all Liabilities in respect of letters of credit and bankers' acceptances, to the extent drawn and payable, (f) all Liabilities in respect of "earn-out" obligations and other obligations for the deferred purchase price of property, assets, or services, including any royalty or "earn-out" payments (other than trade payables or accruals incurred in the Ordinary Course of Business), (g) book overdraft, and (h) all Indebtedness of others guaranteed, directly or indirectly, by such Person or as to which such Person has an obligation (contingent or otherwise) that is substantially the economic equivalent of a guarantee or that is otherwise recognized in the financial statements of such Person.

"***Insurance Policies***" has the meaning set forth in <u>Section 3.17</u>.

"***Intellectual Property Rights***" means all rights in the following in any jurisdiction throughout the world: (a) patents, patent applications, patent disclosures and statutory invention registrations, including reissues, divisions, continuations, continuations in part, extensions and reexaminations thereof, all rights therein provided by international treaties or conventions ("***Patents***"); (b) trademarks, service marks, trade dress, trade names, logos (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, together with all goodwill associated with each of the foregoing, any and all common law rights, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing; (c) copyrightable works (including computer software source code, executable code, databases and related documentation and maskworks), copyrights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions; and (d) confidential and proprietary information, including trade secrets, unpatented inventions, data and know-how ("***Trade Secrets***").

"***Inventory***" means all inventory Related to the Business, wherever located, including all finished goods whether held at any location or facility of Sellers or any of their respective Affiliates or in transit to Sellers or any of their respective Affiliates, all semi-finished and finished goods, raw materials, works in progress, samples, prototypes, displays, packaging, supplies, tooling and parts, together with all rights of Sellers against suppliers thereof, in each case, as of the Closing Date, except to the extent included in Excluded Assets.

"***Investment***" means, as to any Person, any direct or indirect investment by such Person, by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in <u>clause (h)</u> of the definition of Indebtedness in respect of such Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such other Person.

"***IP Assignment***" has the meaning set forth in <u>Section 2.8(b)(ii)</u>.

"***IT Equipment***" means networks and communications equipment, information technology assets, network appliances, and storage devices, and any attached and associated hardware, routers, devices,

panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto.

"***Key Customers***" has the meaning set forth in <u>Section 3.16</u>.

"***Key Vendors***" has the meaning set forth in <u>Section 3.16</u>.

"***Knowledge***" means, with respect to Sellers, the knowledge, after reasonable inquiry, of any of the individuals listed on <u>Schedule 1.1(a)</u>.

"***Labor Agreement***" has the meaning set forth in <u>Section 3.9(a)(xv)</u>.

"***Law***" means any and all applicable international, foreign, federal, state and local laws (statutory, common or otherwise, and including international conventions, protocols and treaties), acts, statutes, constitutions, treaties, conventions, rules, guidelines, regulations, ordinances, codes, policies, and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"***Lease Assignment Agreement***" has the meaning set forth in <u>Section 2.8(b)(vi)</u>.

"***Leased Real Property***" has the meaning set forth in <u>Section 3.8(b)</u>.

"***Letter of Credit***" has the meaning set forth in <u>Section 3.6(e)</u>.

"***Liability***" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including, whether arising out of any contract or tort based on negligence or strict liability).

"***Lien***" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any leases evidencing Capitalized Lease Obligations (as defined in the DIP Credit Agreement) having substantially the same economic effect as any of the foregoing).

"***M&F***" has the meaning set forth in <u>Section 10.20(a)</u>.

"***Material Adverse Effect***" means any change, event, circumstance, occurrence, condition, development, fact, or state of facts occurring that has had or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on: (a) the Business, the Purchased Assets, the Assumed Liabilities, or the condition (financial or otherwise), operations, cash flows, or results of operations of the Business, the Purchased Assets, or the Assumed Liabilities, taken as a whole, or (b) any Seller's ability to consummate the transactions contemplated by this Agreement and the other Transaction Documents; *provided*, *however*, that, solely with respect to the preceding clause (b), any change, event, circumstance, occurrence, condition, development, fact, or state of facts arising from or related to the following shall be disregarded in determining whether there has been a Material Adverse Effect or whether a Material Adverse Effect could reasonably be expected to occur: (i) general economic, business, industry or credit, financial or capital market conditions (whether in the United States or internationally), including

10

conditions affecting generally all companies engaged in the same industry as the Business, and certain activities ancillary thereto or a segment thereof, or the industries served by the Business; (ii) the announcement of this Agreement or pendency of the transactions contemplated hereby in accordance with the terms hereof; (iii) the breach of this Agreement or any other Transaction Document by Purchaser; (iv) pandemics and any response of any Governmental Authority thereto; (v) earthquakes, tornados, hurricanes, floods and acts of God; (vi) acts of war (whether declared or not declared), sabotage, terrorism, military actions or the escalation thereof; (vii) any changes or prospective changes in applicable laws, regulations or accounting rules, including GAAP or interpretations thereof, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, or any changes in general legal, regulatory or political conditions after the date hereof; (viii) adverse changes or effects on the Business or the Purchased Assets that directly result from the filing or pendency of the Bankruptcy Cases; (ix) the commencement of the Bankruptcy Cases; and (x) any action or omission by Sellers required or permitted to be taken by this Agreement or the other Transaction Documents, except, in the case of the foregoing clauses (i), (iv), (v), (vi) and (vii), to the extent that the Business or the Purchased Assets are disproportionately adversely affected thereby relative to other similarly situated Persons operating in the industries in which the Business operates.

"*Material Contract*" has the meaning set forth in <u>Section 3.9(a)</u>.

"*Multiemployer Plan*" has the meaning set forth in Section 3(37) of the Code.

"*Necessary Consent*" means, with respect to any Contract or Permit, the approval, authorization, consent or waiver of, or granting or issuance of any license or permit required under such Contract or Permit in order to transfer it to Purchaser by any party thereto.

"*Notice of Potential Assignment*" has the meaning set forth in <u>Section 2.7(c)</u>.

"*Notice of Successful Bidder*" has the meaning set forth in the Bid Procedures Order.

"*OFAC*" has the meaning set forth in the definition of "Sanction."

"*Order*" means any order, judgment, decree, award, decision, injunction, order, ruling, writ, award, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Authority or by any arbitrator, including any order entered by the Bankruptcy Court in the Bankruptcy Cases.

"*Ordinary Course of Business*" and similar terms means the ordinary and usual course of operations of the Business, taken as a whole, taking into account the contemplation, commencement and pendency of the Bankruptcy Cases and recent past practice in response to any tariffs, sanctions, or trade policies implemented by any Governmental Authority.

"*Organizational Documents*" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, trust or other applicable agreement of formation or organization and, if applicable, any agreement or instrument with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

11

"***Owned Intellectual Property***" has the meaning set forth in Section 3.12(a).

"***Owned Real Property***" has the meaning set forth in Section 3.8(a).

"***Party***" and "***Parties***" each has the meaning set forth in the preamble.

"***Patents***" has the meaning set forth in the definition of Intellectual Property Rights.

"***Permit***" means any consent, license, permit, certificate, clearance, qualification, franchise, waiver, approval, authorization, certificate, registration, certificate of occupancy or filing issued by, obtained from, or made with a Governmental Authority or that are otherwise necessary for Sellers to own the Purchased Assets or operate the Business.

"***Permitted Access Parties***" has the meaning set forth in Section 5.4(a).

"***Permitted Liens***" means, as of the Closing Date, all (a) Liens for Taxes, assessments and governmental charges or levies not yet delinquent or for which adequate reserves are maintained on the financial statements of Sellers; (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's liens and other similar liens arising in the Ordinary Course of Business securing obligations that are not overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves are maintained on the financial statements of Sellers; (c) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations that are not otherwise due or delinquent; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the Ordinary Course of Business consistent with past practice and set forth on the financial statements of Sellers; (e) all matters of record, including survey exceptions, reciprocal easement agreements and other encumbrances on title to real property; (f) all applicable zoning, entitlement, conservation restrictions and other land use and environmental regulations; (g) all exceptions, restrictions, easements, charges, rights-of-way and other Liens set forth in any permits, any deed restrictions, groundwater or land use limitations or other institutional controls utilized in connection with any required environmental remedial actions, or other state, local or municipal franchise applicable to Sellers or any of their respective properties; and (h) Liens referred to on Schedule 1.1(b).

"***Permitted Post-Closing Encumbrance***" means (a) zoning restrictions, building codes and other land use laws regulating the use or occupancy of real property and imperfections in title, charges, easements, rights of way, covenants, restrictions, licenses and other Liens that do not materially affect the value, use or transferability of the affected asset or property or materially interfere with the operation of the assets or property to which they relate; (b) Liens on the interest of any landlord or sublandlord or underlying fee interest of any Acquired Real Property Lease, but only those not extinguished by the Sale Order; (c) mechanics', carriers', workmen's, repairmen's or other similar Liens arising or incurred in the Ordinary Course of Business for amounts which are (i) not due and payable, and (ii) not, individually or in the aggregate, material to the Business or the Purchased Assets; and (d) Liens for Taxes, assessments or other governmental charges or levies that are not yet due or payable or are being contested in good faith by appropriate proceedings with reserves taken pursuant to applicable accounting standards.

"***Person***" means an individual, corporation, partnership, joint venture, trust, association, estate, joint stock company, limited liability company, unincorporated organization, Governmental Authority or any other organization of any kind.

"***Personal Information***" means any information that (a) relates to an identified or identifiable natural person; an "identifiable person" is one who can be identified, directly or indirectly, in particular by

reference to an identification number or to one or more factors specific to his, her, or their physical, physiological, mental, economic, cultural or social identity, including, unique device or browser identifiers, names, addresses, telephone numbers, email addresses, social security numbers, or account information, and (b) is defined as "personally identifiable information" (PII), "personal information," "personal data," or other similar term (as applicable), within the meaning of any Privacy Laws in effect prior to, or as of, the Closing.

"*Petition Date*" means August 17, 2025.

"*Prepetition Documents*" has the meaning set forth in the DIP Orders.

"*Prepetition Liens*" has the meaning set forth in the DIP Orders.

"*Prepetition Obligations*" has the meaning set forth in the DIP Orders.

"*Previously Omitted Contract*" has the meaning set forth in Section 2.7(k).

"*Previously Omitted Contract Designation*" has the meaning set forth in Section 2.7(k).

"*Previously Omitted Contract Notice*" has the meaning set forth in Section 2.7(l).

"*Privacy Laws*" means any and all Applicable Laws, legal requirements, and binding self-regulatory guidelines relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (both technical and physical), disposal, destruction, disclosure or transfer (including cross-border) of Personal Information, including Section 5 of the Federal Trade Commission Act, California Consumer Privacy Act, Gramm-Leach-Bliley Act, Payment Card Industry Data Security Standard, EU General Data Protection Regulation, and any and all Applicable Laws relating to breach notification or marketing in connection with Personal Information.

"*Property Taxes*" means ad valorem, property, excise or similar Taxes (including any interest, fine, penalty or additions to tax imposed by any Governmental Authority in connection with such Taxes) based upon the acquisition, operation or ownership of the Purchased Assets but excluding, for the avoidance of doubt, Income Taxes and Transfer Taxes.

"*Purchase Price*" has the meaning set forth in Section 2.5.

"*Purchased Assets*" has the meaning set forth in Section 2.1.

"*Purchaser*" has the meaning set forth in the preamble.

"*Purchaser Designee*" has the meaning set forth in Section 2.9.

"*Real Property Lease*" has the meaning set forth in Section 3.8(b).

"*Registered Intellectual Property*" has the meaning set forth in Section 3.12(a).

"*Rejected Contracts Schedule*" has the meaning set forth in Section 2.7(c).

"*Rejected Identified Contracts*" has the meaning set forth in Section 2.7(c).

"*Related to the Business*" means related to, owned, leased, licensed, used, or held for use or in consignment, in connection with the Business as conducted by Sellers prior to the Closing.

"**_Release_**" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, placing, disposal, dispersal, leaching or migration into the environment (including ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of any Hazardous Material through or in the air, vapor, soil, surface water, groundwater or property.

"**_Required Consents_**" has the meaning set forth in Section 3.3(a).

"**_Response Action_**" means any action taken to investigate, abate, treat, remediate, clean up, remove or mitigate any violation of Environmental Law, any Contamination of any property owned, leased or used by the Business or any release or threatened release of Hazardous Materials. Without limitation, Response Action shall include any action that would be a response as defined by the Comprehensive Environmental Response, Compensation and Liability Act, as amended at the date of Closing, 42 U.S.C. § 9601 (25).

"**_Sale Hearing_**" has the meaning set forth in the Bid Procedures Order.

"**_Sale Order_**" means an Order of the Bankruptcy Court entered in the Bankruptcy Cases approving and authorizing this Agreement and the transactions contemplated herein (including approving and authorizing any Seller's assumption and assignment pursuant to section 365 of the Bankruptcy Code of the Assumed Contracts), which Sale Order shall be in the form attached as Exhibit 1.1 to this Agreement, with such changes to which Sellers consent (such consent not to be unreasonably withheld, delayed, or conditioned) and Purchaser consents (such consent to be exercised in its sole and absolute discretion).

"**_Sanction_**" shall mean any sanction administered or enforced by the United States Government, including the Department of the Treasury's Office of Foreign Assets Control ("**_OFAC_**"), the Department of State, and the United Nations Security Council, the European Union, His Majesty's Treasury ("**_HMT_**") or other relevant sanctions authority.

"**_Scheduled Employees_**" has the meaning set forth in Section 3.10(g).

"**_Schedules and Statements_**" means the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs filed in the Bankruptcy Cases on October 1, 2025 (ECF Nos. 189-194).

"**_Selected Employees_**" has the meaning set forth in Section 5.5(a).

"**_Seller Intellectual Property_**" means Owned Intellectual Property, together with all other Intellectual Property Rights exclusively licensed to Sellers or which Sellers otherwise have the exclusive right to use.

"**_Seller Property Taxes_**" means the Property Taxes allocable to Sellers pursuant to the procedures set forth in Section 5.8(b) to the extent unpaid at the Closing.

"**_Sellers_**" has the meaning set forth in the preamble.

"**_Seller Transaction Expenses_**" means, to the extent not paid prior to the Closing, an amount equal to the M&A Transaction Fee or Restructuring Fee due and owing to Jefferies LLC ("**_Jefferies_**") as of Closing in connection with this Agreement pursuant to and as defined in that certain engagement letter between the Parent and Jefferies, dated as of June 25, 2025 (the "**_Engagement Letter_**"), and approved by the Bankruptcy Court; _provided_, that Jefferies shall only be paid either an M&A Transaction Fee or a Restructuring Fee on account of the Closing in connection with this Agreement as provided for in the foregoing Engagement Letter, but not both such fees.

"**Subject Employees**" has the meaning set forth in Section 5.5(a).

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (a) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or (b) the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person and, in the case of this clause (b), which is treated as a consolidated subsidiary for accounting purposes.

"**Successful Bidder**" has the meaning set forth in the Bid Procedures Order.

"**Take-Back Indebtedness**" means the portion of the obligations under the DIP Credit Agreement in an aggregate principal amount of $120,000,000.00 assumed by Purchaser at Closing.

"**Tax**" (and, with correlative meaning, "**Taxes**," "**Taxable**," and "**Taxing**") means (a) any net income, capital gains, gross income, gross receipts, sales, use, transfer, ad valorem, franchise, profits, license, capital, withholding, payroll, estimated, employment, excise, goods and services, severance, stamp, occupation, premium, property, social security, environmental (including Code section 59A), alternative or add-on, value added, registration, windfall profits or other taxes, duties, charges, fees, levies or other assessments imposed by any Governmental Authority, or any interest, penalties, or additions to tax incurred under Applicable Laws with respect to taxes; and (b) any liability in respect of any item described in clause (a) above that arises by reason of a contract, assumption, transferee or successor liability, operation of law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"**Tax Returns**" means any report, return (including any information return), declaration or other filing required or permitted to be supplied to any taxing authority or jurisdiction with respect to Taxes, including any amendments or attachments to such reports, returns, declarations or other filings.

"**TCEQ**" means the Texas Commission on Environmental Quality.

"**Termination Date**" has the meaning set forth in Section 8.1(b).

"**Title Company**" means Stewart Title Guaranty Company or any other nationally recognized title insurance company designated by Purchaser.

"**Trade Secrets**" has the meaning set forth in the definition of Intellectual Property Rights.

"**Transaction Documents**" means this Agreement and all other ancillary agreements, documents, certificate, or instruments to be entered into by, or documentation delivered by, any Party pursuant to this Agreement.

"**Transfer Taxes**" has the meaning set forth in Section 5.8(a).

"**Transferred Employees**" has the meaning set forth in Section 5.5(a).

"**Transferred Intellectual Property**" means all Seller Intellectual Property other than any Intellectual Property Right which is an Excluded Asset.

"**Transferred IT Equipment**" means all IT Equipment that is Related to the Business, except to the extent included in Excluded Assets.

"***Transferred Owned Real Property***" means all Owned Real Property other than any Owned Real Property which is an Excluded Asset.

"***Transferred Permit***" has the meaning set forth in Section 2.1(m).

"***Transferred Seller Plans***" has the meaning set forth in Section 2.1(o).

"***WARN Act***" means the Worker Adjustment and Retraining Notification Act of 1988, as amended or any similar applicable state law.

"***Wayward Assets***" is defined in Section 5.11.

"***Wind Down Account***" means a segregated account designated by the Sellers to hold the Wind Down Amount in accordance with the Sale Order.

"***Wind Down Amount***" means an amount equal to $1,100,000.

## ARTICLE II
## PURCHASE AND SALE; CLOSING

2.1 **Purchase and Sale**. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement (including entry of the Sale Order), at the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Sellers, all of Sellers' right, good title, and interest in and to all of the assets of Sellers, other than the Excluded Assets, to the extent such assets exist as of the Closing Date, wherever located, including, without limitation, the following assets (the "***Purchased Assets***"), in each case free and clear of all Liens to the extent provided in the Sale Order (other than Permitted Post-Closing Encumbrances):

(a) all Cash and Cash Equivalents, security entitlements, securities accounts, commodity contracts and commodity account and including any cash collateral that is collateralizing any letters of credit or Insurance Policies, excluding (i) the Carve-Out Account, but including any funds remaining in the Carve-Out Account after all Allowed Professional Fees have been irrevocably paid in full, and (ii) the Cash Consideration;

(b) Accounts Receivables;

(c) Inventory;

(d) Transferred Owned Real Property;

(e) Fixtures and Equipment, including Transferred IT Equipment;

(f) Transferred Intellectual Property;

(g) each Contract listed on Schedule 2.1(g), including the Acquired Real Property Leases (such Contracts, collectively, the "***Closing Assumed Contracts***"), and each Additional Assumed Contract, together with all outstanding purchase orders related thereto, it being understood that the Closing Assumed Contracts will not include any of the Rejected Identified Contracts;

(h) each non-executory Contract Related to the Business listed on Schedule 2.1(h);

16

(i)       all leasehold rights in personal property leased by Sellers and used or held for use primarily in connection with the Business;

(j)       all of Sellers' rights under confidentiality or non-disclosure agreements with respect to confidential treatment of information Related to the Business or the Purchased Assets and with respect to solicitation and hiring of Scheduled Employees;

(k)       for each Seller, the books and records, and the corporate charter, seal, minute books, stock record books and other similar documents, including all personnel records (including all human resources and other records) relating to the Transferred Employees;

(l)       all Claims and Actions owned by or available to any Seller (excluding Commercial Tort Claims but including Avoidance Actions), (i) Related to the Business or related to the Purchased Assets, the Assumed Liabilities, or the acquisition, ownership, management, operation, use, function, or value of the Business or any Purchased Asset; (ii) against any counterparty to a Assumed Contract, or any Affiliate of such counterparty; or (iii) against any current or former director, officer, manager, Employee, contractor, consultant or advisor employed by or providing services to any Seller to the extent Related to the Business (such actions, the "***Assigned Actions***");

(m)       all Permits (including Environmental Permits, subject to any TCEQ specific terms set forth in the Sale Order or any other order of the Bankruptcy Court), and all pending applications therefor, in each case, to the extent Related to the Business and necessary for the current operation and conduct of the Business and Purchased Assets (the "***Transferred Permits***"), including the Permits set forth on Schedule 2.1(m);

(n)       any interests, shares, securities, or other investments set forth on Schedule 2.1(n);

(o)       the Benefit Plans set forth on Schedule 2.1(o), together with any additional Benefit Plans, if any, designated by Purchaser by providing written notice to Sellers not later than ten (10) Business Days prior to the expected Closing Date, and all rights and interests of any Seller thereunder, and any trusts, funding vehicles, insurance policies, administrative services agreements, files and records, and other assets related thereto to the extent Related to the Business or Transferred Employees (collectively, the "***Transferred Seller Plans***");

(p)       all credits, prepaid expenses, prepayments, deferred charges, advance payments, refunds, customer deposits and security deposits, prepaid items and duties, customer or vendor rebates, credits or other refunds, earnest deposits, bid, performance, lease, utility and other deposits, and all other forms of deposit or security placed by Sellers for the performance of an Assumed Contract, in each case, to the extent Related to the Business or related to a Purchased Asset;

(q)       any claim, interest, right, award, recovery, indemnity, warranty, right to insurance proceeds, rebate, right of set off, refund, reimbursement, audit right, duty, obligation, liability or other intangible right in favor of or owed to any Seller (other than rights arising under or relating to this Agreement and the other Transaction Documents), to the extent (i) related to any Assigned Action or Transferred Seller Plan, (ii) related to any other Purchased Asset, any Assumed Liability, or the Business, or (iii) related to any insurance proceeds as set forth in Section 5.12;

(r)       all of Sellers' rights under invention, intellectual property assignment, non-competition, non-solicitation of customers and Employees, and non-disparagement agreements, with current and former Employees and agents of any Seller or third party to the extent related to the Purchased Assets (or any portion thereof) or with the Transferred Employees;

(s)     all customer and supplier lists Related to the Business and all telephone and telephone facsimile numbers and other directory listings of the Business;

(t)     all goodwill, customer and referral relationships, other intangible property, and all privileges and rights of set-off, in each case, Related to the Business or to the extent attributable to the Purchased Assets or the Assumed Liabilities;

(u)     all rights of any Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, and contractors to any Seller to the extent related to the Purchased Assets;

(v)     all bank accounts Related to the Business, other than those set forth on <u>Schedule 2.2(f)</u>;

(w)     any refund of any Taxes paid by or allocable to any Seller other than any refund of Taxes that are Excluded Liabilities;

(x)     all current and historical primary, excess and umbrella policies, self-insurance and captive insurance company arrangements, casualty, workers' compensation, general liability and auto liability insurance policies, including the policies set forth on <u>Schedule 3.17</u>, and all rights of any nature with respect to any such insurance policy, including any recoveries thereunder and any claims, rights to assert claims, or causes of action thereunder or proceeds thereof;

(y)     prepaid expenses of Sellers and any of their respective Affiliates to the extent attributable to a Purchased Asset or otherwise Related to the Business;

(z)     the rights under the trust funds established under the trust agreements identified on <u>Schedule 3.13(f)</u> with respect to Environmental Liabilities, subject to any TCEQ specific terms set forth in the Sale Order or any other order of the Bankruptcy Court;

(aa)     other than any Excluded Asset, all right, title, and interest of Sellers in, for or under the Business and other assets, properties or rights of every kind and description, wherever located, whether real, personal, or mixed, tangible or intangible, Related to the Business, whether owned, leased, licensed, used, occupied, or held for use by Sellers; and

(bb)     all proceeds and products of any and all of the foregoing Purchased Assets.

2.2     **Excluded Assets**. Notwithstanding anything to the contrary contained in <u>Section 2.1</u> above or any other provision of this Agreement or any Transaction Document, the following assets are not being sold, assigned, transferred, or conveyed to Purchaser by Sellers hereunder (collectively, the "***Excluded Assets***"):

(a)     the Cash Consideration;

(b)     data files, archive files, systems documentation, and other data processing information and records relating solely to any of the Excluded Assets;

(c)     all Contracts (other than Closing Assumed Contracts or Additional Assumed Contracts), including the Contracts set forth on the Rejected Contracts Schedule (the "***Excluded Contracts***");

18

(d)        all current and prior directors' and officers' liability insurance policies maintained by Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(e)        the Carve-Out Account, excluding any funds remaining in the Carve-Out Account after all Allowed Professional Fees have been irrevocably paid in full;

(f)        the bank accounts set forth on Schedule 2.2(f) (including any cash held therein);

(g)        the rights which accrue or will accrue to Sellers under this Agreement and the Transaction Documents;

(h)        any rights, claims, or causes of action, including rights pursuant to warranties, representations, and guarantees, each to the extent related to (i) Excluded Assets described herein, and (ii) intercompany obligations between Sellers or any of their respective Affiliates;

(i)        any tangible or intangible asset held by Sellers pursuant to a lease, license, contract, or other agreement where such lease, license, contract, or other agreement is an Excluded Contract;

(j)        all securities, whether capital stock or debt, of Sellers, other than those set forth on Schedule 2.1(n);

(k)        all Personal Information that Sellers are prohibited by Applicable Law, including applicable Privacy Laws, or by any of Seller's public-facing policies, notices or other disclosures from delivering or transferring to Purchaser;

(l)        all personnel records (including all human resources and other records) of Employees who are not Transferred Employees;

(m)        all open purchase orders for goods and services with customers of the Business outstanding as of the Closing, other than the Assumed Customer Orders;

(n)        all open orders for goods and services with suppliers of the Business that remain unfulfilled as of the Closing, other than the Assumed Supplier Orders;

(o)        any Benefit Plan other than the Transferred Seller Plans and any trusts, funding vehicles, insurance policies, administrative services agreements, files and records, and other assets, related thereto (other than with respect to the Transferred Seller Plans);

(p)        documents that (i) Sellers are required by Applicable Law to retain, (ii) if transferred would violate any Applicable Laws (including with respect to privacy), or (iii) are subject to any attorney-client, work product or similar privilege with respect to work performed in anticipation of or in connection with the preparation or administration of the Bankruptcy Cases, this Agreement or the transactions contemplated by this Agreement;

(q)        any assets, properties and rights described or set forth on Schedule 2.2(q); and

(r)        Sellers' Commercial Tort Claims and any Avoidance Actions unrelated to the Purchased Assets, Assumed Liabilities or the Business.

2.3     **Assumed Liabilities**. On the terms and conditions contained in this Agreement, Purchaser shall, after the Closing, assume and be liable and responsible for paying and satisfying, solely and only the following Liabilities, all items not set forth below in this <u>Section 2.3</u> being excluded (all Liabilities so assumed, the "***Assumed Liabilities***"):

(a)     all Liabilities exclusively arising in connection with or from the use of the Purchased Assets or operation of the Business after the Closing;

(b)     all Liabilities arising after the Closing of any Seller to deliver products or services pursuant to Assumed Customer Orders;

(c)     all Liabilities under the Assumed Contracts, in each case to the extent arising out of any event, fact, act, omission, or condition occurring after the Closing and excluding any Liabilities arising from or relating to any breaches under such Assumed Contracts prior to the Closing;

(d)     all Liabilities under the Transferred Seller Plans, to the extent arising from Purchaser's employment of Transferred Employees and all Liabilities assumed by Purchaser pursuant to <u>Section 5.5</u>, in each case to the extent arising out of any event, fact, act, omission, or condition occurring after the Closing;

(e)     all Liabilities related to the Assigned Actions to the extent arising out of any event, fact, act, omission, or condition occurring after the Closing;

(f)     all Assumed Cure Costs payable pursuant to <u>Section 2.7(a)</u> and all Liabilities described in <u>Section 2.7(i)</u>;

(g)     the Take-Back Indebtedness;

(h)     Liabilities for accrued and unpaid vacation, holidays, sick pay and other paid time-off for the Transferred Employees (the "***Assumed PTO***");

(i)     all Liabilities under any Transferred Permit to the extent arising out of any event, fact, act, omission, or condition occurring after the Closing;

(j)     all Liabilities with respect to any product liability or warranty claims relating to the Business and arising out of facts, events, or conditions first existing or first occurring after the Closing;

(k)     all Liabilities for Taxes imposed on or with respect to the Purchased Assets or the Business that are attributable to any period or portion thereof beginning after the Closing;

(l)     Liabilities for trade accounts payable incurred from and after the Petition Date and until and including the Closing Date; and

(m)     without duplication of any other item described in this <u>Section 2.3</u>, all financing or capital leases secured by any of the Purchased Assets set forth on <u>Schedule 2.3(k)</u>.

2.4     **Excluded Liabilities**. Anything in this Agreement or in any other Transaction Document to the contrary notwithstanding, except for the Assumed Liabilities set forth in <u>Section 2.3</u>, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or otherwise become responsible for Sellers' or any of their respective Affiliates' Liabilities that are not Assumed Liabilities (such excluded Liabilities are collectively referred to herein as the "***Excluded Liabilities***"), and Sellers and their Affiliates

shall remain fully and solely responsible for all Excluded Liabilities. For the avoidance of doubt, any and all of the following shall constitute Excluded Liabilities:

(a)     any Liability under the DIP Credit Agreement (except the Take-Back Indebtedness), the Prepetition Obligations, and any other Indebtedness of Sellers;

(b)     any Liability to the extent arising out of any Excluded Asset, including the Excluded Contracts;

(c)     all Claims or Actions pending on or before the Closing against Sellers and all Claims or Actions against or giving rise to liabilities or obligations of the Business or the Purchased Assets based on acts or omissions by Sellers (or any of them) prior to the Closing even if instituted after the Closing;

(d)     all Liabilities to any current or former holder or owner of capital stock or other Equity Interests of Sellers or any security convertible into, exchangeable or exercisable for shares of capital stock or other Equity Interests of Sellers or any current or former holder of Indebtedness of Sellers;

(e)     all drafts or checks outstanding at the Closing under which Sellers are obligated;

(f)     indemnification or advancement of expenses for any current or former officer or director of any Seller or any of the Subsidiaries of Sellers;

(g)     all Liabilities for trade or accounts payable and other obligations of payment to any Person to the extent arising prior to the Closing other than as assumed pursuant to Section 2.3(l);

(h)     any Liability with respect to any of the current or former Employees arising prior to the Closing, other than (i) the Assumed PTO and (ii) Liabilities arising under a Transferred Seller Plan (prior to or on Closing);

(i)     all Liabilities under any futures contracts, options on futures, swap agreements, or forward sale agreements;

(j)     any and all (i) Taxes allocated to, of or imposed on Sellers (or any member or Affiliate of a Seller), (ii) Taxes imposed on or with respect to the Business or the Purchased Assets that are attributable to any period or portion thereof ending on or prior to the Closing, (iii) Taxes that arise from the consummation of the transactions contemplated by this Agreement, (iv) Transfer Taxes that are the responsibility of Sellers pursuant to Section 5.8(a), and (v) any Taxes payable to the extent arising out of or related to the Excluded Assets or with respect to the activities of any Seller or any of their respective Affiliates (including divested or discontinued business of any Seller or their respective Affiliates);

(k)     any Environmental Liability arising out of or relating to (i) the Excluded Assets, (ii) the conduct of the Business or the ownership or operation of the Business and the Purchased Assets, in each case, on or prior to the Closing; (iii) the presence, Release or threat of Release of or exposure to any Hazardous Materials at, on, or under or migrating from any Owned Real Property, Leased Real Property or otherwise with respect to the Purchased Assets, or otherwise arising out of the ownership or operation of, the Business, in each case, arising on or prior to the Closing; (iv) the transportation, storage, treatment, disposal, generation, manufacturing, recycling, reclamation, use or other handling of any Hazardous Materials with respect to the Purchased Assets, or relating in any manner to the ownership or operation of, the Business on or prior to the Closing; (v) the presence, existence or human exposure to asbestos in any form at, on, under or within any Purchased Asset, Owned Real Property, or Leased Real Property occurring,

arising or existing on or prior to the Closing; (vi) Liabilities that Sellers have assumed by Contract from a third party prior to the Closing that are not a Closing Assumed Contract; (vii) any Contract that is not an Assumed Contract; (viii) any violations of Environmental Law to the extent such violations occurred prior to the Closing regardless of whether those violations continue on or past the Closing (subject to TCEQ specific terms in the Sale Order or any other order of the Bankruptcy Court or as otherwise expressly assumed by Purchaser); or (ix) the matters set forth on Schedule 2.4(k);

(l)        all Liabilities relating to (i) the collection, storage, transmission, use or disposal of any Personal Information of any third party, in each case, on or before the Closing, and (ii) the transfer of any such Personal Information to Purchaser to the extent permitted under this Agreement;

(m)        all Liabilities, including any Claims or Actions, with respect to current or former Employees (or their representatives or beneficiaries) or employees of any ERISA Affiliate, or any officers, directors, retirees, independent contractors, consultants or job applicants of any Seller or any ERISA Affiliate, for any action or inaction of any Seller (or any predecessor of any Seller) occurring on or prior to the Closing, including with respect to any Benefit Plan, severance, vacation, payroll, sick leave, unemployment benefits, retirement benefits, pension benefits, Employee stock options, equity compensation, Employee stock purchases, or profit sharing plans, health care and other welfare plans or benefits, or any other Employee plans or arrangements or benefits or other compensation of any kind to any Employee, officer, director, retiree, independent contractor, consultant or job applicant, including under any benefit plans, programs and arrangements of an ERISA Affiliate and Liabilities of Sellers and their predecessors for severance and Liabilities pursuant to the WARN Act;

(n)        all Liabilities of Sellers or any of their respective ERISA Affiliates relating to, arising out of, or with respect to any Multiemployer Plan;

(o)        any payment obligation or liability, contingent or otherwise, for brokerage or finders' fees or similar payment in connection with this Agreement (including all Allowed Professional Fees and all amounts necessary to wind-down the Sellers' estates);

(p)        all Liabilities relating to, arising from or with respect to the failure to comply with any bulk sales laws;

(q)        all Liabilities relating to, arising from or with respect to any worker's compensation claims and any other occurrence-based claim to the extent arising out of any event, fact, act, omission, or condition occurring prior to the Closing, irrespective of when such Liabilities arise;

(r)        all Liabilities of Sellers under or arising out of the Transaction Documents and all Liabilities for which Sellers or any of their respective Affiliates are expressly made responsible pursuant to this Agreement or any other Transaction Document;

(s)        all Cure Costs, other than Assumed Cure Costs;

(t)        all Liabilities for all costs and expenses incurred or owed by Sellers in connection with (i) the administration of the Bankruptcy Cases, or (ii) the negotiation, execution and consummation of the transactions contemplated under this Agreement or any other Transaction Document or the DIP Credit Agreement;

(u)        subject to Section 2.4(h), all Liabilities relating to, arising from or with respect to, the conduct of the Business or to the Purchased Assets (and the use thereof) arising or accruing at any time at or prior to the Closing;

(v)     all Liabilities that existed, arose, or were incurred (i) prior to the Petition Date unless assumed in Section 2.3, or (ii) subsequent to the Petition Date and prior to the Closing Date, unless expressly assumed herein, including in each case of (i) and (ii) Liabilities that are dischargeable in the Bankruptcy Cases; and

(w)     any other Liability of any kind, whether known or unknown, contingent or noncontingent, matured or otherwise, whether currently existing or hereinafter created, other than an Assumed Liability.

2.5     **Purchase Price**

(a)     The aggregate purchase price for the purchase, sale, assignment and conveyance of Sellers' respective right, title and interest in, to and under the Purchased Assets will consist of the following (collectively, the "***Purchase Price***"):

(i)     the credit bid in the amount of the Credit Bid Amount;

(ii)     an amount in cash equal to the Cash Consideration; and

(iii)     the assumption of the Assumed Liabilities, including payment of the Assumed Cure Costs payable pursuant to Section 2.7(a).

(b)     In accordance with the foregoing, Purchaser shall (i) deliver, or cause to be delivered, to (1) Sellers an aggregate amount in cash equal to the Cash Consideration and (2) the respective non-Seller counterparties to the Assumed Contracts, the applicable Assumed Cure Costs (collectively, the "***Closing Date Payment***"); and (ii) satisfy the Purchase Price at the Closing as to the Credit Bid Amount by discharging Sellers, and Sellers shall be deemed discharged, from the obligations under the DIP Credit Agreement in an aggregate amount equal to the Credit Bid Amount (for the avoidance of doubt, any Lien and security interest under the DIP Credit Agreement on any encumbered asset that is not a Purchased Asset shall not be released and will continue to secure the remaining outstanding obligations under the DIP Credit Agreement). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made, and such designation shall be made, at least two (2) Business Days prior to the date such payment is to be made.

2.6     **Purchase Price Allocation**. Within ninety (90) days after the Closing Date, Purchaser will prepare or cause to be prepared and delivered to Sellers an allocation of the Purchase Price (and any other items constituting consideration for Tax purposes) among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. Sellers and Purchaser shall cooperate in good faith to finalize a mutually agreeable Internal Revenue Service Form 8594 allocation within thirty (30) days after the delivery of the allocation by Purchaser to Sellers. If within thirty (30) days after receiving the allocation, Sellers have not objected, Purchaser's proposed allocation shall become final and binding. If within thirty (30) days after receiving the allocation Sellers object to the allocation, Purchaser and Sellers shall reasonably cooperate in good faith to resolve their differences and finalize the allocation. If the Parties reach agreement on the allocation, Sellers and Purchaser covenant (a) to report gain or loss or cost basis, as the case may be, in a manner consistent with such allocation, (b) to prepare and file, and cause their respective Affiliates to prepare and file, their Tax Returns, including Internal Revenue Service Form 8594, on a basis consistent with the allocation, (c) not to voluntarily take any position inconsistent therewith in any proceeding relating to Taxes, and (d) to use commercially reasonable efforts to sustain such allocation in any subsequent Tax audit or Tax dispute. If Purchaser and Sellers are unable to reach an agreement as to

the finalized allocation within such thirty (30) day period, Purchaser's proposed allocation shall become final and binding for all Tax purposes.

2.7     **Assumption and Assignment of Contracts**.

(a)     Sellers shall assign to Purchaser, and Purchaser shall assume, the Closing Assumed Contracts at the Closing pursuant to the Sale Order, subject to the other provisions of this Section 2.7. Purchaser shall pay all Assumed Cure Costs in respect of the Assumed Contracts, which shall not be the obligation, liability or responsibility of Sellers. Purchaser shall provide adequate assurances of any future performance in connection with the assignment and assumption of the Closing Assumed Contracts at Closing or the effective date of such assignment and assumption of an Additional Assumed Contract; *provided*, that, whether before or after the Closing, to the extent the aggregate Cure Costs with respect to the Assumed Contracts exceeds the Assumed Cure Costs Cap, (i) Purchaser, in its sole discretion, may agree to increase the Assumed Cure Costs Cap in an amount equal to such excess, such determination to be made as soon as reasonably practicable following Purchaser's receipt of written notice of such excess amount and (ii) if Purchaser does not agree to increase the Assumed Cure Costs Cap (as described in clause (i) above) then Purchaser shall remove one or more Assumed Contract(s) from the Closing Assumed Contracts list or Additional Assumed Contracts list, as applicable, as Purchaser may determine in its sole discretion, and such Assumed Contract(s) shall thereafter be deemed to be Excluded Contract(s) and may be rejected by any Seller.

(b)     The Sale Order shall provide for the assumption by the applicable Seller party thereto, and the assignment to the extent legally capable of being assigned by such Seller to Purchaser, of (i) each Closing Assumed Contract pursuant to section 365 of the Bankruptcy Code on the terms and conditions set forth in the remainder of this Section 2.7, and (ii) each Additional Assumed Contract pursuant to section 365 of the Bankruptcy Code on the terms and conditions set forth in the remainder of this Section 2.7.

(c)     No later than September 23, 2025, Sellers shall file a notice (a "***Notice of Potential Assignment***") with the Bankruptcy Court in the form approved by the Bid Procedures Order and serve such Notice of Potential Assignment by first-class mail on all non-Seller counterparties to those certain executory Contracts and unexpired leases related to the Business or the Purchased Assets to which one or more Sellers or their respective Affiliates are party that Sellers may wish to assign in connection with the transactions contemplated hereby (each, an "***Identified Contract***"). In accordance with this Section 2.7(c), during the period following the date hereof to the Closing Date, Purchaser may, in its sole discretion, designate (or remove the designation of) any Identified Contract for rejection effective on or as soon as reasonably practicable after the Closing (such Identified Contracts, the "***Rejected Identified Contracts***"). The Rejected Identified Contracts as of the date hereof are set forth on Schedule 2.7(c), which schedule shall be (and shall be deemed) modified or supplemented to reflect additions or removals, as applicable, of Identified Contracts that are designated for rejection as set forth in this Section 2.7 (including pursuant to Section 2.7(a) as a result of Purchaser not agreeing to increase the Assumed Cure Costs Cap with respect to any Assumed Contract due to the Cure Costs exceeding the Assumed Cure Costs Cap) (the "***Rejected Contracts Schedule***"). Within one (1) day after the conclusion or cancellation of the Auction, or as soon as reasonably practicable thereafter, Sellers shall file with the Bankruptcy Court, and serve by first class mail on non-Seller counterparties, a notice in the form approved by the Bid Procedures Order reflecting Sellers' proposed assignment and assumption of the Closing Assumed Contracts. At the Closing, subject to Section 2.7(a), Sellers shall assume and assign to Purchaser the Closing Assumed Contracts, in each case, pursuant to section 365 of the Bankruptcy Code and the Sale Order, subject to provision by Purchaser of adequate assurance and payment of the Assumed Cure Costs related thereto as may be required under section 365 of the Bankruptcy Code. Pursuant to the terms of the Bid Procedures Order, the Sale Order, or any other Order of the Bankruptcy Court, as the case may be, and subject to Section 2.7(a), Sellers shall assume and assign

to Purchaser the Additional Assumed Contracts, in each case, pursuant to section 365 of the Bankruptcy Code and the Sale Order, subject to provision by Purchaser of adequate assurance and payment of the Assumed Cure Costs related thereto, as may be required under section 365 of the Bankruptcy Code.

(d)     From time to time following the date hereof (and not later than thirty (30) days after the Closing Date), Purchaser may, subject to the terms of the Bid Procedures Order, (i) designate additional Identified Contracts or any other executory contracts or unexpired leases that Purchaser wishes to assume in connection with the transactions contemplated hereby as "***Additional Assumed Contracts***" by providing written notice to Sellers in the form of an updated Additional Assumed Contracts Schedule; and (ii) designate additional Identified Contracts or any other executory Contracts or unexpired leases that Purchaser wishes to reject in connection with the transactions contemplated hereby as "***Additional Rejected Contracts***" by providing written notice to Sellers in the form of an updated Rejected Contracts Schedule. Such notice must be sent by Purchaser no later than thirty (30) days after the Closing Date (the "***Designation Deadline***"). Notwithstanding anything to the contrary contained in this Agreement, if as of the Closing Date, any Closing Assumed Contract is the subject of an objection as to the amount of the Cure Costs required for Sellers to assume and assign such contract to Purchaser, or other objection as to the assumption and assignability of such contract, and such objection has not been resolved to the satisfaction of Purchaser prior to or after the Closing Date, Purchaser reserves the right to remove such contract from the Closing Assumed Contracts list before or after the Closing Date such that such contract shall not be considered assumed and assigned to Purchaser hereunder.

(e)     Following service of the notice of the Additional Assumed Contracts, Sellers shall file with the Bankruptcy Court a further assumption notice (a "***Further Assignment Notice***") by first-class mail in the form approved by the Bid Procedures Order on all non-Seller counterparties to all Additional Assumed Contracts not previously noticed by Sellers and provide a copy of the same to Purchaser. Following filing of the Further Assignment Notice, Sellers shall assume and assign to Purchaser the Additional Assumed Contracts on such date as specified in such Further Assignment Notice; *provided*, that no such designation date with respect to such Additional Assumed Contract shall be later than the forty-fifth (45th) day following the Closing Date, in each case, pursuant to section 365 of the Bankruptcy Code and an order providing for the assumption by the applicable Seller party thereto, and the assignment to the extent legally capable of being assigned by such Seller to Purchaser and, of each of the Additional Assumed Contracts pursuant to section 365 of the Bankruptcy Code on the terms and conditions set forth in this Section 2.7, subject to provision by Purchaser of adequate assurance and payment of the Assumed Cure Costs related thereto as may be required under section 365 of the Bankruptcy Code. For the avoidance of doubt, (x) if Purchaser has not provided Sellers an updated Additional Assumed Contract Schedule to assume any additional Identified Contracts or other executory contracts or unexpired leases in accordance with the foregoing, then such Identified Contract or other executory contract or unexpired lease shall, together with the Rejected Identified Contracts and other executory Contracts or unexpired leases set forth on the Rejected Contracts Schedule (as may be amended, updated or modified in accordance with this Section 2.7), be deemed to be an Excluded Contract and may be rejected by any Seller party thereto after the expiration of the Designation Deadline, (y) no prepetition Cure Cost shall be due or payable with respect to any executory contract or unexpired lease until the assumption thereof, and (z) each Identified Contract or other executory contract or unexpired lease that becomes an Additional Assumed Contract pursuant to this Section 2.7(e) shall concurrently be deemed to have become a Purchased Asset.

(f)     As part of the motion with respect to the Bid Procedures Order (or as necessary in one or more separate motions), Sellers shall request that, by virtue of any Seller providing seven (7) days' prior notice of its intent to assume and assign any Assumed Contract, the Bankruptcy Court deem any non-Seller party to such Assumed Contract that does not file an objection with the Bankruptcy Court during such notice period to have given any Necessary Consent to the assumption of the Assumed Contract by the relevant Seller and assignment to Purchaser.

(g)    At Purchaser's request, Sellers shall reasonably cooperate with Purchaser as reasonably requested by Purchaser to allow Purchaser to enter into an amendment of any Assumed Contract upon assumption of such Assumed Contract by Purchaser (and Sellers shall reasonably cooperate with Purchaser to the extent reasonably requested by Purchaser in negotiations with the non-Seller counterparties thereof); *provided*, that (i) in no event shall any such amendments be effective prior to the Closing, and (ii) Sellers shall not be required to enter into any such amendment if such amendment would result in the incurrence of any additional Liability that would not have existed but for such amendment by Sellers that is not otherwise paid by Purchaser at the time of the assumption by Sellers of such Assumed Contract.

(h)    Sellers shall use their respective reasonable best efforts to obtain one or more Orders of the Bankruptcy Court (which may be the Sale Order), which Order(s) shall be in form and substance acceptable to Purchaser, and shall reflect the terms and conditions set forth herein, to assume and assign the Assumed Contracts to Purchaser on the terms set forth in this <u>Section 2.7</u> and the Bid Procedures Order.

(i)    Subject to <u>Section 2.7(j)</u>, to the extent that there is (i) an objection to the assignment and assumption of any Closing Assumed Contract or Transferred Permit outstanding at the Closing Date, (ii) an objection to the assignment and assumption of any Additional Assumed Contract or Transferred Permit on or prior to the seventh (7th) day after the Further Assignment Notice is served, or (iii) any Necessary Consent that is required to assume and assign to Purchaser any Assumed Contract or Transferred Permit is not obtained by the Closing Date, each Seller shall, with respect to each such Contract or Permit, from and after the Closing and until the earliest to occur of (A) the date on which such objection is resolved or such applicable Necessary Consent is obtained, and (B) the date on which such Contract or Permit is deemed rejected under section 365 of the Bankruptcy Code, use reasonable best efforts during the term of such Contract or Permit (and to the extent the term of such Contract or Permit ends prior to the earlier of clauses (A) or (B) above) to (1) provide to Purchaser the benefits under such Contract or Permit (<u>it being understood</u> that Purchaser shall be solely responsible for the obligations under such Contract or Permit), (2) cooperate at Purchaser's cost and expense in any reasonable and lawful arrangement, including holding such Contract or Permit in trust for Purchaser pending resolution of such objection or receipt of the Necessary Consent, designed to provide such benefits to Purchaser, and (3) enforce for the account of Purchaser any rights of such Seller under such Contract or Permit, including the right to elect to terminate such Contract or Permit in accordance with the terms thereof upon the written direction of Purchaser; *provided*, *however*, that notwithstanding the foregoing, Sellers shall not be obligated to take any action that breaches, violates, or results in default under the terms of any Contract or Permit; *provided*, *further*, that no Seller shall be required to pay or commit to pay any amount or incur any obligation in favor of or offer or grant any accommodation (financial or otherwise) to any Person. Purchaser shall reasonably cooperate with Sellers in order to enable Sellers to provide to Purchaser the benefits contemplated by this <u>Section 2.7(i)</u>.

(j)    Notwithstanding the foregoing, a Contract shall not be a Assumed Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is (i) deemed rejected under section 365 of the Bankruptcy Code, or (ii) the subject of an objection to assignment or assumption or requires, under applicable non-bankruptcy Law, the Necessary Consent of any Governmental Authority or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the assumption and assignment by the applicable Seller to Purchaser of such Contract pursuant to section 365 of the Bankruptcy Code, and such objection has not been resolved or such Necessary Consent has not been obtained prior to the sixtieth (60th) day following the Closing (as such sixty-day period may be extended by mutual agreement of Purchaser and Sellers); *provided*, that any Assumed Contract that is the subject of an objection with respect solely to the amount of the Cure Cost may be assumed and assigned prior to the resolution of such objection.

(k)     If prior to or following Closing, it is discovered that a Contract should have been listed on the Notice of Potential Assignment but was not so listed and has not been rejected by Sellers (any such Contract, a "**Previously Omitted Contract**"), Sellers shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify Purchaser in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract. Purchaser shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "**Previously Omitted Contract Designation**"). A Previously Omitted Contract designated in accordance with this Section 2.7(k) as "Rejected," or with respect to which Purchaser fails to deliver a Previously Omitted Contract Designation, shall be deemed an Excluded Contract and added to the Rejected Contracts Schedule.

(l)     If Purchaser designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.7(k), (i) such Previously Omitted Contract shall be added to the Additional Assumed Contracts Schedule and deemed to be an "Additional Assumed Contract" for all purposes hereunder, and (ii) Sellers shall serve a notice (the "**Previously Omitted Contract Notice**") on the non-Seller counterparty to such Previously Omitted Contract notifying such counterparty of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.7(l). The Previously Omitted Contract Notice shall provide the non-Seller counterparty to such Previously Omitted Contract with seven (7) days to object, in writing to Sellers and Purchaser, to the Cure Costs or the assumption of its Contract. If the non-Seller counterparty, Sellers, and Purchaser are unable to reach a consensual resolution with respect to the objection, Sellers will seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption. If no objection is served on Sellers and Purchaser within the seven (7)-day period, Sellers shall obtain an order of the Bankruptcy Court fixing the Cure Costs and approving the assumption of the Previously Omitted Contract. For the avoidance of doubt, Purchaser shall not be responsible for any Liabilities relating to such "Assumed" Previously Omitted Contracts other than the Assumed Cure Costs relating thereto only upon assumption and assignment of such Previously Omitted Contracts to Purchaser.

2.8     **Closing**.

(a)     The Closing shall take place remotely, via electronic exchange of documents, at 10:00 a.m., prevailing Eastern time, on the date that is three (3) Business Days after the satisfaction or waiver of the conditions precedent set forth in Articles VI and VII (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) or on such other date, and at such time and place, as may be agreed by Purchaser and Sellers. The date on which the Closing occurs in accordance with the preceding sentence is referred to in this Agreement as the "**Closing Date**." The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 11:59 p.m. Central Time on the Closing Date.

(b)     At the Closing, Sellers shall deliver counterparts of the following to Purchaser:

(i)     a bill of sale and assignment and assumption agreement in the form attached hereto as Exhibit 2.8(b)(i) (the "**Bill of Sale, Assignment and Assumption Agreement**") duly executed by Sellers;

(ii)     an assignment of the Registered Intellectual Property in the form attached hereto as Exhibit 2.8(b)(ii) (the "**IP Assignment**") duly executed by Sellers;

(iii)    a certificate from Sellers signed by an authorized officer of Sellers on behalf of Sellers, dated as of the Closing Date, certifying as to the satisfaction of the conditions set forth in Sections 6.1, 6.2, and 6.6 hereof;

(iv)    a certified copy of the Sale Order as entered by the Bankruptcy Court, vesting the Purchased Assets in Purchaser free and clear of any Liens (except for Permitted Post-Closing Encumbrances), and a certified copy of the docket for the period following entry of the Sale Order and through the date immediately prior to the date of the Closing;

(v)    with respect to each Transferred Owned Real Property, (1) a duly executed special warranty deed (or the local equivalent thereof), in form and substance as required by local Law or custom so that such deed will be in recordable form, conveying the fee estate in such Transferred Owned Real Property to Purchaser (the "***Deed***"), (2) with respect to any Transferred Owned Real Property which is subject to a ground lease as of the Closing, a duly executed and acknowledged by the applicable Seller assignment and assumption of ground lease (the "***Assignment and Assumption of Ground Lease***"), conveying the leasehold estate in such Transferred Owned Real Property to Purchaser, in recordable form in the applicable local jurisdiction, and (3) any additional documents, instruments and/or agreements, each in form and substance reasonably satisfactory to Sellers and Purchaser, which are required by local Law to be, or are customarily, filed and/or recorded with the Deed and/or the Assignment and Assumption of Ground Lease in the applicable local jurisdiction, including those certain documents, instruments, and/or agreements set forth on Schedule 2.8(b)(v);

(vi)    with respect to each Closing Assumed Contract constituting an Acquired Real Property Lease, an assignment and assumption agreement conveying such Acquired Real Property Lease to Purchaser, in each case in customary form reasonably approved by Purchaser (each, a "***Lease Assignment Agreement***"), duly executed by the applicable Seller;

(vii)    a certificate of an authorized officer of each Seller certifying as to the incumbency and signatures of the executing officers of such Seller;

(viii)    duly executed counterparts to each other Transaction Document;

(ix)    from each Seller (or if such Seller is disregarded for U.S. federal income tax purposes, its regarded owner), an IRS Form W-9 with respect to such Seller, duly completed and executed;

(x)    all personnel records relating to the Transferred Employees; *provided*, that the delivery obligations of Sellers hereunder shall be deemed satisfied if such personnel records remain at the Facility; and

(xi)    such other instruments and documents as may be reasonably requested by Purchaser at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

(c)    At the Closing, Purchaser shall deliver the following to Sellers:

(i)    payment of the Closing Date Payment pursuant to Section 2.5;

(ii)     duly executed counterpart of the Bill of Sale, Assignment and Assumption Agreement;

(iii)    duly executed counterpart of the IP Assignment;

(iv)    duly executed counterpart of the Assignment and Assumption of Ground Lease;

(v)     duly executed counterpart of the Lease Assignment Agreement;

(vi)    duly executed counterparts of each other Transaction Document;

(vii)   a certificate of Purchaser, dated as of the Closing Date, as to the satisfaction of the conditions set forth in Sections 7.1 and 7.2; and

(viii)  such other instruments and documents as may be reasonably requested by Sellers at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

2.9     **Purchaser Designees**. Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.9, one or more Affiliates of Purchaser to (a) purchase specified Purchased Assets; (b) assume specified Assumed Liabilities; and/or (c) employ specified Transferred Employees, in each case, as of the Closing Date (any Person that shall be properly designated by Purchaser in accordance with this clause, a "***Purchaser Designee***"). As soon as reasonably practicable and in no event later than three (3) Business Days prior to the Closing, Purchaser shall make any such designations of Purchaser Designees by way of a written notice to be delivered to Sellers. Purchaser and any Purchaser Designees shall be jointly and severally liable for any obligations of Purchaser and such Purchaser Designees hereunder. For the avoidance of doubt, and notwithstanding anything to the contrary herein, all Purchaser Designees appointed in accordance with this Section 2.9 shall be included in the definition of "Purchaser" *mutatis mutandis* for all purposes under this Agreement and all such Purchaser Designees shall be deemed to have made all of the representations and warranties of Purchaser set forth in this Agreement.

2.10    **Withholding**. Purchaser shall be entitled to deduct and withhold from amounts payable pursuant to this Agreement any amounts required to be deducted and withheld under the Code or any provision of any U.S. federal, state, local, or foreign Tax Law. Prior to withholding any amount, Purchaser shall use commercially reasonable efforts to provide written notice to any Seller to whom such amounts would otherwise have been paid, together with reasonably sufficient details regarding the relevant withholding Law. To the extent that amounts are so deducted and withheld and properly remitted to the appropriate Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the applicable Seller. The Parties shall cooperate and use their commercially reasonable efforts to obtain any available reduction to or exemption from any such withholding requirement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the corresponding numbered section or subsection of the Disclosure Schedule (it being agreed that for the purposes of the representations and warranties made by Sellers in this Agreement, disclosure of any item in any section of the Disclosure Schedule shall be deemed disclosure with respect to any other section or sub-section of the Agreement to which the relevance of such item is

29

reasonably apparent on its face), Sellers hereby represent and warrant, jointly and severally, to Purchaser, as of the date hereof and as of the Closing Date, as follows:

3.1     **Due Incorporation; Good Standing**. Each Seller is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization. Each Seller has all requisite limited liability company or similar power and authority to own, lease and operate its properties and assets and to carry on the Business as presently conducted, and is qualified to do business and, to the extent such concept applies, is in good standing as a foreign legal entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of the Business requires such qualification, except where the failure to be so qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2     **Due Authorization**. Subject to entry of the Sale Order, (a) each Seller has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents to which such Seller is a party and to perform its obligations hereunder and to consummate the transactions contemplated hereby and thereby; (b) the execution, delivery, and performance by each Seller of this Agreement and the other Transaction Documents to which such Seller is a party, and the consummation by such Seller of the transactions contemplated hereby and thereby, have been duly authorized by all requisite corporate action or limited liability company action on behalf of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery, and performance by such Seller of this Agreement or the other Transaction Documents and the consummation by it of the transactions contemplated hereby and hereby; and (c) this Agreement and the other Transaction Documents to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming the authorization, execution, and delivery thereof by Purchaser and Sellers, as applicable, constitutes, or will constitute, legal, valid, and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally; and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (clauses (c)(i) and (ii), collectively, the "***Enforceability Exceptions***").

3.3     **Governmental Filings; No Violations**.

(a)     Other than the filings and/or notices under the HSR Act and the filings, notices, reports, consents, registrations, approvals, permits and authorization set forth on <u>Schedule 3.3(a)</u> (the "***Required Consents***"), and subject to the issuance of the Sale Order and any other Order required by the Bankruptcy Court in connection with the transactions contemplated hereby, no filing, notice, report, consent, registration, approval, Permit or authorization is required to be given, filed or obtained by any Seller to or from any Person, including any Governmental Authority, in connection with the execution, delivery and performance by any Seller of this Agreement and the Transaction Documents to which any Seller is a party or the transactions contemplated hereby or thereby, except those that the failure to make or obtain would not, individually or in the aggregate, reasonably be expected to be material to the Business (taken as a whole) or prevent or materially delay the consummation of the transactions contemplated hereby.

(b)     The execution, delivery and performance by Sellers of this Agreement and the other Transaction Documents does not, and the consummation of the transactions contemplated hereby and thereby, (i) will not result in the creation of any Lien under, and (ii) will not, conflict with, or result in any violation of or default (with or without notice, lapse of time or both) under, require a consent or notice under, or give rise to a right of termination, loss of rights, adverse modification of provisions, cancellation or acceleration of any obligation under (1) any provision of the Organizational Documents of any Seller or

30

government agreement applicable to any Investment, (2) subject to the Sale Order or any other Order required by the Bankruptcy Court in connection with the transactions contemplated hereby and subject to obtaining the Required Consents, any Law or Order to which any Seller, the Business, or the Purchased Assets are subject, or (3) subject to the Sale Order or any other Order required by the Bankruptcy Court in connection with the transactions contemplated hereby, any Assumed Contracts, except, in the cases of clause (2) and (3) above, for any such creation of any Lien, breach, violation, termination, default, right or loss of rights, adverse modification, cancellation or acceleration, that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially delay or materially impair the consummation of the transactions contemplated hereby.

3.4    **Compliance With Laws; Permits**.

(a)    Except as otherwise set forth on Schedule 3.4(a), each Seller is, and at all times for the past five (5) years has been, in material compliance with all Applicable Laws and the Business is and at all times for the past five (5) years has been conducted in material compliance with all Applicable Laws. No Seller has received any written notice of (i) any investigation or review by any Governmental Authority with respect to the Business or the Purchased Assets, or (ii) any material noncompliance with any Applicable Laws which noncompliance has not been cured. Each Seller has obtained and is in material compliance with all Permits and Orders issued or granted by a Governmental Authority necessary to conduct its Business as presently conducted, except those the absence of which to have or be in compliance with would not, individually or in the aggregate, reasonably be expected to be material.

(b)    Sellers hold all Permits (including Environmental Permits) necessary for the current operation and conduct of the Business, and the Purchased Assets, except where the failure to hold any such Permit has not been, and would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Purchased Assets. The Permits set forth on Schedule 3.4(b) are all of the Permits (including Environmental Permits) held by any Seller with respect to the ownership, construction, and maintenance of, or otherwise issued in connection with, the Purchased Assets and the Facility, and the operation and conduct of the Business. Sellers have made all filings and paid all fees and duties, in each case, necessary to maintain the Permits (including Environmental Permits), each of which is valid and in full force and effect. Except as otherwise set forth on Schedule 3.4(b), (i) Sellers are in compliance in all material respects with all of the Permits (including Environmental Permits), and no condition exists that with notice or passage of time or both would reasonably be expected to constitute a material default under any such Permits, and (ii) no Seller has received any written notice of any violation of any Permits (including Environmental Permits) or written notice of any proposal to revoke, cancel, rescind, modify, or refuse to renew any of such Permits.

(c)    Each Seller and each of their respective directors, managers, officers and, to the Knowledge of Sellers, their Employees and each other Person acting on behalf of Sellers, is and has for the past five (5) years been in compliance in all material respects with the Foreign Corrupt Practices Act of 1977, as amended (the "***FCPA***"), and any other Applicable Law concerning anti-corruption or anti-bribery. No Seller and none of their respective directors, managers, or officers or, to the Knowledge of Sellers, their Employees or any other Person acting on behalf of Sellers, has been at any time in the past five (5) years, or is currently, the subject of any allegation, voluntary disclosure, prosecution, investigation or other enforcement Action with respect to, or been given notice in writing by a Governmental Authority of, any violation by any Seller of the FCPA or any other Applicable Law concerning anti-corruption or anti-bribery. In the past five (5) years, no Seller and none of their respective directors, managers, or officers or, to the Knowledge of Sellers, their Employees, or any other Person acting on their behalf, has, in connection with the Business, paid, offered, promised, or authorized the payment of money or anything of value, directly or indirectly, to any foreign official (as such term is defined in the FCPA) in violation of applicable anti-corruption or anti-bribery Laws. Each Seller has devised and maintains a system of internal controls

31

designed to provide reasonable assurances that it is in compliance with the FCPA and any other Applicable Law concerning anti-corruption or anti-bribery. No Seller and none of their respective Affiliates or, any director or officer, nor, to the Knowledge of Sellers, any agent, Employee or other Person acting on behalf of Sellers, directly or indirectly, is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, OFAC's Foreign Sanctions Evaders List, OFAC's Sectoral Sanctions Identifications List, the U.S. Department of Commerce Denied Person's List, the U.S. Department of Commerce's Entity List, the U.S. Department of Commerce's Unverified List, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List or any similar list enforced by the United States federal government or (iii) located, organized or resident in a Designated Jurisdiction in violation of any Sanctions. Sellers are in compliance with all applicable Export/Import Laws and Sanctions Laws, in each case, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Sellers (w) have not been found in violation of, charged with or convicted in connection with, any Export/Import Laws or any Sanctions Laws, (x) to Sellers' Knowledge, are not under investigation by any Governmental Authority for possible violations of any Export/Import Law or any Sanctions Law, (y) have not been assessed civil penalties under any Export/Import Laws or any Sanctions Laws and (z) have not filed any voluntary disclosures with any Governmental Authority regarding possible violations of any Export/Import Laws or Sanctions Laws, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business (taken as a whole).

3.5     **Litigation**. Except for the general pendency of the Bankruptcy Cases and Actions that would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Purchased Assets and for the Actions described on Schedule 3.5: (a) there have not been in the past five (5) years, and there are no, Actions pending or, to the Knowledge of Sellers, threatened (i) against any Seller or the Purchased Assets, (ii) that would reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by this Agreement or the other Transaction Documents; and (b) no Seller is subject to any outstanding Order that prohibits or otherwise restricts the ability of Sellers or any of their respective Affiliates to consummate the transactions contemplated by this Agreement or any of the other Transaction Documents or that is or is reasonably expected to be material to the Business.

3.6     **Certain Financial Information**.

(a)     Schedule 3.6(a) sets forth true and complete copies of the (i) unaudited financial results of Parent for each fiscal quarter of 2024, and the related unaudited consolidated balance sheets as of the end of such quarters, (ii) unaudited statements of operations and cash flows of GMR for the years ended December 31, 2023 and December 31, 2024, the unaudited financial results of GMR for the six-month period ended June 30, 2025, and the related unaudited consolidated balance sheets as of the end of such years and such six-month period, and (iii) unaudited financial results of Aleon for each fiscal quarter of 2024 and for the six-month period ended June 30, 2025, and the related unaudited consolidated balance sheets as of the end of such quarters and six-month period (collectively, the "***Financial Statements***"). The Financial Statements fairly present, in all material respects, the consolidated financial position of Parent and its Subsidiaries in respect of the Business as of the dates thereof and the consolidated results of operations and cash flows for the periods then ended (subject to notes and normal and year-end adjustments that will not be material in amount or effect), have been prepared from, and are consistent with, the books and records of Parent and its Subsidiaries and have been prepared in accordance with GAAP applied on a consistent basis during the period involved (except as may be noted therein or the notes thereto). Parent maintains a system of internal controls over financial reporting that is reasonably designed to provide reasonable assurance regarding the reliability of the financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and includes policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of Parent and its Subsidiaries, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with

GAAP, and that receipts and expenditures of Parent and its Subsidiaries are being made only in accordance with authorizations of management and directors of Parent and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of Parent and its Subsidiaries that could have a material effect on the financial statements of Parent and its Subsidiaries.

(b)     Except for Liabilities reflected or reserved against on the Schedules and Statements, Sellers do not have any material Liabilities, other than (i) Liabilities that have been incurred in the Ordinary Course of Business since the commencement of the Bankruptcy Cases, (ii) contractual liabilities incurred in the Ordinary Course of Business that are not material and, in the case of clauses (i) and (ii), none of which is a liability for breach of Contract, breach of representation or warranty, violation of Applicable Law, tort or infringement by Sellers, (iii) Liabilities contemplated by or in connection with this Agreement, the other Transaction Documents, or the transactions contemplated hereby or thereby, or (iv) Liabilities that are otherwise disclosed on Schedule 3.6(b).

(c)     Schedule 3.6(c) sets forth a true, correct and complete list of all Accounts Receivable, including a true and complete list of all Accounts Receivable that are more than thirty (30) days past due as of the date hereof. All Accounts Receivables resulted from bona fide sales in the Ordinary Course of Business and represent the genuine and, to Sellers' Knowledge, valid and legally enforceable Indebtedness of the account debtor. To the Knowledge of Sellers, there are no material disputes with respect to any of the Accounts Receivables that have not been reserved for on the Financial Statements. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all trade accounts payable have arisen in the Ordinary Course of Business, and there are no trade accounts payable for purchases in material excess of usual requirements.

(d)     All Acquired Inventories are (i) free of any material defect or deficiency, (ii) in all material respects in good, merchantable, usable, fit for their intended purpose and currently marketable condition in the Ordinary Course of Business (subject, in the case of raw materials and work-in-process, to the completion of the production process), (iii) of a quality and quantity usable and salable in the Ordinary Course of Business, and (iv) properly stated on the books and records of the applicable Seller at the lesser of cost and fair market value, with adequate obsolesces reserves, all as determined in accordance with GAAP. No Acquired Inventory is held on a consignment basis. All Acquired Inventories are located at the Facility or are in transit thereto.

(e)     Each letter of credit or similar financial accommodation issued to any third party(ies) for the account of any Seller (and any collateral therefor) (each, a "***Letter of Credit***") is a validly issued and outstanding standby letter of credit that is in full force and effect. Each Letter of Credit has been cash collateralized in a manner that meets the requirements of the issuer of such Letter of Credit. Schedule 3.6(e) accurately lists each Letter of Credit and the amounts of cash collateral posted for each Letter of Credit. Except as set forth on Schedule 3.6(e), no amounts are currently drawn under any Letter of Credit, and Sellers have not received a draw request from any Letter of Credit beneficiary.

(f)     Schedule 3.6(f) accurately lists Seller's reasonable good faith estimate of the items and amounts of the Cure Costs and Seller Property Taxes.

3.7     **Absence of Developments**. Since December 31, 2024, other than as contemplated by the Transaction Documents or actions taken in connection with or related to the filing of the Bankruptcy Cases or arising out of the Bankruptcy Cases, Sellers have conducted the Business in the Ordinary Course of Business. Since December 31, 2024, there has not been any effect, change, event, occurrence, development, circumstance, condition or state of facts that, individually or in the aggregate, has had, or would reasonably be expected to have a Material Adverse Effect. Since June 30, 2025, Sellers have not taken any actions

which would, had such actions been taken after the date of this Agreement, required the consent pursuant to Section 5.2(b).

3.8     **Real Property**.

(a)     Schedule 3.8(a) sets forth a complete and correct list of all of the real property owned by Sellers, specifying the address, ownership of, and any other information necessary to identify all such real property (the "***Owned Real Property***"). Sellers have good and marketable title to the Owned Real Property free and clear of all Liens, other than (i) as of the date hereof, Permitted Liens, and (ii) as of the Closing Date, Permitted Post-Closing Encumbrances. As of the date hereof, there are no pending, or, to the Knowledge of Sellers, threatened, appropriation, condemnation, eminent domain or like proceedings relating to any Owned Real Property in any material respect. As of the date hereof, no Seller has granted or is obligated under any option, right of first offer, right of first refusal or other contractual right to purchase, acquire, sell or dispose of any Owned Real Property or any material portion thereof or interest therein.

(b)     Schedule 3.8(b) sets forth a complete and correct list of all of the real property leased by Sellers (each a "***Real Property Lease***"), specifying, in respect of each Real Property Lease, the lease agreement by and between Seller(s) and the landlord and the address of such property (the "***Leased Real Property***"). No Seller is in default under any Real Property Lease (not including any default directly arising due to the commencement of the Bankruptcy Cases or the financial condition of Sellers), no written notice of any default under any Real Property Lease (not including any default directly arising due to the commencement of the Bankruptcy Cases or the financial condition of Sellers), which default remains uncured, has been sent or received by any Seller, and to the Knowledge of Sellers, no conditions or circumstances exist which, and no event has occurred which constitutes or which, in each case, with the lapse of time or the giving of notice, or both, would constitute a default or breach under any Real Property Lease (not including any default directly arising due to the commencement of the Bankruptcy Cases or the financial condition of Sellers), except in each case for those breaches or defaults which would not, individually or in the aggregate, reasonably be expected to be material to the Business (taken as a whole). The Real Property Leases are in full force and effect in accordance with their terms (subject to Enforceability Exceptions). Sellers have made available to Purchaser true and complete copies of all Real Property Leases.

(c)     Sellers have exclusive possession of each parcel of the Owned Real Property (subject to (i) as of the date hereof, Permitted Liens and (ii) as of the Closing Date, Permitted Post-Closing Encumbrances) and the Leased Real Property. To the Knowledge of Sellers, (i) there is no existing breach or default (not including any default directly arising due to the commencement of the Bankruptcy Cases or the financial condition of Sellers) by any party under any easements, restrictive covenants or similar instruments affecting the Transferred Owned Real Property or Leased Real Property which breach or default has not yet been cured, (ii) no Seller has received any written notice of any default (not including any default directly arising due to the commencement of the Bankruptcy Cases or the financial condition of Sellers), under any easements, restrictive covenants or similar instruments affecting the Transferred Owned Real Property or Leased Real Property which default has not yet been cured, and (iii) there does not exist any condition or event that with the lapse of time or the giving of notice, or both, would constitute such a breach or default (not including any default directly arising due to the commencement of the Bankruptcy Cases or the financial condition of Sellers), under any easements, restrictive covenants or similar instruments affecting the Transferred Owned Real Property or Leased Real Property, except in each case for those breaches or defaults which would not, individually or in the aggregate, reasonably be expected to be material to the Business (taken as a whole).

3.9     **Material Contracts**.

(a)      Schedule 3.9(a) contains a true and complete list of the following types of Contracts to which Sellers are a party or bound or by which any of the Purchased Assets are bound or affected (each Contract listed, and each Contract that should be listed, on Schedule 3.9(a) being referred to as a "**Material Contract**"), a complete and correct copy of which (as in effect on the date hereof), and including all amendments, supplements, restatements, waivers, side letters, addenda, exhibits, schedules and modifications thereto, and summaries of any oral versions of same, has been furnished to Purchaser by Sellers:

(i)      any Contract involving the lease of any real property, including the Acquired Real Property Leases;

(ii)      any Contract (other than a purchase order) with a Key Customer or Key Vendor;

(iii)      any outstanding purchase order or related series of purchase orders included in the Purchased Assets in excess of $250,000;

(iv)      any Contract for the distribution of products of the Business, including any dealer, representative, agency or similar Contract;

(v)      any Contract (other than a purchase order) pursuant to which Sellers would reasonably be expected to make or receive payments of more than $100,000 during any fiscal year;

(vi)      any Contract with any Governmental Authority or any instrumentality of any such Governmental Authority;

(vii)      any (1) employment and similar Contract (other than offer letters or similar agreements in the standard form used by Sellers in the Business and made available to Purchaser) with an officer or other member of management with annual base compensation in excess of $100,000, and (2) Contract with a consultant pursuant to which the Business is or could become obligated to make payments exceeding $100,000 per annum;

(viii)      any Contract involving a change of control or retention bonus, "stay bonus" or similar arrangement or providing for the grant or acceleration of any benefit payable to any Employee;

(ix)      any Contract (other than offer letters or similar agreements in the standard form used by Sellers in the Business and made available to Purchaser) between any current or former Employee of any Seller or their respective Affiliates or current or former consultant of any Seller or their respective Affiliates, on the one hand, and any Seller or their respective Affiliates, on the other hand, that as of the date hereof restricts any such Person (1) from competing, directly or indirectly, with Sellers, the Business, or any other Person, or (2) from soliciting or hiring current Employees or customers of Sellers, the Business, or any other Person;

(x)      any Contract that includes a "most favored nation," "meet or release" or similar pricing and delivery arrangement or that includes a minimum volume commitment or any other similar performance or financial goal, or involves the payment by the Business of amounts that include "take or pay" requirements or output terms or similar pricing or delivery arrangements;

(xi)    any Contract that restricts the ability of any Seller or the Business to compete with any Person, solicit or hire any Person, engage in any business, or operate in any geographical area;

(xii)   any Contract pursuant to which any Seller grants or receives any license, sublicense, co-existence agreement, covenant not to sue, or similar right with respect to any Intellectual Property Rights material to the Business (other than Contracts that are shrinkwrap, clickwrap or other standard terms for third-party software that are available to the general public as of the Closing Date);

(xiii)  any performance bond or surety Contract;

(xiv)   any Contract that settled any Action (1) for monetary payments to or by any Seller or any of its Affiliates in excess of $250,000, or (2) that involves any equitable or other non-monetary relief and that is binding on any Seller or the Business;

(xv)    any collective bargaining or other labor-related Contracts (including, works council, shop, enterprise or recognition Contract) with any labor union, labor organization, or works council (each a "***Labor Agreement***"); and

(xvi)   any Contract pursuant to which any Seller currently leases personal property to or from any Person or holds or currently operates any tangible personal property owned by another Person, in each case, that is material to the Business taken as a whole.

(b)    With respect to each Material Contract: (i) such Material Contract is the legal and valid obligation of the applicable Sellers and each other party thereto, and constitutes the binding and enforceable obligation of the applicable Sellers and, to the Knowledge of Sellers, each other party thereto, in accordance with its terms, subject to Enforceability Exceptions; (ii) Sellers are not, nor, to the Knowledge of Sellers, is any other Person, in material breach or material default thereunder and, except as otherwise set forth on Schedule 3.9(b) or as a result of the pendency of the Bankruptcy Cases, to the Knowledge of Sellers, no condition exists or event has occurred (including any condition or event that with notice or lapse of time, or both) that would constitute a material breach or default, or permit termination, modification in any manner adverse to the Business or the Purchased Assets or acceleration thereunder; (iii) to the Knowledge of Sellers, no party has asserted nor has (except by operation of Law) any right to offset, discount or otherwise abate any amount owing under such Material Contract; and (iv) no amendment or modification has been made thereto except those, if any, reflected in the copies previously furnished to Purchaser. There are no material disputes by and between any Seller and any counterparty to any Material Contract.

3.10   **Employees and Labor Matters**.

(a)    Schedule 3.10(a) sets forth the following information for each current Employee (including each current Employee on leave of absence): employer; name or employee ID; date of hire; job title or position; current compensation paid or payable; status as exempt or non-exempt under the Fair Labor Standards Act of 1938, as amended; current base salary or rate of pay; bonus compensation (if any) paid or payable for calendar year 2024 and for the six months ended June 30, 2025; leave status and all accrued and unpaid vacation, holidays, sick pay and other paid time-off (whether accrued prior to or during the Bankruptcy Cases) to which the Employee is entitled with respect to all periods of service up to and including the Closing Date under the policies and practices of Sellers or their respective Affiliates.

(b) To the Knowledge of Sellers, no Employee is a party to, or is otherwise bound by, any agreement, including any confidentiality, noncompetition, or proprietary rights agreement, between such Employee and any other Person that in any way (i) adversely affects the performance of his, her, or their duties as an Employee; (ii) adversely affects the ability of Sellers, or could reasonably be expected to adversely affect the ability of Purchaser after the Closing Date, to conduct the Business; or (iii) is being violated by virtue of the Employee's provision of services to Sellers or any of their respective Affiliates.

(c) No Seller and none of their respective Affiliates or ERISA Affiliates is or has ever been a party to, bound by, subject to, or has any obligations under any current or expired Labor Agreement applicable to the Employees and, to the Knowledge of Sellers, there are not any activities or Actions of any labor union to organize any of the Employees.

(d) The employment or other engagement of all Employees is terminable at will without any penalty or severance obligation of any kind on the part of the employer. All sums due for Employee compensation and benefits and all vacation time or paid time off or sick pay owing to any Employees have been duly and adequately accrued in all material respects on the accounting records of Sellers. Each Subject Employee (as defined in Section 5.5(a)) has completed a Form I-9.

(e) During the past five (5) years, any individual who performs or performed services for Sellers or any of their respective Affiliates and who is not treated as an Employee for U.S. federal income tax purposes by Sellers or an Affiliate, as applicable, is not an Employee under Applicable Laws or for any purpose, including, without limitation, for Tax withholding purposes or Benefit Plan purposes.

(f) During the past five (5) years, Sellers have not effectuated (i) a "plant closing" (as defined in the WARN Act) in connection with the Business; or (ii) a "mass layoff" (as defined in the WARN Act) of individuals employed at or who primarily provided service to the Business. Sellers have heretofore made available to Purchaser a true and complete list of layoffs, by location, implemented by Sellers since January 1, 2025.

(g) Schedule 3.10(g) sets forth the names of all individuals who are Employees as of the date hereof and (a) whose job responsibilities primarily relate to the ownership, operation or use of the Purchased Assets or (b) whom Purchaser and Sellers have otherwise designated as Scheduled Employees (such individuals, the "***Scheduled Employees***"). Schedule 3.10(g) also sets forth, for each Scheduled Employee, as applicable, the Employee's job title, date of hire, work location, annual base salary (and base wages), and target bonus opportunity for 2025, any other supplemental or bonus compensation (including commission opportunity and any retention bonus arrangements), job classifications, and whether or not the Employee is a member of a labor union and, if so, the identity of such labor union and shall be held in confidence and shall not be filed with the Bankruptcy Court (unless under seal).

(h) No Seller has any material Liability with respect to any Taxes (or the withholding thereof) in connection with any independent contractor that would result in any Liability to Purchaser.

(i) During the past five (5) years there have not been any material (i) allegations or formal or informal complaints made to or filed with Sellers related to sexual harassment or sexual misconduct, (ii) other claims initiated, filed or, to the Knowledge of Sellers, threatened against Sellers related to sexual harassment or sexual misconduct, or (iii) other allegations, formal or informal complaints or any other claims initiated, filed or, to the Knowledge of Sellers, threatened against any director, officer, Employee, agent, or representative of Sellers related to sexual harassment or sexual misconduct, in each case by or against any current or former director, officer or Employees.

(j)      There are no, and in the past five (5) years have not been any material, (i) picketing actions, strikes, work stoppages, work slowdowns, lockouts, or other job actions pending or, to the Knowledge of Sellers, threatened against or involving Sellers, or (ii) unfair labor practice charges, or any material grievances or complaints, pending or, to the Knowledge of Sellers, threatened by or on behalf of any Employees or former Employees of Sellers. There are no, and in the past five (5) years have not been any, complaints, charges, or claims against Sellers pending, brought, filed, or, to the Knowledge of Sellers, threatened with any Governmental Authority based on, arising out of, in connection with or otherwise relating to the employment or termination of employment or failure to employ by Sellers, of any individual.

(k)      For the past five (5) years, Sellers have been in compliance in all material respects with Applicable Law relating to labor and employment, including all Applicable Law relating to employment practices, discrimination, disability, equal employment opportunities, labor relations, wages and hours, the collection and payment of withholding and/or employment taxes, classification of independent contractors, immigration, workers' compensation, background and credit checks, working conditions, data privacy and data protection, occupational safety and health, and family and medical leave. Each of the Employees has all required work permits, visas or other authorizations required by Applicable Law for such Employee to be employed in the Employee's current position. There is no Action pending, or to the Knowledge of Sellers, threatened against or relating to Sellers or any Affiliate of Sellers with respect to any employment or labor matter with respect to the Business, and to the Knowledge of Sellers no reasonable basis for any Claim or Action exists.

3.11    **Benefit Plans**.

(a)      Schedule 3.11(a) sets forth an accurate and complete list of all Benefit Plans. Sellers have made available to Purchaser or its counsel a true and complete copy of all plan documents (including related trust agreements, funding arrangements, Form 5500s and insurance contracts and all amendments thereto) with respect to each Benefit Plan in which any Employees participate or are eligible to participate.

(b)      Each Benefit Plan has been established, funded, maintained, and administered in all material respects in accordance with its terms, and in compliance with the applicable provisions of ERISA, the Code, and other Applicable Law. With respect to each Benefit Plan that is intended to qualify under Section 401(a) of the Code, Sellers have received a favorable determination, opinion or advisory letter with respect to such Benefit Plan and its related trust that has not been revoked and no circumstances exist and no events have occurred that could adversely affect the qualified status of such Benefit Plan or the related trust. No Benefit Plan provides retiree health or life insurance benefits except as may be required by Section 4980B of the Code and Section 601 of ERISA, any other Applicable Law or at the sole expense of the participant or the participant's beneficiary. No Benefit Plan that provides health insurance or medical coverage is self-funded or self-insured and all premiums that have become due have been paid in full.

(c)      Neither any Seller nor ERISA Affiliate has, or has ever had, any liability or obligation to contribute to, or with respect to, any (i) "defined benefit plan" (as defined in Section 3(35) of ERISA), (ii) an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Title IV of ERISA or Sections 412 or 430 of the Internal Revenue Code, (iii) Multiemployer Plan, or (iv) a "multiple employer plan" within the meaning of Section 413(c) of the Code.

(d)      Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due and payable from Sellers, or increase the amount of any compensation due and payable from Sellers, to any Employee, (ii) increase any benefits otherwise payable under any Benefit Plan, (iii) result in the acceleration of the time of payment or vesting of any compensation or benefits under any

Benefit Plan, (iv) result in the triggering or imposition of any restrictions or limitations on the rights of Sellers or any of their respective ERISA Affiliates to amend or terminate any Benefit Plan, or (v) result in any amount or benefit that may not be deductible by reason of Section 280G of the Code or that will be subject to an excise tax under Section 4999 of the Code (or any corresponding provision of state, local, or non-U.S. Tax law).

(e)     Other than routine claims for benefits, no Liens, lawsuits, or complaints to or by any Person or Governmental Authority are pending against any Benefit Plan or against Sellers with respect to any Benefit Plan and, to the Knowledge of Sellers, no such material Liens, lawsuits, or complaints are threatened with respect to any Benefit Plan. There is no audit or investigation of any Benefit Plan by any Governmental Authority pending or to the Knowledge of Sellers threatened. Sellers have paid and discharged promptly when due all Liabilities due under each Benefit Plan. There are no corrections, audits or proceedings initiated pursuant to the IRS Employee Plans Compliance Resolution System or similar proceedings pending with the Internal Revenue Service or Department of Labor with respect to any Benefit Plan.

(f)     Sellers do not have a legally binding plan, contract or commitment to create any new employee benefit or compensation plans, policies or arrangements for any Transferred Employee or, except as may be required by Applicable Law, to modify any Benefit Plan.

(g)     Each Benefit Plan that is or has ever been a "nonqualified deferred compensation plan" (as defined under Section 409A of the Code) has at all times complied with all applicable document requirements of, and been operated in compliance with, Section 409A of the Code.

(h)     No Seller nor any other "party in interest" or "disqualified person" with respect to any Benefit Plan has engaged in a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code involving such Benefit Plan which, individually or in the aggregate, could reasonably be expected to subject Purchaser or any of its Affiliates to Liability, tax or penalty imposed by Section 4975 of the Code or Sections 501, 502 or 510 of ERISA.

(i)     All contributions or premium payments required by Applicable Law or by the terms of any Benefit Plan or any agreement relating thereto have been timely made (taking into account any waivers granted with respect thereto) to any funds or trusts established thereunder or in connection therewith or have been reflected on the applicable financial statements.

3.12    **Intellectual Property**.

(a)     Schedule 3.12(a) sets forth a true and complete list of all (i) Patents; (ii) registered trademarks, service marks and trade names and those for which an application is pending; (iii) registered or applied for copyrights; and (iv) Internet domain names and social media accounts, in each case, owned or purported to be owned by Sellers and otherwise included in the Transferred Intellectual Property (items (i) through (iii), the "***Registered Intellectual Property***," together with all other Intellectual Property Rights owned or purported to be owned by Sellers, collectively the "***Owned Intellectual Property***"). Other than pending applications included in the Registered Intellectual Property, to the Knowledge of Sellers, the Owned Intellectual Property is subsisting, valid and enforceable. No Seller is subject to any Order which (i) permits any third party to use any Owned Intellectual Property or restricts such Seller's ability to enforce its rights with respect to such Transferred Intellectual Property, (ii) restricts or impairs its use of any Owned Intellectual Property, (iii) restricts the Business to accommodate any other Person's Intellectual Property Rights, or (iv) requires any payment by any Seller to any Person in connection with any Intellectual Property Rights of such Person. No Person has alleged, in an Action to which any Seller is a party or otherwise in

writing, that any Owned Intellectual Property is not owned by Sellers or that rights thereto are invalid or unenforceable.

(b)      Sellers exclusively own all right, title and interest in and to all Registered Intellectual Property and Owned Intellectual Property, free and clear of all Liens. To the Knowledge of Sellers, there is no Claim or Action against Sellers pending before any Governmental Authority concerning the ownership, validity, registrability, enforceability, infringement, misappropriation or violation of any Transferred Intellectual Property except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. None of the Transferred Intellectual Property is subject to any outstanding injunction, directive, order, decree, award, settlement or judgment restricting the use or validity thereof, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Sellers have valid, subsisting and enforceable licenses to use all Intellectual Property Rights used in the conduct of the Business that are owned by any third party, including sufficient quantities of seat, server core, or other license units. Sellers are in compliance in all material respects with all such licenses, and all license fees, renewal fees and maintenance fees that have become due have been timely paid by Sellers, including with respect to seat, server core or other unit license restrictions. The consummation of the transactions contemplated by this Agreement will not alter or impair any rights of Sellers to the Transferred Intellectual Property.

(c)      Except as set forth on Schedule 3.12(c), (i) the operation of the Business as currently conducted does not, and the services provided by Sellers do not, infringe, misappropriate, or otherwise violate in any material respect, and have not infringed, misappropriated or otherwise violated in any material respect, the Intellectual Property Rights of any third party, and, to the Knowledge of Sellers, no third party is infringing, misappropriating, or otherwise violating the Owned Intellectual Property, (ii) no Seller and none of their respective Affiliates has received any written communication regarding any actual, alleged or suspected material infringement, misappropriation or other material violation of Intellectual Property Rights of a third party by Sellers, and (iii) no Seller and none of their respective Affiliates has sent any written notice, charge, complaint, claim or other written assertion asserting or threatening to assert in any Actions against any Person regarding the material infringement, misappropriation, dilution or other material violation of any Owned Intellectual Property.

(d)      No current or former Employee or officer of Sellers and no current or former consultant or contractor of Sellers has any right, title or interest in or to any Seller Intellectual Property. No funding, facilities, or personnel of any Governmental Authority or academic or research institution were used to develop or create, in whole or in part, any Owned Intellectual Property.

(e)      Sellers have taken commercially reasonable actions to safeguard and maintain the secrecy and the confidentiality of, and their respective proprietary rights in and to, all non-public Owned Intellectual Property. All current and former Employees and contractors of Sellers and third parties having access to the non-public Owned Intellectual Property have executed and delivered to Sellers a written legally binding agreement regarding the protection of such non-public Owned Intellectual Property. Sellers have implemented and maintain a reasonable security plan consistent with industry practices of companies offering similar products or services. To the Knowledge of Sellers, Sellers have not experienced any breach of security or otherwise unauthorized access by third parties to the non-public Owned Intellectual Property in Sellers' possession, custody or control.

(f)      Sellers have secured from all consultants, advisors, employees and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property Rights for Sellers (each, an "*Author*"), unencumbered and unrestricted exclusive ownership of all of the Authors' Intellectual Property Rights in such contribution that Sellers do not already own by operation of law and have obtained the waiver of all

40

non-assignable rights. No current or former Employee, contractor or consultant of Sellers has a valid claim of ownership over any Owned Intellectual Property, nor has any such claim been asserted in writing.

(g)     The computer software, computer hardware, firmware, networks, interfaces and related systems included in the Purchased Assets (collectively, "**Computer Systems**") are sufficient in all material respects for Sellers' operation of the Business and the Purchased Assets as conducted as of the date hereof and consistent with past practice and, except as set forth on Schedule 3.12(g), to the Knowledge of Sellers, there have been no material failures, crashes, ransomware attacks, security breaches or similar adverse events affecting the Computer Systems. Sellers provide for the backup and recovery of material data and have implemented and maintain commercially reasonable disaster recovery plans, procedures, and facilities. Sellers have taken commercially reasonable steps, as necessary and appropriate, to protect the integrity and security of the Computer Systems and the information stored therein, processed thereon or transmitted therefrom from misuse or unauthorized use, access, disclosure or modification by third parties, and there has been no such misuse or unauthorized use, access, disclosure or modification thereof. None of the Computer Systems are used in any business other than the Business.

3.13    **Environmental Matters**.

(a)     Except as set forth on Schedule 3.13(a), there is no Environmental Claim pending or, to the Knowledge of Sellers, threatened against Sellers or with respect to the Business or the Purchased Assets, including the Owned Real Property and Leased Real Property, except for those which would not, individually or in the aggregate, reasonably be expected to be material to the Business, and all past material Environmental Claims have been resolved in all material respects. The Business and the Purchased Assets, including the Owned Real Property and the Leased Real Property, are and have been in material compliance with all applicable Environmental Laws. To the Knowledge of Sellers, there are no past or present actions, activities, circumstances, conditions, events or incidents, including the Release, presence, handling, management, use, generation, disposal, or arrangement for disposal of any Hazardous Materials at the Facility or any other location that could reasonably be expected to form the basis of any Environmental Claim that would have a Material Adverse Effect or otherwise result in any material costs or liabilities under Environmental Law with respect to the Business or the Purchased Assets.

(b)     Except as set forth on Schedule 3.13(b), and to the Knowledge of Sellers, no Release of Hazardous Material has occurred or is currently occurring or, to the Knowledge of Sellers, threatened at or from any Owned Real Property or Leased Real Property for which Environmental Law requires notice to any Person or any form of Response Action. Sellers have not received any written notice that the operation of the Business has caused the Contamination of any other property which has resulted or would reasonably be expected to result in an Environmental Claim against, or material Liability under Environmental Law for or relating to, the Business or the Purchased Assets. Except as in compliance with Environmental Laws, to the Knowledge of Sellers, there are no (i) polychlorinated biphenyl-containing equipment, (ii) underground storage tanks, or (iii) asbestos-containing material at any Owned Real Property, Leased Real Property, or Purchased Asset.

(c)     Except as otherwise set forth on Schedule 3.13(c), no Seller has, either expressly or by operation of law, assumed responsibility for or agreed to indemnify or hold harmless any Person for any Environmental Liability with respect to the Business or the Purchased Assets.

(d)     Sellers have identified and made available to Purchaser complete and correct copies of all material studies, audits, assessments, reports, data, memoranda and investigations, and other material information relating to Hazardous Materials, Environmental Claims or Environmental Liabilities that are in its possession or control pertaining to, or the environmental condition of, the Business and the

Purchased Assets or the compliance (or noncompliance) by Sellers or any of their respective predecessors or Affiliates with Environmental Laws.

(e)     Except as set forth on Schedule 3.13(e),  to the Knowledge of Sellers, Sellers are not required by any Environmental Law or by virtue of the transactions set forth herein and contemplated hereby, or as a condition to the effectiveness of any transactions contemplated hereby, to (i) remove or remediate Hazardous Materials, (ii) give notice to or receive approval from any Governmental Authority or other Person, or to record any disclosure document or statement pertaining to environmental matters, or (iii) alter, modify, renew, change or update any Environmental Permit, in each case with respect to the Business or the Purchased Assets.

(f)     Schedule 3.13(f) sets forth a true, correct and complete list of all trust agreements with respect to Environmental Liabilities Related to the Business or attributable to a Purchased Asset.

(g)     Sellers (i) hold and are and have been, in material compliance with all Environmental Permits (each of which is in full force and effect and is not subject to appeal, except in such instances where Sellers are contesting the requirement to hold an Environmental Permit in good faith by appropriate, diligently conducted proceedings) required to be held by Sellers under applicable Environmental Law for the operation of the Business or for the ownership, operation, or use of the Facility or the Purchased Assets, or, to the extent currently required, any pending construction or expansion related thereto, (ii) for the past five (5) years has used commercially reasonable efforts to cause all contractors, lessees, and other Persons occupying, operating, or using the Facility to materially comply with applicable Environmental Law and obtain all necessary Permits required under applicable Environmental Law, (iii) has timely renewed or applied to renew any required Environmental Permits, and (iv) has not received any written notice that any Environmental Permits will not be renewed or will be renewed with conditions that are materially more restrictive or that cannot be met without incurring material additional costs.

3.14    **Title to Assets; Sufficiency of Assets; Condition of Assets**.

(a)     Sellers have good and valid legal and beneficial title to, or a valid, binding and enforceable leasehold interest in, as applicable, all of the Purchased Assets, and such Purchased Assets are not subject to any Liens (other than (x) as of the date hereof, Permitted Liens, and (y) as of the Closing Date, Permitted Post-Closing Encumbrances). At the Closing, Purchaser will receive good and valid title to, or in the case of leased assets, good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (other than Permitted Post-Closing Encumbrances), to the fullest extent permissible under Applicable Law, including section 363(f) of the Bankruptcy Code. The Purchased Assets constitute all of the tangible and intangible assets, rights and properties that are used or held for use by Sellers or any of their respective Affiliates in connection with the Business.

(b)     The Purchased Assets are in good working condition and are suitable for the purposes for which they are used (subject to normal wear and tear), including for Purchaser to conduct and operate the Business in the Ordinary Course of Business. The Purchased Assets constitute all of the assets, rights and properties necessary for the conduct of the Business in the Ordinary Course of Business following the Closing.

3.15    **Taxes**. Except to the extent an inaccuracy of the following would neither result in a Lien on any of the Purchased Assets nor a Tax liability to Purchaser or its Affiliates or except as set forth on Schedule 3.15:

(a)     All Income Tax and other material Tax Returns required to be filed by Sellers or otherwise related to the Purchased Assets or the Business have been duly and timely filed and each such

42

Tax Return is true, correct, and complete in all material respects. All Income Tax and other material amounts of Taxes owed by Sellers or otherwise related to the Purchased Assets or the Business for which Purchaser may be liable that are or have become due have been paid in full, and all other Taxes attributable to pre-Closing periods have been fully accrued through Closing on the Financials Statements.

(b)     Sellers do not have in force any waiver of any statute of limitations in respect of Taxes or any extension of time related to a Tax assessment or deficiency with respect to the Purchased Assets or the Business. No extension of time within which to file any Tax Return with respect to the Purchased Assets or the Business is currently in effect. There is no audit, litigation or other Action, Claim, assessment, deficiency, or adjustment pending or asserted or (to the Knowledge of Sellers) proposed or threatened with respect to Taxes of Sellers or otherwise with respect to the Purchased Assets or the Business. All of the Purchased Assets have been properly listed and described on the Property Tax rolls for all periods prior to and including the Closing Date, and no portion of the Purchased Assets constitutes omitted property for Property Tax purposes. There are no Liens for Taxes other than Permitted Post-Closing Encumbrances upon any of the Purchased Assets. Purchaser will not be held liable for any unpaid Taxes that are or have become due on or prior to the Closing Date as a successor or transferee, by statute, contract or otherwise, as a result of the transfer of the Purchased Assets pursuant to this Agreement.

(c)     Other than assets held for resale in the Ordinary Course of Business and motor vehicles, the sale of the Purchased Assets qualifies as an occasional sale pursuant to Texas Comptroller's Sales Tax Rule 34 Tex. Admin. Code § 3.316 and Texas Tax Code § 151.304.

(d)     As of the date hereof, there are no Liens that arose in connection with any failure (or alleged failure) to pay any Tax on any of the assets of Sellers that could result in a Lien or assessment of any Liability for Taxes, reporting or other compliance obligations or any other successor Liability with respect to the Purchased Assets or the Business.

(e)     Sellers have not executed nor entered into any agreement with, or obtained any consents or clearances from, any Governmental Authority, or have been subject to any ruling guidance specific to Sellers, that would be binding on Purchaser for any Taxable period beginning after the Closing.

(f)     Sellers are not party to any Tax allocation or sharing agreement that would be binding on Purchaser for any Taxable period beginning after the Closing.

(g)     No claim has been made within the preceding six (6) years by a Governmental Authority in a jurisdiction where Sellers have not filed a Tax Return with respect to the Purchased Assets or Business that Sellers are or may be subject to Tax by such jurisdiction with respect to the Purchased Assets or Business, nor to the Knowledge of Sellers is any such assertion threatened.

(h)     Sellers, with respect to the Business and the Purchased Assets, have collected all sales and use Taxes required to be collected and have remitted or will remit on a timely basis such amounts to the appropriate Governmental Authority, or have been furnished properly completed exemption certificates or other valid forms of exemption.

(i)     Sellers have, to the extent related to the Purchased Assets or the Business, withheld and paid all Taxes required to be withheld with respect to amounts paid or owing to any Employee, creditor, independent contractor, or other third party and have complied in all material respects with all information reporting and backup withholding provisions of Applicable Law.

(j)     Each Seller has been treated as a disregarded entity for U.S. federal, state, and local income tax purposes since its formation.

(k)      No Seller (or regarded owner of Seller) is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

(l)      No Seller is, and has been, a party to, or a promoter of, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b).

3.16      **Key Business Relationships**.  Schedule 3.16(i) sets forth a true and complete list of (i) the top ten (10) customers of the Business based on revenue collected for the fiscal year period ended December 31, 2024 (each, a "***Key Customer***" and, together, the "***Key Customers***") and the amount of such revenue collected with respect to each Key Customer, and (ii) the top fifteen (15) vendors or suppliers of the Business based on purchases for the fiscal year period ended December 31, 2024 (each, a "***Key Vendor***" and, together, the "***Key Vendors***") and the amount of such disbursements made with respect to each Key Vendor. Except as set forth on Schedule 3.16(ii), (1) no Key Customer has (A) materially decreased or notified Sellers in writing of its intention to materially decrease its aggregate level of purchases of services from Sellers relative to such Key Customer's purchasing history during the 12 months prior to such change, or (B) requested in writing reduced pricing (whether through increased credits or otherwise) from that in effect under an existing Contract; and (2) no Key Vendor has adversely altered or notified Sellers or their respective Affiliates in writing of the foregoing of its intention to adversely alter in any material respect the terms (including price) on which it sells goods or services to the Business. To the Knowledge of Sellers, no facts or circumstances exist that would reasonably be expected to affect any Key Customer's or Key Vendor's solvency or ability to pay its debts.

3.17      **Insurance**. Schedule 3.17 sets forth a true and complete list of all insurance policies maintained by Sellers or their respective Affiliates with respect to the Business, the Employees, or the Purchased Assets (collectively, the "***Insurance Policies***"). Each Insurance Policy is in full force and effect and, except as otherwise set forth on Schedule 3.17, all premiums due to date thereunder have been paid in full and no Seller and none of their respective Affiliates is in material default thereunder. No Seller has received any written notice of cancellation or nonrenewal, in whole or in part, in respect of any Insurance Policy.

3.18      **Brokers and Finders**. Other than as set forth on Schedule 3.18, no agent, broker, investment banker, financial advisor or other firm or Person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission payable by any Seller in connection with the transactions contemplated by this Agreement. Purchaser and its Affiliates shall not be liable for, and no Person is entitled to, any brokerage, finder's, financial advisor's or other similar fee or commission or like payment in connection with the transactions contemplated by this Agreement as a result of any actions taken by or on behalf of Sellers or any of their respective Affiliates.

3.19      **Product Quality**. All products manufactured, fabricated, sold or distributed by the Business prior to the Closing Date comply with applicable customer specifications and Applicable Laws for the intended use of such products, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.20      **Intercompany Agreements**. Other than as set forth on Schedule 3.20, there are no Contracts between Sellers, on the one hand, and any Affiliate of Sellers, on the other hand, relating to the ownership, management, or operation of the Business or the Purchased Assets.

3.21      **Data Privacy**.

(a)      With respect to the Business and the Purchased Assets, Sellers and, to the Knowledge of Sellers, any Person acting for or on Sellers' behalf have for the past three (3) years, as

applicable, materially complied with (i) all applicable Privacy Laws, (ii) all of Sellers' policies and notices regarding Personal Information, and (iii) all of Sellers' contractual obligations with respect to Personal Information. Sellers have not received any written notice of any Claims of or investigations or regulatory inquiries related to, or been charged with, the violation of any Privacy Laws, applicable privacy policies, or contractual commitments with respect to Personal Information in connection with the Business or the Purchased Assets. To the Knowledge of Sellers, there are no facts or circumstances that could reasonably form the basis of any such notice or Claim.

(b)     With respect to the Business and the Purchased Assets, Sellers have (i) implemented and for the past three (3) years, as applicable, maintained reasonable and appropriate technical and organizational safeguards, at least consistent with practices in the industry in which Sellers operate, to protect Personal Information and other confidential data in its possession or under its control against loss, theft, misuse or unauthorized access, use, modification, alteration, destruction or disclosure, and (ii) taken reasonable steps to ensure that any third party with access to Personal Information collected by or on behalf of Sellers have implemented and maintained the same. To the Knowledge of Sellers, any third party who has provided Personal Information to Sellers in connection with the Business or the Purchased Assets has done so in material compliance with applicable Privacy Laws. Except as would not reasonably be expected to be material to the Business or the Purchased Assets, there have been no breaches, security incidents, misuse of or unauthorized access to or disclosure of any Personal Information in the possession or control of Sellers or collected, used or processed by or on behalf of Sellers. Sellers have not provided or been legally required to provide any notices to any Person in connection with a disclosure of Personal Information in violation of Applicable Law in connection with the Business or the Purchased Assets. The transfer of Personal Information in connection with the transactions contemplated by this Agreement will not violate in any material respect any applicable Privacy Laws or Sellers' privacy policies as they currently exist or as they existed at any time during which any of the Personal Information was collected or obtained.

3.22    **Bank Accounts**. Sellers have made available to Purchaser a complete list of all bank accounts (including any deposit accounts, securities accounts and any sub-accounts), safety deposit boxes and lock boxes (in each case, designating each authorized signatory with respect thereto) maintained with respect to the Business.

3.23    **Affiliate Transactions**. Except as set forth on Schedule 3.23, no Affiliate, principal, owner, stockholder, member, partner, director, manager, officer or Employee of any Seller or, to Sellers' Knowledge, any of their respective Affiliates, or any individual related by blood, marriage, or adoption to such Person, is a party to any Assumed Contract.

3.24    **Disclaimer of Additional Representations and Warranties**. EXCEPT AS SPECIFICALLY SET FORTH IN THIS ARTICLE III, THE TRANSACTION DOCUMENTS AND FILINGS MADE IN CONNECTION WITH THE BANKRUPTCY CASES, NO SELLER AND NONE OF THEIR RESPECTIVE AFFILIATES HAS MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE BUSINESS, ANY OF THEIR ASSETS (INCLUDING THE PURCHASED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES), INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR THE ACCURACY OR COMPLETENESS OF ANY PROJECTIONS, ESTIMATES OR OTHER FORWARD LOOKING INFORMATION PROVIDED OR OTHERWISE MADE AVAILABLE TO PURCHASER OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, CONTROLLING PERSONS, AGENTS, OR REPRESENTATIVES AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT PURCHASER IS PURCHASING THE PURCHASED

ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

<div align="center">

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

</div>

Purchaser hereby represents and warrants to Sellers as of the date hereof and as of the Closing, as follows:

4.1  **Due Organization**. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware with all requisite power and authority to own and operate its assets and properties as they are now being owned and operated.

4.2  **Due Authorization**. Purchaser has full power and authority to enter into this Agreement and its Transaction Documents and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and its Transaction Documents have been duly authorized by all necessary entity action of Purchaser. Purchaser has duly and validly executed and delivered this Agreement and has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) its Transaction Documents. This Agreement constitutes the legal, valid and binding obligation of Purchaser, and its Transaction Documents, upon execution and delivery by Purchaser, will constitute legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms, subject to the Enforceability Exceptions.

4.3  **Consents and Approvals; No Violations**.

(a)  Other than the filings and/or notices under the HSR Act, and subject to the issuance of the Sale Order and any other Order required by the Bankruptcy Court in connection with the transactions contemplated hereby, no filing, notice, report, consent, registration, approval, permit or authorization is required to be given, filed or obtained by Purchaser to or from any Governmental Authority in connection with the execution, delivery and performance by Purchaser of this Agreement and the Transaction Documents to which it is a party or the transactions contemplated hereby, except those that the failure to make or obtain would not, individually or in the aggregate, reasonably be expected to materially delay the consummation of the transactions contemplated hereby.

(b)  The execution, delivery and performance by Purchaser of this Agreement does not, and the consummation of the transactions contemplated hereby will not, conflict with, or result in any violation of or default (with or without notice, lapse of time or both) under, or give rise to a right of termination, loss of rights, adverse modification of provisions, cancellation or acceleration of any obligation under (i) any provision of the Organizational Documents of Purchaser, or (ii) subject to the Sale Order, any Law or Order to which Purchaser, except, in the case of clause (i) and (ii) is subject for any such breach, violation, termination, default, creation or acceleration that would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the transactions contemplated by this Agreement.

4.4  **Available Funds**. Purchaser has sufficient cash resources on hand or available to it in an aggregate amount sufficient to pay in cash any and all amounts required to be paid by it pursuant to this Agreement and the Transaction Documents to which it is a party, including the Cash Consideration and all fees and expenses related to the transactions contemplated by this Agreement and the Transaction Documents to which it is a party to be paid by Purchaser.

<div align="center">46</div>

4.5     **Solvency**. As of the Closing and immediately after consummating the transactions contemplated by this Agreement and the other transactions contemplated by the Transaction Documents, Purchaser will not (a) be insolvent as defined in Section 101 of the Bankruptcy Code; (b) have unreasonably small capital with which to engage in its business; or (c) have incurred debts beyond its ability to repay such debts as they become absolute and matured.

4.6     **Investigation; Limitation on Warranties**.

(a)     Purchaser acknowledges and agrees that no Seller and none of their respective Affiliates or representatives has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Sellers, the Business, or the Purchased Assets, except as expressly set forth in this Agreement or the Transaction Documents.

(b)     Purchaser acknowledges and agrees that except for the representations and warranties of Sellers expressly set forth in this Agreement and the Transaction Documents, the Purchased Assets are being acquired AS IS WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR INTENDED USE OR OTHER EXPRESSED OR IMPLIED WARRANTY.

(c)     In connection with Purchaser's investigation of Sellers and the Business, Purchaser has received from or on behalf of Sellers certain projections, including projected statements of operating revenues and income from operations of the Business and certain business plan information of Sellers. Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, and that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

4.7     **Brokers and Finders**. No agent, broker, investment banker, financial advisor or other firm or Person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Sellers or any of their respective Affiliates could become liable in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Purchaser or any of its Subsidiaries.

## ARTICLE V
## COVENANTS

5.1     **Access to Information and the Facility**.

(a)     From the date of this Agreement to the earlier of the Closing Date or the date this Agreement is terminated, Sellers shall give Purchaser and its representatives, upon reasonable advance written notice, reasonable access during normal business hours to the offices, the Facility, the Purchased Assets, the Employees, and books and records of or Related to the Business (including financial, operating, and other data and information related to the Purchased Assets and the Assumed Liabilities), and shall make the officers and Employees of Sellers available to Purchaser and its representatives as Purchaser and its representatives shall from time to time reasonably request, in each case to the extent that such access and disclosure would not obligate Sellers to take any actions that would unreasonably disrupt the normal course of the Business or violate the terms of any contract to which Sellers are bound or any Applicable Law.

(b)     Nothing in this Section 5.1 shall require Sellers to take any such action if (i) such action (1) could result in a waiver or breach of any attorney-client, attorney work product, or other legally recognized privileges or immunity from disclosure, or (2) would result in the disclosure of any Trade

Secrets of third parties or violate any Applicable Laws related to the exchange of information or any obligation of Sellers with respect to confidentiality, or (ii) such access or information is requested in relation to disputes involving Sellers (or any of them), its equity holders or any of their respective Affiliates in disputes arising under this Agreement or any other Transaction Document.

5.2    **Interim Operations of the Business**.

(a)    Except (i)(1) as required by Applicable Law, (2) as required by the DIP Credit Agreement or the Prepetition Documents (to the extent then in effect), or (3) as authorized by any Order of the Bankruptcy Court, which Order is consistent with this Agreement, (ii) as otherwise expressly contemplated by this Agreement, (iii) with the prior written consent of Purchaser, or (iv) as set forth on Schedule 5.2, during the period from the date of this Agreement until the earlier of the Closing Date or the date this Agreement is terminated, Sellers will: (A) conduct the Business in the Ordinary Course of Business and maintain and preserve the Purchased Assets in their current condition, ordinary wear and tear excepted; (B) preserve in all material respects the present business operations, organization and goodwill of the Business, and the present relationships with the Employees, Key Customers and Key Vendors of the Business; and (C) maintain their books, accounts, and records in the Ordinary Course of Business.

(b)    Notwithstanding Section 5.2(a), except (i)(1) as required by Applicable Law, (2) as required by the DIP Credit Agreement or the Prepetition Documents (to the extent then in effect), or (3) as authorized by any Order of the Bankruptcy Court, which Order is consistent with this Agreement, (ii) as otherwise expressly contemplated by this Agreement, including the actions contemplated by the proviso in Section 8.1(j), or any other Transaction Document, (iii) with the prior written consent of Purchaser, or (iv) as set forth on Schedule 5.2, during the period from the date of this Agreement until the earlier of the Closing Date or the date this Agreement is terminated, no Seller shall take any of the following actions:

(i)    sell, lease, transfer, mortgage, pledge, assign, exclusively license or otherwise dispose of or encumber any of the Purchased Assets, including the Owned Real Property and Leased Real Property (or permit any of the Purchased Assets to become subject to any additional Liens, other than in respect of Permitted Post-Closing Encumbrances (including, for the avoidance of doubt, Liens arising in connection with the DIP Credit Agreement)), other than (1) dispositions of inventory in the Ordinary Course of Business, or (2) dispositions not relating to any Owned Real Property or any Leased Real Property, in each case, of less than $100,000 individually or $250,000 in the aggregate;

(ii)    enter into any new Contract that would constitute a Material Contract if entered into prior to the date of this Agreement, or amend or modify any Material Contract (other than in any such cases involving any Excluded Contract);

(iii)    make or authorize any payment of, or accrual or commitment for, capital expenditures, other than capital expenditures contemplated by the then Approved Budget as of the date of this Agreement and set forth on Schedule 5.2(b)(iii);

(iv)    except as required pursuant to the terms of any Benefit Plan in effect as of the date hereof or as otherwise required by Applicable Law, (1) grant or announce any increase in the compensation (other than salary increases in the Ordinary Course of Business consistent with past practice and not to exceed $25,000 in the aggregate) or benefits (including severance or termination pay) of, or grant new retention awards, incentive awards or severance or termination pay to, any Scheduled Employee, (2) become a party to, establish, adopt, amend, commence participation in or terminate any Benefit

Plan or any arrangement that would have been a Benefit Plan had it been entered into prior to this Agreement, (3) take any action to accelerate the vesting or lapsing of restrictions or payment, or fund or in any other way secure the payment, of compensation or benefits of any Scheduled Employee, (4) forgive any loans or issue any loans (other than routine travel advances issued in the Ordinary Course of Business) to any director, officer or Scheduled Employee, (5) hire any individual who would be a Scheduled Employee, or change the terms of employment of any Employee so that he, she, or they would become a Scheduled Employee (other than in the Ordinary Course of Business for any Scheduled Employee, in each case, with annual compensation not exceeding $150,000), (6) terminate the employment of any Scheduled Employee (excluding hourly Employees) other than for cause (other than in the Ordinary Course of Business), or (7) become a party to, establish, adopt, amend, terminate, extend or commence participation in any Labor Agreement covering any Scheduled Employee;

(v)     implement any layoffs of Employees that implicate the WARN Act;

(vi)     waive, release, assign, settle, or compromise any material Claim or Action relating to the Business to the extent that such waiver, release, assignment, settlement, or compromise (1) imposes any binding obligation or restriction, whether contingent or realized, on the Business, the Purchased Assets, and/or Purchaser, or (2) waives or releases any material rights or claims that would constitute Purchased Assets;

(vii)     with respect to the Business or the Purchased Assets, make (other than in the Ordinary Course of Business consistent with past practice) or change any Tax election, file any amended Tax Return, enter into any closing agreement, settle any Tax claim or assessment, surrender any right to claim a refund of Taxes, or, other than in the Ordinary Course of Business, consent to any extension or waiver of the limitation period applicable to any material Tax claim or assessment;

(viii)     assume, reject, or assign any Assumed Contract other than pursuant to Section 2.7;

(ix)     (1) adjust, split, combine, or reclassify the Equity Interests of any Seller, (2) redeem, purchase, or otherwise acquire, directly or indirectly, any Equity Interests or any securities convertible or exchangeable into or exercisable for any Equity Interests of any Seller, (3) grant any Person any right or option to acquire any Equity Interests of any Seller, or (4) issue, deliver, or sell any additional Equity Interests or any securities convertible or exchangeable into or exercisable for any Equity Interests of any Seller;

(x)     amend or authorize the amendment of its or its Subsidiaries' articles of organization, bylaws, or operating agreement (or similar Organizational Documents);

(xi)     change its accounting policies or procedures, other than as required by GAAP or Applicable Law;

(xii)     (1) materially amend or materially modify any pricing policies or delay or postpone payment of any trade accounts payables or commissions or any other Liability, or enter into any agreement with any Person to extend the payment date of any trade accounts payables or commissions or any other Liability, or (2) accelerate the collection or receipt of, or cancel or discount, any Accounts Receivable, in each case, outside of the Ordinary Course of Business;

(xiii)   grant any refunds in excess of $100,000 in the aggregate other than in the Ordinary Course of Business or grant any credits, rebates, or other allowances in excess of $100,000 in the aggregate other than to the extent set forth in the terms of any Contract, in each case, to any end user, customer, reseller, or distributor;

(xiv)   acquire (by merger, consolidation, acquisition of stock or assets or otherwise) any Person or division;

(xv)   incur, assume, or guarantee any Indebtedness (other than under the DIP Credit Agreement);

(xvi)   (1) amend, modify, terminate, or fail to exercise any renewal option with respect to any Real Property Lease; or (2) enter into any lease, sublease, license, or agreement to use or occupy real property;

(xvii)   except in the Ordinary Course of Business, cancel, surrender, allow to expire, or fail to renew any Permit that is Related to the Business;

(xviii)   propose or adopt a plan of complete or partial liquidation or dissolution, merger, consolidation, restructuring, recapitalization, or other reorganization;

(xix)   enter into a joint venture, partnership, joint development program, or similar transaction;

(xx)   enter into, modify or amend any Contract between Sellers and any Affiliates; or

(xxi)   authorize, or commit or agree to take, any of the foregoing actions.

5.3   **Cooperation; Status Updates; Regulatory Filings; Consents**.

(a)   <u>Cooperation</u>. Subject to the terms and conditions set forth in this Agreement, the Parties shall cooperate with each other and use their respective commercially reasonable efforts to: (i) take or cause to be taken all actions reasonably necessary, proper or advisable on their part under this Agreement or Applicable Law to consummate the transactions contemplated hereby as promptly as reasonably practicable in accordance with the Bidding Procedures; (ii) execute, acknowledge, and deliver in proper form any further documents, certificates, agreements, and other writings, and take such other action as such other Party may reasonably require, in order to effectively carry out the intent of the Transaction Documents; (iii) make or cause to be made all registrations, filings, notifications, submissions, and applications with, give all notices to and obtain any consents, governmental transfers, approvals, orders, qualifications, and waivers from any Governmental Authority necessary for the consummation of the transactions contemplated hereby (including, any consent, clearance, expiration or termination of a waiting period, authorization, order or approval of, or any exemption by, any Governmental Authority, under the HSR Act or other competition Laws); (iv) not take any action prior to the Closing that would reasonably be expected to prevent, materially impair, or materially delay the consummation of the transactions contemplated hereby, except to the extent such action is otherwise expressly contemplated by this Agreement or the Bidding Procedures; (v) provide the other Party with cooperation and take such actions as such other Party may reasonably request in connection with the consummation of the transactions contemplated hereby and by the other Transaction Documents; and (vi) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated hereby and by the other Transaction Documents.

(b)   Status Updates. Each of Sellers and Purchaser shall promptly notify the other Party or Parties, as applicable, of the occurrence, to such Parties' or Party's, as applicable, knowledge, of any event or condition, or the existence of any fact or circumstance, that would reasonably be expected to result in any of the conditions set forth in Article VI or Article VII not being satisfied as of the Termination Date.

(c)   Regulatory Filings.

(i)   Sellers and Purchaser shall prepare and file as promptly as practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, clearances, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any Governmental Authority in order to consummate the transactions contemplated hereby, including, (1) all filings pursuant to the HSR Act within ten (10) Business Days after the date of this Agreement (subject to Sellers and Purchaser supplying as promptly as practicable (but no later than five (5) Business Days after the date such information is requested) any information and documentary material that may be requested by the other Party in connection with such filings), and (2) all other filings for required competition or other governmental approvals as promptly as practicable after the date of this Agreement. Sellers and Purchaser shall request early termination of the waiting period with respect to the transactions contemplated hereby under the HSR Act. Whether or not the transactions contemplated hereby are consummated, Purchaser shall be responsible for all fees and payments to any Governmental Authority (including filing fees) in each case, relating to filing under the HSR Act or similar competition Law.

(ii)   Subject to Applicable Law, Sellers and Purchaser shall cooperate with each other and shall promptly furnish to the other Party all information necessary or desirable in connection with making any filing under the HSR Act or with making any other filing to be made pursuant to any competition or investment review Law, and in connection with resolving any investigation or other inquiry by any Governmental Authority under any competition or investment review Laws with respect to the transactions contemplated by this Agreement. Each of the Parties shall promptly inform the other Party of any substantive communication with any Governmental Authority regarding any such filings relating to the HSR Act or other competition Laws or any such transaction. To the extent practicable, neither any Seller nor Purchaser shall participate in any meeting with any Governmental Authority in respect of any such filings, investigation, or other inquiry without giving the other Party prior notice of the meeting. Such other Party shall be permitted to participate in any meeting with any Governmental Authority in respect of any such filings, investigation, or other inquiry relating to the HSR Act or other competition Laws, to the extent permitted by such Governmental Authority. The Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions, and proposals made or submitted by or on behalf of any Party in connection with all meetings, actions, and proceedings under or relating to the HSR Act or other competition Laws (including, with respect to making a particular filing, by providing copies of all such documents to the non-filing Party and their advisors prior to filing and, if requested, giving due consideration to all reasonable additions, deletions or changes suggested in connection therewith); provided, that the Parties shall not be required to provide to each other any confidential information or business secrets, which information shall be provided on an outside counsel-only basis; provided, further, that Purchaser shall have primary responsibility for directing and implementing the general strategy for obtaining all consents, clearances, registrations,

approvals, permits, and authorizations necessary or advisable to be obtained from any Governmental Authority in order to consummate the transactions contemplated hereby.

(d)    Contract Cooperation. Prior to the Designation Deadline, Sellers shall reasonably cooperate with Purchaser, to the extent reasonably requested by Purchaser, to identify all Identified Contracts with a Key Customer or Key Vendor for the purposes of assisting Purchaser to designate such Contracts as either Additional Assumed Contracts or Additional Rejected Contracts.

(e)    Sellers will use their commercially reasonable efforts, and Purchaser will cooperate with Sellers, to obtain at the earliest practicable date all Required Consents (including any consents and approvals necessary to transfer or reissue any Permits).

5.4    **Preservation of Records; Post-Closing Access and Cooperation**.

(a)    For a period of six (6) years after the Closing Date or such other period (if longer) required by Applicable Law, Purchaser shall preserve and retain all corporate, accounting, legal, auditing, human resources and other books and records included in the Purchased Assets that are in its possession relating to the Business and the Purchased Assets prior to the Closing Date. Purchaser shall, after the Closing Date, (i) permit Sellers' and their respective representatives (collectively, the "***Permitted Access Parties***") reasonable access, for the purpose of Sellers' tax reporting requirements, financial accounting and compliance with Applicable Law (including with respect to Sellers' wind-down and related activities), to the material financial and other books and records included in the Purchased Assets that are in its possession, during regular business hours and upon reasonable advance written notice, which access shall include (1) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may reasonably request in furtherance of the purposes described above, and (2) Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they may reasonably request in furtherance of the purposes described above, but only to the extent the applicable Permitted Access Party reimburses Purchaser for the reasonable costs and expenses thereof, and (ii) provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to a representative during regular business hours and upon reasonable advance written notice so that Sellers and the other Permitted Access Parties have information necessary for the preparation of Tax Returns, collection of those Accounts Receivable that are Excluded Assets, and other activities in connection with the administration and wind-down of the Bankruptcy Cases (including the prosecution or processing of insurance/benefit claims); *provided*, that such access does not unreasonably interfere with Purchaser's operation of the Business and Purchaser shall not be required to provide access for requests unrelated to the Business or the Purchased Assets.

(b)    Nothing in this Section 5.4 shall require Purchaser to take any such action if (i) such action (1) could result in a waiver or breach of any attorney-client, attorney work product, or other legally recognized privileges or immunity from disclosure, or (2) would result in the disclosure of any Trade Secrets of third parties or violate any Applicable Laws related to the exchange of information or any obligation of Purchaser with respect to confidentiality, or (ii) such access or information is requested in relation to disputes involving Purchaser, its equity holders or any of their respective Affiliates or the Business or the Purchased Assets, including disputes arising under this Agreement or any other Transaction Document.

5.5    **Employees and Benefits**.

(a)    As of the Closing, Sellers shall terminate the employment of all of those Employees identified on Schedule 5.5(a) (the "***Subject Employees***"). Schedule 5.5(a) hereto shall be amended from time to time prior to the Closing (i) to delete any individuals who are no longer employed

by Sellers, or (ii) upon written notice from Purchaser to Sellers, to add or remove any other individuals. Purchaser, in cooperation with Sellers, shall, at least five (5) Business Days prior to the Closing Date and effective as of the Closing Date, extend a written offer of employment to those Employees selected by Purchaser, in its sole and absolute discretion (the "**Selected Employees**"), at a level and with responsibilities that are substantially commensurate with their employment with Sellers and at a wage or salary and bonus opportunity that is substantially comparable to the respective wage or salary and bonus opportunity specified for such Selected Employees on Schedule 5.5(a) and with other benefits substantially comparable to those provided to similarly situated Employees of Purchaser. Those Selected Employees who accept offers of employment with Purchaser and who become Employees of Purchaser as of the Closing Date are referred to as "**Transferred Employees**."  Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Purchaser any obligation to retain any Transferred Employee in its employment for any amount of time or on any terms and conditions of employment. Purchaser shall assume, honor and be solely responsible for paying, providing and satisfying when due all compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, personal days, sick pay and other paid time off, benefits and benefit claims, severance and termination pay, notice, and benefits (including any employer Taxes or other payments related thereto), in each case, accruing, incurred or arising as a result of employment or separation from employment with Purchaser after the Closing Date with respect to Transferred Employees. For the avoidance of doubt, all Liabilities arising in respect of periods on or prior to the Closing Date relating to the employment with, termination of employment with, application for employment with or any other employment or labor-related Liabilities, including severance, with respect to any current or former Employee or other service provider of Sellers and their Affiliates (excluding any Transferred Employees) shall be retained by Sellers and their Affiliates on the Closing Date, and Sellers and their Affiliates shall be solely responsible for such Liabilities.  All Liabilities arising in respect of periods after the Closing Date relating to the employment with, termination of employment with, application for employment with or any other employment or labor-related Liabilities, including severance, with respect to any Transferred Employee, shall be the obligation of Purchaser.

(b)     It is understood and agreed between the Parties that all provisions contained in this Agreement with respect to Benefit Plans or Employee compensation are included for the sole benefit of the respective Parties hereto and do not and shall not create any right in any other Person, including, but not limited to, any Employee, any participant in any benefit or compensation plan or any beneficiary thereof, including any right to any continued employment with Purchaser or compensation or benefits of any nature or kind whatsoever.

(c)     Purchaser shall not at any time prior to sixty (60) days after the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act affecting in whole or in part any facility, site of employment, operating unit or Employee of the Business without complying fully with the requirements of the WARN Act. Purchaser shall be solely responsible for, and will bear the entire cost of, compliance with (or failure to comply with) any such laws following the Closing Date.

(d)     Prior to the Closing, Sellers shall cooperate in good faith with and provide reasonable assistance to Purchaser in connection with and to facilitate Purchaser's and/or its Affiliates' establishment of new health, welfare and retirement plans for the Transferred Employees (including, without limitation, Sellers' prompt execution and delivery of broker access and change of broker forms in respect of Benefit Plans in form and content reasonably satisfactory to Sellers and the delivery of claims and other participant information, in each case, as reasonably requested by Purchaser and not prohibited or restricted by applicable law).

(e)     To the extent permissible under the Benefit Plans as of the Closing Date, Purchaser shall administer COBRA continuation coverage (other than with respect to flexible spending accounts) for

M&A Qualified Beneficiaries (as defined in COBRA) that both (i) are Subject Employees (and not probationary or inactive Employees as of the Closing Date), and (ii) were not made offers of employment by Purchaser in accordance with Section 5.5(a).

5.6     **Confidentiality**. The Parties acknowledge and agree that from and after the Closing, all non-public information relating to the other Parties, including, in respect of Purchaser, the Business, the Purchased Assets, and the Assumed Liabilities, is valuable and proprietary to the respective Party and its respective Affiliates, including any and all confidential and proprietary information that relates to the actual or anticipated business and/or products, research, or development of the Business, or to any technical data, trade secrets, or know-how, is valuable and proprietary to the respective Party and its respective Affiliates. Each Party agrees that, from and after the Closing, each Party and its representatives will hold in confidence, will not disclose to any Person and will not use any information relating to the other Party and its Affiliates, the Business, the Purchased Assets, or the Assumed Liabilities, except as required by Applicable Law or Order or Bankruptcy Court requirement, or as otherwise becomes available in the public domain other than through any action by any Party in violation of its obligations under this Section 5.6.

5.7     **Public Announcements**. Purchaser and Sellers will consult with each other before issuing any press release or otherwise making any public statements or disclosures with respect to the transactions contemplated by this Agreement, including the terms hereof, and no Party shall, without the prior written consent of the other Party, issue any such press release or make any such public statement, except as may be required by Applicable Law; *provided, however*, that Sellers may make public statements or disclosures with respect to this Agreement and the transactions contemplated herein as may be necessary or advisable in connection with the Bankruptcy Cases, including, without limitation, to comply with the Bid Procedures Order and/or in seeking issuance of the Sale Order.

5.8     **Tax Matters**.

(a)     Transfer Taxes. To the extent that any sales, purchase, transfer, stamp, documentary stamp, registration, use or similar taxes (collectively, the "***Transfer Taxes***") are payable by reason of the sale of the Purchased Assets under this Agreement, such Transfer Taxes shall be borne by Purchaser. The Party responsible under Applicable Law shall timely file all Tax Returns related to any Transfer Taxes with the appropriate taxing authority. The Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available under the Bankruptcy Code unless otherwise indicated in the Sale Order. Purchaser and Sellers will reasonably cooperate in good faith prior to Closing to determine the amount of Transfer Taxes required to be paid in connection with the transactions contemplated by this Agreement and to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes that might otherwise be imposed in connection with the transactions contemplated by this Agreement, including by soliciting and providing appropriate resale exemption certificates or other evidence acceptable to Purchaser or Sellers, as appropriate, of exemption from such Transfer Taxes.

(b)     Property Taxes. All Property Taxes levied with respect to the Purchased Assets for any Taxable period falling entirely within the period ending on or before the Closing Date shall be the responsibility of Sellers. All Property Taxes levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date will be prorated based on the number of days in such period that occur on or before the Closing Date, on the one hand, and the number of days in such period that occur after the Closing Date, on the other hand, the amount of such Property Taxes allocable to the portion of the period ending on or before the Closing Date being the responsibility of Sellers and the remainder being the responsibility of Purchaser. If the exact amount of any Property Taxes is not known on the Closing Date, such Taxes shall be estimated based upon the best available information at the time of Closing (*i.e.*, the Taxable value currently assigned to the real property). There shall be no re-proration of Property Taxes after Closing. The

amount of such Property Taxes allocable to Sellers pursuant to this Section 5.8(b) that have not been paid prior to Closing, if any, shall be paid to the appropriate Governmental Authority by Purchaser, but shall result in a reduction of the Cash Consideration in like amount. Purchaser shall be responsible for the preparation and timely filing of any Tax Returns and the payment to the applicable Governmental Authority of all Property Taxes that become due and payable after the Closing Date. Sellers shall be responsible for the preparation and timely filing of any Tax Returns and payment to the applicable Governmental Authority of all Property Taxes that become due and payable on or prior to the Closing Date.

(c)       Cooperation and Audits. Purchaser and Sellers will cooperate fully with each other regarding Tax matters and will make available to the other as reasonably requested all information, records, and documents relating to Taxes with regard to the Purchased Assets and the Transferred Employees until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals, or litigation with respect to such Taxes. Notwithstanding anything in this Section 5.8(c) to the contrary, Sellers, Purchaser and their respective Affiliates shall not be required to provide to Sellers and their Affiliates or Purchaser and its Affiliates, as the case may be, any records, Tax Returns or any other information related to Taxes, in each case, to the extent such records, Tax Returns, or other information do not relate to the Business, Purchased Assets or the Transferred Employees.

(d)       Preparation of Tax Returns and Payment of Taxes.

(i)       Sellers shall prepare and timely file (i) all Tax Returns with respect to the Purchased Assets and the Business for any Tax period ending on or before the Closing Date (the "***Applicable Seller Prepared Returns***") (and Purchaser shall cooperate with Sellers in causing such Tax Returns to be filed) and (ii) all Income Tax Returns of Sellers and their Affiliates. Sellers shall provide Purchaser with a draft of all Applicable Seller Prepared Returns at least thirty (30) days (or such shorter period of time as is reasonably practicable) prior to the filing of any such Tax Return. Sellers shall incorporate any changes reasonably requested by Purchaser with respect to such Tax Returns that are supported at a "more likely than not" (or higher) level of confidence and consistent with past practice. As between Sellers and Purchaser, unless such Taxes are an Assumed Liability as set forth in Section 2.3, Purchaser shall not be responsible for paying any Taxes shown on any Tax Return Sellers are obligated to file under this Section 5.8(d)(i).

(ii)       Except as otherwise provided by Section 5.8(a), Purchaser shall prepare and timely file all Tax Returns with respect to the Purchased Assets and the Business for any Tax period ending after the Closing Date, excluding, for the avoidance of doubt, any Income Tax Returns of Sellers. With respect to any Tax period beginning before and ending on or after the Closing Date, Purchaser shall prepare such Tax Returns consistent with past practice unless otherwise required by Applicable Law, and shall provide Sellers or their successors in rights, as applicable, with a draft of such Tax Returns at least thirty (30) days prior to the filing of any such Tax Return to the extent any Seller or its successor in rights could reasonably be expected to be liable for any such Taxes under this Agreement. Purchaser shall incorporate any changes reasonably requested by Sellers with respect to such Tax Returns that are supported at a "more likely than not" (or higher) level of confidence and consistent with past practice. Purchaser shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 5.8(d)(ii) to the extent constituting an Assumed Liability.

5.9       **Use of Names and Marks**. As soon as reasonably practicable after the Closing, but in no event more than thirty (30) Business Days after the Closing, Sellers shall cause an amendment to the certificate or articles of incorporation or formation (or any equivalent organizational documents) of Sellers

to be filed with the appropriate Governmental Authority and shall take all other action necessary to change Sellers' legal, registered, assumed, trade and "doing business as" name, as applicable, to a name or names not containing any Transferred Intellectual Property, including "Gladieux Metals Recycling," "Aleon Renewable Metals," "GMR," "Aleon," or any name confusingly similar to the foregoing, and will cause to be filed as soon as practicable after the Closing, in all jurisdictions in which Sellers are qualified to do business, any documents necessary to reflect such change in its legal, registered, assumed, trade and "doing business as" name, as applicable, or to terminate its qualification therein. Sellers further agree that from and after the Closing, Sellers and their respective Affiliates will cease to make any use of all Transferred Intellectual Property, the names "Gladieux Metals Recycling," "Aleon Renewable Metals," "GMR," "Aleon," and any similar names indicating affiliation with Purchaser, any of its Affiliates, the Business, the Purchased Assets, or the business or activities engaged in by Purchaser or any of its Affiliates, other than to make limited factual statements regarding the historical relationship between Sellers and the Business.

5.10   **No Successor Liability**. The Parties hereto agree that the Sale Order shall provide that, to the fullest extent permitted by Applicable Law (including under section 363(f) of the Bankruptcy Code), (a) Purchaser shall not be liable for any Liability or Lien (other than Assumed Liabilities) against Sellers or any of their respective predecessors or Affiliates, and (b) Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets, or any liabilities of Sellers arising prior to the Closing Date.

5.11   **Purchased Assets held by Affiliates**. Without limiting any Seller's obligations under Section 10.9 hereof, in the event that an Affiliate of Sellers  (including Parent) owns or holds any assets rights or properties that, if owned or held by Sellers at the Closing, would constitute Purchased Assets ("*Wayward Assets*"), Parent shall cause each such Affiliate to transfer and assign, for no additional consideration, such Wayward Assets to Purchaser by transfer documents in form and content not inconsistent with the terms and provisions hereof and otherwise in form and content reasonably requested by Purchaser.

5.12   **Insurance Matters**.

(a)   Sellers shall, and shall cause their Affiliates to, assign, to the extent assignable, to Purchaser any and all proceeds owing to Sellers under Sellers' or any of their respective Affiliates' third-party insurance policies written prior to the Closing in connection with (i) the damage or destruction of any of the Purchased Assets from and after the date of this Agreement and prior to the Closing that is, or would have been but for such damage or destruction, included in the Purchased Assets, or (ii) any Assumed Liability (other than, in the case of this clause (ii), where insurance proceeds are directly or indirectly funded by Sellers or any of their respective Affiliates through self-insurance or other similar arrangement). If such proceeds are not assignable, Sellers agree to pay any such proceeds received by them or any of their respective Affiliates to Purchaser promptly upon the receipt thereof.

(b)   From and after the Closing Date, Sellers agree that, with respect to acts, omissions, events, or circumstances relating to the Business and the Purchased Assets that occurred or existed on or prior to the Closing, whether known or unknown, and that are covered by the Insurance Policies, each Seller shall (or shall cause its Affiliates to) make claims under such insurance policies on behalf of Purchaser, subject to all of the terms and conditions of such Insurance Policies and this Agreement. Sellers shall take no action following the Closing that may invalidate coverage of the Business or the Purchased Assets under the Insurance Policies; *provided*, *however*, that the Insurance Policies shall be permitted to lapse in accordance with their respective terms.

5.13     **Title Insurance Policies**.  From the date of this Agreement to the earlier of the Closing Date or the date this Agreement is terminated, Sellers shall use commercially reasonable efforts to cooperate with Purchaser, at Purchaser's sole expense and at no cost, expense, or liability to Sellers, in Purchaser's efforts to obtain any title commitments, title policies (including endorsements thereto), and surveys with respect to the Transferred Owned Real Property, including by providing reasonable affidavits and other similar instruments as are reasonably required by the Title Company for the issuance of customary endorsements to such title policies reasonably requested by Purchaser, or for the deletion of any standard or printed exceptions in Purchaser's title insurance policies that are customarily deleted by virtue of a seller delivering such instruments in commercial real estate transactions in the state in which the Transferred Owned Real Property which is the subject of such policy is located (including, without limitation, any statements within such affidavits or other similar instruments with respect to any customary factual statements regarding unpaid bills or claims for labor or services performed or materials furnished or delivered to the Transferred Owned Real Property during applicable statutory lien periods and contracts for the making of repairs or improvements on the Transferred Owned Real Property to the extent reasonably required by the Title Company in order to remove any exceptions, and provide customary coverage, related to mechanics' liens or other similar liens).

5.14     **Refunds and Remittances**. To the extent Sellers, on the one hand, and Purchaser or any Purchaser Designee, on the other hand, receives any payment to which the other Party is entitled, each of Purchaser or the applicable Purchaser Designee, on the one hand, and Sellers, on the other hand, agree to promptly remit the proceeds to the other party, as appropriate. The Parties acknowledge and agree there is no right of offset regarding such payments and a party may not withhold funds received from third parties for the account of the other Party in the event there is a dispute regarding any other issue under this Agreement or any other agreement or document contemplated hereby. The provisions of this <u>Section 5.14</u> shall not apply with respect to Taxes.

## ARTICLE VI
## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser at Closing under this Agreement are subject to the satisfaction (or waiver by Purchaser) of the following conditions precedent on or before the Closing Date:

6.1     **Accuracy of Representations**. (a) The representation and warranty of Sellers made in the second sentence of <u>Section 3.7</u> shall be true and correct in all respects on and as of the Closing; (b) the Fundamental Representations shall be true and correct in all respects (other than in *de minimis* respects) on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all respects (other than in *de minimis* respects) as of such earlier date; and (c) all other representations of Sellers contained in this Agreement (without giving effect to any materiality limitations, such as "material," "in all material respects," and "Material Adverse Effect" set forth therein) shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except for any failure of any such representation and warranty to be so true and correct that has not had and would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect.

6.2     **Compliance with Agreements and Covenants**. Sellers shall have performed and complied in all material respects with all of the covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date including delivery of the documents referred to in <u>Section 2.8(b)</u>.

6.3    **No Prohibition**. No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit or proceeding shall be pending which would be reasonably expected to prohibit, the consummation of the transactions contemplated hereby.

6.4    **Waiting Periods; Required Consents**. The waiting period (and any extension thereof) applicable to the consummation of the transactions contemplated hereby under the HSR Act shall have expired or been earlier terminated, and the Required Consents shall have been received.

6.5    **Entry of Sale Order**. The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been vacated, reversed, stayed, modified or amended as of the Closing Date, and shall have become final and no longer be subject to (or subject to a pending) appeal, vacatur, reversal or motion for reconsideration.

6.6    **No Material Adverse Effect**. Since the date of this Agreement, no Material Adverse Effect shall have occurred.

Any waiver of a condition by Purchaser shall be effective only if such waiver is stated in writing and signed by Purchaser; *provided*, *however*, that the consent of Purchaser to the Closing shall constitute a waiver by Purchaser of any conditions to Closing as to Purchaser not satisfied as of the Closing Date.

## ARTICLE VII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligations of Sellers at Closing under this Agreement are subject to the satisfaction (or waiver in writing by Sellers) of the following conditions precedent on or before the Closing Date:

7.1    **Accuracy of Representations**. The representations and warranties of Purchaser contained in this Agreement shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except for any failure of any such representation and warranty to be so true and correct as would not, individually or in the aggregate, reasonably be expected to adversely affect, materially delay or prevent the ability of Purchaser (a) perform its obligations under this Agreement or any other Transaction Document, or (b) consummate the transactions contemplated by this Agreement or any other Transaction Document.

7.2    **Compliance with Agreements and Covenants**. Purchaser shall have performed and complied in all material respects with all of its covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date, including delivery of the documents referred to in <u>Section 2.8(c)</u> hereof.

7.3    **No Prohibition**. No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit or proceeding shall be pending which would be reasonably expected to prohibit, the consummation of the transactions contemplated hereby.

7.4    **Entry of Sale Order**. The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been vacated, reversed, stayed, modified or amended as of the Closing Date, and shall have become final and no longer be subject to (or subject to a pending) appeal, vacatur, reversal or motion for reconsideration.

7.5     **Waiting Periods; Required Consents**. The waiting period (and any extension thereof) applicable to the consummation of the transactions contemplated hereby under the HSR Act shall have expired or been earlier terminated, and the Required Consents shall have been received.

Any waiver of a condition by Sellers shall be effective only if such waiver is stated in writing and signed by Sellers; *provided*, *however*, that the consent of Sellers to the Closing shall constitute a waiver by Sellers of any conditions as to Sellers to Closing not satisfied as of the Closing Date.

## ARTICLE VIII
## TERMINATION

8.1     **Termination**. This Agreement may be terminated at any time on or prior to the Closing Date:

(a)     With the mutual written consent of Purchaser and Sellers;

(b)     By either Purchaser or Sellers if the Closing shall not have occurred on or before sixty (60) days after the Petition Date (as may be extended pursuant to Section 8.1(j)) (the "***Termination Date***"); *provided*, that the right to terminate this Agreement under this Section 8.1(b) shall not be available to any Party whose failure to fulfill any obligation under this Agreement has been the primary cause of, or materially contributed to, the failure of the Closing to occur on or before the Termination Date;

(c)     By Sellers, if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants, or other agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 7.1 or Section 7.2, and (ii) has not been or is incapable of being cured by Purchaser within ten (10) Business Days after its receipt of written notice thereof from Sellers;

(d)     By Purchaser, if Sellers shall have breached or failed to perform any of their representations, warranties, covenants, or other agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 6.1 or Section 6.2, and (ii) has not been or is incapable of being cured by Sellers within ten (10) Business Days after their receipt of written notice thereof from Purchaser;

(e)     By Sellers, if (i) all of the conditions set forth in Article VI have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing), and (ii) Purchaser fails to proceed with and consummate the Closing within three (3) Business Days after receipt of written notice from Sellers that Sellers are ready, willing, and able to proceed with and consummate the Closing;

(f)     By Purchaser, if (i) all of the conditions set forth in Article VII have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing), and (ii) Sellers fail to proceed with and consummate the Closing within three (3) Business Days after receipt of written notice from Purchaser that Purchaser is ready, willing, and able to proceed with and consummate the Closing;

(g)     By Purchaser, if (i) Sellers file a motion to have the Bankruptcy Court enter an Order (1) dismissing the Bankruptcy Cases, or (2) converting the Bankruptcy Cases into cases under chapter 7 of the Bankruptcy Code or appointing a trustee in the Bankruptcy Cases or appointing an examiner with enlarged powers related to the operation of the Business (beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code, (ii) an Order is entered (1) dismissing the Bankruptcy Cases, or (2) converting the Bankruptcy Cases into cases under chapter 7 of the

Bankruptcy Code or appointing a trustee or examiner in the Bankruptcy Cases, and, in each case, such Order is not reversed or vacated within fourteen (14) days after entry thereof, (iii) the Sale Order (1) shall not have been entered by the Bankruptcy Court by fifty-two (52) days after the Petition Date (unless, prior to termination of this Agreement by Purchaser, the Bankruptcy Court shall have entered the Sale Order), (2) shall have been entered in a form not acceptable to Purchaser, or (3) shall have been stayed, vacated, modified, or supplemented without Purchaser's prior written consent, (iv) Sellers publicly announce, file, or otherwise takes material steps in furtherance of any chapter 11 plan(s) of reorganization or plan(s) of liquidation with respect to the Bankruptcy Cases that fail to provide for or otherwise contemplate the Closing pursuant to the terms hereof, or (v) any of the conditions set forth in <u>ARTICLE VII</u> has become incapable of fulfillment and such condition is not waived by Purchaser;

(h)     By either Purchaser or Sellers if any Governmental Authority shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling, or other action shall have become final and nonappealable;

(i)     Automatically if Sellers consummate any Alternative Transaction with someone other than Purchaser involving the Purchased Assets; or

(j)     By Purchaser if: (i) the Auction shall not have been held, conducted, or concluded on or before forty-five (45) days after the Petition Date; (ii) Purchaser is not selected and designated as the Successful Bidder or Back-Up Bidder in the Notice of Successful Bidder to be filed by Sellers on or before two (2) days after the Auction; (iii) the Sale Hearing shall not have been held and concluded on or before fifty (50) days after the Petition Date; (iv) the Sale Order shall not have been entered on or before fifty-two (52) days after the Petition Date; (v) the Closing of the transactions contemplated by this Agreement shall not have occurred on or before the Termination Date; *provided*, that Sellers and Purchaser may mutually agree in writing to extend such milestones in the foregoing clauses (i) through (v), in accordance with the DIP Credit Agreement; (vi) after the conclusion of the Auction, if Purchaser is the Successful Bidder, Sellers or any of their respective Affiliates take steps in further of any Alternative Transaction; or (vii) after the conclusion of the Auction if Purchaser is the Back-Up Bidder, Sellers or any of their respective Affiliates take steps in furtherance of any Alternative Transaction other than that of the Successful Bidder.

Notwithstanding anything else contained in this Agreement, the right to terminate this Agreement under this <u>Section 8.1</u> shall not be available to any Party (a) that is in material breach of its obligations hereunder, or (b) whose failure to fulfill its obligations or to comply with its covenants under this Agreement has been the primary cause of, or materially contributed to, the failure to satisfy any condition to the obligations of either party hereunder.

8.2     **Effect of Termination**. In the event of termination of this Agreement by either Purchaser or Sellers as provided in <u>Section 8.1</u>, this Agreement will forthwith become void and have no further force or effect, without any liability (other than as set forth in <u>Section 9.3</u> or this <u>Section 8.2</u>) on the part of Purchaser or Sellers; *provided*, *however*, that the provisions of this <u>Section 8.2</u>, <u>Section 9.3</u> and <u>Article X</u> will survive any termination hereof; *provided*, *further*, *however*, that subject to the terms of this <u>Section 8.2</u>, nothing in this <u>Section 8.2</u> shall relieve any Party of any liability for any breach by such Party of this Agreement prior to the date of any such termination.

60

## ARTICLE IX
## BANKRUPTCY COURT MATTERS

9.1 **Alternative Transactions**.

(a)  Consummation of the transactions contemplated hereby is subject to approval by the Bankruptcy Court and the consideration by the Debtors of higher or better competing bids in accordance with the Bidding Procedures. From and after the date hereof until the Auction is declared closed by Purchaser, Sellers shall be permitted to cause their respective representatives and Affiliates to (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents, and representatives) with respect to an Alternative Transaction, and (ii) respond to any inquiries or offers related to an Alternative Transaction and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code, the Bid Procedures Order or other Applicable Law, including supplying information relating to the Business and the assets of Sellers to prospective purchasers.

(b)  If, upon completion of the Auction, Sellers have agreed to sell their assets under an Alternative Transaction, Sellers may select Purchaser as the Back-Up Bidder or may select another Back-Up Bidder as provided in the Bidding Procedures. Purchaser hereby agrees and acknowledges that it shall serve as a Back-Up Bidder if so requested.

9.2 **Bankruptcy Actions**.

(a)  On the Petition Date, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Bid Procedures Order approving, among other things, the execution, delivery, and performance of this Agreement by Sellers, other than the performance of those obligations to be performed at or after the Closing. The form and substance of such motion shall be reasonably acceptable to Purchaser. From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII, and (ii) the Closing Date, the Parties shall use their respective reasonable efforts to obtain entry by the Bankruptcy Court of the Bid Procedures Order and the Sale Order.

(b)  Each of Sellers and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement, and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement.

(c)  No later than the times set forth in the Bid Procedures Order (as may be modified pursuant to the terms thereof with the prior written consent of Purchaser to the extent such modifications relate to this Agreement and adversely affect Purchaser, such consent not to be unreasonably withheld), Sellers will (subject to Purchaser's and Sellers' rights and obligations set forth in Section 9.2(e) below) make all filings and give all notices relating to this Agreement as Sellers are required to make and give pursuant to the Bid Procedures Order. Sellers shall take all actions as may be reasonably necessary to obtain entry of the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Both Purchaser's and Sellers' obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Sale Order. If the Bankruptcy Court refuses to issue the Sale Order or to approve a sale of the Purchased Assets to Purchaser at the Sale Hearing, then this transaction shall automatically terminate, and Sellers and Purchaser shall be relieved of any further liability or obligation hereunder. Upon entry of the Sale Order in accordance with the provisions of this Section 9.2(a), the condition set forth in this Section 9.2(a) shall conclusively be deemed satisfied.

(d)     If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or re-argument shall be filed with respect to the Bid Procedures Order and the Sale Order, or other such order) subject to the rights otherwise arising from this Agreement, Sellers shall take all actions as may be reasonably necessary to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion; *provided*, *however*, nothing herein shall be deemed to require Sellers to so pursue any such appeal or other actions beyond the Termination Date if this Agreement is terminated in accordance with its terms after the Termination Date.

(e)     Purchaser and Sellers shall consult with each other regarding pleadings, notices and filings that either of them intends to file with the Bankruptcy Court in connection with, or which might reasonably be expected to affect the Bankruptcy Court's approval of the Sale Order, including, with respect to Sellers, sharing in advance any drafts for Purchaser's review and comment, it being agreed that Sellers shall give reasonable consideration to, and incorporate into the relevant pleading, notice or filing, any reasonable comments Purchaser may provide within a reasonable time prior to the filing of any of such pleading, notice or filing. Each Seller shall promptly provide Purchaser and its outside legal counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Seller has in its possession (or receives) pertaining to the Sale Order, or any other order related to any of the transactions contemplated hereby, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court. No Seller shall seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Bankruptcy Cases has been appealed, in each case, without prior written consent of Purchaser in its sole discretion.

9.3     **Bid Protections**.

(a)     Notwithstanding Section 8.2, (i) if this Agreement is terminated other than pursuant to Section 8.1(a), Section 8.1(b), Section 8.1(c), or Section 8.1(e), and (ii) at the time of such termination, Purchaser is not then in material breach of any of its representations, warranties, covenants, or agreements contained in this Agreement that would result in a failure of a condition set forth in Section 7.1 or Section 7.2, then Sellers will pay the Expense Reimbursement Amount to Purchaser by wire transfer of immediately available funds, without further order of the Bankruptcy Court, within three (3) Business Days following such termination of this Agreement.

(b)     The Expense Reimbursement Amount shall, pursuant to the Bid Procedures Order, constitute allowed administrative expenses of Sellers' estates under section 503(b) of the Bankruptcy Code.

(c)     Sellers acknowledge and agree that the agreements contained in this Section 9.3 are an integral part of the transactions contemplated hereby and that, without these agreements, Purchaser would not enter into this Agreement. Each of the Parties further acknowledges that the payment by Sellers of the Expense Reimbursement Amount is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Purchaser, together with any additional damages to which Purchaser may be entitled hereunder, in the circumstances in which such Expense Reimbursement Amount is payable, for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(d)     For the avoidance of doubt, under no circumstances shall Purchaser be permitted or entitled to receive both (i) the remedy of specific performance to cause the Closing and (ii) the payment of the Expense Reimbursement Amount.

9.4     **Sale Order**. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Liens (other than Permitted Post-Closing Encumbrances), and (iii) the execution, delivery, and performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assumed Contracts, (c) find that Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assumed Contracts, and (e) find that Purchaser shall have no Liability for any Excluded Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, *de facto* merger, environmental, or substantial continuity. Without limiting Sellers' obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Purchaser agrees that it will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (A) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (B) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code and in accordance with the Bid Procedures Order.

## ARTICLE X
## MISCELLANEOUS

10.1     **Survival**. The Parties agree that the representations, warranties, covenants or agreements contained in this Agreement (other than with respect to <u>Section 3.24</u>, <u>Section 4.5</u>, and <u>Section 5.6</u>) will not survive the Closing hereunder, and none of the Parties will have any liability to each other after the Closing for any breach of such representations, warranties, covenants or agreements which may be made, or any Claim or Action instituted, after the Closing. Notwithstanding the foregoing, the covenants and agreements that by their terms are to be satisfied after the Closing Date, shall survive until satisfied in accordance with their terms.

10.2     **Notices**. Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person or by courier or a courier service, (b) on the date of transmission if sent by electronic mail (without receipt of a delivery error), (c) on the next Business Day if sent by an overnight delivery service, or (d) five (5) Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

        (a)     If to Sellers, addressed as follows:

        Gladieux Metals Recycling, LLC
        Aleon Renewable Metals, LLC
        Aleon Metals, LLC
        302 Midway Road
        Freeport, Texas 77541
        Attn: Roy Gallagher
        Email: roy.gallagher@ankura.com

With a copy (which shall not constitute notice) to:

Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Attn: Jennifer Marines; Benjamin Butterfield
Email: jmarines@mofo.com; bbutterfield@mofo.com

(b)     If to Purchaser, addressed as follows:

AM Bidco Operations LLC
302 Midway Road
Freeport, Texas 77541
Attn: Roy Gallagher
Email: roy.gallagher@ankura.com

With a copy (which shall not constitute notice) to:

Arnold & Porter Kaye Scholer LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602
Attn: Michael Messersmith and Sarah Gryll
Email: michael.messersmith@arnoldporter.com and
sarah.gryll@arnoldporter.com

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

10.3    **Entire Agreement**. This Agreement (including any exhibits and schedules hereto) and the other Transaction Documents represents the entire understanding and agreement between the Parties with respect to the subject matter hereof and thereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.

10.4    **Amendments and Waivers**. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed, in the case of an amendment, supplement or change, by the Parties, or in the case of a waiver, by the Party against whom enforcement of such waiver is sought. The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

10.5    **Counterparts**. This Agreement may be executed in counterparts and such counterparts may be delivered in electronic format (including by email), all of which shall be considered an original and one and the same agreement. Such delivery of counterparts shall be conclusive evidence of the intent to be bound hereby, and each such counterpart and copies produced therefrom shall have the same effect as an original. To the extent applicable, the foregoing constitutes the election of the parties to invoke any law authorizing electronic signatures.

10.6     **Interpretation; Construction**.

(a)     The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties, and shall not in any way affect the meaning or interpretation of this Agreement.

(b)     Unless otherwise specified in this Agreement or the context otherwise requires: (i) the words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (ii) any reference to the masculine, feminine or neuter gender shall include all genders, the plural shall include the singular, and the singular shall include the plural; (iii) all preamble, recital, Article, Section, clause, schedule and exhibit references used in this Agreement are to the preamble, recitals, articles, sections, clauses, schedules and exhibits to this Agreement; (iv) wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation;" (v) the terms "date hereof" and "date of this Agreement" mean the date first written above; (vi) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding;" (vii) (A) any reference to "days" means calendar days unless Business Days are expressly specified, and (B) any reference to "months" or "years" shall mean calendar months or calendar years, respectively, in each case unless otherwise expressly specified; (viii) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends and such phrase shall not mean simply "if;" (ix) each accounting term not otherwise defined in this Agreement has the meaning commonly applied to it in accordance with GAAP; (x) the term "made available" means made available in the Data Room or otherwise delivered or provided by Sellers to Purchaser hereby at least one (1) Business Day prior to the date hereof; (xi) any reference in this Agreement to "***Dollars***" or "**$**" means United States dollars; (xii) time is of the essence of each and every covenant, agreement, and obligation in this Agreement, and (xiii) neither Purchaser nor Sellers shall be deemed to be in breach of any covenant contained in this Agreement if such party's deemed breach is the result of any action or inaction on the part of the other.

(c)     Unless otherwise specified in this Agreement, any deadline or time period set forth in this Agreement that by its terms ends on a day that is not a Business Day shall be automatically extended to the next succeeding Business Day. Unless otherwise specified in this Agreement or the context otherwise requires, all references to any (i) statute in this Agreement include the rules and regulations promulgated thereunder and all applicable guidance, guidelines, bulletins, or policies issued or made in connection therewith by a Governmental Authority, and (ii) Law in this Agreement shall be a reference to such Law as amended, re-enacted, consolidated, or replaced as of the applicable date or during the applicable period of time.

(d)     Unless otherwise specified in this Agreement all references in this Agreement (i) to any Contract, other agreement, document, or instrument (excluding this Agreement) mean such Contract, other agreement, document, or instrument as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and, unless otherwise specified therein, include all schedules, annexes, addendums, exhibits and any other documents attached thereto or incorporated therein by reference, and (ii) to this Agreement mean this Agreement (taking into account the provisions of Sections 10.4) as amended, supplemented or otherwise modified from time to time in accordance with Section 10.4.

(e)     With regard to each and every term and condition of this Agreement, the Parties understand and agree that the same have or has been mutually negotiated, prepared, and drafted, and that if at any time the Parties desire or are required to interpret or construe any such term or condition or any agreement or instrument subject thereto, no consideration shall be given to the issue of which Party actually prepared, drafted or requested any term or condition of this Agreement.

(f)      All capitalized terms in this Agreement (including the exhibits and schedules hereto) shall have the meaning set forth in <u>Section 1.1</u>, except as otherwise specifically provided herein. Each of the other capitalized terms used in this Agreement has the meaning set forth where such term is first used or, if no meaning is set forth, the meaning required by the context in which such term is used.

10.7      **Binding Agreement; Assignment**. This Agreement and the other Transaction Documents shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns; *provided*, that neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (including by operation of law) by any Party without the prior written consent of the other Party(ies). For all purposes hereof, a transfer, sale or disposition of a majority of the capital stock or other voting interest of a Party (whether by contract or otherwise) shall be deemed an assignment requiring consent hereunder. Any purported assignment in contravention of this <u>Section 10.7</u> shall be null and void. Notwithstanding the foregoing or anything else in this Agreement to the contrary, Purchaser may (a) transfer or assign its rights, interests or obligations under this Agreement, in whole or from time to time in part, to one or more of its Affiliates, provided that Purchaser will remain liable for the performance of its obligations and will provide notice to Sellers of such assignment; and (b) collaterally assign its rights hereunder to any lender of Purchaser. Notwithstanding anything to the contrary herein, no assignment of this Agreement or any rights, interests or obligations hereunder (including any assignment pursuant to the immediately preceding sentence) shall be deemed to release, relieve, or otherwise affect the assigning Party's continuing liability hereunder.

10.8      **Third Party Beneficiaries**. This Agreement is solely for the benefit of the Parties hereto, and no provision of this Agreement shall be deemed to confer upon third parties, either express or implied, any remedy, claim, liability, reimbursement, cause of action or other right.

10.9      **Further Assurances**. Upon the reasonable request of Purchaser or Sellers, each Party will, on and after the Closing Date, execute and deliver to the other Parties such other documents, assignments and other instruments as may be reasonably required (without imposing any material monetary obligations or other obligations beyond those specifically imposed on the cooperating Party(ies) by the other provisions of this Agreement or the other Transaction Documents) to effectuate completely the transactions contemplated hereby, and to effect and evidence the provisions of this Agreement and the other Transaction Documents and the transactions contemplated hereby. For the avoidance of doubt, as to Sellers, the obligations set forth in this <u>Section 10.9</u> shall lapse and cease to be of any further force or effect upon the closing of the Bankruptcy Cases.

10.10      **Governing Law**. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF.

10.11      **EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT**. IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING, OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, ANY OTHER TRANSACTION DOCUMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN OR THEREIN, THE PARTIES TO THIS AGREEMENT HEREBY (A) AGREE ANY LITIGATION, PROCEEDING, OR OTHER LEGAL ACTION SHALL BE INSTITUTED ONLY IN THE BANKRUPTCY COURT, WHICH SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY SUCH MATTERS; (B) CONSENT AND SUBMIT TO PERSONAL JURISDICTION OF THE BANKRUPTCY COURT AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS; AND (C) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR

HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING, OR ACTION WAS BROUGHT IN AN INCONVENIENT FORUM.

10.12   **WAIVER OF JURY TRIAL**. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.12.

10.13   **Schedules**. Provided that any such amended disclosure or updated schedule does not materially affect the value of the Purchased Assets or result in additional liability to Purchaser, Purchaser and Sellers may mutually agree at any time prior to Closing to amend all schedules to correct errors and to add omitted items, or new items that first arise or occur after the date hereof. Sellers shall update Schedule 3.6(f) (a) at least five (5) Business Days prior to the Closing to reflect an accurate list of the final Cure Costs, and (b) at the times, and subject to the terms and conditions specified in Section 2.7.

10.14   **Severability**. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

10.15   **Expenses**. Except as otherwise provided in this Agreement, whether or not the Closing occurs, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such Expenses.

10.16   **Attorneys' Fees**. In the event that Sellers or Purchaser bring an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party(ies) in that action or proceeding shall be entitled to have and recover from the non-prevailing party(ies) all such reasonable, out of pocket fees, costs, and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party(ies) may suffer or incur in the pursuit or defense of such action or proceeding.

10.17   **Bulk Transfer Laws**. The Parties intend that, under section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any encumbrances arising out of bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the

Sale Order.  In furtherance of the foregoing, each Party hereby waives compliance by the Parties with "bulk sales," "bulk transfers," or similar Laws in respect of the transactions contemplated by this Agreement.

10.18    **No Vicarious Liability**. This Agreement may only be enforced against the Parties hereto and their respective successors and permitted assigns. Any Claims or Actions that may be based upon, arise out of, or relate to this Agreement or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) may be made only against the Persons that are signatories to this Agreement, and their respective successors and permitted assigns, and no agent, Affiliate, or representative of any such Person (including any Person negotiating or executing this Agreement on behalf of such Person), will have any liability with respect to this Agreement or with respect to any Claim or Action that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement (including a representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement). Nothing in this Section 10.18 will impair or adversely affect the rights of Purchaser or any other Person set forth in any other agreement executed and delivered in connection with the consummation of the transactions contemplated under this Agreement and the other Transaction Documents.

10.19    **Specific Performance**.  The Parties agree that irreparable damages would occur if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises, and agreements contained in this Agreement. Accordingly, Sellers, on the one hand, and Purchaser on the other hand, will be entitled to obtain an injunction or injunctions to prevent breach of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions, without the necessity of posting bond or other security against it or of proving the inadequacy of money damages as a remedy, in addition to any other remedy to which they may be entitled, at law or in equity. The Parties agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Sellers, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Purchaser or Sellers, as applicable, under this Agreement, all in accordance with the terms of this Section 10.19.

10.20    **Conflicts; Privileges.**

(a)    It is acknowledged by each of the Parties that Sellers have retained Morrison & Foerster LLP ("***M&F***") to act as its counsel in connection with this Agreement and the transactions contemplated hereby (the "***Current Representation***"). Purchaser hereby agrees that after the Closing, Purchaser will not object to M&F representing any Seller or any of its Affiliates or any of their respective representatives (any such Person, a "***Designated Person***") in any matter involving or arising from the Current Representation, including any interpretation or application of this Agreement or any other agreement entered into in connection with the transactions contemplated hereby, and including for the avoidance of doubt any Action between or among Purchaser or any of its Affiliates, on the one hand, and any Designated Person, on the other hand, even though the interests of such Designated Person may be directly adverse to Purchaser or any of its Affiliates. Purchaser hereby waives and agrees not to assert any claim that M&F has a conflict of interest in any representation described in this Section 10.20.

(b)    Purchaser hereby agrees that all communications (whether before, at or after the Closing) between M&F, on the one hand, and any Designated Person, on the other hand, that relate in any way to the Current Representation that are attorney-client privileged (the "***Deal Communications***") and all rights to any other evidentiary privilege, and the protections afforded to information relating to representation of a client under applicable rules of professional conduct that may apply to such Deal Communications, belong to such Seller and may be controlled by such Seller and will not pass to or be

claimed by Purchaser or any of its representatives and Purchaser hereby agrees that it will not seek to compel disclosure to Purchaser or any of its representatives of any such Deal Communications.

(c)     Notwithstanding the foregoing, in the event that a dispute arises between Purchaser and any Person that is not a Seller, Purchaser may assert the attorney-client privilege to prevent the disclosure of the Deal Communications to such Person; *provided*, *however*, that Purchaser may not waive such privilege without the prior written consent of the applicable Seller (which such consent shall not be unreasonably withheld, conditioned or delayed). In the event that Purchaser or any of its respective directors, officers, employees, or other representatives is legally required by an Order made or rendered by any Governmental Authority to access or obtain a copy of all or a portion of the Deal Communications, Purchaser shall, to the extent legally permissible, (i) reasonably promptly notify the applicable Seller in writing (including by making specific reference to this Section 10.20(c)), (ii) agree that such Seller may, at such Seller's sole cost and expense, seek a protective Order and (iii) use, at such Seller's sole cost and expense, commercially reasonable efforts to assist therewith.

[*Signature page follows*]

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**DATED AS OF OCTOBER [•]21, 2025**

**BY AND AMONG**

**GLADIEUX METALS RECYCLING, LLC,**

**ALEON RENEWABLE METALS, LLC,**

**ALEON METALS, LLC**

**AND**

**AM BIDCO OPERATIONS LLC**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ................................................................................................... 1

    1.1    **Definitions.** ....................................................................................................... 1

ARTICLE II PURCHASE AND SALE; CLOSING ............................................................... 16

    2.1    **Purchase and Sale.** ........................................................................................... 16
    2.2    **Excluded Assets.** ............................................................................................. 18
    2.3    **Assumed Liabilities.** ...................................................................................... ~~19~~20
    2.4    **Excluded Liabilities.** ...................................................................................... 20
    2.5    **Purchase Price** ............................................................................................... 23
    2.6    **Purchase Price Allocation.** ............................................................................ 23
    2.7    **Assumption and Assignment of Contracts.** .................................................. 24
    2.8    **Closing.** ........................................................................................................... 27
    2.9    **Purchaser Designees.** ..................................................................................... 29
    2.10   **Withholding.** .................................................................................................. 29

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS ........................ 29

    3.1    **Due Incorporation; Good Standing.** ............................................................. ~~29~~30
    3.2    **Due Authorization.** ........................................................................................ 30
    3.3    **Governmental Filings; No Violations.** ......................................................... 30
    3.4    **Compliance With Laws; Permits.** ................................................................. 31
    3.5    **Litigation.** ...................................................................................................... 32
    3.6    **Certain Financial Information.** ..................................................................... 32
    3.7    **Absence of Developments.** ............................................................................ 33
    3.8    **Real Property.** ............................................................................................... ~~33~~34
    3.9    **Material Contracts.** ....................................................................................... 34
    3.10   **Employees and Labor Matters.** ................................................................... 36
    3.11   **Benefit Plans.** ................................................................................................ 38
    3.12   **Intellectual Property.** .................................................................................... 39
    3.13   **Environmental Matters.** ............................................................................... 41
    3.14   **Title to Assets; Sufficiency of Assets; Condition of Assets.** ...................... 42
    3.15   **Taxes.** ............................................................................................................. 42
    3.16   **Key Business Relationships.** ........................................................................ ~~43~~44
    3.17   **Insurance.** ...................................................................................................... 44
    3.18   **Brokers and Finders.** .................................................................................... 44
    3.19   **Product Quality.** ........................................................................................... 44
    3.20   **Intercompany Agreements.** .......................................................................... 44
    3.21   **Data Privacy.** ................................................................................................. 44
    3.22   **Bank Accounts.** ............................................................................................. 45
    3.23   **Affiliate Transactions.** .................................................................................. 45
    3.24   **Disclaimer of Additional Representations and Warranties.** ...................... 45

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ................. ~~45~~46

    4.1    **Due Organization.** ........................................................................................ ~~45~~46
    4.2    **Due Authorization.** ........................................................................................ 46

| | | |
|---|---|---|
| 4.3 | **Consents and Approvals; No Violations.** | 46 |
| 4.4 | **Available Funds.** | 46 |
| 4.5 | **Solvency.** | ~~46~~47 |
| 4.6 | **Investigation; Limitation on Warranties.** | ~~46~~47 |
| 4.7 | **Brokers and Finders.** | 47 |

ARTICLE V COVENANTS ... 47

| | | |
|---|---|---|
| 5.1 | **Access to Information and the Facility.** | 47 |
| 5.2 | **Interim Operations of the Business.** | ~~47~~48 |
| 5.3 | **Cooperation; Status Updates; Regulatory Filings; Consents.** | 50 |
| 5.4 | **Preservation of Records; Post-Closing Access and Cooperation.** | 52 |
| 5.5 | **Employees and Benefits.** | 52 |
| 5.6 | **Confidentiality.** | ~~53~~54 |
| 5.7 | **Public Announcements.** | 54 |
| 5.8 | **Tax Matters.** | 54 |
| 5.9 | **Use of Names and Marks.** | 55 |
| 5.10 | **No Successor Liability.** | 56 |
| 5.11 | **Purchased Assets held by Affiliates.** | 56 |
| 5.12 | **Insurance Matters.** | 56 |
| 5.13 | **Title Insurance Policies.** | ~~56~~57 |
| 5.14 | **Refunds and Remittances.** | 57 |

ARTICLE VI CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER ... 57

| | | |
|---|---|---|
| 6.1 | **Accuracy of Representations.** | 57 |
| 6.2 | **Compliance with Agreements and Covenants.** | 57 |
| 6.3 | **No Prohibition.** | ~~57~~58 |
| 6.4 | **Waiting Periods; Required Consents.** | ~~57~~58 |
| 6.5 | **Entry of Sale Order.** | ~~57~~58 |
| 6.6 | **No Material Adverse Effect.** | ~~57~~58 |

ARTICLE VII CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS ... 58

| | | |
|---|---|---|
| 7.1 | **Accuracy of Representations.** | 58 |
| 7.2 | **Compliance with Agreements and Covenants.** | 58 |
| 7.3 | **No Prohibition.** | 58 |
| 7.4 | **Entry of Sale Order.** | 58 |
| 7.5 | **Waiting Periods; Required Consents.** | ~~58~~59 |

ARTICLE VIII TERMINATION ... ~~58~~59

| | | |
|---|---|---|
| 8.1 | **Termination.** | ~~58~~59 |
| 8.2 | **Effect of Termination.** | 60 |

ARTICLE IX BANKRUPTCY COURT MATTERS ... ~~60~~61

| | | |
|---|---|---|
| 9.1 | **Alternative Transactions.** | ~~60~~61 |
| 9.2 | **Bankruptcy Actions.** | 61 |
| 9.3 | **Bid Protections.** | 62 |

9.4      **Sale Order.** .................................................................................................... ~~62~~63

ARTICLE X MISCELLANEOUS ........................................................................................... 63

10.1     **Survival.** ....................................................................................................... 63
10.2     **Notices.** ......................................................................................................... 63
10.3     **Entire Agreement.** ...................................................................................... 64
10.4     **Amendments and Waivers.** ......................................................................... 64
10.5     **Counterparts.** .............................................................................................. 64
10.6     **Interpretation; Construction.** .................................................................... ~~64~~65
10.7     **Binding Agreement; Assignment.** ............................................................... ~~65~~66
10.8     **Third Party Beneficiaries.** ........................................................................ ~~65~~66
10.9     **Further Assurances.** .................................................................................... 66
10.10    **Governing Law.** ........................................................................................... 66
10.11    **EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT.** ........... 66
10.12    **WAIVER OF JURY TRIAL.** ........................................................................ ~~66~~67
10.13    **Schedules.** ................................................................................................... ~~66~~67
10.14    **Severability.** ............................................................................................... 67
10.15    **Expenses.** .................................................................................................... 67
10.16    **Attorneys' Fees.** .......................................................................................... 67
10.17    **Bulk Transfer Laws.** ................................................................................... 67
10.18    **No Vicarious Liability.** .............................................................................. ~~67~~68
10.19    **Specific Performance.** ................................................................................ ~~67~~68
10.20    **Conflicts; Privileges.** ................................................................................. 68

## EXHIBITS

Exhibit 1.1                Form of Sale Order
Exhibit 2.8(b)(i)          Form of Bill of Sale, Assignment and Assumption Agreement
Exhibit 2.8(b)(ii)         Form of IP Assignment

## SCHEDULES

Schedule 1.1(a)            Knowledge Individuals
Schedule 1.1(b)            Liens
Schedule 2.1(g)            Closing Assumed Contracts
Schedule 2.1(h)            Non-Executory Contracts Related to the Business
Schedule 2.1(m)            Transferred Permits
Schedule 2.1(n)            Interests, Shares, Securities, or Other Investments
Schedule 2.1(o)            Transferred Benefit Plans
Schedule 2.2(f)            Excluded Bank Accounts
Schedule 2.2(q)            Excluded Assets
Schedule 2.3(k)            Capital Leases
Schedule 2.4(k)            Excluded Environmental Liabilities
Schedule 2.7(c)            Rejected Identified Contracts
Schedule 2.7(d)            Additional Assumed Contracts
Schedule 2.8(b)(v)         Additional Documents to Record
Schedule 3.3(a)            Required Consents
Schedule 3.4(a)            Compliance with Laws
Schedule 3.4(b)            Permits
Schedule 3.5               Litigation
Schedule 3.6(a)            Financial Statements
Schedule 3.6(b)            Undisclosed Liabilities
Schedule 3.6(c)            Accounts Receivable
Schedule 3.6(e)            Letters of Credit
Schedule 3.6(f)            Cure Costs and Seller Property Taxes
Schedule 3.8(a)            Owned Real Property
Schedule 3.8(b)            Leased Real Property
Schedule 3.9(a)            Material Contracts
Schedule 3.9(b)            Breaches and Defaults in Material Contracts
Schedule 3.10(a)           Employee Information
Schedule 3.10(g)           Scheduled Employees
Schedule 3.11(a)           Benefit Plans
Schedule 3.12(a)           Registered Intellectual Property
Schedule 3.12(c)           Infringement
Schedule 3.12(g)           Failures in Computer Systems
Schedule 3.13(a)           Environmental Claims
Schedule 3.13(b)           Release of Hazardous Materials
Schedule 3.13(c)           Environmental Indemnities
Schedule 3.13(e)           Environmental Remediation and Consents
Schedule 3.13(f)           Trust Agreements with respect to Environmental Liabilities
Schedule 3.15              Taxes
Schedule 3.16(i)           Key Customers

Schedule 3.16(ii)        Key Vendors
Schedule 3.17           Insurance Policies
Schedule 3.18           Brokers
Schedule 3.20           Intercompany Agreements
Schedule 3.23           Affiliate Transactions
Schedule 5.2            Interim Operations of the Business
Schedule 5.2(b)(iii)     Approved Budget
Schedule 5.5(a)         Subject Employees and Selected Employees

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "***Agreement***"), dated as of October [●]21, 2025, is by and among AM BidCo Operations LLC, a Delaware limited liability company ("***Purchaser***"), Gladieux Metals Recycling, LLC, a Texas limited liability company ("***GMR***"), Aleon Renewable Metals, LLC, a Delaware limited liability company ("***Aleon***"), and Aleon Metals, LLC, a Texas limited liability company ("***Parent***" and, collectively with GMR and Aleon, "***Sellers***" and each a "***Seller***," and, collectively with Purchaser, a "***Party***" and, together the "***Parties***"). Certain capitalized terms used herein are defined in Article I.

## RECITALS

WHEREAS, Sellers are engaged in the conduct of the Business;

WHEREAS, on August 17, 2025, the Sellers (collectively, the "***Debtors***") commenced voluntary cases (the "***Bankruptcy Cases***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") by filing petitions for relief in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***");

WHEREAS, Purchaser desires to purchase and assume the Purchased Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell and assign to Purchaser, pursuant to, among other provisions thereof, section 363 of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities, for the consideration and upon the terms and conditions contained in this Agreement;

WHEREAS, on August 22, 2025, the Bankruptcy Court entered the Bid Procedures Order approving the Bidding Procedures and designating Purchaser as a "stalking horse bidder" for the Purchased Assets; and

WHEREAS, Sellers' ability, and Purchaser's willingness, to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained herein, and for their mutual reliance, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     **Definitions**. The following terms have the following meanings for the purposes of this Agreement:

"***Accounts Receivable***" means any and all accounts, notes, trade, and other receivables owed to Sellers, all in accordance with GAAP, consistently applied in accordance with past practices, together with all security or collateral thereof and any interest or unpaid financing charges accrued thereon, including vendor/supplier, Employee and other receivables, and all Actions pertaining to the collection of amounts that are payable, or that may become payable, to Sellers with respect to products sold or services performed prior to the Closing, net of any applicable reserve for returns, discounts, doubtful accounts or other similar deductions reflected thereon, but does not include (a) rights or claims to proceeds under Insurance Policies held by Sellers or (b) accounts and notes receivable from Affiliates of Sellers.

1

"*Acquired Inventories*" means all inventories of raw materials, works in process, finished goods, parts, office supplies, packing materials, janitorial supplies and other supplies owned by any Seller and used or held for use in connection with the Business.

"*Acquired Real Property Leases*" means the Real Property Leases included in the Closing Assumed Contracts or Additional Assumed Contracts.

"*Action*" means any action, suit, claim, counterclaim, demand, hearing, summons, litigation, investigation, prosecution, contest, inquest, audit, examination, proceeding (including any civil, criminal, administrative, investigative, appellate, or eminent domain proceeding), condemnation, mediation, arbitration, dispute, or similar matter by or before any Governmental Authority.

"*Additional Assumed Contracts*" means the executory Contracts listed on the Additional Assumed Contracts Schedule, to the extent not included in Excluded Assets.

"*Additional Assumed Contracts Schedule*" means Schedule 2.7(d) as modified by Purchaser from time to time pursuant to Section 2.7(d) between the date hereof and two Business Days prior to the Closing Date.

"*Additional Rejected Contracts*" means the Identified Contracts and any other executory Contracts or unexpired leases that Purchaser designates to reject from time to time as set forth on the Rejected Contracts Schedule pursuant to Section 2.7(k) prior to the Designation Deadline.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly, controlling, controlled by, or under common control with, such Person as of the date on which, or any time during the period for which, the determination of affiliation is being made. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means (a) the beneficial owner of more than fifty percent (50%) of the equity or voting securities of another Person, or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble and includes the Disclosure Schedule and all other exhibits and schedules hereto, as it and they may be amended from time to time.

"*Allowed Professional Fees*" has the meaning ascribed to such term in the DIP Orders.

"*Alternative Transaction*" means any transaction or series of transactions (whether pursuant to section 363 or 1129 of the Bankruptcy Code or pursuant to any applicable non-bankruptcy law), whereby any Person or group of Persons (other than Purchaser and its Affiliates) acquires (a) all, or a material portion of, the Purchased Assets, (b) beneficial ownership of a majority of the Equity Interests of any Seller, or (c) any other transaction the consummation of which would be substantially inconsistent with the transactions contemplated by this Agreement, in each case, whether by merger, sale of assets or equity, transfer, exchange, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, a liquidation or wind-down of Sellers' estates that does not involve a going concern sale of the Business shall not be an Alternative Transaction.

"*Applicable Laws*" means, with respect to any Person, any Law, Order, or other similar requirement enacted, adopted, promulgated, enforced or applied by any Governmental Authority that is

binding upon or applicable to such Person or its assets or properties, as amended unless expressly specified otherwise.

"*Applicable Seller Prepared Returns*" has the meaning set forth in Section 5.8(d)(i).

"*Approved Budget*" has the meaning set forth in the DIP Credit Agreement.

"*Assigned Actions*" has the meaning set forth in Section 2.1(l).

"*Assignment and Assumption of Ground Lease*" has the meaning set forth in Section 2.8(b)(v).

"*Assumed Contracts*" means, collectively, the Closing Assumed Contracts and the Additional Assumed Contracts.

"*Assumed Cure Costs*" means the Cure Costs with respect to any Assumed Contract as set forth on, and in the amounts included on any Notice of Potential Assignment, net of any rebates or refunds related to such Closing Assumed Contracts or Additional Assumed Contracts, up to an aggregate amount equal to $[•]632,522.18 (the "*Assumed Cure Costs Cap*"), unless otherwise agreed to by Purchaser in its sole discretion.

"*Assumed Customer Orders*" means all open orders for goods and services with customers of the Business outstanding as of the Closing Date and included in the Closing Assumed Contracts or Additional Assumed Contracts.

"*Assumed Liabilities*" has the meaning set forth in Section 2.3.

"*Assumed PTO*" has the meaning set forth in Section 2.3(h).

"*Assumed Supplier Orders*" means the right to receive goods or services from suppliers that remain unfulfilled as of the Closing Date to be provided to any Seller in connection with the Business pursuant to the open orders included in the Closing Assumed Contracts or Additional Assumed Contracts.

"*Auction*" has the meaning set forth in the Bid Procedures Order.

"*Author*" has the meaning set forth in Section 3.12(f).

"*Avoidance Action*" means any avoidance claims, rights, recoveries, subordinations or causes of action or remedies under Chapter 5 of the Bankruptcy Code, including any proceeds thereof, and any analogous state law claims, in each case, of Sellers and their estates that relate to the Purchased Assets, Assumed Liabilities or the Business.

"*Back-Up Bidder*" has the meaning set forth in the Bid Procedures Order.

"*Bankruptcy Cases*" has the meaning ascribed to such term in the recitals of the Agreement.

"*Bankruptcy Code*" has the meaning ascribed to such term in the recitals of the Agreement.

"*Bankruptcy Court*" has the meaning ascribed to such term in the recitals of the Agreement.

"*Benefit Plans*" means (a) any "employee welfare benefit plan" or "employee pension benefit plan" (as those terms are respectively defined in Sections 3(1) and 3(2) of ERISA); and (b) any

retirement or deferred compensation plan, incentive compensation, employment, change-in-control, retention, compensation, employee loan, consulting, severance, stock, share appreciation right, unemployment compensation, vacation pay, severance pay, bonus arrangement, health benefit, profit-sharing, death or disability plan, agreement, commitment, program, policy, practice or arrangement or any other welfare or fringe benefit arrangements in each case in which any Employees participate or with respect to which Sellers have or may have any liability.

"**Bid Procedures Order**" means the order of the Bankruptcy Court approving the *Debtors' Emergency Motion for Entry of (I) an Order (A) Approving Bidding Procedures for the Sale Of Substantially All of the Debtors' Assets, (B) Authorizing Entry into the Stalking Horse Agreement, (C) Approving Procedures for the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling an Auction and Sale Hearing, (E) Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief, and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief*, which order shall be reasonably acceptable to Purchaser.

"**Bidding Procedures**" means the process and procedures established with respect to Sellers' proposed sale of the Purchased Assets and the assumption of the Assumed Liabilities to be approved in the Bid Procedures Order, which shall be in form and substance reasonably acceptable to Purchaser.

"**Bill of Sale, Assignment and Assumption Agreement**" has the meaning set forth in <u>Section 2.8(b)(i)</u>.

"**Business**" means the business of recycling spent hydroprocessing catalyst generated by petroleum refineries during the production of gasoline, diesel and jet fuel and recycling batteries to produce battery metals suitable for electric vehicles and electrical storage systems, and certain activities ancillary thereto (including, but not limited to, operation of the Purchased Assets), conducted by Sellers in the Ordinary Course of Business.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which banking institutions in New York City, New York and Freeport, Texas are authorized or required by law or other action of a Governmental Authority to close.

"**Carve-Out Account**" has the meaning ascribed to such term in the DIP Orders.

"**Cash and Cash Equivalents**" means, collectively, all of Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bank deposits, other deposits, bankers' acceptances, commercial paper, government securities, investment accounts and other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held, net of uncleared checks issued by Sellers that are not yet reflected in the applicable bank account of Sellers.

"**Cash Consideration**" means cash in an amount equal to $[●]1,070,760.37 plus the amount of Seller Transaction Expenses and the Wind Down Amount.

"**Claim**" means any claim, cause of action, action, demand, debt, lien, liability, counterclaim, cross-claim, damage, loss, attorneys' or consultants' fees, costs or expenses, lawsuit, investigation, review, grievance, citation, summons, subpoena, inquiry, audit, hearing, arbitration or other similar proceeding of any nature, civil, criminal, regulatory, administrative or otherwise, of any nature whatsoever, whether in law or in equity, in contact, in tort, or otherwise, and attributable to any Person or

any Persons or any Party, directly or indirectly arising out of, or incident to or in connection with this Agreement or the performance, defective performance, or non-performance of any obligation under this Agreement.

"*Closing*" means the consummation of the transaction contemplated herein.

"*Closing Assumed Contracts*" has the meaning set forth in Section 2.1(g).

"*Closing Date*" has the meaning set forth in Section 2.8(a).

"*Closing Date Payment*" has the meaning set forth in Section 2.5.

"*COBRA*" means and refer to the applicable requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code (and predecessors thereof).

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Commercial Tort Claim*" has the meaning set forth in § 9-102(a)(13) of the Uniform Commercial Code.

"*Computer Systems*" has the meaning set forth in Section 3.12(g).

"*Consent*" means any approval, consent, ratification, permission, waiver, license, or other authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"*Contamination*" or "*Contaminated*" means the presence of Hazardous Material in, on or under the soil, groundwater, surface water or other environmental media to an extent that any Response Action is legally required by any Governmental Authority under any Environmental Law with respect to such presence of Hazardous Material.

"*Contract*" means any contract, agreement, grant, sub-grant, arrangement, understanding, commitment, ground lease, lease, sublease, license, mortgage, guarantee, bond, note or other instrument (including any instrument evidencing Indebtedness), or other legally binding obligation, and all amendments thereof (whether written or oral).

"*Credit Bid Amount*" means an amount equal to $187,506,000.00.

"*Cure Costs*" means the monetary amounts that must be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Closing Assumed Contract, Additional Assumed Contract, or Permits, as agreed upon by the Parties or determined by the Bankruptcy Court pursuant to procedures in the Bid Procedures Order.

"*Current Representation*" has the meaning set forth in Section 10.20(a).

"*Data Room*" means that certain virtual data room entitled Project Atom established by Sellers at https://ipreoprism.com/tvdr/#/workspace/2972/documents/3633143.

"*Deal Communications*" has the meaning set forth in Section 10.20(b).

"*Debtors*" has the meaning ascribed to such term in the recitals of this Agreement.

"***Deed***" has the meaning set forth in <u>Section 2.8(b)(v)</u>.

"***Designated Jurisdiction***" shall mean any country or territory to the extent that such country or territory itself is the subject of any Sanction, including Cuba, Iran, North Korea and the Crimea region of Ukraine.

"***Designated Person***" has the meaning set forth in <u>Section 10.20(a)</u>.

"***Designation Deadline***" has the meaning set forth in <u>Section 2.7(d)</u>.

"***DIP Credit Agreement***" means that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of August 21, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), among the Debtors, each of the lenders party thereto from time to time (the "***DIP Lenders***"), and UMB Bank, National Association, solely in its capacity as the administrative agent.

"***DIP Lenders***" has the meaning set forth in the definition of "DIP Credit Agreement."

"***DIP Orders***" has the meaning ascribed to such term in the DIP Credit Agreement.

"***Disclosure Schedule***" means the Disclosure Schedule delivered by Sellers to Purchaser on the date of this Agreement, as amended, modified, or supplemented in accordance with this Agreement.

"***Employees***" means all full-time and part-time employees employed by Sellers immediately prior to the Closing Date in connection with the Business.

"***Enforceability Exceptions***" has the meaning set forth in <u>Section 3.2</u>.

"***Environment***" means any surface or subsurface physical medium or natural resource, including air, land, soil, surface waters, ground waters, stream and river sediments, biota and any indoor area, surface or physical medium.

"***Environmental Claim***" means any claim, notice, demand, order, action, suit, proceeding, or other communication alleging or asserting liability or obligations under or relating to any Environmental Law, including liability or obligation for investigation, assessment, remediation, removal, cleanup, response, corrective action, monitoring, post-remedial or post-closure studies, investigations, operations and maintenance, injury, damage, destruction or loss to natural resources, personal injury, wrongful death, property damage, fines, penalties or other costs resulting from, related to or arising out of (a) the presence, Release or threatened Release of Hazardous Material in, on, into or from the Environment at any location; or (b) any violation of or non-compliance with Environmental Law, and shall include any claim, notice, demand, order, action, suit or proceeding seeking damages (including the costs of remediation), contribution, indemnification, cost recovery, penalties, fines, indemnities, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to human health, safety or the Environment resulting from said violation or non-compliance with Environmental Law.

"***Environmental Law***" means any and all federal, state, local and foreign statutes, laws, including applicable common law, regulations, ordinances, rules, judgments, orders, decrees or governmental restrictions relating to pollution, the protection of the environment, the release of Hazardous Materials into the environment or human exposure to Hazardous Materials, including those related to the treatment, transport, storage and disposal of Hazardous Materials, air emissions and discharges to public wastewater treatment systems.

6

"***Environmental Liabilities***" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, monitoring or oversight by a Governmental Authority, fines, or penalties), of any Seller directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law; (b) the generation, use, handling, transportation, storage, treatment, use or disposal of any Hazardous Materials; (c) human exposure to any Hazardous Materials; (d) the release or threatened release of any Hazardous Materials into the environment; or (e) any contract, agreement, or other binding consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"***Environmental Permit***" means any Permit, approval, identification number, license or other authorization required under any Environmental Law.

"***Equity Interests***" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, and the rules and regulations thereunder, each as amended or modified from time to time.

"***ERISA Affiliate***" means, with respect to any Person, any entity, trade or business that is, or at any applicable time was, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes such Person.

"***Excluded Assets***" has the meaning set forth in Section 2.2.

"***Excluded Contracts***" has the meaning set forth in Section 2.2(c).

"***Excluded Liabilities***" has the meaning set forth in Section 2.4.

"***Expense Reimbursement Amount***" means an amount equal to the reasonable and documented out-of-pocket fees and expenses of Purchaser incurred in connection with this Agreement and the transactions contemplated hereby, including all such fees and expenses related to negotiating this Agreement, or any of the other Transaction Documents, preparing to implement the transaction contemplated hereby and thereby, and investigating and evaluating the Purchased Assets, the Excluded Assets, and the Assumed Liabilities, which shall constitute an allowed superpriority administrative expense claim against each Seller under sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of Sellers of the kind specified in section 503(b) of the Bankruptcy Code, which amount shall be subject to approval by the Bankruptcy Court pursuant to the Bid Procedures Order; *provided*, that the "Expense Reimbursement Amount" shall not exceed $2,500,000.

"***Expenses***" means the out-of-pocket fees and expenses of a Party's independent advisor, counsel and accountants, incurred or paid by such party or on its behalf in connection with this Agreement and the transactions contemplated hereby.

"***Export/Import Laws***" shall mean, collectively, any Laws, regulations, Orders, and authorizations issued by a Governmental Authority applicable to the export or import of goods, technology or software, including the U.S. Export Administration Regulations (EAR) (15 C.F.R. 768-799); the U.S. Arms Export Control Act (22 U.S.C. 2751-2779); the International Traffic in Arms

Regulations (ITAR) (22 C.F.R. 120-130); the Regulations of the Bureau of Alcohol, Tobacco, and Firearms (ATF) (27 C.F.R. 447-555); the Homeland Security Act of 2002; and the U.S. Customs Regulations (19 C.F.R. 1-199).

"***Facility***" means the solid waste disposal facilities of Sellers located in Brazoria County, Texas, including any and all real and personal property thereon, which is subject to the Prepetition Liens and the DIP Liens (each as defined in the DIP Credit Agreement).

"***FCPA***" has the meaning set forth in <u>Section 3.4(c)</u>.

"***Financial Statements***" has the meaning set forth in <u>Section 3.6(a)</u>.

"***Fixtures and Equipment***" means all furniture, furnishings, vehicles, equipment, machinery, tools, fixtures, Transferred IT Equipment and other personal and mixed property, operation and nonoperational, that are Related to the Business, wherever located, including any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person, except to the extent included in Excluded Assets. "Fixtures and Equipment" shall include all rights under any leases relating to, arising from, or with respect to such Fixtures and Equipment, to the extent such leases constitute Assumed Contracts.

"***Fundamental Representations***" means the representations and warranties of Sellers set forth in <u>Section 3.1</u> (Due Incorporation; Good Standing), <u>Section 3.2</u> (Due Authorization), <u>Section 3.3(b)(ii)(2)</u> (Governmental Filings; No Violations), <u>Section 3.14(a)</u> (Title to Assets; Sufficiency of Assets; Condition of Assets), and <u>Section 3.18</u> (Brokers and Finders).

"***Further Assignment Notice***" has the meaning set forth in <u>Section 2.7(e)</u>.

"***GAAP***" means generally accepted accounting principles in the United States, as in effect from time to time.

"***Governmental Authority***" means any U.S., state, local or foreign governmental, regulatory or administrative body, agency or authority, any court or judicial authority or arbitration tribunal, whether national, Federal, state or local or otherwise, or any Person lawfully empowered by any of the foregoing to enforce or seek compliance with any applicable law, statute, regulation, order, or decree.

"***Hazardous Material***" means any chemicals, materials, or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "hazardous constituents," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants," "pollutants," "toxic pollutants," under any Environmental Law or for which liability or standards of conduct may be imposed pursuant to Environmental Law, including petroleum and petroleum products, by-products, derivatives or wastes, radioactive materials, asbestos or asbestos-containing materials or products, per- and polyfluoroalkyl substances, polychlorinated biphenyls (PCBs) or materials containing same, lead or lead-based paints or materials, radon, fungus, mold in quantities or concentrations that may adversely affect human health or materially affect the value or utility of the building(s) in which it is present, or other substances that may have an adverse effect on human health or the environment.

"***HMT***" has the meaning set forth in the definition of "Sanction."

"***HSR Act***" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"*Identified Contracts*" has the meaning set forth in <u>Section 2.7(c)</u>.

"*Income Tax*" means any United States or foreign, federal, state, provincial, municipal, or county Tax that, in whole or in part, is based on, measured by or calculated by reference to net income, profits or gains, including any state or local franchise Tax, and including any interest, penalty or addition thereto, whether disputed or not.

"*Income Tax Returns*" means any Tax Return with respect to Income Taxes.

"*Indebtedness*" means, with respect to any Person, without duplication, the outstanding principal amount of, accrued and unpaid interest on, and other payment obligations (including any prepayment premiums or penalties payable as a result of the repayment thereof) arising under, any obligations consisting of (a) indebtedness for borrowed money or indebtedness issued in substitution or exchange for borrowed money for the deferred purchase price of property or services, (b) indebtedness evidenced by any note, bond, debenture or other debt security, (c) all obligations under financing or capital leases, including obligations created or arising under any conditional sale or other title retention agreement, or incurred as financing, (d) all deferred obligations to reimburse any bank or other Person in respect of amounts paid or advanced under a letter of credit, surety bond, performance bond or other instrument, (e) all Liabilities in respect of letters of credit and bankers' acceptances, to the extent drawn and payable, (f) all Liabilities in respect of "earn-out" obligations and other obligations for the deferred purchase price of property, assets, or services, including any royalty or "earn-out" payments (other than trade payables or accruals incurred in the Ordinary Course of Business), (g) book overdraft, and (h) all Indebtedness of others guaranteed, directly or indirectly, by such Person or as to which such Person has an obligation (contingent or otherwise) that is substantially the economic equivalent of a guarantee or that is otherwise recognized in the financial statements of such Person.

"*Insurance Policies*" has the meaning set forth in <u>Section 3.17</u>.

"*Intellectual Property Rights*" means all rights in the following in any jurisdiction throughout the world: (a) patents, patent applications, patent disclosures and statutory invention registrations, including reissues, divisions, continuations, continuations in part, extensions and reexaminations thereof, all rights therein provided by international treaties or conventions ("*Patents*"); (b) trademarks, service marks, trade dress, trade names, logos (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, together with all goodwill associated with each of the foregoing, any and all common law rights, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing; (c) copyrightable works (including computer software source code, executable code, databases and related documentation and maskworks), copyrights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions; and (d) confidential and proprietary information, including trade secrets, unpatented inventions, data and know-how ("*Trade Secrets*").

"*Inventory*" means all inventory Related to the Business, wherever located, including all finished goods whether held at any location or facility of Sellers or any of their respective Affiliates or in transit to Sellers or any of their respective Affiliates, all semi-finished and finished goods, raw materials, works in progress, samples, prototypes, displays, packaging, supplies, tooling and parts, together with all rights of Sellers against suppliers thereof, in each case, as of the Closing Date, except to the extent included in Excluded Assets.

"*Investment*" means, as to any Person, any direct or indirect investment by such Person, by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another

Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in <u>clause (h)</u> of the definition of Indebtedness in respect of such Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such other Person.

"***IP Assignment***" has the meaning set forth in <u>Section 2.8(b)(ii)</u>.

"***IT Equipment***" means networks and communications equipment, information technology assets, network appliances, and storage devices, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto.

"***Key Customers***" has the meaning set forth in <u>Section 3.16</u>.

"***Key Vendors***" has the meaning set forth in <u>Section 3.16</u>.

"***Knowledge***" means, with respect to Sellers, the knowledge, after reasonable inquiry, of any of the individuals listed on <u>Schedule 1.1(a)</u>.

"***Labor Agreement***" has the meaning set forth in <u>Section 3.9(a)(xv)</u>.

"***Law***" means any and all applicable international, foreign, federal, state and local laws (statutory, common or otherwise, and including international conventions, protocols and treaties), acts, statutes, constitutions, treaties, conventions, rules, guidelines, regulations, ordinances, codes, policies, and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"***Lease Assignment Agreement***" has the meaning set forth in <u>Section 2.8(b)(vi)</u>.

"***Leased Real Property***" has the meaning set forth in <u>Section 3.8(b)</u>.

"***Letter of Credit***" has the meaning set forth in <u>Section 3.6(e)</u>.

"***Liability***" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including, whether arising out of any contract or tort based on negligence or strict liability).

"***Lien***" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any leases evidencing Capitalized Lease Obligations (as defined in the DIP Credit Agreement) having substantially the same economic effect as any of the foregoing).

"*M&F*" has the meaning set forth in Section 10.20(a).

"*Material Adverse Effect*" means any change, event, circumstance, occurrence, condition, development, fact, or state of facts occurring that has had or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on: (a) the Business, the Purchased Assets, the Assumed Liabilities, or the condition (financial or otherwise), operations, cash flows, or results of operations of the Business, the Purchased Assets, or the Assumed Liabilities, taken as a whole, or (b) any Seller's ability to consummate the transactions contemplated by this Agreement and the other Transaction Documents; *provided*, *however*, that, solely with respect to the preceding clause (b), any change, event, circumstance, occurrence, condition, development, fact, or state of facts arising from or related to the following shall be disregarded in determining whether there has been a Material Adverse Effect or whether a Material Adverse Effect could reasonably be expected to occur: (i) general economic, business, industry or credit, financial or capital market conditions (whether in the United States or internationally), including conditions affecting generally all companies engaged in the same industry as the Business, and certain activities ancillary thereto or a segment thereof, or the industries served by the Business; (ii) the announcement of this Agreement or pendency of the transactions contemplated hereby in accordance with the terms hereof; (iii) the breach of this Agreement or any other Transaction Document by Purchaser; (iv) pandemics and any response of any Governmental Authority thereto; (v) earthquakes, tornados, hurricanes, floods and acts of God; (vi) acts of war (whether declared or not declared), sabotage, terrorism, military actions or the escalation thereof; (vii) any changes or prospective changes in applicable laws, regulations or accounting rules, including GAAP or interpretations thereof, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, or any changes in general legal, regulatory or political conditions after the date hereof; (viii) adverse changes or effects on the Business or the Purchased Assets that directly result from the filing or pendency of the Bankruptcy Cases; (ix) the commencement of the Bankruptcy Cases; and (x) any action or omission by Sellers required or permitted to be taken by this Agreement or the other Transaction Documents, except, in the case of the foregoing clauses (i), (iv), (v), (vi) and (vii), to the extent that the Business or the Purchased Assets are disproportionately adversely affected thereby relative to other similarly situated Persons operating in the industries in which the Business operates.

"*Material Contract*" has the meaning set forth in Section 3.9(a).

"*Multiemployer Plan*" has the meaning set forth in Section 3(37) of the Code.

"*Necessary Consent*" means, with respect to any Contract or Permit, the approval, authorization, consent or waiver of, or granting or issuance of any license or permit required under such Contract or Permit in order to transfer it to Purchaser by any party thereto.

"*Notice of Potential Assignment*" has the meaning set forth in Section 2.7(c).

"*Notice of Successful Bidder*" has the meaning set forth in the Bid Procedures Order.

"*OFAC*" has the meaning set forth in the definition of "Sanction."

"*Order*" means any order, judgment, decree, award, decision, injunction, order, ruling, writ, award, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Authority or by any arbitrator, including any order entered by the Bankruptcy Court in the Bankruptcy Cases.

"*Ordinary Course of Business*" and similar terms means the ordinary and usual course of operations of the Business, taken as a whole, taking into account the contemplation, commencement and

pendency of the Bankruptcy Cases and recent past practice in response to any tariffs, sanctions, or trade policies implemented by any Governmental Authority.

"***Organizational Documents***" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, trust or other applicable agreement of formation or organization and, if applicable, any agreement or instrument with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"***Owned Intellectual Property***" has the meaning set forth in Section 3.12(a).

"***Owned Real Property***" has the meaning set forth in Section 3.8(a).

"***Party***" and "***Parties***" each has the meaning set forth in the preamble.

"***Patents***" has the meaning set forth in the definition of Intellectual Property Rights.

"***Permit***" means any consent, license, permit, certificate, clearance, qualification, franchise, waiver, approval, authorization, certificate, registration, certificate of occupancy or filing issued by, obtained from, or made with a Governmental Authority or that are otherwise necessary for Sellers to own the Purchased Assets or operate the Business.

"***Permitted Access Parties***" has the meaning set forth in Section 5.4(a).

"***Permitted Liens***" means, as of the Closing Date, all (a) Liens for Taxes, assessments and governmental charges or levies not yet delinquent or for which adequate reserves are maintained on the financial statements of Sellers; (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's liens and other similar liens arising in the Ordinary Course of Business securing obligations that are not overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves are maintained on the financial statements of Sellers; (c) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations that are not otherwise due or delinquent; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the Ordinary Course of Business consistent with past practice and set forth on the financial statements of Sellers; (e) all matters of record, including survey exceptions, reciprocal easement agreements and other encumbrances on title to real property; (f) all applicable zoning, entitlement, conservation restrictions and other land use and environmental regulations; (g) all exceptions, restrictions, easements, charges, rights-of-way and other Liens set forth in any permits, any deed restrictions, groundwater or land use limitations or other institutional controls utilized in connection with any required environmental remedial actions, or other state, local or municipal franchise applicable to Sellers or any of their respective properties; and (h) Liens referred to on Schedule 1.1(b).

"***Permitted Post-Closing Encumbrance***" means (a) zoning restrictions, building codes and other land use laws regulating the use or occupancy of real property and imperfections in title, charges, easements, rights of way, covenants, restrictions, licenses and other Liens that do not materially affect

the value, use or transferability of the affected asset or property or materially interfere with the operation of the assets or property to which they relate; (b) Liens on the interest of any landlord or sublandlord or underlying fee interest of any Acquired Real Property Lease, but only those not extinguished by the Sale Order; (c) mechanics', carriers', workmen's, repairmen's or other similar Liens arising or incurred in the Ordinary Course of Business for amounts which are (i) not due and payable, and (ii) not, individually or in the aggregate, material to the Business or the Purchased Assets; and (d) Liens for Taxes, assessments or other governmental charges or levies that are not yet due or payable or are being contested in good faith by appropriate proceedings with reserves taken pursuant to applicable accounting standards.

"*Person*" means an individual, corporation, partnership, joint venture, trust, association, estate, joint stock company, limited liability company, unincorporated organization, Governmental Authority or any other organization of any kind.

"*Personal Information*" means any information that (a) relates to an identified or identifiable natural person; an "identifiable person" is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his, her, or their physical, physiological, mental, economic, cultural or social identity, including, unique device or browser identifiers, names, addresses, telephone numbers, email addresses, social security numbers, or account information, and (b) is defined as "personally identifiable information" (PII), "personal information," "personal data," or other similar term (as applicable), within the meaning of any Privacy Laws in effect prior to, or as of, the Closing.

"*Petition Date*" means August 17, 2025.

"*Prepetition Documents*" has the meaning set forth in the DIP Orders.

"*Prepetition Liens*" has the meaning set forth in the DIP Orders.

"*Prepetition Obligations*" has the meaning set forth in the DIP Orders.

"*Previously Omitted Contract*" has the meaning set forth in Section 2.7(k).

"*Previously Omitted Contract Designation*" has the meaning set forth in Section 2.7(k).

"*Previously Omitted Contract Notice*" has the meaning set forth in Section 2.7(l).

"*Privacy Laws*" means any and all Applicable Laws, legal requirements, and binding self-regulatory guidelines relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (both technical and physical), disposal, destruction, disclosure or transfer (including cross-border) of Personal Information, including Section 5 of the Federal Trade Commission Act, California Consumer Privacy Act, Gramm-Leach-Bliley Act, Payment Card Industry Data Security Standard, EU General Data Protection Regulation, and any and all Applicable Laws relating to breach notification or marketing in connection with Personal Information.

"*Property Taxes*" means ad valorem, property, excise or similar Taxes (including any interest, fine, penalty or additions to tax imposed by any Governmental Authority in connection with such Taxes) based upon the acquisition, operation or ownership of the Purchased Assets but excluding, for the avoidance of doubt, Income Taxes and Transfer Taxes.

"*Purchase Price*" has the meaning set forth in Section 2.5.

"**Purchased Assets**" has the meaning set forth in Section 2.1.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Designee**" has the meaning set forth in Section 2.9.

"**Real Property Lease**" has the meaning set forth in Section 3.8(b).

"**Registered Intellectual Property**" has the meaning set forth in Section 3.12(a).

"**Rejected Contracts Schedule**" has the meaning set forth in Section 2.7(c).

"**Rejected Identified Contracts**" has the meaning set forth in Section 2.7(c).

"**Related to the Business**" means related to, owned, leased, licensed, used, or held for use or in consignment, in connection with the Business as conducted by Sellers prior to the Closing.

"**Release**" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, placing, disposal, dispersal, leaching or migration into the environment (including ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of any Hazardous Material through or in the air, vapor, soil, surface water, groundwater or property.

"**Required Consents**" has the meaning set forth in Section 3.3(a).

"**Response Action**" means any action taken to investigate, abate, treat, remediate, clean up, remove or mitigate any violation of Environmental Law, any Contamination of any property owned, leased or used by the Business or any release or threatened release of Hazardous Materials. Without limitation, Response Action shall include any action that would be a response as defined by the Comprehensive Environmental Response, Compensation and Liability Act, as amended at the date of Closing, 42 U.S.C. § 9601 (25).

"**Sale Hearing**" has the meaning set forth in the Bid Procedures Order.

"**Sale Order**" means an Order of the Bankruptcy Court entered in the Bankruptcy Cases approving and authorizing this Agreement and the transactions contemplated herein (including approving and authorizing any Seller's assumption and assignment pursuant to section 365 of the Bankruptcy Code of the Assumed Contracts), which Sale Order shall be in the form attached as Exhibit 1.1 to this Agreement, with such changes to which Sellers consent (such consent not to be unreasonably withheld, delayed, or conditioned) and Purchaser consents (such consent to be exercised in its sole and absolute discretion).

"**Sanction**" shall mean any sanction administered or enforced by the United States Government, including the Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"), the Department of State, and the United Nations Security Council, the European Union, His Majesty's Treasury ("**HMT**") or other relevant sanctions authority.

"**Scheduled Employees**" has the meaning set forth in Section 3.10(g).

"**Schedules and Statements**" means the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs filed in the Bankruptcy Cases on [●]October 1, 2025 (ECF Nos. [●] [●]189-194).

"**Selected Employees**" has the meaning set forth in Section 5.5(a).

"**Seller Intellectual Property**" means Owned Intellectual Property, together with all other Intellectual Property Rights exclusively licensed to Sellers or which Sellers otherwise have the exclusive right to use.

"**Seller Property Taxes**" means the Property Taxes allocable to Sellers pursuant to the procedures set forth in Section 5.8(b) to the extent unpaid at the Closing.

"**Sellers**" has the meaning set forth in the preamble.

"**Seller Transaction Expenses**" means, to the extent not paid prior to the Closing, an amount equal to the M&A Transaction Fee or Restructuring Fee due and owing to Jefferies LLC ("**Jefferies**") as of Closing in connection with this Agreement pursuant to and as defined in that certain engagement letter between the Parent and Jefferies, dated as of June 25, 2025 (the "**Engagement Letter**"), and approved by the Bankruptcy Court; *provided*, that Jefferies shall only be paid either an M&A Transaction Fee or a Restructuring Fee on account of the Closing in connection with this Agreement as provided for in the foregoing Engagement Letter, but not both such fees.

"**Subject Employees**" has the meaning set forth in Section 5.5(a).

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (a) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or (b) the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person and, in the case of this clause (b), which is treated as a consolidated subsidiary for accounting purposes.

"**Successful Bidder**" has the meaning set forth in the Bid Procedures Order.

"**Take-Back Indebtedness**" means the portion of the obligations under the DIP Credit Agreement in an aggregate principal amount of $[●]120,000,000.00 assumed by Purchaser at Closing.

"**Tax**" (and, with correlative meaning, "**Taxes**," "**Taxable**," and "**Taxing**") means (a) any net income, capital gains, gross income, gross receipts, sales, use, transfer, ad valorem, franchise, profits, license, capital, withholding, payroll, estimated, employment, excise, goods and services, severance, stamp, occupation, premium, property, social security, environmental (including Code section 59A), alternative or add-on, value added, registration, windfall profits or other taxes, duties, charges, fees, levies or other assessments imposed by any Governmental Authority, or any interest, penalties, or additions to tax incurred under Applicable Laws with respect to taxes; and (b) any liability in respect of any item described in clause (a) above that arises by reason of a contract, assumption, transferee or successor liability, operation of law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"***Tax Returns***" means any report, return (including any information return), declaration or other filing required or permitted to be supplied to any taxing authority or jurisdiction with respect to Taxes, including any amendments or attachments to such reports, returns, declarations or other filings.

"***TCEQ***" means the Texas Commission on Environmental Quality.

"***Termination Date***" has the meaning set forth in Section 8.1(b).

"***Title Company***" means Stewart Title Guaranty Company or any other nationally recognized title insurance company designated by Purchaser.

"***Trade Secrets***" has the meaning set forth in the definition of Intellectual Property Rights.

"***Transaction Documents***" means this Agreement and all other ancillary agreements, documents, certificate, or instruments to be entered into by, or documentation delivered by, any Party pursuant to this Agreement.

"***Transfer Taxes***" has the meaning set forth in Section 5.8(a).

"***Transferred Employees***" has the meaning set forth in Section 5.5(a).

"***Transferred Intellectual Property***" means all Seller Intellectual Property other than any Intellectual Property Right which is an Excluded Asset.

"***Transferred IT Equipment***" means all IT Equipment that is Related to the Business, except to the extent included in Excluded Assets.

"***Transferred Owned Real Property***" means all Owned Real Property other than any Owned Real Property which is an Excluded Asset.

"***Transferred Permit***" has the meaning set forth in Section 2.1(m).

"***Transferred Seller Plans***" has the meaning set forth in Section 2.1(o).

"***WARN Act***" means the Worker Adjustment and Retraining Notification Act of 1988, as amended or any similar applicable state law.

"***Wayward Assets***" is defined in Section 5.11.

"***Wind Down Account***" means a segregated account designated by the Sellers to hold the Wind Down Amount in accordance with the Sale Order.

"***Wind Down Amount***" means an amount equal to $[1,100,000].

## ARTICLE II
## PURCHASE AND SALE; CLOSING

2.1     **Purchase and Sale**. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement (including entry of the Sale Order), at the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Sellers, all of Sellers' right, good title, and interest in and to all of the assets of Sellers, other than the Excluded Assets, to the extent such assets exist as of the Closing Date, wherever

located, including, without limitation, the following assets (the "***Purchased Assets***"), in each case free and clear of all Liens to the extent provided in the Sale Order (other than Permitted Post-Closing Encumbrances):

        (a)     all Cash and Cash Equivalents, security entitlements, securities accounts, commodity contracts and commodity account and including any cash collateral that is collateralizing any letters of credit or Insurance Policies, excluding (i) the Carve-Out Account, but including any funds remaining in the Carve-Out Account after all Allowed Professional Fees have been irrevocably paid in full, and (ii) the Cash Consideration;

        (b)     Accounts Receivables;

        (c)     Inventory;

        (d)     Transferred Owned Real Property;

        (e)     Fixtures and Equipment, including Transferred IT Equipment;

        (f)     Transferred Intellectual Property;

        (g)     each Contract listed on Schedule 2.1(g), including the Acquired Real Property Leases (such Contracts, collectively, the "***Closing Assumed Contracts***"), and each Additional Assumed Contract, together with all outstanding purchase orders related thereto, it being understood that the Closing Assumed Contracts will not include any of the Rejected Identified Contracts;

        (h)     each non-executory Contract Related to the Business listed on Schedule 2.1(h);

        (i)     all leasehold rights in personal property leased by Sellers and used or held for use primarily in connection with the Business;

        (j)     all of Sellers' rights under confidentiality or non-disclosure agreements with respect to confidential treatment of information Related to the Business or the Purchased Assets and with respect to solicitation and hiring of Scheduled Employees;

        (k)     for each Seller, the books and records, and the corporate charter, seal, minute books, stock record books and other similar documents, including all personnel records (including all human resources and other records) relating to the Transferred Employees;

        (l)     all Claims and Actions owned by or available to any Seller (excluding Commercial Tort Claims but including Avoidance Actions), (i) Related to the Business or related to the Purchased Assets, the Assumed Liabilities, or the acquisition, ownership, management, operation, use, function, or value of the Business or any Purchased Asset; (ii) against any counterparty to a Assumed Contract, or any Affiliate of such counterparty; or (iii) against any current or former director, officer, manager, Employee, contractor, consultant or advisor employed by or providing services to any Seller to the extent Related to the Business (such actions, the "***Assigned Actions***");

        (m)     all Permits (including Environmental Permits, subject to any TCEQ specific terms set forth in the Sale Order or any other order of the Bankruptcy Court), and all pending applications therefor, in each case, to the extent Related to the Business and necessary for the current operation and conduct of the Business and Purchased Assets (the "***Transferred Permits***"), including the Permits set forth on Schedule 2.1(m);

(n)        any interests, shares, securities, or other investments set forth on Schedule 2.1(n);

(o)        the Benefit Plans set forth on Schedule 2.1(o), together with any additional Benefit Plans, if any, designated by Purchaser by providing written notice to Sellers not later than ten (10) Business Days prior to the expected Closing Date, and all rights and interests of any Seller thereunder, and any trusts, funding vehicles, insurance policies, administrative services agreements, files and records, and other assets related thereto to the extent Related to the Business or Transferred Employees (collectively, the "*Transferred Seller Plans*");

(p)        all credits, prepaid expenses, prepayments, deferred charges, advance payments, refunds, customer deposits and security deposits, prepaid items and duties, customer or vendor rebates, credits or other refunds, earnest deposits, bid, performance, lease, utility and other deposits, and all other forms of deposit or security placed by Sellers for the performance of an Assumed Contract, in each case, to the extent Related to the Business or related to a Purchased Asset;

(q)        any claim, interest, right, award, recovery, indemnity, warranty, right to insurance proceeds, rebate, right of set off, refund, reimbursement, audit right, duty, obligation, liability or other intangible right in favor of or owed to any Seller (other than rights arising under or relating to this Agreement and the other Transaction Documents), to the extent (i) related to any Assigned Action or Transferred Seller Plan, (ii) related to any other Purchased Asset, any Assumed Liability, or the Business, or (iii) related to any insurance proceeds as set forth in Section 5.12;

(r)        all of Sellers' rights under invention, intellectual property assignment, non-competition, non-solicitation of customers and Employees, and non-disparagement agreements, with current and former Employees and agents of any Seller or third party to the extent related to the Purchased Assets (or any portion thereof) or with the Transferred Employees;

(s)        all customer and supplier lists Related to the Business and all telephone and telephone facsimile numbers and other directory listings of the Business;

(t)        all goodwill, customer and referral relationships, other intangible property, and all privileges and rights of set-off, in each case, Related to the Business or to the extent attributable to the Purchased Assets or the Assumed Liabilities;

(u)        all rights of any Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, and contractors to any Seller to the extent related to the Purchased Assets;

(v)        all bank accounts Related to the Business, other than those set forth on Schedule 2.2(f);

(w)        any refund of any Taxes paid by or allocable to any Seller other than any refund of Taxes that are Excluded Liabilities;

(x)        all current and historical primary, excess and umbrella policies, self-insurance and captive insurance company arrangements, casualty, workers' compensation, general liability and auto liability insurance policies, including the policies set forth on Schedule 3.17, and all rights of any nature with respect to any such insurance policy, including any recoveries thereunder and any claims, rights to assert claims, or causes of action thereunder or proceeds thereof;

(y)      prepaid expenses of Sellers and any of their respective Affiliates to the extent attributable to a Purchased Asset or otherwise Related to the Business;

(z)      the rights under the trust funds established under the trust agreements identified on <u>Schedule 3.13(f)</u> with respect to Environmental Liabilities, subject to any TCEQ specific terms set forth in the Sale Order or any other order of the Bankruptcy Court;

(aa)     other than any Excluded Asset, all right, title, and interest of Sellers in, for or under the Business and other assets, properties or rights of every kind and description, wherever located, whether real, personal, or mixed, tangible or intangible, Related to the Business, whether owned, leased, licensed, used, occupied, or held for use by Sellers; and

(bb)     all proceeds and products of any and all of the foregoing Purchased Assets.

2.2      **Excluded Assets**. Notwithstanding anything to the contrary contained in <u>Section 2.1</u> above or any other provision of this Agreement or any Transaction Document, the following assets are not being sold, assigned, transferred, or conveyed to Purchaser by Sellers hereunder (collectively, the "***Excluded Assets***"):

(a)      the Cash Consideration;

(b)      data files, archive files, systems documentation, and other data processing information and records relating solely to any of the Excluded Assets;

(c)      all Contracts (other than Closing Assumed Contracts or Additional Assumed Contracts), including the Contracts set forth on the Rejected Contracts Schedule (the "***Excluded Contracts***");

(d)      all current and prior directors' and officers' liability insurance policies maintained by Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(e)      the Carve-Out Account, excluding any funds remaining in the Carve-Out Account after all Allowed Professional Fees have been irrevocably paid in full;

(f)      the bank accounts set forth on <u>Schedule 2.2(f)</u> (including any cash held therein);

(g)      the rights which accrue or will accrue to Sellers under this Agreement and the Transaction Documents;

(h)      any rights, claims, or causes of action, including rights pursuant to warranties, representations, and guarantees, each to the extent related to (i) Excluded Assets described herein, and (ii) intercompany obligations between Sellers or any of their respective Affiliates;

(i)      any tangible or intangible asset held by Sellers pursuant to a lease, license, contract, or other agreement where such lease, license, contract, or other agreement is an Excluded Contract;

(j)      all securities, whether capital stock or debt, of Sellers, other than those set forth on <u>Schedule 2.1(n)</u>;

(k)      all Personal Information that Sellers are prohibited by Applicable Law, including applicable Privacy Laws, or by any of Seller's public-facing policies, notices or other disclosures from delivering or transferring to Purchaser;

(l)      all personnel records (including all human resources and other records) of Employees who are not Transferred Employees;

(m)      all open purchase orders for goods and services with customers of the Business outstanding as of the Closing, other than the Assumed Customer Orders;

(n)      all open orders for goods and services with suppliers of the Business that remain unfulfilled as of the Closing, other than the Assumed Supplier Orders;

(o)      any Benefit Plan other than the Transferred Seller Plans and any trusts, funding vehicles, insurance policies, administrative services agreements, files and records, and other assets, related thereto (other than with respect to the Transferred Seller Plans);

(p)      documents that (i) Sellers are required by Applicable Law to retain, (ii) if transferred would violate any Applicable Laws (including with respect to privacy), or (iii) are subject to any attorney-client, work product or similar privilege with respect to work performed in anticipation of or in connection with the preparation or administration of the Bankruptcy Cases, this Agreement or the transactions contemplated by this Agreement;

(q)      any assets, properties and rights described or set forth on Schedule 2.2(q); and

(r)      Sellers' Commercial Tort Claims and any Avoidance Actions unrelated to the Purchased Assets, Assumed Liabilities or the Business.

2.3      **Assumed Liabilities**. On the terms and conditions contained in this Agreement, Purchaser shall, after the Closing, assume and be liable and responsible for paying and satisfying, solely and only the following Liabilities, all items not set forth below in this Section 2.3 being excluded (all Liabilities so assumed, the "***Assumed Liabilities***"):

(a)      all Liabilities exclusively arising in connection with or from the use of the Purchased Assets or operation of the Business after the Closing;

(b)      all Liabilities arising after the Closing of any Seller to deliver products or services pursuant to Assumed Customer Orders;

(c)      all Liabilities under the Assumed Contracts, in each case to the extent arising out of any event, fact, act, omission, or condition occurring after the Closing and excluding any Liabilities arising from or relating to any breaches under such Assumed Contracts prior to the Closing;

(d)      all Liabilities under the Transferred Seller Plans, to the extent arising from Purchaser's employment of Transferred Employees and all Liabilities assumed by Purchaser pursuant to Section 5.5, in each case to the extent arising out of any event, fact, act, omission, or condition occurring after the Closing;

(e)      all Liabilities related to the Assigned Actions to the extent arising out of any event, fact, act, omission, or condition occurring after the Closing;

20

(f)      all Assumed Cure Costs payable pursuant to Section 2.7(a) and all Liabilities described in Section 2.7(i);

(g)      the Take-Back Indebtedness;

(h)      Liabilities for accrued and unpaid vacation, holidays, sick pay and other paid time-off for the Transferred Employees (the "***Assumed PTO***");

(i)      all Liabilities under any Transferred Permit to the extent arising out of any event, fact, act, omission, or condition occurring after the Closing;

(j)      all Liabilities with respect to any product liability or warranty claims relating to the Business and arising out of facts, events, or conditions first existing or first occurring after the Closing;

(k)      all Liabilities for Taxes imposed on or with respect to the Purchased Assets or the Business that are attributable to any period or portion thereof beginning after the Closing;

(l)      Liabilities for trade accounts payable incurred from and after the Petition Date and until and including the Closing Date; and

(m)      without duplication of any other item described in this Section 2.3, all financing or capital leases secured by any of the Purchased Assets set forth on Schedule 2.3(k).

2.4      **Excluded Liabilities**. Anything in this Agreement or in any other Transaction Document to the contrary notwithstanding, except for the Assumed Liabilities set forth in Section 2.3, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or otherwise become responsible for Sellers' or any of their respective Affiliates' Liabilities that are not Assumed Liabilities (such excluded Liabilities are collectively referred to herein as the "***Excluded Liabilities***"), and Sellers and their Affiliates shall remain fully and solely responsible for all Excluded Liabilities. For the avoidance of doubt, any and all of the following shall constitute Excluded Liabilities:

(a)      any Liability under the DIP Credit Agreement (except the Take-Back Indebtedness), the Prepetition Obligations, and any other Indebtedness of Sellers;

(b)      any Liability to the extent arising out of any Excluded Asset, including the Excluded Contracts;

(c)      all Claims or Actions pending on or before the Closing against Sellers and all Claims or Actions against or giving rise to liabilities or obligations of the Business or the Purchased Assets based on acts or omissions by Sellers (or any of them) prior to the Closing even if instituted after the Closing;

(d)      all Liabilities to any current or former holder or owner of capital stock or other Equity Interests of Sellers or any security convertible into, exchangeable or exercisable for shares of capital stock or other Equity Interests of Sellers or any current or former holder of Indebtedness of Sellers;

(e)      all drafts or checks outstanding at the Closing under which Sellers are obligated;

(f)     indemnification or advancement of expenses for any current or former officer or director of any Seller or any of the Subsidiaries of Sellers;

(g)     all Liabilities for trade or accounts payable and other obligations of payment to any Person to the extent arising prior to the Closing other than as assumed pursuant to Section 2.3(l);

(h)     any Liability with respect to any of the current or former Employees arising prior to the Closing, other than (i) the Assumed PTO and (ii) Liabilities arising under a Transferred Seller Plan (prior to or on Closing);

(i)     all Liabilities under any futures contracts, options on futures, swap agreements, or forward sale agreements;

(j)     any and all (i) Taxes allocated to, of or imposed on Sellers (or any member or Affiliate of a Seller), (ii) Taxes imposed on or with respect to the Business or the Purchased Assets that are attributable to any period or portion thereof ending on or prior to the Closing, (iii) Taxes that arise from the consummation of the transactions contemplated by this Agreement, (iv) Transfer Taxes that are the responsibility of Sellers pursuant to Section 5.8(a), and (v) any Taxes payable to the extent arising out of or related to the Excluded Assets or with respect to the activities of any Seller or any of their respective Affiliates (including divested or discontinued business of any Seller or their respective Affiliates);

(k)     any Environmental Liability arising out of or relating to (i) the Excluded Assets, (ii) the conduct of the Business or the ownership or operation of the Business and the Purchased Assets, in each case, on or prior to the Closing; (iii) the presence, Release or threat of Release of or exposure to any Hazardous Materials at, on, or under or migrating from any Owned Real Property, Leased Real Property or otherwise with respect to the Purchased Assets, or otherwise arising out of the ownership or operation of, the Business, in each case, arising on or prior to the Closing; (iv) the transportation, storage, treatment, disposal, generation, manufacturing, recycling, reclamation, use or other handling of any Hazardous Materials with respect to the Purchased Assets, or relating in any manner to the ownership or operation of, the Business on or prior to the Closing; (v) the presence, existence or human exposure to asbestos in any form at, on, under or within any Purchased Asset, Owned Real Property, or Leased Real Property occurring, arising or existing on or prior to the Closing; (vi) Liabilities that Sellers have assumed by Contract from a third party prior to the Closing that are not a Closing Assumed Contract; (vii) any Contract that is not an Assumed Contract; (viii) any violations of Environmental Law to the extent such violations occurred prior to the Closing regardless of whether those violations continue on or past the Closing (subject to TCEQ specific terms in the Sale Order or any other order of the Bankruptcy Court or as otherwise expressly assumed by Purchaser); or (ix) the matters set forth on Schedule 2.4(k);

(l)     all Liabilities relating to (i) the collection, storage, transmission, use or disposal of any Personal Information of any third party, in each case, on or before the Closing, and (ii) the transfer of any such Personal Information to Purchaser to the extent permitted under this Agreement;

(m)     all Liabilities, including any Claims or Actions, with respect to current or former Employees (or their representatives or beneficiaries) or employees of any ERISA Affiliate, or any officers, directors, retirees, independent contractors, consultants or job applicants of any Seller or any ERISA Affiliate, for any action or inaction of any Seller (or any predecessor of any Seller) occurring on or prior to the Closing, including with respect to any Benefit Plan, severance, vacation, payroll, sick leave, unemployment benefits, retirement benefits, pension benefits, Employee stock options, equity compensation, Employee stock purchases, or profit sharing plans, health care and other welfare plans or benefits, or any other Employee plans or arrangements or benefits or other compensation of any kind to

any Employee, officer, director, retiree, independent contractor, consultant or job applicant, including under any benefit plans, programs and arrangements of an ERISA Affiliate and Liabilities of Sellers and their predecessors for severance and Liabilities pursuant to the WARN Act;

(n)     all Liabilities of Sellers or any of their respective ERISA Affiliates relating to, arising out of, or with respect to any Multiemployer Plan;

(o)     any payment obligation or liability, contingent or otherwise, for brokerage or finders' fees or similar payment in connection with this Agreement (including all Allowed Professional Fees and all amounts necessary to wind-down the Sellers' estates);

(p)     all Liabilities relating to, arising from or with respect to the failure to comply with any bulk sales laws;

(q)     all Liabilities relating to, arising from or with respect to any worker's compensation claims and any other occurrence-based claim to the extent arising out of any event, fact, act, omission, or condition occurring prior to the Closing, irrespective of when such Liabilities arise;

(r)     all Liabilities of Sellers under or arising out of the Transaction Documents and all Liabilities for which Sellers or any of their respective Affiliates are expressly made responsible pursuant to this Agreement or any other Transaction Document;

(s)     all Cure Costs, other than Assumed Cure Costs;

(t)     all Liabilities for all costs and expenses incurred or owed by Sellers in connection with (i) the administration of the Bankruptcy Cases, or (ii) the negotiation, execution and consummation of the transactions contemplated under this Agreement or any other Transaction Document or the DIP Credit Agreement;

(u)     subject to Section 2.4(h), all Liabilities relating to, arising from or with respect to, the conduct of the Business or to the Purchased Assets (and the use thereof) arising or accruing at any time at or prior to the Closing;

(v)     all Liabilities that existed, arose, or were incurred (i) prior to the Petition Date unless assumed in Section 2.3, or (ii) subsequent to the Petition Date and prior to the Closing Date, unless expressly assumed herein, including in each case of (i) and (ii) Liabilities that are dischargeable in the Bankruptcy Cases; and

(w)     any other Liability of any kind, whether known or unknown, contingent or noncontingent, matured or otherwise, whether currently existing or hereinafter created, other than an Assumed Liability.

2.5     **Purchase Price**

(a)     The aggregate purchase price for the purchase, sale, assignment and conveyance of Sellers' respective right, title and interest in, to and under the Purchased Assets will consist of the following (collectively, the "***Purchase Price***"):

(i)     the credit bid in the amount of the Credit Bid Amount;

(ii)     an amount in cash equal to the Cash Consideration; and

(iii)     the assumption of the Assumed Liabilities, including payment of the Assumed Cure Costs payable pursuant to <u>Section 2.7(a)</u>.

(b)     In accordance with the foregoing, Purchaser shall (i) deliver, or cause to be delivered, to (1) Sellers an aggregate amount in cash equal to the Cash Consideration[1] and (2) the respective non-Seller counterparties to the Assumed Contracts, the applicable Assumed Cure Costs (collectively, the "***Closing Date Payment***"); and (ii) satisfy the Purchase Price at the Closing as to the Credit Bid Amount by discharging Sellers, and Sellers shall be deemed discharged, from the obligations under the DIP Credit Agreement in an aggregate amount equal to the Credit Bid Amount (for the avoidance of doubt, any Lien and security interest under the DIP Credit Agreement on any encumbered asset that is not a Purchased Asset shall not be released and will continue to secure the remaining outstanding obligations under the DIP Credit Agreement). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made, and such designation shall be made, at least two (2) Business Days prior to the date such payment is to be made.

2.6     **Purchase Price Allocation**. Within ninety (90) days after the Closing Date, Purchaser will prepare or cause to be prepared and delivered to Sellers an allocation of the Purchase Price (and any other items constituting consideration for Tax purposes) among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. Sellers and Purchaser shall cooperate in good faith to finalize a mutually agreeable Internal Revenue Service Form 8594 allocation within thirty (30) days after the delivery of the allocation by Purchaser to Sellers. If within thirty (30) days after receiving the allocation, Sellers have not objected, Purchaser's proposed allocation shall become final and binding. If within thirty (30) days after receiving the allocation Sellers object to the allocation, Purchaser and Sellers shall reasonably cooperate in good faith to resolve their differences and finalize the allocation. If the Parties reach agreement on the allocation, Sellers and Purchaser covenant (a) to report gain or loss or cost basis, as the case may be, in a manner consistent with such allocation, (b) to prepare and file, and cause their respective Affiliates to prepare and file, their Tax Returns, including Internal Revenue Service Form 8594, on a basis consistent with the allocation, (c) not to voluntarily take any position inconsistent therewith in any proceeding relating to Taxes, and (d) to use commercially reasonable efforts to sustain such allocation in any subsequent Tax audit or Tax dispute. If Purchaser and Sellers are unable to reach an agreement as to the finalized allocation within such thirty (30) day period, Purchaser's proposed allocation shall become final and binding for all Tax purposes.

2.7     **Assumption and Assignment of Contracts**.

(a)     Sellers shall assign to Purchaser, and Purchaser shall assume, the Closing Assumed Contracts at the Closing pursuant to the Sale Order, subject to the other provisions of this <u>Section 2.7</u>.  Purchaser shall pay all Assumed Cure Costs in respect of the Assumed Contracts, which shall not be the obligation, liability or responsibility of Sellers. Purchaser shall provide adequate assurances of any future performance in connection with the assignment and assumption of the Closing Assumed Contracts at Closing or the effective date of such assignment and assumption of an Additional Assumed Contract; *provided*, that, whether before or after the Closing, to the extent the aggregate Cure Costs with respect to the Assumed Contracts exceeds the Assumed Cure Costs Cap, (i) Purchaser, in its sole discretion, may agree to increase the Assumed Cure Costs Cap in an amount equal to such excess, such determination to be made as soon as reasonably practicable following Purchaser's receipt of written notice of such excess amount and (ii) if Purchaser does not agree to increase the Assumed Cure Costs Cap (as described in clause (i) above) then Purchaser shall remove one or more Assumed Contract(s)

---

[1] ~~**Note to MoFo**: The cash is still subject to the prepetition liens.~~

from the Closing Assumed Contracts list or Additional Assumed Contracts list, as applicable, as Purchaser may determine in its sole discretion, and such Assumed Contract(s) shall thereafter be deemed to be Excluded Contract(s) and may be rejected by any Seller.

(b)     The Sale Order shall provide for the assumption by the applicable Seller party thereto, and the assignment to the extent legally capable of being assigned by such Seller to Purchaser, of (i) each Closing Assumed Contract pursuant to section 365 of the Bankruptcy Code on the terms and conditions set forth in the remainder of this <u>Section 2.7</u>, and (ii) each Additional Assumed Contract pursuant to section 365 of the Bankruptcy Code on the terms and conditions set forth in the remainder of this <u>Section 2.7</u>.

(c)     No later than September 23, 2025, Sellers shall file a notice (a "***Notice of Potential Assignment***") with the Bankruptcy Court in the form approved by the Bid Procedures Order and serve such Notice of Potential Assignment by first-class mail on all non-Seller counterparties to those certain executory Contracts and unexpired leases related to the Business or the Purchased Assets to which one or more Sellers or their respective Affiliates are party that Sellers may wish to assign in connection with the transactions contemplated hereby (each, an "***Identified Contract***"). In accordance with this <u>Section 2.7(c)</u>, during the period following the date hereof to the Closing Date, Purchaser may, in its sole discretion, designate (or remove the designation of) any Identified Contract for rejection effective on or as soon as reasonably practicable after the Closing (such Identified Contracts, the "***Rejected Identified Contracts***"). The Rejected Identified Contracts as of the date hereof are set forth on <u>Schedule 2.7(c)</u>, which schedule shall be (and shall be deemed) modified or supplemented to reflect additions or removals, as applicable, of Identified Contracts that are designated for rejection as set forth in this <u>Section 2.7</u> (including pursuant to <u>Section 2.7(a)</u> as a result of Purchaser not agreeing to increase the Assumed Cure Costs Cap with respect to any Assumed Contract due to the Cure Costs exceeding the Assumed Cure Costs Cap) (the "***Rejected Contracts Schedule***"). Within one (1) day after the conclusion or cancellation of the Auction, or as soon as reasonably practicable thereafter, Sellers shall file with the Bankruptcy Court, and serve by first class mail on non-Seller counterparties, a notice in the form approved by the Bid Procedures Order reflecting Sellers' proposed assignment and assumption of the Closing Assumed Contracts. At the Closing, subject to <u>Section 2.7(a)</u>, Sellers shall assume and assign to Purchaser the Closing Assumed Contracts, in each case, pursuant to section 365 of the Bankruptcy Code and the Sale Order, subject to provision by Purchaser of adequate assurance and payment of the Assumed Cure Costs related thereto as may be required under section 365 of the Bankruptcy Code. Pursuant to the terms of the Bid Procedures Order, the Sale Order, or any other Order of the Bankruptcy Court, as the case may be, and subject to <u>Section 2.7(a)</u>, Sellers shall assume and assign to Purchaser the Additional Assumed Contracts, in each case, pursuant to section 365 of the Bankruptcy Code and the Sale Order, subject to provision by Purchaser of adequate assurance and payment of the Assumed Cure Costs related thereto, as may be required under section 365 of the Bankruptcy Code.

(d)     From time to time following the date hereof (and not later than thirty (30) days after the Closing Date), Purchaser may, subject to the terms of the Bid Procedures Order, (i) designate additional Identified Contracts or any other executory contracts or unexpired leases that Purchaser wishes to assume in connection with the transactions contemplated hereby as "***Additional Assumed Contracts***" by providing written notice to Sellers in the form of an updated Additional Assumed Contracts Schedule; and (ii) designate additional Identified Contracts or any other executory Contracts or unexpired leases that Purchaser wishes to reject in connection with the transactions contemplated hereby as "***Additional Rejected Contracts***" by providing written notice to Sellers in the form of an updated Rejected Contracts Schedule. Such notice must be sent by Purchaser no later than thirty (30) days after the Closing Date (the "***Designation Deadline***"). Notwithstanding anything to the contrary contained in this Agreement, if as of the Closing Date, any Closing Assumed Contract is the subject of an objection as to the amount of the Cure Costs required for Sellers to assume and assign such contract to Purchaser, or other objection as to

the assumption and assignability of such contract, and such objection has not been resolved to the satisfaction of Purchaser prior to or after the Closing Date, Purchaser reserves the right to remove such contract from the Closing Assumed Contracts list before or after the Closing Date such that such contract shall not be considered assumed and assigned to Purchaser hereunder.

(e)     Following service of the notice of the Additional Assumed Contracts, Sellers shall file with the Bankruptcy Court a further assumption notice (a "***Further Assignment Notice***") by first-class mail in the form approved by the Bid Procedures Order on all non-Seller counterparties to all Additional Assumed Contracts not previously noticed by Sellers and provide a copy of the same to Purchaser. Following filing of the Further Assignment Notice, Sellers shall assume and assign to Purchaser the Additional Assumed Contracts on such date as specified in such Further Assignment Notice; *provided*, that no such designation date with respect to such Additional Assumed Contract shall be later than the forty-fifth (45th) day following the Closing Date, in each case, pursuant to section 365 of the Bankruptcy Code and an order providing for the assumption by the applicable Seller party thereto, and the assignment to the extent legally capable of being assigned by such Seller to Purchaser and, of each of the Additional Assumed Contracts pursuant to section 365 of the Bankruptcy Code on the terms and conditions set forth in this <u>Section 2.7</u>, subject to provision by Purchaser of adequate assurance and payment of the Assumed Cure Costs related thereto as may be required under section 365 of the Bankruptcy Code. For the avoidance of doubt, (x) if Purchaser has not provided Sellers an updated Additional Assumed Contract Schedule to assume any additional Identified Contracts or other executory contracts or unexpired leases in accordance with the foregoing, then such Identified Contract or other executory contract or unexpired lease shall, together with the Rejected Identified Contracts and other executory Contracts or unexpired leases set forth on the Rejected Contracts Schedule (as may be amended, updated or modified in accordance with this <u>Section 2.7</u>), be deemed to be an Excluded Contract and may be rejected by any Seller party thereto after the expiration of the Designation Deadline, (y) no prepetition Cure Cost shall be due or payable with respect to any executory contract or unexpired lease until the assumption thereof, and (z) each Identified Contract or other executory contract or unexpired lease that becomes an Additional Assumed Contract pursuant to this <u>Section 2.7(e)</u> shall concurrently be deemed to have become a Purchased Asset.

(f)     As part of the motion with respect to the Bid Procedures Order (or as necessary in one or more separate motions), Sellers shall request that, by virtue of any Seller providing seven (7) days' prior notice of its intent to assume and assign any Assumed Contract, the Bankruptcy Court deem any non-Seller party to such Assumed Contract that does not file an objection with the Bankruptcy Court during such notice period to have given any Necessary Consent to the assumption of the Assumed Contract by the relevant Seller and assignment to Purchaser.

(g)     At Purchaser's request, Sellers shall reasonably cooperate with Purchaser as reasonably requested by Purchaser to allow Purchaser to enter into an amendment of any Assumed Contract upon assumption of such Assumed Contract by Purchaser (and Sellers shall reasonably cooperate with Purchaser to the extent reasonably requested by Purchaser in negotiations with the non-Seller counterparties thereof); *provided*, that (i) in no event shall any such amendments be effective prior to the Closing, and (ii) Sellers shall not be required to enter into any such amendment if such amendment would result in the incurrence of any additional Liability that would not have existed but for such amendment by Sellers that is not otherwise paid by Purchaser at the time of the assumption by Sellers of such Assumed Contract.

(h)     Sellers shall use their respective reasonable best efforts to obtain one or more Orders of the Bankruptcy Court (which may be the Sale Order), which Order(s) shall be in form and substance acceptable to Purchaser, and shall reflect the terms and conditions set forth herein, to assume

and assign the Assumed Contracts to Purchaser on the terms set forth in this <u>Section 2.7</u> and the Bid Procedures Order.

(i)     Subject to <u>Section 2.7(j)</u>, to the extent that there is (i) an objection to the assignment and assumption of any Closing Assumed Contract or Transferred Permit outstanding at the Closing Date, (ii) an objection to the assignment and assumption of any Additional Assumed Contract or Transferred Permit on or prior to the seventh (7th) day after the Further Assignment Notice is served, or (iii) any Necessary Consent that is required to assume and assign to Purchaser any Assumed Contract or Transferred Permit is not obtained by the Closing Date, each Seller shall, with respect to each such Contract or Permit, from and after the Closing and until the earliest to occur of (A) the date on which such objection is resolved or such applicable Necessary Consent is obtained, and (B) the date on which such Contract or Permit is deemed rejected under section 365 of the Bankruptcy Code, use reasonable best efforts during the term of such Contract or Permit (and to the extent the term of such Contract or Permit ends prior to the earlier of clauses (A) or (B) above) to (1) provide to Purchaser the benefits under such Contract or Permit (<u>it being understood</u> that Purchaser shall be solely responsible for the obligations under such Contract or Permit), (2) cooperate at Purchaser's cost and expense in any reasonable and lawful arrangement, including holding such Contract or Permit in trust for Purchaser pending resolution of such objection or receipt of the Necessary Consent, designed to provide such benefits to Purchaser, and (3) enforce for the account of Purchaser any rights of such Seller under such Contract or Permit, including the right to elect to terminate such Contract or Permit in accordance with the terms thereof upon the written direction of Purchaser; *provided*, *however*, that notwithstanding the foregoing, Sellers shall not be obligated to take any action that breaches, violates, or results in default under the terms of any Contract or Permit; *provided*, *further*, that no Seller shall be required to pay or commit to pay any amount or incur any obligation in favor of or offer or grant any accommodation (financial or otherwise) to any Person. Purchaser shall reasonably cooperate with Sellers in order to enable Sellers to provide to Purchaser the benefits contemplated by this <u>Section 2.7(i)</u>.

(j)     Notwithstanding the foregoing, a Contract shall not be a Assumed Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is (i) deemed rejected under section 365 of the Bankruptcy Code, or (ii) the subject of an objection to assignment or assumption or requires, under applicable non-bankruptcy Law, the Necessary Consent of any Governmental Authority or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the assumption and assignment by the applicable Seller to Purchaser of such Contract pursuant to section 365 of the Bankruptcy Code, and such objection has not been resolved or such Necessary Consent has not been obtained prior to the sixtieth (60th) day following the Closing (as such sixty-day period may be extended by mutual agreement of Purchaser and Sellers); *provided*, that any Assumed Contract that is the subject of an objection with respect solely to the amount of the Cure Cost may be assumed and assigned prior to the resolution of such objection.

(k)     If prior to or following Closing, it is discovered that a Contract should have been listed on the Notice of Potential Assignment but was not so listed and has not been rejected by Sellers (any such Contract, a "***Previously Omitted Contract***"), Sellers shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify Purchaser in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract. Purchaser shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "***Previously Omitted Contract Designation***"). A Previously Omitted Contract designated in accordance with this <u>Section 2.7(k)</u> as "Rejected," or with respect to which Purchaser fails to deliver a Previously Omitted Contract Designation, shall be deemed an Excluded Contract and added to the Rejected Contracts Schedule.

(l)      If Purchaser designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.7(k), (i) such Previously Omitted Contract shall be added to the Additional Assumed Contracts Schedule and deemed to be an "Additional Assumed Contract" for all purposes hereunder, and (ii) Sellers shall serve a notice (the "**Previously Omitted Contract Notice**") on the non-Seller counterparty to such Previously Omitted Contract notifying such counterparty of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.7(l). The Previously Omitted Contract Notice shall provide the non-Seller counterparty to such Previously Omitted Contract with seven (7) days to object, in writing to Sellers and Purchaser, to the Cure Costs or the assumption of its Contract. If the non-Seller counterparty, Sellers, and Purchaser are unable to reach a consensual resolution with respect to the objection, Sellers will seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption. If no objection is served on Sellers and Purchaser within the seven (7)-day period, Sellers shall obtain an order of the Bankruptcy Court fixing the Cure Costs and approving the assumption of the Previously Omitted Contract. For the avoidance of doubt, Purchaser shall not be responsible for any Liabilities relating to such "Assumed" Previously Omitted Contracts other than the Assumed Cure Costs relating thereto only upon assumption and assignment of such Previously Omitted Contracts to Purchaser.

2.8      **Closing**.

(a)      The Closing shall take place remotely, via electronic exchange of documents, at 10:00 a.m., prevailing Eastern time, on the date that is three (3) Business Days after the satisfaction or waiver of the conditions precedent set forth in Articles VI and VII (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) or on such other date, and at such time and place, as may be agreed by Purchaser and Sellers. The date on which the Closing occurs in accordance with the preceding sentence is referred to in this Agreement as the "**Closing Date**."  The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 11:59 p.m. Central Time on the Closing Date.

(b)      At the Closing, Sellers shall deliver counterparts of the following to Purchaser:

(i)      a bill of sale and assignment and assumption agreement in the form attached hereto as Exhibit 2.8(b)(i) (the "**Bill of Sale, Assignment and Assumption Agreement**") duly executed by Sellers;

(ii)      an assignment of the Registered Intellectual Property in the form attached hereto as Exhibit 2.8(b)(ii) (the "**IP Assignment**") duly executed by Sellers;

(iii)      a certificate from Sellers signed by an authorized officer of Sellers on behalf of Sellers, dated as of the Closing Date, certifying as to the satisfaction of the conditions set forth in Sections 6.1, 6.2, and 6.6 hereof;

(iv)      a certified copy of the Sale Order as entered by the Bankruptcy Court, vesting the Purchased Assets in Purchaser free and clear of any Liens (except for Permitted Post-Closing Encumbrances), and a certified copy of the docket for the period following entry of the Sale Order and through the date immediately prior to the date of the Closing;

(v)      with respect to each Transferred Owned Real Property, (1) a duly executed special warranty deed (or the local equivalent thereof), in form and substance as required by local Law or custom so that such deed will be in recordable form,

28

conveying the fee estate in such Transferred Owned Real Property to Purchaser (the "***Deed***"), (2) with respect to any Transferred Owned Real Property which is subject to a ground lease as of the Closing, a duly executed and acknowledged by the applicable Seller assignment and assumption of ground lease (the "***Assignment and Assumption of Ground Lease***"), conveying the leasehold estate in such Transferred Owned Real Property to Purchaser, in recordable form in the applicable local jurisdiction, and (3) any additional documents, instruments and/or agreements, each in form and substance reasonably satisfactory to Sellers and Purchaser, which are required by local Law to be, or are customarily, filed and/or recorded with the Deed and/or the Assignment and Assumption of Ground Lease in the applicable local jurisdiction, including those certain documents, instruments, and/or agreements set forth on <u>Schedule 2.8(b)(v)</u>;

(vi)     with respect to each Closing Assumed Contract constituting an Acquired Real Property Lease, an assignment and assumption agreement conveying such Acquired Real Property Lease to Purchaser, in each case in customary form reasonably approved by Purchaser (each, a "***Lease Assignment Agreement***"), duly executed by the applicable Seller;

(vii)     a certificate of ~~the Secretary or an Assistant Secretary~~<u>an authorized officer</u> of each Seller certifying as to the incumbency and signatures of the executing officers of such Seller;

(viii)     duly executed counterparts to each other Transaction Document;

(ix)     from each Seller (or if such Seller is disregarded for U.S. federal income tax purposes, its regarded owner), an IRS Form W-9 with respect to such Seller, duly completed and executed;

(x)     all personnel records relating to the Transferred Employees; *provided*, that the delivery obligations of Sellers hereunder shall be deemed satisfied if such personnel records remain at the Facility; and

(xi)     such other instruments and documents as may be reasonably requested by Purchaser at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

(c)     At the Closing, Purchaser shall deliver the following to Sellers:

(i)     payment of the Closing Date Payment pursuant to <u>Section 2.5</u>;

(ii)     duly executed counterpart of the Bill of Sale, Assignment and Assumption Agreement;

(iii)     duly executed counterpart of the IP Assignment;

(iv)     duly executed counterpart of the Assignment and Assumption of Ground Lease;

(v)     duly executed counterpart of the Lease Assignment Agreement;

(vi)     duly executed counterparts of each other Transaction Document;

29

(vii)    a certificate of Purchaser, dated as of the Closing Date, as to the satisfaction of the conditions set forth in Sections 7.1 and 7.2; and

(viii)    such other instruments and documents as may be reasonably requested by Sellers at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

2.9     **Purchaser Designees**. Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.9, one or more Affiliates of Purchaser to (a) purchase specified Purchased Assets; (b) assume specified Assumed Liabilities; and/or (c) employ specified Transferred Employees, in each case, as of the Closing Date (any Person that shall be properly designated by Purchaser in accordance with this clause, a "***Purchaser Designee***"). As soon as reasonably practicable and in no event later than three (3) Business Days prior to the Closing, Purchaser shall make any such designations of Purchaser Designees by way of a written notice to be delivered to Sellers. Purchaser and any Purchaser Designees shall be jointly and severally liable for any obligations of Purchaser and such Purchaser Designees hereunder. For the avoidance of doubt, and notwithstanding anything to the contrary herein, all Purchaser Designees appointed in accordance with this Section 2.9 shall be included in the definition of "Purchaser" *mutatis mutandis* for all purposes under this Agreement and all such Purchaser Designees shall be deemed to have made all of the representations and warranties of Purchaser set forth in this Agreement.

2.10     **Withholding**. Purchaser shall be entitled to deduct and withhold from amounts payable pursuant to this Agreement any amounts required to be deducted and withheld under the Code or any provision of any U.S. federal, state, local, or foreign Tax Law. Prior to withholding any amount, Purchaser shall use commercially reasonable efforts to provide written notice to any Seller to whom such amounts would otherwise have been paid, together with reasonably sufficient details regarding the relevant withholding Law. To the extent that amounts are so deducted and withheld and properly remitted to the appropriate Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the applicable Seller. The Parties shall cooperate and use their commercially reasonable efforts to obtain any available reduction to or exemption from any such withholding requirement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the corresponding numbered section or subsection of the Disclosure Schedule (it being agreed that for the purposes of the representations and warranties made by Sellers in this Agreement, disclosure of any item in any section of the Disclosure Schedule shall be deemed disclosure with respect to any other section or sub-section of the Agreement to which the relevance of such item is reasonably apparent on its face), Sellers hereby represent and warrant, jointly and severally, to Purchaser, as of the date hereof and as of the Closing Date, as follows:

3.1     **Due Incorporation; Good Standing**. Each Seller is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization. Each Seller has all requisite limited liability company or similar power and authority to own, lease and operate its properties and assets and to carry on the Business as presently conducted, and is qualified to do business and, to the extent such concept applies, is in good standing as a foreign legal entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of the Business requires such qualification, except where the failure to be so qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2     **Due Authorization**. Subject to entry of the Sale Order, (a) each Seller has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents to which such Seller is a party and to perform its obligations hereunder and to consummate the transactions contemplated hereby and thereby; (b) the execution, delivery, and performance by each Seller of this Agreement and the other Transaction Documents to which such Seller is a party, and the consummation by such Seller of the transactions contemplated hereby and thereby, have been duly authorized by all requisite corporate action or limited liability company action on behalf of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery, and performance by such Seller of this Agreement or the other Transaction Documents and the consummation by it of the transactions contemplated hereby and hereby; and (c) this Agreement and the other Transaction Documents to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming the authorization, execution, and delivery thereof by Purchaser and Sellers, as applicable, constitutes, or will constitute, legal, valid, and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally; and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (clauses (c)(i) and (ii), collectively, the "***Enforceability Exceptions***").

3.3     **Governmental Filings; No Violations**.

(a)     Other than the filings and/or notices under the HSR Act and the filings, notices, reports, consents, registrations, approvals, permits and authorization set forth on <u>Schedule 3.3(a)</u> (the "***Required Consents***"), and subject to the issuance of the Sale Order and any other Order required by the Bankruptcy Court in connection with the transactions contemplated hereby, no filing, notice, report, consent, registration, approval, Permit or authorization is required to be given, filed or obtained by any Seller to or from any Person, including any Governmental Authority, in connection with the execution, delivery and performance by any Seller of this Agreement and the Transaction Documents to which any Seller is a party or the transactions contemplated hereby or thereby, except those that the failure to make or obtain would not, individually or in the aggregate, reasonably be expected to be material to the Business (taken as a whole) or prevent or materially delay the consummation of the transactions contemplated hereby.

(b)     The execution, delivery and performance by Sellers of this Agreement and the other Transaction Documents does not, and the consummation of the transactions contemplated hereby and thereby, (i) will not result in the creation of any Lien under, and (ii) will not, conflict with, or result in any violation of or default (with or without notice, lapse of time or both) under, require a consent or notice under, or give rise to a right of termination, loss of rights, adverse modification of provisions, cancellation or acceleration of any obligation under (1) any provision of the Organizational Documents of any Seller or government agreement applicable to any Investment, (2) subject to the Sale Order or any other Order required by the Bankruptcy Court in connection with the transactions contemplated hereby and subject to obtaining the Required Consents, any Law or Order to which any Seller, the Business, or the Purchased Assets are subject, or (3) subject to the Sale Order or any other Order required by the Bankruptcy Court in connection with the transactions contemplated hereby, any Assumed Contracts, except, in the cases of clause (2) and (3) above, for any such creation of any Lien, breach, violation, termination, default, right or loss of rights, adverse modification, cancellation or acceleration, that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially delay or materially impair the consummation of the transactions contemplated hereby.

3.4     **Compliance With Laws; Permits**.

(a)     Except as otherwise set forth on Schedule 3.4(a), each Seller is, and at all times for the past five (5) years has been, in material compliance with all Applicable Laws and the Business is and at all times for the past five (5) years has been conducted in material compliance with all Applicable Laws. No Seller has received any written notice of (i) any investigation or review by any Governmental Authority with respect to the Business or the Purchased Assets, or (ii) any material noncompliance with any Applicable Laws which noncompliance has not been cured. Each Seller has obtained and is in material compliance with all Permits and Orders issued or granted by a Governmental Authority necessary to conduct its Business as presently conducted, except those the absence of which to have or be in compliance with would not, individually or in the aggregate, reasonably be expected to be material.

(b)     Sellers hold all Permits (including Environmental Permits) necessary for the current operation and conduct of the Business, and the Purchased Assets, except where the failure to hold any such Permit has not been, and would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Purchased Assets. The Permits set forth on Schedule 3.4(b) are all of the Permits (including Environmental Permits) held by any Seller with respect to the ownership, construction, and maintenance of, or otherwise issued in connection with, the Purchased Assets and the Facility, and the operation and conduct of the Business. Sellers have made all filings and paid all fees and duties, in each case, necessary to maintain the Permits (including Environmental Permits), each of which is valid and in full force and effect. Except as otherwise set forth on Schedule 3.4(b), (i) Sellers are in compliance in all material respects with all of the Permits (including Environmental Permits), and no condition exists that with notice or passage of time or both would reasonably be expected to constitute a material default under any such Permits, and (ii) no Seller has received any written notice of any violation of any Permits (including Environmental Permits) or written notice of any proposal to revoke, cancel, rescind, modify, or refuse to renew any of such Permits.

(c)     Each Seller and each of their respective directors, managers, officers and, to the Knowledge of Sellers, their Employees and each other Person acting on behalf of Sellers, is and has for the past five (5) years been in compliance in all material respects with the Foreign Corrupt Practices Act of 1977, as amended (the "***FCPA***"), and any other Applicable Law concerning anti-corruption or anti-bribery. No Seller and none of their respective directors, managers, or officers or, to the Knowledge of Sellers, their Employees or any other Person acting on behalf of Sellers, has been at any time in the past five (5) years, or is currently, the subject of any allegation, voluntary disclosure, prosecution, investigation or other enforcement Action with respect to, or been given notice in writing by a Governmental Authority of, any violation by any Seller of the FCPA or any other Applicable Law concerning anti-corruption or anti-bribery. In the past five (5) years, no Seller and none of their respective directors, managers, or officers or, to the Knowledge of Sellers, their Employees, or any other Person acting on their behalf, has, in connection with the Business, paid, offered, promised, or authorized the payment of money or anything of value, directly or indirectly, to any foreign official (as such term is defined in the FCPA) in violation of applicable anti-corruption or anti-bribery Laws. Each Seller has devised and maintains a system of internal controls designed to provide reasonable assurances that it is in compliance with the FCPA and any other Applicable Law concerning anti-corruption or anti-bribery. No Seller and none of their respective Affiliates or, any director or officer, nor, to the Knowledge of Sellers, any agent, Employee or other Person acting on behalf of Sellers, directly or indirectly, is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, OFAC's Foreign Sanctions Evaders List, OFAC's Sectoral Sanctions Identifications List, the U.S. Department of Commerce Denied Person's List, the U.S. Department of Commerce's Entity List, the U.S. Department of Commerce's Unverified List, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List or any similar list enforced by the United States federal government or (iii) located, organized or resident in a Designated Jurisdiction in violation of any Sanctions. Sellers

are in compliance with all applicable Export/Import Laws and Sanctions Laws, in each case, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Sellers (w) have not been found in violation of, charged with or convicted in connection with, any Export/Import Laws or any Sanctions Laws, (x) to Sellers' Knowledge, are not under investigation by any Governmental Authority for possible violations of any Export/Import Law or any Sanctions Law, (y) have not been assessed civil penalties under any Export/Import Laws or any Sanctions Laws and (z) have not filed any voluntary disclosures with any Governmental Authority regarding possible violations of any Export/Import Laws or Sanctions Laws, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business (taken as a whole).

3.5     **Litigation**. Except for the general pendency of the Bankruptcy Cases and Actions that would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Purchased Assets and for the Actions described on <u>Schedule 3.5</u>: (a) there have not been in the past five (5) years, and there are no, Actions pending or, to the Knowledge of Sellers, threatened (i) against any Seller or the Purchased Assets, (ii) that would reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by this Agreement or the other Transaction Documents; and (b) no Seller is subject to any outstanding Order that prohibits or otherwise restricts the ability of Sellers or any of their respective Affiliates to consummate the transactions contemplated by this Agreement or any of the other Transaction Documents or that is or is reasonably expected to be material to the Business.

3.6     **Certain Financial Information**.

(a)     <u>Schedule 3.6(a)</u> sets forth true and complete copies of the (i) unaudited, financial results of Parent for each fiscal quarter of 2024, and the related unaudited consolidated balance sheets as of the end of such quarters, (ii) unaudited statements of operations and cash flows of ~~Parent and its Subsidiaries~~GMR for the years ended December 31, 2023 and December 31, 2024 ~~and for the six months~~, the unaudited financial results of GMR for the six-month period ended June 30, 2025, and the related unaudited consolidated balance sheets as of ~~such dates (the~~the end of such years and such six-month period, and (iii) unaudited financial results of Aleon for each fiscal quarter of 2024 and for the six-month period ended June 30, 2025, and the related unaudited consolidated balance sheets as of the end of such quarters and six-month period (collectively, the "***Financial Statements***"). The Financial Statements fairly present, in all material respects, the consolidated financial position of Parent and its Subsidiaries in respect of the Business as of the dates thereof and the consolidated results of operations and cash flows for the periods then ended (subject to notes and normal and year-end adjustments that will not be material in amount or effect), have been prepared from, and are consistent with, the books and records of Parent and its Subsidiaries and have been prepared in accordance with GAAP applied on a consistent basis during the period involved (except as may be noted therein or the notes thereto). Parent maintains a system of internal controls over financial reporting that is reasonably designed to provide reasonable assurance regarding the reliability of the financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and includes policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of Parent and its Subsidiaries, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of Parent and its Subsidiaries are being made only in accordance with authorizations of management and directors of Parent and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of Parent and its Subsidiaries that could have a material effect on the financial statements of Parent and its Subsidiaries.

(b)     Except for Liabilities reflected or reserved against on the Schedules and Statements, Sellers do not have any material Liabilities, other than (i) Liabilities that have been incurred in the Ordinary Course of Business since the commencement of the Bankruptcy Cases, (ii) contractual liabilities incurred in the Ordinary Course of Business that are not material and, in the case of clauses (i) and (ii), none of which is a liability for breach of Contract, breach of representation or warranty, violation of Applicable Law, tort or infringement by Sellers, (iii) Liabilities contemplated by or in connection with this Agreement, the other Transaction Documents, or the transactions contemplated hereby or thereby, or (iv) Liabilities that are otherwise disclosed on Schedule 3.6(b).

(c)     Schedule 3.6(c) sets forth a true, correct and complete list of all Accounts Receivable, including a true and complete list of all Accounts Receivable that are more than thirty (30) days past due as of the date hereof. All Accounts Receivables resulted from bona fide sales in the Ordinary Course of Business and represent the genuine and, to Sellers' Knowledge, valid and legally enforceable Indebtedness of the account debtor. To the Knowledge of Sellers, there are no material disputes with respect to any of the Accounts Receivables that have not been reserved for on the Financial Statements. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all trade accounts payable have arisen in the Ordinary Course of Business, and there are no trade accounts payable for purchases in material excess of usual requirements.

(d)     All Acquired Inventories are (i) free of any material defect or deficiency, (ii) in all material respects in good, merchantable, usable, fit for their intended purpose and currently marketable condition in the Ordinary Course of Business (subject, in the case of raw materials and work-in-process, to the completion of the production process), (iii) of a quality and quantity usable and salable in the Ordinary Course of Business, and (iv) properly stated on the books and records of the applicable Seller at the lesser of cost and fair market value, with adequate obsolesces reserves, all as determined in accordance with GAAP. No Acquired Inventory is held on a consignment basis. All Acquired Inventories are located at the Facility or are in transit thereto.

(e)     Each letter of credit or similar financial accommodation issued to any third party(ies) for the account of any Seller (and any collateral therefor) (each, a "***Letter of Credit***") is a validly issued and outstanding standby letter of credit that is in full force and effect. Each Letter of Credit has been cash collateralized in a manner that meets the requirements of the issuer of such Letter of Credit. Schedule 3.6(e) accurately lists each Letter of Credit and the amounts of cash collateral posted for each Letter of Credit. Except as set forth on Schedule 3.6(e), no amounts are currently drawn under any Letter of Credit, and Sellers have not received a draw request from any Letter of Credit beneficiary.

(f)     Schedule 3.6(f) accurately lists Seller's reasonable good faith estimate of the items and amounts of the Cure Costs and Seller Property Taxes.

3.7     **Absence of Developments**. Since December 31, 2024, other than as contemplated by the Transaction Documents or actions taken in connection with or related to the filing of the Bankruptcy Cases or arising out of the Bankruptcy Cases, Sellers have conducted the Business in the Ordinary Course of Business. Since December 31, 2024, there has not been any effect, change, event, occurrence, development, circumstance, condition or state of facts that, individually or in the aggregate, has had, or would reasonably be expected to have a Material Adverse Effect. Since June 30, 2025, Sellers have not taken any actions which would, had such actions been taken after the date of this Agreement, required the consent pursuant to Section 5.2(b).

3.8    **Real Property**.

(a)    Schedule 3.8(a) sets forth a complete and correct list of all of the real property owned by Sellers, specifying the address, ownership of, and any other information necessary to identify all such real property (the "***Owned Real Property***"). Sellers have good and marketable title to the Owned Real Property free and clear of all Liens, other than (i) as of the date hereof, Permitted Liens, and (ii) as of the Closing Date, Permitted Post-Closing Encumbrances. As of the date hereof, there are no pending, or, to the Knowledge of Sellers, threatened, appropriation, condemnation, eminent domain or like proceedings relating to any Owned Real Property in any material respect. As of the date hereof, no Seller has granted or is obligated under any option, right of first offer, right of first refusal or other contractual right to purchase, acquire, sell or dispose of any Owned Real Property or any material portion thereof or interest therein.

(b)    Schedule 3.8(b) sets forth a complete and correct list of all of the real property leased by Sellers (each a "***Real Property Lease***"), specifying, in respect of each Real Property Lease, the lease agreement by and between Seller(s) and the landlord and the address of such property (the "***Leased Real Property***"). No Seller is in default under any Real Property Lease (not including any default directly arising due to the commencement of the Bankruptcy Cases or the financial condition of Sellers), no written notice of any default under any Real Property Lease (not including any default directly arising due to the commencement of the Bankruptcy Cases or the financial condition of Sellers), which default remains uncured, has been sent or received by any Seller, and to the Knowledge of Sellers, no conditions or circumstances exist which, and no event has occurred which constitutes or which, in each case, with the lapse of time or the giving of notice, or both, would constitute a default or breach under any Real Property Lease (not including any default directly arising due to the commencement of the Bankruptcy Cases or the financial condition of Sellers), except in each case for those breaches or defaults which would not, individually or in the aggregate, reasonably be expected to be material to the Business (taken as a whole). The Real Property Leases are in full force and effect in accordance with their terms (subject to Enforceability Exceptions). Sellers have made available to Purchaser true and complete copies of all Real Property Leases.

(c)    Sellers have exclusive possession of each parcel of the Owned Real Property (subject to (i) as of the date hereof, Permitted Liens and (ii) as of the Closing Date, Permitted Post-Closing Encumbrances) and the Leased Real Property. To the Knowledge of Sellers, (i) there is no existing breach or default (not including any default directly arising due to the commencement of the Bankruptcy Cases or the financial condition of Sellers) by any party under any easements, restrictive covenants or similar instruments affecting the Transferred Owned Real Property or Leased Real Property which breach or default has not yet been cured, (ii) no Seller has received any written notice of any default (not including any default directly arising due to the commencement of the Bankruptcy Cases or the financial condition of Sellers), under any easements, restrictive covenants or similar instruments affecting the Transferred Owned Real Property or Leased Real Property which default has not yet been cured, and (iii) there does not exist any condition or event that with the lapse of time or the giving of notice, or both, would constitute such a breach or default (not including any default directly arising due to the commencement of the Bankruptcy Cases or the financial condition of Sellers), under any easements, restrictive covenants or similar instruments affecting the Transferred Owned Real Property or Leased Real Property, except in each case for those breaches or defaults which would not, individually or in the aggregate, reasonably be expected to be material to the Business (taken as a whole).

3.9    **Material Contracts**.

(a)    Schedule 3.9(a) contains a true and complete list of the following types of Contracts to which Sellers are a party or bound or by which any of the Purchased Assets are bound or

affected (each Contract listed, and each Contract that should be listed, on <u>Schedule 3.9(a)</u> being referred to as a "***Material Contract***"), a complete and correct copy of which (as in effect on the date hereof), and including all amendments, supplements, restatements, waivers, side letters, addenda, exhibits, schedules and modifications thereto, and summaries of any oral versions of same, has been furnished to Purchaser by Sellers:

(i)　　any Contract involving the lease of any real property, including the Acquired Real Property Leases;

(ii)　　any Contract (other than a purchase order) with a Key Customer or Key Vendor;

(iii)　　any outstanding purchase order or related series of purchase orders included in the Purchased Assets in excess of $250,000;

(iv)　　any Contract for the distribution of products of the Business, including any dealer, representative, agency or similar Contract;

(v)　　any Contract (other than a purchase order) pursuant to which Sellers would reasonably be expected to make or receive payments of more than $100,000 during any fiscal year;

(vi)　　any Contract with any Governmental Authority or any instrumentality of any such Governmental Authority;

(vii)　　any (1) employment and similar Contract (other than offer letters or similar agreements in the standard form used by Sellers in the Business and made available to Purchaser) with an officer or other member of management with annual base compensation in excess of $100,000, and (2) Contract with a consultant pursuant to which the Business is or could become obligated to make payments exceeding $100,000 per annum;

(viii)　　any Contract involving a change of control or retention bonus, "stay bonus" or similar arrangement or providing for the grant or acceleration of any benefit payable to any Employee;

(ix)　　any Contract (other than offer letters or similar agreements in the standard form used by Sellers in the Business and made available to Purchaser) between any current or former Employee of any Seller or their respective Affiliates or current or former consultant of any Seller or their respective Affiliates, on the one hand, and any Seller or their respective Affiliates, on the other hand, that as of the date hereof restricts any such Person (1) from competing, directly or indirectly, with Sellers, the Business, or any other Person, or (2) from soliciting or hiring current Employees or customers of Sellers, the Business, or any other Person;

(x)　　any Contract that includes a "most favored nation," "meet or release" or similar pricing and delivery arrangement or that includes a minimum volume commitment or any other similar performance or financial goal, or involves the payment by the Business of amounts that include "take or pay" requirements or output terms or similar pricing or delivery arrangements;

(xi)    any Contract that restricts the ability of any Seller or the Business to compete with any Person, solicit or hire any Person, engage in any business, or operate in any geographical area;

(xii)    any Contract pursuant to which any Seller grants or receives any license, sublicense, co-existence agreement, covenant not to sue, or similar right with respect to any Intellectual Property Rights material to the Business (other than Contracts that are shrinkwrap, clickwrap or other standard terms for third-party software that are available to the general public as of the Closing Date);

(xiii)    any performance bond or surety Contract;

(xiv)    any Contract that settled any Action (1) for monetary payments to or by any Seller or any of its Affiliates in excess of $250,000, or (2) that involves any equitable or other non-monetary relief and that is binding on any Seller or the Business;

(xv)    any collective bargaining or other labor-related Contracts (including, works council, shop, enterprise or recognition Contract) with any labor union, labor organization, or works council (each a "*Labor Agreement*"); and

(xvi)    any Contract pursuant to which any Seller currently leases personal property to or from any Person or holds or currently operates any tangible personal property owned by another Person, in each case, that is material to the Business taken as a whole.

(b)    With respect to each Material Contract: (i) such Material Contract is the legal and valid obligation of the applicable Sellers and each other party thereto, and constitutes the binding and enforceable obligation of the applicable Sellers and, to the Knowledge of Sellers, each other party thereto, in accordance with its terms, subject to Enforceability Exceptions; (ii) Sellers are not, nor, to the Knowledge of Sellers, is any other Person, in material breach or material default thereunder and, except as otherwise set forth on Schedule 3.9(b) or as a result of the pendency of the Bankruptcy Cases, to the Knowledge of Sellers, no condition exists or event has occurred (including any condition or event that with notice or lapse of time, or both) that would constitute a  material breach or default, or permit termination, modification in any manner adverse to the Business or the Purchased Assets or acceleration thereunder; (iii) to the Knowledge of Sellers, no party has asserted nor has (except by operation of Law) any right to offset, discount or otherwise abate any amount owing under such Material Contract; and (iv) no amendment or modification has been made thereto except those, if any, reflected in the copies previously furnished to Purchaser. There are no material disputes by and between any Seller and any counterparty to any Material Contract.

3.10    **Employees and Labor Matters**.

(a)    Schedule 3.10(a) sets forth the following information for each current Employee (including each current Employee on leave of absence): employer; name or employee ID; date of hire; job title or position; current compensation paid or payable; status as exempt or non-exempt under the Fair Labor Standards Act of 1938, as amended; current base salary or rate of pay; bonus compensation (if any) paid or payable for calendar year 2024 and for the six months ended June 30, 2025; leave status and all accrued and unpaid vacation, holidays, sick pay and other paid time-off (whether accrued prior to or during the Bankruptcy Cases) to which the Employee is entitled with respect to all periods of service up to and including the Closing Date under the policies and practices of Sellers or their respective Affiliates.

(b)     To the Knowledge of Sellers, no Employee is a party to, or is otherwise bound by, any agreement, including any confidentiality, noncompetition, or proprietary rights agreement, between such Employee and any other Person that in any way (i) adversely affects the performance of his, her, or their duties as an Employee; (ii) adversely affects the ability of Sellers, or could reasonably be expected to adversely affect the ability of Purchaser after the Closing Date, to conduct the Business; or (iii) is being violated by virtue of the Employee's provision of services to Sellers or any of their respective Affiliates.

(c)     No Seller and none of their respective Affiliates or ERISA Affiliates is or has ever been a party to, bound by, subject to, or has any obligations under any current or expired Labor Agreement applicable to the Employees and, to the Knowledge of Sellers, there are not any activities or Actions of any labor union to organize any of the Employees.

(d)     The employment or other engagement of all Employees is terminable at will without any penalty or severance obligation of any kind on the part of the employer. All sums due for Employee compensation and benefits and all vacation time or paid time off or sick pay owing to any Employees have been duly and adequately accrued in all material respects on the accounting records of Sellers. Each Subject Employee (as defined in Section 5.5(a)) has completed a Form I-9.

(e)     During the past five (5) years, any individual who performs or performed services for Sellers or any of their respective Affiliates and who is not treated as an Employee for U.S. federal income tax purposes by Sellers or an Affiliate, as applicable, is not an Employee under Applicable Laws or for any purpose, including, without limitation, for Tax withholding purposes or Benefit Plan purposes.

(f)     During the past five (5) years, Sellers have not effectuated (i) a "plant closing" (as defined in the WARN Act) in connection with the Business; or (ii) a "mass layoff" (as defined in the WARN Act) of individuals employed at or who primarily provided service to the Business.  Sellers have heretofore made available to Purchaser a true and complete list of layoffs, by location, implemented by Sellers since January 1, 2025.

(g)     Schedule 3.10(g) sets forth the names of all individuals who are Employees as of the date hereof and (a) whose job responsibilities primarily relate to the ownership, operation or use of the Purchased Assets or (b) whom Purchaser and Sellers have otherwise designated as Scheduled Employees (such individuals, the "***Scheduled Employees***").  Schedule 3.10(g) also sets forth, for each Scheduled Employee, as applicable, the Employee's job title, date of hire, work location, annual base salary (and base wages), and target bonus opportunity for 2025, any other supplemental or bonus compensation (including commission opportunity and any retention bonus arrangements), job classifications, and whether or not the Employee is a member of a labor union and, if so, the identity of such labor union and shall be held in confidence and shall not be filed with the Bankruptcy Court (unless under seal).

(h)     No Seller has any material Liability with respect to any Taxes (or the withholding thereof) in connection with any independent contractor that would result in any Liability to Purchaser.

(i)     During the past five (5) years there have not been any material (i) allegations or formal or informal complaints made to or filed with Sellers related to sexual harassment or sexual misconduct, (ii) other claims initiated, filed or, to the Knowledge of Sellers, threatened against Sellers related to sexual harassment or sexual misconduct, or (iii) other allegations, formal or informal complaints or any other claims initiated, filed or, to the Knowledge of Sellers, threatened against any

director, officer, Employee, agent, or representative of Sellers related to sexual harassment or sexual misconduct, in each case by or against any current or former director, officer or Employees.

(j)      There are no, and in the past five (5) years have not been any material, (i) picketing actions, strikes, work stoppages, work slowdowns, lockouts, or other job actions pending or, to the Knowledge of Sellers, threatened against or involving Sellers, or (ii) unfair labor practice charges, or any material grievances or complaints, pending or, to the Knowledge of Sellers, threatened by or on behalf of any Employees or former Employees of Sellers. There are no, and in the past five (5) years have not been any, complaints, charges, or claims against Sellers pending, brought, filed, or, to the Knowledge of Sellers, threatened with any Governmental Authority based on, arising out of, in connection with or otherwise relating to the employment or termination of employment or failure to employ by Sellers, of any individual.

(k)      For the past five (5) years, Sellers have been in compliance in all material respects with Applicable Law relating to labor and employment, including all Applicable Law relating to employment practices, discrimination, disability, equal employment opportunities, labor relations, wages and hours, the collection and payment of withholding and/or employment taxes, classification of independent contractors, immigration, workers' compensation, background and credit checks, working conditions, data privacy and data protection, occupational safety and health, and family and medical leave. Each of the Employees has all required work permits, visas or other authorizations required by Applicable Law for such Employee to be employed in the Employee's current position. There is no Action pending, or to the Knowledge of Sellers, threatened against or relating to Sellers or any Affiliate of Sellers with respect to any employment or labor matter with respect to the Business, and to the Knowledge of Sellers no reasonable basis for any Claim or Action exists.

3.11    **Benefit Plans**.

(a)      Schedule 3.11(a) sets forth an accurate and complete list of all Benefit Plans. Sellers have made available to Purchaser or its counsel a true and complete copy of all plan documents (including related trust agreements, funding arrangements, Form 5500s and insurance contracts and all amendments thereto) with respect to each Benefit Plan in which any Employees participate or are eligible to participate.

(b)      Each Benefit Plan has been established, funded, maintained, and administered in all material respects in accordance with its terms, and in compliance with the applicable provisions of ERISA, the Code, and other Applicable Law. With respect to each Benefit Plan that is intended to qualify under Section 401(a) of the Code, Sellers have received a favorable determination, opinion or advisory letter with respect to such Benefit Plan and its related trust that has not been revoked and no circumstances exist and no events have occurred that could adversely affect the qualified status of such Benefit Plan or the related trust. No Benefit Plan provides retiree health or life insurance benefits except as may be required by Section 4980B of the Code and Section 601 of ERISA, any other Applicable Law or at the sole expense of the participant or the participant's beneficiary. No Benefit Plan that provides health insurance or medical coverage is self-funded or self-insured and all premiums that have become due have been paid in full.

(c)      Neither any Seller nor ERISA Affiliate has, or has ever had, any liability or obligation to contribute to, or with respect to, any (i) "defined benefit plan" (as defined in Section 3(35) of ERISA), (ii) an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Title IV of ERISA or Sections 412 or 430 of the Internal Revenue Code, (iii) Multiemployer Plan, or (iv) a "multiple employer plan" within the meaning of Section 413(c) of the Code.

(d)        Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due and payable from Sellers, or increase the amount of any compensation due and payable from Sellers, to any Employee, (ii) increase any benefits otherwise payable under any Benefit Plan, (iii) result in the acceleration of the time of payment or vesting of any compensation or benefits under any Benefit Plan, (iv) result in the triggering or imposition of any restrictions or limitations on the rights of Sellers or any of their respective ERISA Affiliates to amend or terminate any Benefit Plan, or (v) result in any amount or benefit that may not be deductible by reason of Section 280G of the Code or that will be subject to an excise tax under Section 4999 of the Code (or any corresponding provision of state, local, or non-U.S. Tax law).

(e)        Other than routine claims for benefits, no Liens, lawsuits, or complaints to or by any Person or Governmental Authority are pending against any Benefit Plan or against Sellers with respect to any Benefit Plan and, to the Knowledge of Sellers, no such material Liens, lawsuits, or complaints are threatened with respect to any Benefit Plan. There is no audit or investigation of any Benefit Plan by any Governmental Authority pending or to the Knowledge of Sellers threatened. Sellers have paid and discharged promptly when due all Liabilities due under each Benefit Plan. There are no corrections, audits or proceedings initiated pursuant to the IRS Employee Plans Compliance Resolution System or similar proceedings pending with the Internal Revenue Service or Department of Labor with respect to any Benefit Plan.

(f)        Sellers do not have a legally binding plan, contract or commitment to create any new employee benefit or compensation plans, policies or arrangements for any Transferred Employee or, except as may be required by Applicable Law, to modify any Benefit Plan.

(g)        Each Benefit Plan that is or has ever been a "nonqualified deferred compensation plan" (as defined under Section 409A of the Code) has at all times complied with all applicable document requirements of, and been operated in compliance with, Section 409A of the Code.

(h)        No Seller nor any other "party in interest" or "disqualified person" with respect to any Benefit Plan has engaged in a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code involving such Benefit Plan which, individually or in the aggregate, could reasonably be expected to subject Purchaser or any of its Affiliates to Liability, tax or penalty imposed by Section 4975 of the Code or Sections 501, 502 or 510 of ERISA.

(i)        All contributions or premium payments required by Applicable Law or by the terms of any Benefit Plan or any agreement relating thereto have been timely made (taking into account any waivers granted with respect thereto) to any funds or trusts established thereunder or in connection therewith or have been reflected on the applicable financial statements.

3.12    **Intellectual Property**.

(a)        Schedule 3.12(a) sets forth a true and complete list of all (i) Patents; (ii) registered trademarks, service marks and trade names and those for which an application is pending; (iii) registered or applied for copyrights; and (iv) Internet domain names and social media accounts, in each case, owned or purported to be owned by Sellers and otherwise included in the Transferred Intellectual Property (items (i) through (iii), the "***Registered Intellectual Property***," together with all other Intellectual Property Rights owned or purported to be owned by Sellers, collectively the "***Owned Intellectual Property***"). Other than pending applications included in the Registered Intellectual Property, to the Knowledge of Sellers, the Owned Intellectual Property is subsisting, valid and enforceable. No Seller is subject to any Order which (i) permits any third party to use any Owned Intellectual Property or

restricts such Seller's ability to enforce its rights with respect to such Transferred Intellectual Property, (ii) restricts or impairs its use of any Owned Intellectual Property, (iii) restricts the Business to accommodate any other Person's Intellectual Property Rights, or (iv) requires any payment by any Seller to any Person in connection with any Intellectual Property Rights of such Person. No Person has alleged, in an Action to which any Seller is a party or otherwise in writing, that any Owned Intellectual Property is not owned by Sellers or that rights thereto are invalid or unenforceable.

(b)     Sellers exclusively own all right, title and interest in and to all Registered Intellectual Property and Owned Intellectual Property, free and clear of all Liens. To the Knowledge of Sellers, there is no Claim or Action against Sellers pending before any Governmental Authority concerning the ownership, validity, registrability, enforceability, infringement, misappropriation or violation of any Transferred Intellectual Property except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. None of the Transferred Intellectual Property is subject to any outstanding injunction, directive, order, decree, award, settlement or judgment restricting the use or validity thereof, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Sellers have valid, subsisting and enforceable licenses to use all Intellectual Property Rights used in the conduct of the Business that are owned by any third party, including sufficient quantities of seat, server core, or other license units. Sellers are in compliance in all material respects with all such licenses, and all license fees, renewal fees and maintenance fees that have become due have been timely paid by Sellers, including with respect to seat, server core or other unit license restrictions. The consummation of the transactions contemplated by this Agreement will not alter or impair any rights of Sellers to the Transferred Intellectual Property.

(c)     Except as set forth on Schedule 3.12(c), (i) the operation of the Business as currently conducted does not, and the services provided by Sellers do not, infringe, misappropriate, or otherwise violate in any material respect, and have not infringed, misappropriated or otherwise violated in any material respect, the Intellectual Property Rights of any third party, and, to the Knowledge of Sellers, no third party is infringing, misappropriating, or otherwise violating the Owned Intellectual Property, (ii) no Seller and none of their respective Affiliates has received any written communication regarding any actual, alleged or suspected material infringement, misappropriation or other material violation of Intellectual Property Rights of a third party by Sellers, and (iii) no Seller and none of their respective Affiliates has sent any written notice, charge, complaint, claim or other written assertion asserting or threatening to assert in any Actions against any Person regarding the material infringement, misappropriation, dilution or other material violation of any Owned Intellectual Property.

(d)     No current or former Employee or officer of Sellers and no current or former consultant or contractor of Sellers has any right, title or interest in or to any Seller Intellectual Property. No funding, facilities, or personnel of any Governmental Authority or academic or research institution were used to develop or create, in whole or in part, any Owned Intellectual Property.

(e)     Sellers have taken commercially reasonable actions to safeguard and maintain the secrecy and the confidentiality of, and their respective proprietary rights in and to, all non-public Owned Intellectual Property. All current and former Employees and contractors of Sellers and third parties having access to the non-public Owned Intellectual Property have executed and delivered to Sellers a written legally binding agreement regarding the protection of such non-public Owned Intellectual Property. Sellers have implemented and maintain a reasonable security plan consistent with industry practices of companies offering similar products or services. To the Knowledge of Sellers, Sellers have not experienced any breach of security or otherwise unauthorized access by third parties to the non-public Owned Intellectual Property in Sellers' possession, custody or control.

41

(f)        Sellers have secured from all consultants, advisors, employees and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property Rights for Sellers (each, an "***Author***"), unencumbered and unrestricted exclusive ownership of all of the Authors' Intellectual Property Rights in such contribution that Sellers do not already own by operation of law and have obtained the waiver of all non-assignable rights. No current or former Employee, contractor or consultant of Sellers has a valid claim of ownership over any Owned Intellectual Property, nor has any such claim been asserted in writing.

(g)        The computer software, computer hardware, firmware, networks, interfaces and related systems included in the Purchased Assets (collectively, "***Computer Systems***") are sufficient in all material respects for Sellers' operation of the Business and the Purchased Assets as conducted as of the date hereof and consistent with past practice and, except as set forth on Schedule 3.12(g), to the Knowledge of Sellers, there have been no material failures, crashes, ransomware attacks, security breaches or similar adverse events affecting the Computer Systems. Sellers provide for the backup and recovery of material data and have implemented and maintain commercially reasonable disaster recovery plans, procedures, and facilities. Sellers have taken commercially reasonable steps, as necessary and appropriate, to protect the integrity and security of the Computer Systems and the information stored therein, processed thereon or transmitted therefrom from misuse or unauthorized use, access, disclosure or modification by third parties, and there has been no such misuse or unauthorized use, access, disclosure or modification thereof. None of the Computer Systems are used in any business other than the Business.

3.13        **Environmental Matters**.

(a)        Except as set forth on Schedule 3.13(a), there is no Environmental Claim pending or, to the Knowledge of Sellers, threatened against Sellers or with respect to the Business or the Purchased Assets, including the Owned Real Property and Leased Real Property, except for those which would not, individually or in the aggregate, reasonably be expected to be material to the Business, and all past material Environmental Claims have been resolved in all material respects. The Business and the Purchased Assets, including the Owned Real Property and the Leased Real Property, are and have been in material compliance with all applicable Environmental Laws. To the Knowledge of Sellers, there are no past or present actions, activities, circumstances, conditions, events or incidents, including the Release, presence, handling, management, use, generation, disposal, or arrangement for disposal of any Hazardous Materials at the Facility or any other location that could reasonably be expected to form the basis of any Environmental Claim that would have a Material Adverse Effect or otherwise result in any material costs or liabilities under Environmental Law with respect to the Business or the Purchased Assets.

(b)        Except as set forth on Schedule 3.13(b), and to the Knowledge of Sellers, no Release of Hazardous Material has occurred or is currently occurring or, to the Knowledge of Sellers, threatened at or from any Owned Real Property or Leased Real Property for which Environmental Law requires notice to any Person or any form of Response Action. Sellers have not received any written notice that the operation of the Business has caused the Contamination of any other property which has resulted or would reasonably be expected to result in an Environmental Claim against, or material Liability under Environmental Law for or relating to, the Business or the Purchased Assets. Except as in compliance with Environmental Laws, to the Knowledge of Sellers, there are no (i) polychlorinated biphenyl-containing equipment, (ii) underground storage tanks, or (iii) asbestos-containing material at any Owned Real Property, Leased Real Property, or Purchased Asset.

(c)     Except as otherwise set forth on <u>Schedule 3.13(c)</u>, no Seller has, either expressly or by operation of law, assumed responsibility for or agreed to indemnify or hold harmless any Person for any Environmental Liability with respect to the Business or the Purchased Assets.

(d)     Sellers have identified and made available to Purchaser complete and correct copies of all material studies, audits, assessments, reports, data, memoranda and investigations, and other material information relating to Hazardous Materials, Environmental Claims or Environmental Liabilities that are in its possession or control pertaining to, or the environmental condition of, the Business and the Purchased Assets or the compliance (or noncompliance) by Sellers or any of their respective predecessors or Affiliates with Environmental Laws.

(e)     Except as set forth on <u>Schedule 3.13(e)</u>, to the Knowledge of Sellers, Sellers are not required by any Environmental Law or by virtue of the transactions set forth herein and contemplated hereby, or as a condition to the effectiveness of any transactions contemplated hereby, to (i) remove or remediate Hazardous Materials, (ii) give notice to or receive approval from any Governmental Authority or other Person, or to record any disclosure document or statement pertaining to environmental matters, or (iii) alter, modify, renew, change or update any Environmental Permit, in each case with respect to the Business or the Purchased Assets.

(f)     <u>Schedule 3.13(f)</u> sets forth a true, correct and complete list of all trust agreements with respect to Environmental Liabilities Related to the Business or attributable to a Purchased Asset.

(g)     Sellers (i) hold and are and have been, in material compliance with all Environmental Permits (each of which is in full force and effect and is not subject to appeal, except in such instances where Sellers are contesting the requirement to hold an Environmental Permit in good faith by appropriate, diligently conducted proceedings) required to be held by Sellers under applicable Environmental Law for the operation of the Business or for the ownership, operation, or use of the Facility or the Purchased Assets, or, to the extent currently required, any pending construction or expansion related thereto, (ii) for the past five (5) years has used commercially reasonable efforts to cause all contractors, lessees, and other Persons occupying, operating, or using the Facility to materially comply with applicable Environmental Law and obtain all necessary Permits required under applicable Environmental Law, (iii) has timely renewed or applied to renew any required Environmental Permits, and (iv) has not received any written notice that any Environmental Permits will not be renewed or will be renewed with conditions that are materially more restrictive or that cannot be met without incurring material additional costs.

3.14     **Title to Assets; Sufficiency of Assets; Condition of Assets**.

(a)     Sellers have good and valid legal and beneficial title to, or a valid, binding and enforceable leasehold interest in, as applicable, all of the Purchased Assets, and such Purchased Assets are not subject to any Liens (other than (x) as of the date hereof, Permitted Liens, and (y) as of the Closing Date, Permitted Post-Closing Encumbrances). At the Closing, Purchaser will receive good and valid title to, or in the case of leased assets, good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (other than Permitted Post-Closing Encumbrances), to the fullest extent permissible under Applicable Law, including section 363(f) of the Bankruptcy Code. The Purchased Assets constitute all of the tangible and intangible assets, rights and properties that are used or held for use by Sellers or any of their respective Affiliates in connection with the Business.

(b)     The Purchased Assets are in good working condition and are suitable for the purposes for which they are used (subject to normal wear and tear), including for Purchaser to conduct

and operate the Business in the Ordinary Course of Business. The Purchased Assets constitute all of the assets, rights and properties necessary for the conduct of the Business in the Ordinary Course of Business following the Closing.

3.15    **Taxes**. Except to the extent an inaccuracy of the following would neither result in a Lien on any of the Purchased Assets nor a Tax liability to Purchaser or its Affiliates or except as set forth on Schedule 3.15:

(a)    All Income Tax and other material Tax Returns required to be filed by Sellers or otherwise related to the Purchased Assets or the Business have been duly and timely filed and each such Tax Return is true, correct, and complete in all material respects. All Income Tax and other material amounts of Taxes owed by Sellers or otherwise related to the Purchased Assets or the Business for which Purchaser may be liable that are or have become due have been paid in full, and all other Taxes attributable to pre-Closing periods have been fully accrued through Closing on the Financials Statements.

(b)    Sellers do not have in force any waiver of any statute of limitations in respect of Taxes or any extension of time related to a Tax assessment or deficiency with respect to the Purchased Assets or the Business. No extension of time within which to file any Tax Return with respect to the Purchased Assets or the Business is currently in effect. There is no audit, litigation or other Action, Claim, assessment, deficiency, or adjustment pending or asserted or (to the Knowledge of Sellers) proposed or threatened with respect to Taxes of Sellers or otherwise with respect to the Purchased Assets or the Business. All of the Purchased Assets have been properly listed and described on the Property Tax rolls for all periods prior to and including the Closing Date, and no portion of the Purchased Assets constitutes omitted property for Property Tax purposes. There are no Liens for Taxes other than Permitted Post-Closing Encumbrances upon any of the Purchased Assets. Purchaser will not be held liable for any unpaid Taxes that are or have become due on or prior to the Closing Date as a successor or transferee, by statute, contract or otherwise, as a result of the transfer of the Purchased Assets pursuant to this Agreement.

(c)    Other than assets held for resale in the Ordinary Course of Business and motor vehicles, the sale of the Purchased Assets qualifies as an occasional sale pursuant to Texas Comptroller's Sales Tax Rule 34 Tex. Admin. Code § 3.316 and Texas Tax Code § 151.304.

(d)    As of the date hereof, there are no Liens that arose in connection with any failure (or alleged failure) to pay any Tax on any of the assets of Sellers that could result in a Lien or assessment of any Liability for Taxes, reporting or other compliance obligations or any other successor Liability with respect to the Purchased Assets or the Business.

(e)    Sellers have not executed nor entered into any agreement with, or obtained any consents or clearances from, any Governmental Authority, or have been subject to any ruling guidance specific to Sellers, that would be binding on Purchaser for any Taxable period beginning after the Closing.

(f)    Sellers are not party to any Tax allocation or sharing agreement that would be binding on Purchaser for any Taxable period beginning after the Closing.

(g)    No claim has been made within the preceding six (6) years by a Governmental Authority in a jurisdiction where Sellers have not filed a Tax Return with respect to the Purchased Assets or Business that Sellers are or may be subject to Tax by such jurisdiction with respect to the Purchased Assets or Business, nor to the Knowledge of Sellers is any such assertion threatened.

(h)     Sellers, with respect to the Business and the Purchased Assets, have collected all sales and use Taxes required to be collected and have remitted or will remit on a timely basis such amounts to the appropriate Governmental Authority, or have been furnished properly completed exemption certificates or other valid forms of exemption.

(i)     Sellers have, to the extent related to the Purchased Assets or the Business, withheld and paid all Taxes required to be withheld with respect to amounts paid or owing to any Employee, creditor, independent contractor, or other third party and have complied in all material respects with all information reporting and backup withholding provisions of Applicable Law.

(j)     Each Seller has been treated as a disregarded entity for U.S. federal, state, and local income tax purposes since its formation.

(k)     No Seller (or regarded owner of Seller) is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

(l)     No Seller is, and has been, a party to, or a promoter of, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b).

3.16    **Key Business Relationships**.  Schedule 3.16(i) sets forth a true and complete list of (i) the top ten (10) customers of the Business based on revenue collected for the fiscal year period ended December 31, 2024 (each, a "*Key Customer*" and, together, the "*Key Customers*") and the amount of such revenue collected with respect to each Key Customer, and (ii) the top fifteen (15) vendors or suppliers of the Business based on purchases for the fiscal year period ended December 31, 2024 (each, a "*Key Vendor*" and, together, the "*Key Vendors*") and the amount of such disbursements made with respect to each Key Vendor. Except as set forth on Schedule 3.16(ii), (1) no Key Customer has (A) materially decreased or notified Sellers in writing of its intention to materially decrease its aggregate level of purchases of services from Sellers relative to such Key Customer's purchasing history during the 12 months prior to such change, or (B) requested in writing reduced pricing (whether through increased credits or otherwise) from that in effect under an existing Contract; and (2) no Key Vendor has adversely altered or notified Sellers or their respective Affiliates in writing of its intention to adversely alter in any material respect the terms (including price) on which it sells goods or services to the Business. To the Knowledge of Sellers, no facts or circumstances exist that would reasonably be expected to affect any Key Customer's or Key Vendor's solvency or ability to pay its debts.

3.17    **Insurance**. Schedule 3.17 sets forth a true and complete list of all insurance policies maintained by Sellers or their respective Affiliates with respect to the Business, the Employees, or the Purchased Assets (collectively, the "*Insurance Policies*"). Each Insurance Policy is in full force and effect and, except as otherwise set forth on Schedule 3.17, all premiums due to date thereunder have been paid in full and no Seller and none of their respective Affiliates is in material default thereunder. No Seller has received any written notice of cancellation or nonrenewal, in whole or in part, in respect of any Insurance Policy.

3.18    **Brokers and Finders**. Other than as set forth on Schedule 3.18, no agent, broker, investment banker, financial advisor or other firm or Person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission payable by any Seller in connection with the transactions contemplated by this Agreement. Purchaser and its Affiliates shall not be liable for, and no Person is entitled to, any brokerage, finder's, financial advisor's or other similar fee or commission or like payment in connection with the transactions contemplated by this Agreement as a result of any actions taken by or on behalf of Sellers or any of their respective Affiliates.

3.19    **Product Quality**. All products manufactured, fabricated, sold or distributed by the Business prior to the Closing Date comply with applicable customer specifications and Applicable Laws for the intended use of such products, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.20    **Intercompany Agreements**. Other than as set forth on <u>Schedule 3.20</u>, there are no Contracts between Sellers, on the one hand, and any Affiliate of Sellers, on the other hand, relating to the ownership, management, or operation of the Business or the Purchased Assets.

3.21    **Data Privacy**.

(a)    With respect to the Business and the Purchased Assets, Sellers and, to the Knowledge of Sellers, any Person acting for or on Sellers' behalf have for the past three (3) years, as applicable, materially complied with (i) all applicable Privacy Laws, (ii) all of Sellers' policies and notices regarding Personal Information, and (iii) all of Sellers' contractual obligations with respect to Personal Information. Sellers have not received any written notice of any Claims of or investigations or regulatory inquiries related to, or been charged with, the violation of any Privacy Laws, applicable privacy policies, or contractual commitments with respect to Personal Information in connection with the Business or the Purchased Assets. To the Knowledge of Sellers, there are no facts or circumstances that could reasonably form the basis of any such notice or Claim.

(b)    With respect to the Business and the Purchased Assets, Sellers have (i) implemented and for the past three (3) years, as applicable, maintained reasonable and appropriate technical and organizational safeguards, at least consistent with practices in the industry in which Sellers operate, to protect Personal Information and other confidential data in its possession or under its control against loss, theft, misuse or unauthorized access, use, modification, alteration, destruction or disclosure, and (ii) taken reasonable steps to ensure that any third party with access to Personal Information collected by or on behalf of Sellers have implemented and maintained the same. To the Knowledge of Sellers, any third party who has provided Personal Information to Sellers in connection with the Business or the Purchased Assets has done so in material compliance with applicable Privacy Laws. Except as would not reasonably be expected to be material to the Business or the Purchased Assets, there have been no breaches, security incidents, misuse of or unauthorized access to or disclosure of any Personal Information in the possession or control of Sellers or collected, used or processed by or on behalf of Sellers. Sellers have not provided or been legally required to provide any notices to any Person in connection with a disclosure of Personal Information in violation of Applicable Law in connection with the Business or the Purchased Assets. The transfer of Personal Information in connection with the transactions contemplated by this Agreement will not violate in any material respect any applicable Privacy Laws or Sellers' privacy policies as they currently exist or as they existed at any time during which any of the Personal Information was collected or obtained.

3.22    **Bank Accounts**. Sellers have made available to Purchaser a complete list of all bank accounts (including any deposit accounts, securities accounts and any sub-accounts), safety deposit boxes and lock boxes (in each case, designating each authorized signatory with respect thereto) maintained with respect to the Business.

3.23    **Affiliate Transactions**. Except as set forth on <u>Schedule 3.23</u>, no Affiliate, principal, owner, stockholder, member, partner, director, manager, officer or Employee of any Seller or, to Sellers' Knowledge, any of their respective Affiliates, or any individual related by blood, marriage, or adoption to such Person, is a party to any Assumed Contract.

3.24 **Disclaimer of Additional Representations and Warranties**. EXCEPT AS SPECIFICALLY SET FORTH IN THIS ARTICLE III, THE TRANSACTION DOCUMENTS AND FILINGS MADE IN CONNECTION WITH THE BANKRUPTCY CASES, NO SELLER AND NONE OF THEIR RESPECTIVE AFFILIATES HAS MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE BUSINESS, ANY OF THEIR ASSETS (INCLUDING THE PURCHASED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES), INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR THE ACCURACY OR COMPLETENESS OF ANY PROJECTIONS, ESTIMATES OR OTHER FORWARD LOOKING INFORMATION PROVIDED OR OTHERWISE MADE AVAILABLE TO PURCHASER OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, CONTROLLING PERSONS, AGENTS, OR REPRESENTATIVES AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT PURCHASER IS PURCHASING THE PURCHASED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as of the date hereof and as of the Closing, as follows:

4.1 **Due Organization**. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware with all requisite power and authority to own and operate its assets and properties as they are now being owned and operated.

4.2 **Due Authorization**. Purchaser has full power and authority to enter into this Agreement and its Transaction Documents and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and its Transaction Documents have been duly authorized by all necessary entity action of Purchaser. Purchaser has duly and validly executed and delivered this Agreement and has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) its Transaction Documents. This Agreement constitutes the legal, valid and binding obligation of Purchaser, and its Transaction Documents, upon execution and delivery by Purchaser, will constitute legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms, subject to the Enforceability Exceptions.

4.3 **Consents and Approvals; No Violations**.

(a) Other than the filings and/or notices under the HSR Act, and subject to the issuance of the Sale Order and any other Order required by the Bankruptcy Court in connection with the transactions contemplated hereby, no filing, notice, report, consent, registration, approval, permit or authorization is required to be given, filed or obtained by Purchaser to or from any Governmental Authority in connection with the execution, delivery and performance by Purchaser of this Agreement and the Transaction Documents to which it is a party or the transactions contemplated hereby, except those that the failure to make or obtain would not, individually or in the aggregate, reasonably be expected to materially delay the consummation of the transactions contemplated hereby.

(b) The execution, delivery and performance by Purchaser of this Agreement does not, and the consummation of the transactions contemplated hereby will not, conflict with, or result in any violation of or default (with or without notice, lapse of time or both) under, or give rise to a right of

termination, loss of rights, adverse modification of provisions, cancellation or acceleration of any obligation under (i) any provision of the Organizational Documents of Purchaser, or (ii) subject to the Sale Order, any Law or Order to which Purchaser, except, in the case of clause (i) and (ii) is subject for any such breach, violation, termination, default, creation or acceleration that would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the transactions contemplated by this Agreement.

4.4    **Available Funds**. Purchaser has sufficient cash resources on hand or available to it in an aggregate amount sufficient to pay in cash any and all amounts required to be paid by it pursuant to this Agreement and the Transaction Documents to which it is a party, including the Cash Consideration and all fees and expenses related to the transactions contemplated by this Agreement and the Transaction Documents to which it is a party to be paid by Purchaser.

4.5    **Solvency**. As of the Closing and immediately after consummating the transactions contemplated by this Agreement and the other transactions contemplated by the Transaction Documents, Purchaser will not (a) be insolvent as defined in Section 101 of the Bankruptcy Code; (b) have unreasonably small capital with which to engage in its business; or (c) have incurred debts beyond its ability to repay such debts as they become absolute and matured.

4.6    **Investigation; Limitation on Warranties**.

(a)    Purchaser acknowledges and agrees that no Seller and none of their respective Affiliates or representatives has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Sellers, the Business, or the Purchased Assets, except as expressly set forth in this Agreement or the Transaction Documents.

(b)    Purchaser acknowledges and agrees that except for the representations and warranties of Sellers expressly set forth in this Agreement and the Transaction Documents, the Purchased Assets are being acquired AS IS WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR INTENDED USE OR OTHER EXPRESSED OR IMPLIED WARRANTY.

(c)    In connection with Purchaser's investigation of Sellers and the Business, Purchaser has received from or on behalf of Sellers certain projections, including projected statements of operating revenues and income from operations of the Business and certain business plan information of Sellers. Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, and that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

4.7    **Brokers and Finders**. No agent, broker, investment banker, financial advisor or other firm or Person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Sellers or any of their respective Affiliates could become liable in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Purchaser or any of its Subsidiaries.

## ARTICLE V
## COVENANTS

5.1    **Access to Information and the Facility**.

(a)     From the date of this Agreement to the earlier of the Closing Date or the date this Agreement is terminated, Sellers shall give Purchaser and its representatives, upon reasonable advance written notice, reasonable access during normal business hours to the offices, the Facility, the Purchased Assets, the Employees, and books and records of or Related to the Business (including financial, operating, and other data and information related to the Purchased Assets and the Assumed Liabilities), and shall make the officers and Employees of Sellers available to Purchaser and its representatives as Purchaser and its representatives shall from time to time reasonably request, in each case to the extent that such access and disclosure would not obligate Sellers to take any actions that would unreasonably disrupt the normal course of the Business or violate the terms of any contract to which Sellers are bound or any Applicable Law.

(b)     Nothing in this Section 5.1 shall require Sellers to take any such action if (i) such action (1) could result in a waiver or breach of any attorney-client, attorney work product, or other legally recognized privileges or immunity from disclosure, or (2) would result in the disclosure of any Trade Secrets of third parties or violate any Applicable Laws related to the exchange of information or any obligation of Sellers with respect to confidentiality, or (ii) such access or information is requested in relation to disputes involving Sellers (or any of them), its equity holders or any of their respective Affiliates in disputes arising under this Agreement or any other Transaction Document.

5.2     **Interim Operations of the Business**.

(a)     Except (i)(1) as required by Applicable Law, (2) as required by the DIP Credit Agreement or the Prepetition Documents (to the extent then in effect), or (3) as authorized by any Order of the Bankruptcy Court, which Order is consistent with this Agreement, (ii) as otherwise expressly contemplated by this Agreement, (iii) with the prior written consent of Purchaser, or (iv) as set forth on Schedule 5.2, during the period from the date of this Agreement until the earlier of the Closing Date or the date this Agreement is terminated, Sellers will: (A) conduct the Business in the Ordinary Course of Business and maintain and preserve the Purchased Assets in their current condition, ordinary wear and tear excepted; (B) preserve in all material respects the present business operations, organization and goodwill of the Business, and the present relationships with the Employees, Key Customers and Key Vendors of the Business; and (C) maintain their books, accounts, and records in the Ordinary Course of Business.

(b)     Notwithstanding Section 5.2(a), except (i)(1) as required by Applicable Law, (2) as required by the DIP Credit Agreement or the Prepetition Documents (to the extent then in effect), or (3) as authorized by any Order of the Bankruptcy Court, which Order is consistent with this Agreement, (ii) as otherwise expressly contemplated by this Agreement, including the actions contemplated by the proviso in Section 8.1(j), or any other Transaction Document, (iii) with the prior written consent of Purchaser, or (iv) as set forth on Schedule 5.2, during the period from the date of this Agreement until the earlier of the Closing Date or the date this Agreement is terminated, no Seller shall take any of the following actions:

(i)     sell, lease, transfer, mortgage, pledge, assign, exclusively license or otherwise dispose of or encumber any of the Purchased Assets, including the Owned Real Property and Leased Real Property (or permit any of the Purchased Assets to become subject to any additional Liens, other than in respect of Permitted Post-Closing Encumbrances (including, for the avoidance of doubt, Liens arising in connection with the DIP Credit Agreement)), other than (1) dispositions of inventory in the Ordinary Course of Business, or (2) dispositions not relating to any Owned Real Property or any

Leased Real Property, in each case, of less than $100,000 individually or $250,000 in the aggregate;

(ii)    enter into any new Contract that would constitute a Material Contract if entered into prior to the date of this Agreement, or amend or modify any Material Contract (other than in any such cases involving any Excluded Contract);

(iii)    make or authorize any payment of, or accrual or commitment for, capital expenditures, other than capital expenditures contemplated by the then Approved Budget as of the date of this Agreement and set forth on Schedule 5.2(b)(iii);

(iv)    except as required pursuant to the terms of any Benefit Plan in effect as of the date hereof or as otherwise required by Applicable Law, (1) grant or announce any increase in the compensation (other than salary increases in the Ordinary Course of Business consistent with past practice and not to exceed $25,000 in the aggregate) or benefits (including severance or termination pay) of, or grant new retention awards, incentive awards or severance or termination pay to, any Scheduled Employee, (2) become a party to, establish, adopt, amend, commence participation in or terminate any Benefit Plan or any arrangement that would have been a Benefit Plan had it been entered into prior to this Agreement, (3) take any action to accelerate the vesting or lapsing of restrictions or payment, or fund or in any other way secure the payment, of compensation or benefits of any Scheduled Employee, (4) forgive any loans or issue any loans (other than routine travel advances issued in the Ordinary Course of Business) to any director, officer or Scheduled Employee, (5) hire any individual who would be a Scheduled Employee, or change the terms of employment of any Employee so that he, she, or they would become a Scheduled Employee (other than in the Ordinary Course of Business for any Scheduled Employee, in each case, with annual compensation not exceeding $150,000), (6) terminate the employment of any Scheduled Employee (excluding hourly Employees) other than for cause (other than in the Ordinary Course of Business), or (7) become a party to, establish, adopt, amend, terminate, extend or commence participation in any Labor Agreement covering any Scheduled Employee;

(v)    implement any layoffs of Employees that implicate the WARN Act;

(vi)    waive, release, assign, settle, or compromise any material Claim or Action relating to the Business to the extent that such waiver, release, assignment, settlement, or compromise (1) imposes any binding obligation or restriction, whether contingent or realized, on the Business, the Purchased Assets, and/or Purchaser, or (2) waives or releases any material rights or claims that would constitute Purchased Assets;

(vii)    with respect to the Business or the Purchased Assets, make (other than in the Ordinary Course of Business consistent with past practice) or change any Tax election, file any amended Tax Return, enter into any closing agreement, settle any Tax claim or assessment, surrender any right to claim a refund of Taxes, or, other than in the Ordinary Course of Business, consent to any extension or waiver of the limitation period applicable to any material Tax claim or assessment;

(viii)    assume, reject, or assign any Assumed Contract other than pursuant to Section 2.7;

(ix)     (1) adjust, split, combine, or reclassify the Equity Interests of any Seller, (2) redeem, purchase, or otherwise acquire, directly or indirectly, any Equity Interests or any securities convertible or exchangeable into or exercisable for any Equity Interests of any Seller, (3) grant any Person any right or option to acquire any Equity Interests of any Seller, or (4) issue, deliver, or sell any additional Equity Interests or any securities convertible or exchangeable into or exercisable for any Equity Interests of any Seller;

(x)     amend or authorize the amendment of its or its Subsidiaries' articles of organization, bylaws, or operating agreement (or similar Organizational Documents);

(xi)     change its accounting policies or procedures, other than as required by GAAP or Applicable Law;

(xii)     (1) materially amend or materially modify any pricing policies or delay or postpone payment of any trade accounts payables or commissions or any other Liability, or enter into any agreement with any Person to extend the payment date of any trade accounts payables or commissions or any other Liability, or (2) accelerate the collection or receipt of, or cancel or discount, any Accounts Receivable, in each case, outside of the Ordinary Course of Business;

(xiii)     grant any refunds in excess of $100,000 in the aggregate other than in the Ordinary Course of Business or grant any credits, rebates, or other allowances in excess of $100,000 in the aggregate other than to the extent set forth in the terms of any Contract, in each case, to any end user, customer, reseller, or distributor;

(xiv)     acquire (by merger, consolidation, acquisition of stock or assets or otherwise) any Person or division;

(xv)     incur, assume, or guarantee any Indebtedness (other than under the DIP Credit Agreement);

(xvi)     (1) amend, modify, terminate, or fail to exercise any renewal option with respect to any Real Property Lease; or (2) enter into any lease, sublease, license, or agreement to use or occupy real property;

(xvii)     except in the Ordinary Course of Business, cancel, surrender, allow to expire, or fail to renew any Permit that is Related to the Business;

(xviii)     propose or adopt a plan of complete or partial liquidation or dissolution, merger, consolidation, restructuring, recapitalization, or other reorganization;

(xix)     enter into a joint venture, partnership, joint development program, or similar transaction;

(xx)     enter into, modify or amend any Contract between Sellers and any Affiliates; or

(xxi)     authorize, or commit or agree to take, any of the foregoing actions.

5.3     **Cooperation; Status Updates; Regulatory Filings; Consents**.

(a)     Cooperation. Subject to the terms and conditions set forth in this Agreement, the Parties shall cooperate with each other and use their respective commercially reasonable efforts to: (i) take or cause to be taken all actions reasonably necessary, proper or advisable on their part under this Agreement or Applicable Law to consummate the transactions contemplated hereby as promptly as reasonably practicable in accordance with the Bidding Procedures; (ii) execute, acknowledge, and deliver in proper form any further documents, certificates, agreements, and other writings, and take such other action as such other Party may reasonably require, in order to effectively carry out the intent of the Transaction Documents; (iii) make or cause to be made all registrations, filings, notifications, submissions, and applications with, give all notices to and obtain any consents, governmental transfers, approvals, orders, qualifications, and waivers from any Governmental Authority necessary for the consummation of the transactions contemplated hereby (including, any consent, clearance, expiration or termination of a waiting period, authorization, order or approval of, or any exemption by, any Governmental Authority, under the HSR Act or other competition Laws); (iv) not take any action prior to the Closing that would reasonably be expected to prevent, materially impair, or materially delay the consummation of the transactions contemplated hereby, except to the extent such action is otherwise expressly contemplated by this Agreement or the Bidding Procedures; (v) provide the other Party with cooperation and take such actions as such other Party may reasonably request in connection with the consummation of the transactions contemplated hereby and by the other Transaction Documents; and (vi) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated hereby and by the other Transaction Documents.

(b)     Status Updates. Each of Sellers and Purchaser shall promptly notify the other Party or Parties, as applicable, of the occurrence, to such Parties' or Party's, as applicable, knowledge, of any event or condition, or the existence of any fact or circumstance, that would reasonably be expected to result in any of the conditions set forth in Article VI or Article VII not being satisfied as of the Termination Date.

(c)     Regulatory Filings.

(i)     Sellers and Purchaser shall prepare and file as promptly as practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, clearances, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any Governmental Authority in order to consummate the transactions contemplated hereby, including, (1) all filings pursuant to the HSR Act within ten (10) Business Days after the date of this Agreement (subject to Sellers and Purchaser supplying as promptly as practicable (but no later than five (5) Business Days after the date such information is requested) any information and documentary material that may be requested by the other Party in connection with such filings), and (2) all other filings for required competition or other governmental approvals as promptly as practicable after the date of this Agreement. Sellers and Purchaser shall request early termination of the waiting period with respect to the transactions contemplated hereby under the HSR Act. Whether or not the transactions contemplated hereby are consummated, Purchaser shall be responsible for all fees and payments to any Governmental Authority (including filing fees) in each case, relating to filing under the HSR Act or similar competition Law.

(ii)     Subject to Applicable Law, Sellers and Purchaser shall cooperate with each other and shall promptly furnish to the other Party all information necessary or

desirable in connection with making any filing under the HSR Act or with making any other filing to be made pursuant to any competition or investment review Law, and in connection with resolving any investigation or other inquiry by any Governmental Authority under any competition or investment review Laws with respect to the transactions contemplated by this Agreement. Each of the Parties shall promptly inform the other Party of any substantive communication with any Governmental Authority regarding any such filings relating to the HSR Act or other competition Laws or any such transaction. To the extent practicable, neither any Seller nor Purchaser shall participate in any meeting with any Governmental Authority in respect of any such filings, investigation, or other inquiry without giving the other Party prior notice of the meeting. Such other Party shall be permitted to participate in any meeting with any Governmental Authority in respect of any such filings, investigation, or other inquiry relating to the HSR Act or other competition Laws, to the extent permitted by such Governmental Authority. The Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions, and proposals made or submitted by or on behalf of any Party in connection with all meetings, actions, and proceedings under or relating to the HSR Act or other competition Laws (including, with respect to making a particular filing, by providing copies of all such documents to the non-filing Party and their advisors prior to filing and, if requested, giving due consideration to all reasonable additions, deletions or changes suggested in connection therewith); *provided*, that the Parties shall not be required to provide to each other any confidential information or business secrets, which information shall be provided on an outside counsel-only basis; *provided*, *further*, that Purchaser shall have primary responsibility for directing and implementing the general strategy for obtaining all consents, clearances, registrations, approvals, permits, and authorizations necessary or advisable to be obtained from any Governmental Authority in order to consummate the transactions contemplated hereby.

(d) <u>Contract Cooperation</u>. Prior to the Designation Deadline, Sellers shall reasonably cooperate with Purchaser, to the extent reasonably requested by Purchaser, to identify all Identified Contracts with a Key Customer or Key Vendor for the purposes of assisting Purchaser to designate such Contracts as either Additional Assumed Contracts or Additional Rejected Contracts.

(e) Sellers will use their commercially reasonable efforts, and Purchaser will cooperate with Sellers, to obtain at the earliest practicable date all Required Consents (including any consents and approvals necessary to transfer or reissue any Permits).

5.4 **Preservation of Records; Post-Closing Access and Cooperation**.

(a) For a period of six (6) years after the Closing Date or such other period (if longer) required by Applicable Law, Purchaser shall preserve and retain all corporate, accounting, legal, auditing, human resources and other books and records included in the Purchased Assets that are in its possession relating to the Business and the Purchased Assets prior to the Closing Date. Purchaser shall, after the Closing Date, (i) permit Sellers' and their respective representatives (collectively, the "*Permitted Access Parties*") reasonable access, for the purpose of Sellers' tax reporting requirements, financial accounting and compliance with Applicable Law (including with respect to Sellers' wind-down and related activities), to the material financial and other books and records included in the Purchased Assets that are in its possession, during regular business hours and upon reasonable advance written notice, which access shall include (1) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may reasonably request in furtherance of the purposes described above, and (2) Purchaser's copying and delivering to the relevant

Permitted Access Parties such documents or records as they may reasonably request in furtherance of the purposes described above, but only to the extent the applicable Permitted Access Party reimburses Purchaser for the reasonable costs and expenses thereof, and (ii) provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to a representative during regular business hours and upon reasonable advance written notice so that Sellers and the other Permitted Access Parties have information necessary for the preparation of Tax Returns, collection of those Accounts Receivable that are Excluded Assets, and other activities in connection with the administration and wind-down of the Bankruptcy Cases (including the prosecution or processing of insurance/benefit claims); *provided*, that such access does not unreasonably interfere with Purchaser's operation of the Business and Purchaser shall not be required to provide access for requests unrelated to the Business or the Purchased Assets.

(b)     Nothing in this Section 5.4 shall require Purchaser to take any such action if (i) such action (1) could result in a waiver or breach of any attorney-client, attorney work product, or other legally recognized privileges or immunity from disclosure, or (2) would result in the disclosure of any Trade Secrets of third parties or violate any Applicable Laws related to the exchange of information or any obligation of Purchaser with respect to confidentiality, or (ii) such access or information is requested in relation to disputes involving Purchaser, its equity holders or any of their respective Affiliates or the Business or the Purchased Assets, including disputes arising under this Agreement or any other Transaction Document.

5.5     **Employees and Benefits**.

(a)     As of the Closing, Sellers shall terminate the employment of all of those Employees identified on Schedule 5.5(a) (the "***Subject Employees***"). Schedule 5.5(a) hereto shall be amended from time to time prior to the Closing (i) to delete any individuals who are no longer employed by Sellers, or (ii) upon written notice from Purchaser to Sellers, to add or remove any other individuals. Purchaser, in cooperation with Sellers, shall, at least five (5) Business Days prior to the Closing Date and effective as of the Closing Date, extend a written offer of employment to those Employees selected by Purchaser, in its sole and absolute discretion (the "***Selected Employees***"), at a level and with responsibilities that are substantially commensurate with their employment with Sellers and at a wage or salary and bonus opportunity that is substantially comparable to the respective wage or salary and bonus opportunity specified for such Selected Employees on Schedule 5.5(a) and with other benefits substantially comparable to those provided to similarly situated Employees of Purchaser. Those Selected Employees who accept offers of employment with Purchaser and who become Employees of Purchaser as of the Closing Date are referred to as "***Transferred Employees***." Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Purchaser any obligation to retain any Transferred Employee in its employment for any amount of time or on any terms and conditions of employment. Purchaser shall assume, honor and be solely responsible for paying, providing and satisfying when due all compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, personal days, sick pay and other paid time off, benefits and benefit claims, severance and termination pay, notice, and benefits (including any employer Taxes or other payments related thereto), in each case, accruing, incurred or arising as a result of employment or separation from employment with Purchaser after the Closing Date with respect to Transferred Employees. For the avoidance of doubt, all Liabilities arising in respect of periods on or prior to the Closing Date relating to the employment with, termination of employment with, application for employment with or any other employment or labor-related Liabilities, including severance, with respect to any current or former Employee or any other employment or service provider of Sellers and their Affiliates (excluding any Transferred Employees) shall be retained by Sellers and their Affiliates on the Closing Date, and Sellers and their Affiliates shall be solely responsible for such Liabilities. All Liabilities arising in respect of periods after the Closing Date relating to the employment with, termination of employment with,

application for employment with or any other employment or labor-related Liabilities, including severance, with respect to any Transferred Employee, shall be the obligation of Purchaser.

(b)      It is understood and agreed between the Parties that all provisions contained in this Agreement with respect to Benefit Plans or Employee compensation are included for the sole benefit of the respective Parties hereto and do not and shall not create any right in any other Person, including, but not limited to, any Employee, any participant in any benefit or compensation plan or any beneficiary thereof, including any right to any continued employment with Purchaser or compensation or benefits of any nature or kind whatsoever.

(c)      Purchaser shall not at any time prior to sixty (60) days after the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act affecting in whole or in part any facility, site of employment, operating unit or Employee of the Business without complying fully with the requirements of the WARN Act. Purchaser shall be solely responsible for, and will bear the entire cost of, compliance with (or failure to comply with) any such laws following the Closing Date.

(d)      Prior to the Closing, Sellers shall cooperate in good faith with and provide reasonable assistance to Purchaser in connection with and to facilitate Purchaser's and/or its Affiliates' establishment of new health, welfare and retirement plans for the Transferred Employees (including, without limitation, Sellers' prompt execution and delivery of broker access and change of broker forms in respect of Benefit Plans in form and content reasonably satisfactory to Sellers and the delivery of claims and other participant information, in each case, as reasonably requested by Purchaser and not prohibited or restricted by applicable law).

(e)      To the extent permissible under the Benefit Plans as of the Closing Date, Purchaser shall administer COBRA continuation coverage (other than with respect to flexible spending accounts) for M&A Qualified Beneficiaries (as defined in COBRA) that both (i) are Subject Employees (and not probationary or inactive Employees as of the Closing Date), and (ii) were not made offers of employment by Purchaser in accordance with <u>Section 5.5(a)</u>.

5.6     **Confidentiality**. The Parties acknowledge and agree that from and after the Closing, all non-public information relating to the other Parties, including, in respect of Purchaser, the Business, the Purchased Assets, and the Assumed Liabilities, is valuable and proprietary to the respective Party and its respective Affiliates, including any and all confidential and proprietary information that relates to the actual or anticipated business and/or products, research, or development of the Business, or to any technical data, trade secrets, or know-how, is valuable and proprietary to the respective Party and its respective Affiliates. Each Party agrees that, from and after the Closing, each Party and its representatives will hold in confidence, will not disclose to any Person and will not use any information relating to the other Party and its Affiliates, the Business, the Purchased Assets, or the Assumed Liabilities, except as required by Applicable Law or Order or Bankruptcy Court requirement, or as otherwise becomes available in the public domain other than through any action by any Party in violation of its obligations under this <u>Section 5.6</u>.

5.7     **Public Announcements**. Purchaser and Sellers will consult with each other before issuing any press release or otherwise making any public statements or disclosures with respect to the transactions contemplated by this Agreement, including the terms hereof, and no Party shall, without the prior written consent of the other Party, issue any such press release or make any such public statement, except as may be required by Applicable Law; *provided*, *however*, that Sellers may make public statements or disclosures with respect to this Agreement and the transactions contemplated herein as may

be necessary or advisable in connection with the Bankruptcy Cases, including, without limitation, to comply with the Bid Procedures Order and/or in seeking issuance of the Sale Order.

    5.8    **Tax Matters**.

        (a)    <u>Transfer Taxes</u>. To the extent that any sales, purchase, transfer, stamp, documentary stamp, registration, use or similar taxes (collectively, the "***Transfer Taxes***") are payable by reason of the sale of the Purchased Assets under this Agreement, such Transfer Taxes shall be borne by Purchaser. The Party responsible under Applicable Law shall timely file all Tax Returns related to any Transfer Taxes with the appropriate taxing authority. The Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available under the Bankruptcy Code unless otherwise indicated in the Sale Order. Purchaser and Sellers will reasonably cooperate in good faith prior to Closing to determine the amount of Transfer Taxes required to be paid in connection with the transactions contemplated by this Agreement and to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes that might otherwise be imposed in connection with the transactions contemplated by this Agreement, including by soliciting and providing appropriate resale exemption certificates or other evidence acceptable to Purchaser or Sellers, as appropriate, of exemption from such Transfer Taxes.

        (b)    <u>Property Taxes</u>. All Property Taxes levied with respect to the Purchased Assets for any Taxable period falling entirely within the period ending on or before the Closing Date shall be the responsibility of Sellers. All Property Taxes levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date will be prorated based on the number of days in such period that occur on or before the Closing Date, on the one hand, and the number of days in such period that occur after the Closing Date, on the other hand, the amount of such Property Taxes allocable to the portion of the period ending on or before the Closing Date being the responsibility of Sellers and the remainder being the responsibility of Purchaser. If the exact amount of any Property Taxes is not known on the Closing Date, such Taxes shall be estimated based upon the best available information at the time of Closing (*i.e.*, the Taxable value currently assigned to the real property). There shall be no re-proration of Property Taxes after Closing. The amount of such Property Taxes allocable to Sellers pursuant to this <u>Section 5.8(b)</u> that have not been paid prior to Closing, if any, shall be paid to the appropriate Governmental Authority by Purchaser, but shall result in a reduction of the Cash Consideration in like amount. Purchaser shall be responsible for the preparation and timely filing of any Tax Returns and the payment to the applicable Governmental Authority of all Property Taxes that become due and payable after the Closing Date. Sellers shall be responsible for the preparation and timely filing of any Tax Returns and payment to the applicable Governmental Authority of all Property Taxes that become due and payable on or prior to the Closing Date.

        (c)    <u>Cooperation and Audits</u>. Purchaser and Sellers will cooperate fully with each other regarding Tax matters and will make available to the other as reasonably requested all information, records, and documents relating to Taxes with regard to the Purchased Assets and the Transferred Employees until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals, or litigation with respect to such Taxes. Notwithstanding anything in this <u>Section 5.8(c)</u> to the contrary, Sellers, Purchaser and their respective Affiliates shall not be required to provide to Sellers and their Affiliates or Purchaser and its Affiliates, as the case may be, any records, Tax Returns or any other information related to Taxes, in each case, to the extent such records, Tax Returns, or other information do not relate to the Business, Purchased Assets or the Transferred Employees.

(d)    <u>Preparation of Tax Returns and Payment of Taxes</u>.

(i)    Sellers shall prepare and timely file (i) all Tax Returns with respect to the Purchased Assets and the Business for any Tax period ending on or before the Closing Date (the "***Applicable Seller Prepared Returns***") (and Purchaser shall cooperate with Sellers in causing such Tax Returns to be filed) and (ii) all Income Tax Returns of Sellers and their Affiliates. Sellers shall provide Purchaser with a draft of all Applicable Seller Prepared Returns at least thirty (30) days (or such shorter period of time as is reasonably practicable) prior to the filing of any such Tax Return. Sellers shall incorporate any changes reasonably requested by Purchaser with respect to such Tax Returns that are supported at a "more likely than not" (or higher) level of confidence and consistent with past practice. As between Sellers and Purchaser, unless such Taxes are an Assumed Liability as set forth in <u>Section 2.3</u>, Purchaser shall not be responsible for paying any Taxes shown on any Tax Return Sellers are obligated to file under this <u>Section 5.8(d)(i)</u>.

(ii)    Except as otherwise provided by <u>Section 5.8(a)</u>, Purchaser shall prepare and timely file all Tax Returns with respect to the Purchased Assets and the Business for any Tax period ending after the Closing Date, excluding, for the avoidance of doubt, any Income Tax Returns of Sellers. With respect to any Tax period beginning before and ending on or after the Closing Date, Purchaser shall prepare such Tax Returns consistent with past practice unless otherwise required by Applicable Law, and shall provide Sellers or their successors in rights, as applicable, with a draft of such Tax Returns at least thirty (30) days prior to the filing of any such Tax Return to the extent any Seller or its successor in rights could reasonably be expected to be liable for any such Taxes under this Agreement. Purchaser shall incorporate any changes reasonably requested by Sellers with respect to such Tax Returns that are supported at a "more likely than not" (or higher) level of confidence and consistent with past practice. Purchaser shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this <u>Section 5.8(d)(ii)</u> to the extent constituting an Assumed Liability.

5.9    **Use of Names and Marks**. As soon as reasonably practicable after the Closing, but in no event more than thirty (30) Business Days after the Closing, Sellers shall cause an amendment to the certificate or articles of incorporation or formation (or any equivalent organizational documents) of Sellers to be filed with the appropriate Governmental Authority and shall take all other action necessary to change Sellers' legal, registered, assumed, trade and "doing business as" name, as applicable, to a name or names not containing any Transferred Intellectual Property, including "Gladieux Metals Recycling," "Aleon Renewable Metals," "GMR," "Aleon," or any name confusingly similar to the foregoing, and will cause to be filed as soon as practicable after the Closing, in all jurisdictions in which Sellers are qualified to do business, any documents necessary to reflect such change in its legal, registered, assumed, trade and "doing business as" name, as applicable, or to terminate its qualification therein. Sellers further agree that from and after the Closing, Sellers and their respective Affiliates will cease to make any use of all Transferred Intellectual Property, the names "Gladieux Metals Recycling," "Aleon Renewable Metals," "GMR," "Aleon," and any similar names indicating affiliation with Purchaser, any of its Affiliates, the Business, the Purchased Assets, or the business or activities engaged in by Purchaser or any of its Affiliates, other than to make limited factual statements regarding the historical relationship between Sellers and the Business.

5.10    **No Successor Liability**. The Parties hereto agree that the Sale Order shall provide that, to the fullest extent permitted by Applicable Law (including under section 363(f) of the Bankruptcy

Code), (a) Purchaser shall not be liable for any Liability or Lien (other than Assumed Liabilities) against Sellers or any of their respective predecessors or Affiliates, and (b) Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets, or any liabilities of Sellers arising prior to the Closing Date.

5.11    **Purchased Assets held by Affiliates**. Without limiting any Seller's obligations under <u>Section 10.9</u> hereof, in the event that an Affiliate of Sellers (including Parent) owns or holds any assets rights or properties that, if owned or held by Sellers at the Closing, would constitute Purchased Assets ("*Wayward Assets*"), Parent shall cause each such Affiliate to transfer and assign, for no additional consideration, such Wayward Assets to Purchaser by transfer documents in form and content not inconsistent with the terms and provisions hereof and otherwise in form and content reasonably requested by Purchaser.

5.12    **Insurance Matters**.

(a)    Sellers shall, and shall cause their Affiliates to, assign, to the extent assignable, to Purchaser any and all proceeds owing to Sellers under Sellers' or any of their respective Affiliates' third-party insurance policies written prior to the Closing in connection with (i) the damage or destruction of any of the Purchased Assets from and after the date of this Agreement and prior to the Closing that is, or would have been but for such damage or destruction, included in the Purchased Assets, or (ii) any Assumed Liability (other than, in the case of this <u>clause (ii)</u>, where insurance proceeds are directly or indirectly funded by Sellers or any of their respective Affiliates through self-insurance or other similar arrangement). If such proceeds are not assignable, Sellers agree to pay any such proceeds received by them or any of their respective Affiliates to Purchaser promptly upon the receipt thereof.

(b)    From and after the Closing Date, Sellers agree that, with respect to acts, omissions, events, or circumstances relating to the Business and the Purchased Assets that occurred or existed on or prior to the Closing, whether known or unknown, and that are covered by the Insurance Policies, each Seller shall (or shall cause its Affiliates to) make claims under such insurance policies on behalf of Purchaser, subject to all of the terms and conditions of such Insurance Policies and this Agreement. Sellers shall take no action following the Closing that may invalidate coverage of the Business or the Purchased Assets under the Insurance Policies; *provided*, *however*, that the Insurance Policies shall be permitted to lapse in accordance with their respective terms.

5.13    **Title Insurance Policies**.  From the date of this Agreement to the earlier of the Closing Date or the date this Agreement is terminated, Sellers shall use commercially reasonable efforts to cooperate with Purchaser, at Purchaser's sole expense and at no cost, expense, or liability to Sellers, in Purchaser's efforts to obtain any title commitments, title policies (including endorsements thereto), and surveys with respect to the Transferred Owned Real Property, including by providing reasonable affidavits and other similar instruments as are reasonably required by the Title Company for the issuance of customary endorsements to such title policies reasonably requested by Purchaser, or for the deletion of any standard or printed exceptions in Purchaser's title insurance policies that are customarily deleted by virtue of a seller delivering such instruments in commercial real estate transactions in the state in which the Transferred Owned Real Property which is the subject of such policy is located (including, without limitation, any statements within such affidavits or other similar instruments with respect to any customary factual statements regarding unpaid bills or claims for labor or services performed or materials furnished or delivered to the Transferred Owned Real Property during applicable statutory lien periods and contracts for the making of repairs or improvements on the Transferred Owned Real Property to the

extent reasonably required by the Title Company in order to remove any exceptions, and provide customary coverage, related to mechanics' liens or other similar liens).

5.14     **Refunds and Remittances**. To the extent Sellers, on the one hand, and Purchaser or any Purchaser Designee, on the other hand, receives any payment to which the other Party is entitled, each of Purchaser or the applicable Purchaser Designee, on the one hand, and Sellers, on the other hand, agree to promptly remit the proceeds to the other party, as appropriate. The Parties acknowledge and agree there is no right of offset regarding such payments and a party may not withhold funds received from third parties for the account of the other Party in the event there is a dispute regarding any other issue under this Agreement or any other agreement or document contemplated hereby. The provisions of this <u>Section 5.14</u> shall not apply with respect to Taxes.

## ARTICLE VI
## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser at Closing under this Agreement are subject to the satisfaction (or waiver by Purchaser) of the following conditions precedent on or before the Closing Date:

6.1     **Accuracy of Representations**. (a) The representation and warranty of Sellers made in the second sentence of <u>Section 3.7</u> shall be true and correct in all respects on and as of the Closing; (b) the Fundamental Representations shall be true and correct in all respects (other than in *de minimis* respects)  on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all respects (other than in *de minimis* respects) as of such earlier date; and (c) all other representations of Sellers contained in this Agreement (without giving effect to any materiality limitations, such as "material," "in all material respects," and "Material Adverse Effect" set forth therein) shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except for any failure of any such representation and warranty to be so true and correct that has not had and would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect.

6.2     **Compliance with Agreements and Covenants**. Sellers shall have performed and complied in all material respects with all of the covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date including delivery of the documents referred to in <u>Section 2.8(b)</u>.

6.3     **No Prohibition**. No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit or proceeding shall be pending which would be reasonably expected to prohibit, the consummation of the transactions contemplated hereby.

6.4     **Waiting Periods; Required Consents**. The waiting period (and any extension thereof) applicable to the consummation of the transactions contemplated hereby under the HSR Act shall have expired or been earlier terminated, and the Required Consents shall have been received.

6.5     **Entry of Sale Order**. The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been vacated, reversed, stayed, modified or amended as of the Closing Date, and shall have become final and no longer be subject to (or subject to a pending) appeal, vacatur, reversal or motion for reconsideration.

6.6 **No Material Adverse Effect**. Since the date of this Agreement, no Material Adverse Effect shall have occurred.

Any waiver of a condition by Purchaser shall be effective only if such waiver is stated in writing and signed by Purchaser; *provided*, *however*, that the consent of Purchaser to the Closing shall constitute a waiver by Purchaser of any conditions to Closing as to Purchaser not satisfied as of the Closing Date.

## ARTICLE VII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligations of Sellers at Closing under this Agreement are subject to the satisfaction (or waiver in writing by Sellers) of the following conditions precedent on or before the Closing Date:

7.1 **Accuracy of Representations**. The representations and warranties of Purchaser contained in this Agreement shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except for any failure of any such representation and warranty to be so true and correct as would not, individually or in the aggregate, reasonably be expected to adversely affect, materially delay or prevent the ability of Purchaser (a) perform its obligations under this Agreement or any other Transaction Document, or (b) consummate the transactions contemplated by this Agreement or any other Transaction Document.

7.2 **Compliance with Agreements and Covenants**. Purchaser shall have performed and complied in all material respects with all of its covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date, including delivery of the documents referred to in Section 2.8(c) hereof.

7.3 **No Prohibition**. No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit or proceeding shall be pending which would be reasonably expected to prohibit, the consummation of the transactions contemplated hereby.

7.4 **Entry of Sale Order**. The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been vacated, reversed, stayed, modified or amended as of the Closing Date, and shall have become final and no longer be subject to (or subject to a pending) appeal, vacatur, reversal or motion for reconsideration.

7.5 **Waiting Periods; Required Consents**. The waiting period (and any extension thereof) applicable to the consummation of the transactions contemplated hereby under the HSR Act shall have expired or been earlier terminated, and the Required Consents shall have been received.

Any waiver of a condition by Sellers shall be effective only if such waiver is stated in writing and signed by Sellers; *provided*, *however*, that the consent of Sellers to the Closing shall constitute a waiver by Sellers of any conditions as to Sellers to Closing not satisfied as of the Closing Date.

## ARTICLE VIII
## TERMINATION

8.1 **Termination**. This Agreement may be terminated at any time on or prior to the Closing Date:

(a)      With the mutual written consent of Purchaser and Sellers;

(b)      By either Purchaser or Sellers if the Closing shall not have occurred on or before sixty (60) days after the Petition Date (as may be extended pursuant to Section 8.1(j)) (the "**Termination Date**"); *provided*, that the right to terminate this Agreement under this Section 8.1(b) shall not be available to any Party whose failure to fulfill any obligation under this Agreement has been the primary cause of, or materially contributed to, the failure of the Closing to occur on or before the Termination Date;

(c)      By Sellers, if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants, or other agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 7.1 or Section 7.2, and (ii) has not been or is incapable of being cured by Purchaser within ten (10) Business Days after its receipt of written notice thereof from Sellers;

(d)      By Purchaser, if Sellers shall have breached or failed to perform any of their representations, warranties, covenants, or other agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 6.1 or Section 6.2, and (ii) has not been or is incapable of being cured by Sellers within ten (10) Business Days after their receipt of written notice thereof from Purchaser;

(e)      By Sellers, if (i) all of the conditions set forth in Article VI have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing), and (ii) Purchaser fails to proceed with and consummate the Closing within three (3) Business Days after receipt of written notice from Sellers that Sellers are ready, willing, and able to proceed with and consummate the Closing;

(f)      By Purchaser, if (i) all of the conditions set forth in Article VII have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing), and (ii) Sellers fail to proceed with and consummate the Closing within three (3) Business Days after receipt of written notice from Purchaser that Purchaser is ready, willing, and able to proceed with and consummate the Closing;

(g)      By Purchaser, if (i) Sellers file a motion to have the Bankruptcy Court enter an Order (1) dismissing the Bankruptcy Cases, or (2) converting the Bankruptcy Cases into cases under chapter 7 of the Bankruptcy Code or appointing a trustee in the Bankruptcy Cases or appointing an examiner with enlarged powers related to the operation of the Business (beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code, (ii) an Order is entered (1) dismissing the Bankruptcy Cases, or (2) converting the Bankruptcy Cases into cases under chapter 7 of the Bankruptcy Code or appointing a trustee or examiner in the Bankruptcy Cases, and, in each case, such Order is not reversed or vacated within fourteen (14) days after entry thereof, (iii) the Sale Order (1) shall not have been entered by the Bankruptcy Court by fifty-two (52) days after the Petition Date (unless, prior to termination of this Agreement by Purchaser, the Bankruptcy Court shall have entered the Sale Order), (2) shall have been entered in a form not acceptable to Purchaser, or (3) shall have been stayed, vacated, modified, or supplemented without Purchaser's prior written consent, (iv) Sellers publicly announce, file, or otherwise takes material steps in furtherance of any chapter 11 plan(s) of reorganization or plan(s) of liquidation with respect to the Bankruptcy Cases that fail to provide for or otherwise contemplate the Closing pursuant to the terms hereof, or (v) any of the conditions set forth in ARTICLE VII has become incapable of fulfillment and such condition is not waived by Purchaser;

(h)      By either Purchaser or Sellers if any Governmental Authority shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling, or other action shall have become final and nonappealable;

(i)      Automatically if Sellers consummate any Alternative Transaction with someone other than Purchaser involving the Purchased Assets; or

(j)      By Purchaser if: (i) the Auction shall not have been held, conducted, or concluded on or before forty-five (45) days after the Petition Date; (ii) Purchaser is not selected and designated as the Successful Bidder or Back-Up Bidder in the Notice of Successful Bidder to be filed by Sellers on or before two (2) days after the Auction; (iii) the Sale Hearing shall not have been held and concluded on or before fifty (50) days after the Petition Date; (iv) the Sale Order shall not have been entered on or before fifty-two (52) days after the Petition Date; (v) the Closing of the transactions contemplated by this Agreement shall not have occurred on or before the Termination Date; *provided*, that Sellers and Purchaser may mutually agree in writing to extend such milestones in the foregoing clauses (i) through (v), in accordance with the DIP Credit Agreement; (vi) after the conclusion of the Auction, if Purchaser is the Successful Bidder, Sellers or any of their respective Affiliates take steps in further of any Alternative Transaction; or (vii) after the conclusion of the Auction if Purchaser is the Back-Up Bidder, Sellers or any of their respective Affiliates take steps in furtherance of any Alternative Transaction other than that of the Successful Bidder.

Notwithstanding anything else contained in this Agreement, the right to terminate this Agreement under this Section 8.1 shall not be available to any Party (a) that is in material breach of its obligations hereunder, or (b) whose failure to fulfill its obligations or to comply with its covenants under this Agreement has been the primary cause of, or materially contributed to, the failure to satisfy any condition to the obligations of either party hereunder.

8.2      **Effect of Termination**.  In the event of termination of this Agreement by either Purchaser or Sellers as provided in Section 8.1, this Agreement will forthwith become void and have no further force or effect, without any liability (other than as set forth in Section 9.3 or this Section 8.2) on the part of Purchaser or Sellers; *provided*, *however*, that the provisions of this Section 8.2, Section 9.3 and Article X will survive any termination hereof; *provided*, *further*, *however*, that subject to the terms of this Section 8.2, nothing in this Section 8.2 shall relieve any Party of any liability for any breach by such Party of this Agreement prior to the date of any such termination.

## ARTICLE IX
## BANKRUPTCY COURT MATTERS

9.1      **Alternative Transactions**.

(a)      Consummation of the transactions contemplated hereby is subject to approval by the Bankruptcy Court and the consideration by the Debtors of higher or better competing bids in accordance with the Bidding Procedures. From and after the date hereof until the Auction is declared closed by Purchaser, Sellers shall be permitted to cause their respective representatives and Affiliates to (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents, and representatives) with respect to an Alternative Transaction, and (ii) respond to any inquiries or offers related to an Alternative Transaction and perform any and all other acts related thereto which are required or permitted under the Bankruptcy

Code, the Bid Procedures Order or other Applicable Law, including supplying information relating to the Business and the assets of Sellers to prospective purchasers.

(b)    If, upon completion of the Auction, Sellers have agreed to sell their assets under an Alternative Transaction, Sellers may select Purchaser as the Back-Up Bidder or may select another Back-Up Bidder as provided in the Bidding Procedures. Purchaser hereby agrees and acknowledges that it shall serve as a Back-Up Bidder if so requested.

9.2    **Bankruptcy Actions**.

(a)    On the Petition Date, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Bid Procedures Order approving, among other things, the execution, delivery, and performance of this Agreement by Sellers, other than the performance of those obligations to be performed at or after the Closing. The form and substance of such motion shall be reasonably acceptable to Purchaser. From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII, and (ii) the Closing Date, the Parties shall use their respective reasonable efforts to obtain entry by the Bankruptcy Court of the Bid Procedures Order and the Sale Order.

(b)    Each of Sellers and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement, and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement.

(c)    No later than the times set forth in the Bid Procedures Order (as may be modified pursuant to the terms thereof with the prior written consent of Purchaser to the extent such modifications relate to this Agreement and adversely affect Purchaser, such consent not to be unreasonably withheld), Sellers will (subject to Purchaser's and Sellers' rights and obligations set forth in Section 9.2(e) below) make all filings and give all notices relating to this Agreement as Sellers are required to make and give pursuant to the Bid Procedures Order. Sellers shall take all actions as may be reasonably necessary to obtain entry of the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Both Purchaser's and Sellers' obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Sale Order. If the Bankruptcy Court refuses to issue the Sale Order or to approve a sale of the Purchased Assets to Purchaser at the Sale Hearing, then this transaction shall automatically terminate, and Sellers and Purchaser shall be relieved of any further liability or obligation hereunder. Upon entry of the Sale Order in accordance with the provisions of this Section 9.2(a), the condition set forth in this Section 9.2(a) shall conclusively be deemed satisfied.

(d)    If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or re-argument shall be filed with respect to the Bid Procedures Order and the Sale Order, or other such order) subject to the rights otherwise arising from this Agreement, Sellers shall take all actions as may be reasonably necessary to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion; *provided*, *however*, nothing herein shall be deemed to require Sellers to so pursue any such appeal or other actions beyond the Termination Date if this Agreement is terminated in accordance with its terms after the Termination Date.

(e)    Purchaser and Sellers shall consult with each other regarding pleadings, notices and filings that either of them intends to file with the Bankruptcy Court in connection with, or which might reasonably be expected to affect the Bankruptcy Court's approval of the Sale Order, including,

with respect to Sellers, sharing in advance any drafts for Purchaser's review and comment, it being agreed that Sellers shall give reasonable consideration to, and incorporate into the relevant pleading, notice or filing, any reasonable comments Purchaser may provide within a reasonable time prior to the filing of any of such pleading, notice or filing. Each Seller shall promptly provide Purchaser and its outside legal counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Seller has in its possession (or receives) pertaining to the Sale Order, or any other order related to any of the transactions contemplated hereby, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court. No Seller shall seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Bankruptcy Cases has been appealed, in each case, without prior written consent of Purchaser in its sole discretion.

9.3     **Bid Protections**.

(a)     Notwithstanding Section 8.2, (i) if this Agreement is terminated other than pursuant to Section 8.1(a), Section 8.1(b), Section 8.1(c), or Section 8.1(e), and (ii) at the time of such termination, Purchaser is not then in material breach of any of its representations, warranties, covenants, or agreements contained in this Agreement that would result in a failure of a condition set forth in Section 7.1 or Section 7.2, then Sellers will pay the Expense Reimbursement Amount to Purchaser by wire transfer of immediately available funds, without further order of the Bankruptcy Court, within three (3) Business Days following such termination of this Agreement.

(b)     The Expense Reimbursement Amount shall, pursuant to the Bid Procedures Order, constitute allowed administrative expenses of Sellers' estates under section 503(b) of the Bankruptcy Code.

(c)     Sellers acknowledge and agree that the agreements contained in this Section 9.3 are an integral part of the transactions contemplated hereby and that, without these agreements, Purchaser would not enter into this Agreement. Each of the Parties further acknowledges that the payment by Sellers of the Expense Reimbursement Amount is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Purchaser, together with any additional damages to which Purchaser may be entitled hereunder, in the circumstances in which such Expense Reimbursement Amount is payable, for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(d)     For the avoidance of doubt, under no circumstances shall Purchaser be permitted or entitled to receive both (i) the remedy of specific performance to cause the Closing and (ii) the payment of the Expense Reimbursement Amount.

9.4     **Sale Order**. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Liens (other than Permitted Post-Closing Encumbrances), and (iii) the execution, delivery, and performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assumed Contracts, (c) find that Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assumed Contracts,

and (e) find that Purchaser shall have no Liability for any Excluded Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, *de facto* merger, environmental, or substantial continuity. Without limiting Sellers' obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Purchaser agrees that it will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (A) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (B) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code and in accordance with the Bid Procedures Order.

## ARTICLE X
## MISCELLANEOUS

10.1    **Survival**. The Parties agree that the representations, warranties, covenants or agreements contained in this Agreement (other than with respect to Section 3.24, Section 4.5, and Section 5.6) will not survive the Closing hereunder, and none of the Parties will have any liability to each other after the Closing for any breach of such representations, warranties, covenants or agreements which may be made, or any Claim or Action instituted, after the Closing. Notwithstanding the foregoing, the covenants and agreements that by their terms are to be satisfied after the Closing Date, shall survive until satisfied in accordance with their terms.

10.2    **Notices**. Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person or by courier or a courier service, (b) on the date of transmission if sent by electronic mail (without receipt of a delivery error), (c) on the next Business Day if sent by an overnight delivery service, or (d) five (5) Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

(a)      If to Sellers, addressed as follows:

Gladieux Metals Recycling, LLC
Aleon Renewable Metals, LLC
Aleon Metals, LLC
302 Midway Road
Freeport, Texas 77541
Attn: Roy Gallagher
Email: roy.gallagher@ankura.com
With a copy (which shall not constitute notice) to:

Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Attn: Jennifer Marines; Benjamin Butterfield
Email: ~~jmariines~~jmarines@mofo.com; bbutterfield@mofo.com

(b)      If to Purchaser, addressed as follows:

AM Bidco Operations LLC

302 Midway Road
_____

Freeport, Texas 77541
Attn: Roy Gallagher
Email: roy.gallagher@ankura.com

With a copy (which shall not constitute notice) to:

Arnold & Porter Kaye Scholer LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602
Attn: Michael Messersmith and Sarah Gryll
Email: michael.messersmith@arnoldporter.com and
sarah.gryll@arnoldporter.com

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

10.3    **Entire Agreement**. This Agreement (including any exhibits and schedules hereto) and the other Transaction Documents represents the entire understanding and agreement between the Parties with respect to the subject matter hereof and thereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.

10.4    **Amendments and Waivers**. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed, in the case of an amendment, supplement or change, by the Parties, or in the case of a waiver, by the Party against whom enforcement of such waiver is sought. The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

10.5    **Counterparts**. This Agreement may be executed in counterparts and such counterparts may be delivered in electronic format (including by email), all of which shall be considered an original and one and the same agreement. Such delivery of counterparts shall be conclusive evidence of the intent to be bound hereby, and each such counterpart and copies produced therefrom shall have the same effect as an original. To the extent applicable, the foregoing constitutes the election of the parties to invoke any law authorizing electronic signatures.

10.6    **Interpretation; Construction**.

(a)    The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties, and shall not in any way affect the meaning or interpretation of this Agreement.

(b)    Unless otherwise specified in this Agreement or the context otherwise requires: (i) the words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (ii) any reference to the masculine, feminine or neuter gender shall include all genders, the

66

plural shall include the singular, and the singular shall include the plural; (iii) all preamble, recital, Article, Section, clause, schedule and exhibit references used in this Agreement are to the preamble, recitals, articles, sections, clauses, schedules and exhibits to this Agreement; (iv) wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation;" (v) the terms "date hereof" and "date of this Agreement" mean the date first written above; (vi) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding;" (vii) (A) any reference to "days" means calendar days unless Business Days are expressly specified, and (B) any reference to "months" or "years" shall mean calendar months or calendar years, respectively, in each case unless otherwise expressly specified; (viii) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends and such phrase shall not mean simply "if;" (ix) each accounting term not otherwise defined in this Agreement has the meaning commonly applied to it in accordance with GAAP; (x) the term "made available" means made available in the Data Room or otherwise delivered or provided by Sellers to Purchaser hereby at least one (1) Business Day prior to the date hereof; (xi) any reference in this Agreement to "*Dollars*" or "**$**" means United States dollars; (xii) time is of the essence of each and every covenant, agreement, and obligation in this Agreement, and (xiii) neither Purchaser nor Sellers shall be deemed to be in breach of any covenant contained in this Agreement if such party's deemed breach is the result of any action or inaction on the part of the other.

(c)    Unless otherwise specified in this Agreement, any deadline or time period set forth in this Agreement that by its terms ends on a day that is not a Business Day shall be automatically extended to the next succeeding Business Day. Unless otherwise specified in this Agreement or the context otherwise requires, all references to any (i) statute in this Agreement include the rules and regulations promulgated thereunder and all applicable guidance, guidelines, bulletins, or policies issued or made in connection therewith by a Governmental Authority, and (ii) Law in this Agreement shall be a reference to such Law as amended, re-enacted, consolidated, or replaced as of the applicable date or during the applicable period of time.

(d)    Unless otherwise specified in this Agreement all references in this Agreement (i) to any Contract, other agreement, document, or instrument (excluding this Agreement) mean such Contract, other agreement, document, or instrument as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and, unless otherwise specified therein, include all schedules, annexes, addendums, exhibits and any other documents attached thereto or incorporated therein by reference, and (ii) to this Agreement mean this Agreement (taking into account the provisions of Sections 10.4) as amended, supplemented or otherwise modified from time to time in accordance with Section 10.4.

(e)    With regard to each and every term and condition of this Agreement, the Parties understand and agree that the same have or has been mutually negotiated, prepared, and drafted, and that if at any time the Parties desire or are required to interpret or construe any such term or condition or any agreement or instrument subject thereto, no consideration shall be given to the issue of which Party actually prepared, drafted or requested any term or condition of this Agreement.

(f)    All capitalized terms in this Agreement (including the exhibits and schedules hereto) shall have the meaning set forth in Section 1.1, except as otherwise specifically provided herein. Each of the other capitalized terms used in this Agreement has the meaning set forth where such term is first used or, if no meaning is set forth, the meaning required by the context in which such term is used.

10.7    **Binding Agreement; Assignment**. This Agreement and the other Transaction Documents shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns; *provided*, that neither this Agreement nor any of the rights, interests or

obligations hereunder shall be assigned (including by operation of law) by any Party without the prior written consent of the other Party(ies). For all purposes hereof, a transfer, sale or disposition of a majority of the capital stock or other voting interest of a Party (whether by contract or otherwise) shall be deemed an assignment requiring consent hereunder. Any purported assignment in contravention of this Section 10.7 shall be null and void. Notwithstanding the foregoing or anything else in this Agreement to the contrary, Purchaser may (a) transfer or assign its rights, interests or obligations under this Agreement, in whole or from time to time in part, to one or more of its Affiliates, provided that Purchaser will remain liable for the performance of its obligations and will provide notice to Sellers of such assignment; and (b) collaterally assign its rights hereunder to any lender of Purchaser. Notwithstanding anything to the contrary herein, no assignment of this Agreement or any rights, interests or obligations hereunder (including any assignment pursuant to the immediately preceding sentence) shall be deemed to release, relieve, or otherwise affect the assigning Party's continuing liability hereunder.

10.8    **Third Party Beneficiaries**. This Agreement is solely for the benefit of the Parties hereto, and no provision of this Agreement shall be deemed to confer upon third parties, either express or implied, any remedy, claim, liability, reimbursement, cause of action or other right.

10.9    **Further Assurances**. Upon the reasonable request of Purchaser or Sellers, each Party will, on and after the Closing Date, execute and deliver to the other Parties such other documents, assignments and other instruments as may be reasonably required (without imposing any material monetary obligations or other obligations beyond those specifically imposed on the cooperating Party(ies) by the other provisions of this Agreement or the other Transaction Documents) to effectuate completely the transactions contemplated hereby, and to effect and evidence the provisions of this Agreement and the other Transaction Documents and the transactions contemplated hereby. For the avoidance of doubt, as to Sellers, the obligations set forth in this Section 10.9 shall lapse and cease to be of any further force or effect upon the closing of the Bankruptcy Cases.

10.10    **Governing Law**. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF.

10.11    **EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT**. IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING, OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, ANY OTHER TRANSACTION DOCUMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN OR THEREIN, THE PARTIES TO THIS AGREEMENT HEREBY (A) AGREE ANY LITIGATION, PROCEEDING, OR OTHER LEGAL ACTION SHALL BE INSTITUTED ONLY IN THE BANKRUPTCY COURT, WHICH SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY SUCH MATTERS; (B) CONSENT AND SUBMIT TO PERSONAL JURISDICTION OF THE BANKRUPTCY COURT AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS; AND (C) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING, OR ACTION WAS BROUGHT IN AN INCONVENIENT FORUM.

10.12    **WAIVER OF JURY TRIAL**. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY

HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.12</u>.

10.13    **Schedules**. Provided that any such amended disclosure or updated schedule does not materially affect the value of the Purchased Assets or result in additional liability to Purchaser, Purchaser and Sellers may mutually agree at any time prior to Closing to amend all schedules to correct errors and to add omitted items, or new items that first arise or occur after the date hereof. Sellers shall update <u>Schedule 3.6(f)</u> (a) at least five (5) Business Days prior to the Closing to reflect an accurate list of the final Cure Costs, and (b) at the times, and subject to the terms and conditions specified in <u>Section 2.7</u>.

10.14    **Severability**. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

10.15    **Expenses**. Except as otherwise provided in this Agreement, whether or not the Closing occurs, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such Expenses.

10.16    **Attorneys' Fees**. In the event that Sellers or Purchaser bring an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party(ies) in that action or proceeding shall be entitled to have and recover from the non-prevailing party(ies) all such reasonable, out of pocket fees, costs, and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party(ies) may suffer or incur in the pursuit or defense of such action or proceeding.

10.17    **Bulk Transfer Laws**. The Parties intend that, under section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any encumbrances arising out of bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives compliance by the Parties with "bulk sales," "bulk transfers," or similar Laws in respect of the transactions contemplated by this Agreement.

10.18    **No Vicarious Liability**. This Agreement may only be enforced against the Parties hereto and their respective successors and permitted assigns. Any Claims or Actions that may be based upon, arise out of, or relate to this Agreement or the negotiation, execution, or performance of this Agreement

(including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) may be made only against the Persons that are signatories to this Agreement, and their respective successors and permitted assigns, and no agent, Affiliate, or representative of any such Person (including any Person negotiating or executing this Agreement on behalf of such Person), will have any liability with respect to this Agreement or with respect to any Claim or Action that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement (including a representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement). Nothing in this Section 10.18 will impair or adversely affect the rights of Purchaser or any other Person set forth in any other agreement executed and delivered in connection with the consummation of the transactions contemplated under this Agreement and the other Transaction Documents.

10.19    **Specific Performance**.  The Parties agree that irreparable damages would occur if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises, and agreements contained in this Agreement. Accordingly, Sellers, on the one hand, and Purchaser on the other hand, will be entitled to obtain an injunction or injunctions to prevent breach of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions, without the necessity of posting bond or other security against it or of proving the inadequacy of money damages as a remedy, in addition to any other remedy to which they may be entitled, at law or in equity. The Parties agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Sellers, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Purchaser or Sellers, as applicable, under this Agreement, all in accordance with the terms of this Section 10.19.

10.20    **Conflicts; Privileges.**

(a)    It is acknowledged by each of the Parties that Sellers have retained Morrison & Foerster LLP ("**M&F**") to act as its counsel in connection with this Agreement and the transactions contemplated hereby (the "**Current Representation**"). Purchaser hereby agrees that after the Closing, Purchaser will not object to M&F representing any Seller or any of its Affiliates or any of their respective representatives (any such Person, a "**Designated Person**") in any matter involving or arising from the Current Representation, including any interpretation or application of this Agreement or any other agreement entered into in connection with the transactions contemplated hereby, and including for the avoidance of doubt any Action between or among Purchaser or any of its Affiliates, on the one hand, and any Designated Person, on the other hand, even though the interests of such Designated Person may be directly adverse to Purchaser or any of its Affiliates. Purchaser hereby waives and agrees not to assert any claim that M&F has a conflict of interest in any representation described in this Section 10.20.

(b)    Purchaser hereby agrees that all communications (whether before, at or after the Closing) between M&F, on the one hand, and any Designated Person, on the other hand, that relate in any way to the Current Representation that are attorney-client privileged (the "**Deal Communications**") and all rights to any other evidentiary privilege, and the protections afforded to information relating to representation of a client under applicable rules of professional conduct that may apply to such Deal Communications, belong to such Seller and may be controlled by such Seller and will not pass to or be claimed by Purchaser or any of its representatives and Purchaser hereby agrees that it will not seek to compel disclosure to Purchaser or any of its representatives of any such Deal Communications.

(c)    Notwithstanding the foregoing, in the event that a dispute arises between Purchaser and any Person that is not a Seller, Purchaser may assert the attorney-client privilege to

70

prevent the disclosure of the Deal Communications to such Person; *provided*, *however*, that Purchaser may not waive such privilege without the prior written consent of the applicable Seller (which such consent shall not be unreasonably withheld, conditioned or delayed). In the event that Purchaser or any of its respective directors, officers, employees, or other representatives is legally required by an Order made or rendered by any Governmental Authority to access or obtain a copy of all or a portion of the Deal Communications, Purchaser shall, to the extent legally permissible, (i) reasonably promptly notify the applicable Seller in writing (including by making specific reference to this <u>Section 10.20(c)</u>), (ii) agree that such Seller may, at such Seller's sole cost and expense, seek a protective Order and (iii) use, at such Seller's sole cost and expense, commercially reasonable efforts to assist therewith.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**SELLERS:**

Gladieux Metals Recycling, LLC, a Texas limited liability company and Debtor and Debtor in Possession

By: _____
Name:
Title:

Aleon Renewable Metals, LLC, a Delaware limited liability company and Debtor and Debtor in Possession

By: _____
Name:
Title:

Aleon Metals, LLC, a Texas limited liability company and Debtor and Debtor in Possession

By: _____
Name:
Title:

**PURCHASER:**

AM BidCo Operations LLC, a Delaware limited liability company

By: _____
Name:
Title:

| Summary report:<br>**Litera Compare for Word 11.10.1.2 Document comparison done on<br>10/22/2025 3:25:31 PM** | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** GMR_Aleon - Stalking Horse Asset Purchase Agreement [last filed].docx | |
| **Modified filename:** GMR_Aleon - Stalking Horse Asset Purchase Agreement [execution version].docx | |
| **Changes:** | |
| Add | 58 |
| Delete | 47 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 105 |

**<u>Exhibit B</u>**

**Closing Assumed Contracts**

(1) Proposed cure amounts are outstanding pre-petition balances as of October 21, 2025.

(2) Contract counterparties that have more than one contract with a Debtor have their full cure amount attributed to a single contract. Other contracts with that Debtor are reflected as $0.

| Contract ID | Debtor | Counterparty Name | Description | Cure Amount | Status |
|---|---|---|---|---|---|
| 1 | GMR | 902 Gulf, LLC | Commercial Lease and Commercial Lease Addendum for Expense Reimbursement for 1926 FM 523, Freeport, TX  77541 | $         - | Assume |
| 3 | GMR | A&L Sandblasting & Painting, Inc. d/b/a A&L Industrial Services | Master Services Agreement as of May 20, 2020 | $         - | Assume |
| 4 | GMR | ABB Inc | Industry Care Proposal dated as of September 15, 2023 | $    5,916.10 | Assume |
| 6 | GMR | ABET Distributing USA, Inc | Master Services Agreement dated as of September 19, 2019 | $    1,374.65 | Assume |
| 7 | GMR | Absorbent Solutions | Master Services Agreement dated as of July 11, 2017 | $         - | Assume |
| 8 | AM | ADP, LLC | Payroll Services - month to month (Account #2439645) | $         - | Assume |
| 9 | GMR | Advanced Overhead Crane Services, Inc. | Master Services Agreement dated as of July 25, 2017 | $         - | Assume |
| 13 | GMR | Amando Gutierrez | Retention Agreement dated as of July 2, 2025 | $         - | Assume |
| 14 | GMR | Amherst Specialty Insurance Company | Property Insurance Policy (AH03-JRL-250000114-00) | $         - | Assume |
| 15 | GMR | Anchor Roofing, Inc. | Master Services Agreement dated as of August 23, 2019 | $         - | Assume |
| 18 | GMR | Aptean, Inc | Master Solution Agreement dated May 18, 2017 | $         - | Assume |
| 19 | GMR | Aptean, Inc | License Purchase Agreement dated as of April 5, 2021 | $         - | Assume |
| 20 | GMR | Ascot Specialty Insurance Company | Excess Commercial Liability Insurance Policy (ENXS2510001585-01) | $         - | Assume |
| 25 | GMR | Aura Engineering, LLC | Master Services Agreement dated as of December 18, 2019 | $         - | Assume |
| 27 | GMR | Auxilior Capital Partners, Inc. | Lease Agreement #1018740 for 3 Atlas Copco G160 Compressors - WUX458256; WUX458258; WUX458259 | $         - | Assume |
| 28 | GMR | Auxilior Capital Partners, Inc. | Lease Agreement #1019049 for one (1) Atlas Copco BD+1250 Blower Purge Dryer - UTF12EQC1 | $         - | Assume |
| 50 | GMR | BlackWater Industries LLC | Master Services Agreement dated as of January 31, 2020 | $         - | Assume |
| 51 | GMR | BCBS | Medical and Dental Plans with BCBS of Texas for GMR | $         - | Assume |
| 52 | GMR | BCBS | Voluntary Vision Plan  with BCBS for GMR | $         - | Assume |
| 53 | GMR | BCBSTX-Dearborn Life Insurance Company | Life and AD&D Insurance Plan with BCBSTX-Dearborn Life Insurance Company for GMR | $         - | Assume |
| 54 | GMR | BCBSTX-Dearborn Life Insurance Company | Long-term Disability Plan with BCBSTX-Dearborn Life Insurance Company for GMR | $         - | Assume |
| 55 | GMR | BCBSTX-Dearborn Life Insurance Company | Short-Term Disability Plan with BCBSTX-Dearborn Life Insurance Company for GMR | $         - | Assume |
| 57 | GMR | Boretech Industrial Services, LLC | Master Services Agreement dated as of July 14, 2021 | $         - | Assume |
| 63 | GMR | Burrow Global Services, LLC | Master Services Agreement dated as of June 19, 2018 | $         - | Assume |
| 67 | GMR | Chemical Waste Management, Inc. | Industrial Waste & Disposal Services Agreement dated as of May 2, 2018 | $   69,656.63 | Assume |
| 68 | GMR | Chemical Waste Management, Inc. | Addendum to Service Agreement dated as of January 20, 2020 - Waste Management of Texas Inc. Facilities to provide service | $         - | Assume |
| 72 | GMR | Cintas | Standard Rental Service Agreement dated October, 11 2024 | $   23,090.15 | Assume |
| 73 | GMR | Cintas | PO #159483 dated as of May 15, 2025 | $         - | Assume |
| 74 | GMR | Circle 8 Crane Services, LLC | Master Services Agreement dated as of September 11, 2017 | $         - | Assume |
| 75 | GMR | Civil & Environmental Consultants, Inc. | Master Services Agreement dated as of March 19, 2018 | $         - | Assume |
| 76 | GMR | Civil & Environmental Consultants, Inc. | Master Services Agreement dated March 18, 2018 (Referenced in Proposal dated Feb 23, 2024) | $         - | Assume |
| 77 | GMR | Clark Industrial Services LLC | Master Services Agreement dated as of June 27, 2017 | $         - | Assume |
| 78 | GMR | Clear Water Environmental & Transport L.L.C. | Master Services Agreement dated as of July 11, 2017 | $         - | Assume |
| 83 | GMR | Crown Insulation Services | Master Services Agreement dated as of July 6, 2017 | $         - | Assume |
| 84 | GMR | Crum & Forster Indemnity Company | Property Insurance Policy (TRP-105050) | $         - | Assume |
| 86 | GMR | Danners, Incorporated | Master Services Agreement dated as of September 15, 2018 | $         - | Assume |
| 87 | GMR | DELL INC. | PO #159628 dated as of July 29, 2025 | $   11,572.23 | Assume |
| 88 | GMR | Design Security Controls | Master Services Agreement dated October 11, 2018 | $         - | Assume |
| 89 | GMR | Electrical Reliability Services, Inc. | Master Services Agreement dated as of February 1, 2018 | $         - | Assume |
| 90 | GMR | Elite Rotating & Mechanical Services, LLC | Master Services Agreement dated as of February 2, 2023 | $         - | Assume |
| 91 | GMR | Empire Vending, LLC | Master Services Agreement dated as of April 30, 2024 | $         - | Assume |
| 92 | GMR | Endress + Hauser | Master Purchasing and Services Agreement dated September 8, 2020 | $   13,737.95 | Assume |
| 94 | GMR | Enduro Pipe/Tank Field Services | Master Services Agreement dated as of August 4, 2017 | $         - | Assume |

(1) Proposed cure amounts are outstanding pre-petition balances as of October 21, 2025.

(2) Contract counterparties that have more than one contract with a Debtor have their full cure amount attributed to a single contract. Other contracts with that Debtor are reflected as $0.

| Contract ID | Debtor | Counterparty Name | Description | Cure Amount | Status |
|---|---|---|---|---|---|
| 95 | GMR | ENMAS EPC Projects Limited | Master Services Agreement dated as of August 1, 2022 | $ - | Assume |
| 96 | GMR | EPIC a/k/a Edgewood Partners Insurance Center | Consulting Services Agreement and Compensation Disclosure dated July 30, 2024 | $ - | Assume |
| 97 | GMR | EPIC a/k/a Edgewood Partners Insurance Center | Benefits Broker Plan with EPIC for GMR and Aleon Metals LLC | $ - | Assume |
| 113 | GMR | Evolve Holdings | Master Services Agreement dated as of September 20, 2018 | $ - | Assume |
| 114 | GMR | Excel Contractors | Master Services Agreement dated as of August 15, 2017 | $ - | Assume |
| 116 | GMR | Firetrol Protection Systems | Master Services Agreement dated as of August 10, 2018 | $ - | Assume |
| 117 | GMR | First Insurance Funding | Premium Finance Agreement for Commercial General Liability Insurance for Quote #79072898 and executed on April 29, 2025 | $ - | Assume |
| 118 | GMR | First Insurance Funding | Premium Finance Agreement for Commercial Property Insurance for Quote #82760539 and executed on July 11, 2025 | $ - | Assume |
| 119 | GMR | Flowstream Industrial Services, LLC | Master Services Agreement dated as of May 24, 2024 | $ 42,563.38 | Assume |
| 120 | GMR | Freeport Welding & Fabricating, Inc. | Master Services Agreement dated as of June 2, 2021 | $ - | Assume |
| 121 | GMR | Front Line Power Construction, LLC | Master Services Agreement dated September 20, 2019 | $ - | Assume |
| 122 | GMR | General Security Indemnity Company of Arizona | Property Insurance Policy (FA0132814-2025-1) | $ - | Assume |
| 123 | GMR | Generali Global Corporate & Commercial | Property Insurance Policy (25YP00243000) | $ - | Assume |
| 124 | GMR | GFL Plant Services LP (Sprint Waste Services LP) | Master Services Agreement dated as of January 8, 2024 | $ 125,497.52 | Assume |
| 125 | GMR | GFL Plant Services LP (Sprint Waste Services LP) | Lease Agreement dated as of 9/14/20 for leasing of 25- 25 Yard Heavy Duty Liquid Tight, Split Lid Roll Off Containers with Tnemec 391 Interior Liner and Read D-Ring | $ - | Assume |
| 126 | GMR | GFL Plant Services LP (Sprint Waste Services LP) | PO #159462 dated as of May 12, 2025 | $ - | Assume |
| 127 | GMR | GFL Plant Services LP (Sprint Waste Services LP) | PO #159465 dated as of May 12, 2025 | $ - | Assume |
| 128 | GMR | GFL Plant Services LP (Sprint Waste Services LP) | PO #159486 dated as of May 15, 2025 | $ - | Assume |
| 129 | GMR | GFL Plant Services LP (Sprint Waste Services LP) | PO #159515 dated as of June 6, 2025 | $ - | Assume |
| 130 | GMR | GFL Plant Services LP (Sprint Waste Services LP) | PO #159517 dated as of June 6, 2025 | $ - | Assume |
| 131 | GMR | GFL Plant Services LP (Sprint Waste Services LP) | PO #159615 dated as of July 23, 2025 | $ - | Assume |
| 132 | GMR | GFL Plant Services LP (Sprint Waste Services LP) | PO #159633 dated as of August 5, 2025 | $ - | Assume |
| 133 | GMR | GFL Plant Services LP (Sprint Waste Services LP) | PO #159639 dated as of August 5, 2025 | $ - | Assume |
| 134 | GMR | GFL Plant Services LP (Sprint Waste Services LP) | PO #159640 dated as of August 5, 2025 | $ - | Assume |
| 136 | GMR | Gregory Gyomlai | Retention Agreement dated as of July 2, 2025 | $ - | Assume |
| 138 | GMR | Gulf Coast Paper Co | Master Services Agreement dated July 27, 2017 | $ - | Assume |
| 159 | GMR | H+M Industrial EPC | Master Services Agreement dated as of November 15, 2024 | $ - | Assume |
| 160 | GMR | Harbour Security LLC | Master Services Agreement dated as of July 17, 2022 | $ - | Assume |
| 161 | GMR | Harbour Security LLC | Compensation Schedule effective as of August 1, 2022 | $ - | Assume |
| 162 | GMR | Hawk Installation and Construction Inc. | Master Services Agreement dated December 1, 2017 | $ - | Assume |
| 163 | GMR | Honesty Environmental Services, Inc. | Master Services Agreement dated as of September 16, 2019 | $ - | Assume |
| 165 | GMR | HSA Bank | HSA Bank Plan for GMR | $ - | Assume |
| 168 | GMR | I.C.S., Inc. | Master Services Agreement dated as of July 15, 2025 | $ - | Assume |
| 170 | GMR | Industrial Furnace Company | Master Services Agreement dated as of March 15, 2018 | $ - | Assume |
| 172 | GMR | Ipreo LLC | S&P Transaction Data Room Order From and Agreement for Prism Virtual Data Room dated as of June 5, 2024 | $ 330.12 | Assume |
| 173 | ARM | Ipreo LLC | S&P Transaction Data Room Order From and Agreement for Prism Virtual Data Room dated as of June 5, 2024 | $ 330.12 | Assume |
| 179 | GMR | ISC Constructors, LLC | Master Services Agreement dated as of October 20, 2017 | $ - | Assume |
| 180 | GMR | JT Thorpe & Sons | Master Services Agreement dated January 15, 2020 | $ - | Assume |
| 181 | GMR | Justin McCoy | Retention Agreement dated as of July 2, 2025 | $ - | Assume |
| 182 | GMR | Kaw Valley Industrial Services | Master Services Agreement dated as of March 18, 2024 | $ - | Assume |
| 183 | GMR | KCG Industrial, LLC | Master Services Agreement dated January 15, 2024 | $ - | Assume |
| 185 | GMR | Kenkay Industrial Services, Inc. | Master Services Agreement dated as of July 13, 2017 | $ - | Assume |
| 186 | GMR | Killum Pest Control, Inc. | Master Services Agreement dated as of June 4, 2024 | $ - | Assume |
| 188 | GMR | Kinsale Insurance Company | Property Insurance Policy (0100384231-0) | $ - | Assume |
| 189 | GMR | Kleinfelder, Inc. | Proposal dated June 4, 2024 - Response Action Plan Initiation for Pond 4 | $ - | Assume |

(1) Proposed cure amounts are outstanding pre-petition balances as of October 21, 2025.

(2) Contract counterparties that have more than one contract with a Debtor have their full cure amount attributed to a single contract. Other contracts with that Debtor are reflected as $0.

| Contract ID | Debtor | Counterparty Name | Description | Cure Amount | Status |
|---|---|---|---|---|---|
| 190 | GMR | Kleinfelder, Inc. | PO #159359 dated as of March 14, 2025 | $ - | Assume |
| 191 | GMR | L.C Eldridge Sales Co, Ltd | Master Services Agreement dated January 27, 2022 | $ - | Assume |
| 194 | GMR | Lloyds of London | Property Insurance Policy (B128434577W25) | $ - | Assume |
| 195 | GMR | Lloyds of London | Property Insurance Policy (B128435714W25) | $ - | Assume |
| 196 | GMR | Lloyds of London | Property Insurance Policy (B128435718W25) | $ - | Assume |
| 197 | GMR | Lloyds of London | Property Insurance Policy (B128435834W25) | $ - | Assume |
| 198 | GMR | Lloyds of London | Property Insurance Policy (B128435839W25) | $ - | Assume |
| 199 | GMR | Lloyds of London | Property Insurance Policy (B128435843W25) | $ - | Assume |
| 200 | GMR | Lloyds of London | Property Insurance Policy (B128436011W25) | $ - | Assume |
| 201 | AM | MAI Capital Management | Retirement Plan Consulting Services with MAI Capital Management LLC for Aleon Metals LLC | $ - | Assume |
| 202 | GMR | Martha Estrada | Retention Agreement dated as of July 2, 2025 | $ - | Assume |
| 204 | GMR | Michael Taller | Retention Agreement dated as of July 2, 2025 | $ - | Assume |
| 205 | GMR | Micronics Engineered Filtration | PO #159286 dated as of February 17, 2025 | $ 14,517.50 | Assume |
| 206 | GMR | Millenium Industrial Corporation | Master Services Agreement dated as of February 12, 2021 | $ - | Assume |
| 207 | GMR | MS Transverse Specialty Insurance | Commercial General Liability & Environmental Liability Insurance Policy (TSENEC000001701) | $ - | Assume |
| 208 | GMR | MS Transverse Specialty Insurance | Umbrella (Excess) Liability Insurance Policy (TSENXS000003901) | $ - | Assume |
| 216 | GMR | NEC Enterprises, LLC | Master Services Agreement dated as of August 20, 2019 | $ - | Assume |
| 218 | GMR | Network Cabling Services, Inc. | Master Services Agreement dated as of December 1, 2023 | $ - | Assume |
| 220 | GMR | Norrell Construction, Inc. | Master Services Agreement dated September 21, 2023 | $ - | Assume |
| 221 | GMR | Olin Corporation | Sales Contract effective on January 1, 2025 through December 31, 2025 (year-to-year thereafter) | $ - | Assume |
| 222 | GMR | OMI Environmental Solutions | Master Services Agreement dated as of October 1, 2020 | $ - | Assume |
| 223 | GMR | Orthman Manufacturing, Inc. | Master Services Agreement dated as of September 25, 2017 | $ - | Assume |
| 224 | GMR | Paul Hembling | Retention Agreement dated as of July 2, 2025 | $ - | Assume |
| 227 | GMR | Pocock Industrial, Inc. | Master Services Agreement dated as of December 16, 2019 | $ - | Assume |
| 228 | GMR | Premier IEC | Master Services Agreement dated as of May 24, 2018 | $ - | Assume |
| 231 | GMR | Progressive County Mutual Insurance Company | Automobile Liability Insurance Policy (996121181) | $ - | Assume |
| 235 | GMR | Refractory Construction Services Co., LLC d/b/a RCS | Master Services Agreement dated as of May 20, 2020 | $ - | Assume |
| 236 | GMR | Relevant Industrial, LLC | Master Services Agreement dated as of January 17, 2024 | $ - | Assume |
| 237 | GMR | Sabre Demolition Corporation | Master Services Agreement dated as of September 19, 2019 | $ - | Assume |
| 238 | GMR | Safety Kleen | Master Services Agreement dated as of August 10, 2018 | $ - | Assume |
| 239 | GMR | SF Services, LLC dba Superior Fence Services | Master Services Agreement dated as of July 23, 2018 | $ - | Assume |
| 240 | GMR | SGI Matrix, LLC | Master End User Agreement dated as of September 3, 2019 | $ - | Assume |
| 242 | GMR | Shermco Industries, Inc. | Master Services Agreement dated as of November 2, 2017 | $ - | Assume |
| 244 | GMR | Skyhawk Chemicals, Inc. | Master Services Agreement dated as of July 6, 2017 | $ - | Assume |
| 249 | GMR | Sparkling Clear Industries Inc. | Master Services Agreement dated as of May 30, 2024 | $ - | Assume |
| 251 | GMR | Starr Surplus Lines Insurance Company | Property Insurance Policy (25SSLDOND337141) | $ - | Assume |
| 252 | GMR | Stream Environmental, LLC | Master Services Agreement dated as of April 23, 2024 | $ 37,454.79 | Assume |
| 253 | GMR | Sun Coast Resources, Inc. | Master Services Agreement dated as of August 24, 2017 | $ - | Assume |
| 257 | GMR | Tap Industrial Services | Master Services Agreement dated as of January 29, 2024 | $ - | Assume |
| 261 | GMR | Texas Engineering Services | Master Services Agreement dated as of November 26, 2024 | $ - | Assume |
| 263 | GMR | The Babcock & Wilcox Company | Master Services Agreement dated March 7, 2024 | $ - | Assume |
| 264 | GMR | The Dow Chemical Company | Sales Contract for Steam effective March 1, 2018 | $ 31,499.30 | Assume |
| 265 | GMR | The Dow Chemical Company | Escrow Remediation Account Agreement dated as of August 21, 2019 | $ - | Assume |
| 266 | GMR | The Dow Chemical Company | Site Services Agreement dated as of September 1, 2022 | $ - | Assume |
| 268 | GMR | Tons per Hour Inc. | Master Services Agreement dated as of October 10, 2018 | $ - | Assume |
| 269 | GMR | True Steel, LLC | Master Services Agreement dated as of | $ - | Assume |
| 277 | GMR | US Ecology | Waste Transportation, Disposal, and Recycling Agreement dated as of July 10, 2017 | $ - | Assume |

(1) Proposed cure amounts are outstanding pre-petition balances as of October 21, 2025.

(2) Contract counterparties that have more than one contract with a Debtor have their full cure amount attributed to a single contract. Other contracts with that Debtor are reflected as $0.

| Contract ID | Debtor | Counterparty Name | Description | Cure Amount | Status |
|---|---|---|---|---|---|
| 278 | GMR | US Ecology | PO #159200 dated as of January 15, 2025 | $ - | Assume |
| 279 | GMR | Vernor Material & Equipment | Master Services Agreement dated as of July 6, 2017 | $ - | Assume |
| 280 | GMR | Versa Integrity Group, Inc. | Master Services Agreement dated June 8, 2021 | $ - | Assume |
| 281 | GMR | Waid Corporation DBA Waid Environmental | Master Services Agreement dated as of August 10, 2017 | $ - | Assume |
| 282 | GMR | WEAVE Filtration | PO #159504 dated as of May 27, 2025 | $ 3,661.83 | Assume |
| 283 | GMR | WEAVE Filtration | PO #159541 dated as of June 16, 2025 | $ - | Assume |
| 285 | GMR | Weighing Technologies Inc. | Master Services Agreement dated as of July 25, 2017 | $ - | Assume |
| 286 | GMR | Wunderlich-Malec | Master Services Agreement dated as of January 15, 2020 | $ - | Assume |
| 289 | GMR | AT&T | Dedicated Internet & Voice Bundle Agreement dated as of April 25, 2025 | $ 1,783.85 | Assume |
| 290 | GMR | AT&T | Dedicated Internet Pricing Schedule dated as of May 4, 2023 | $ - | Assume |
| 291 | GMR | Comcast Business | Business Service Order Agreement dated as of March 16, 2022 | $ 253.12 | Assume |
| 292 | GMR | Frontline EHS, Inc. | Annual Subscription for software dated as of October 2, 2024 | $ - | Assume |
| 293 | GMR | Suntrac Services, Inc. | Order Form dated as of September 23, 2019 | $ - | Assume |
| 294 | GMR | The Dow Chemical Company | Agreement Regarding Remediation Activities dated as of August 21, 2019 | $ - | Assume |
| 295 | GMR | Houston Pipe Line Company LP | Base Contract for Sale and Purchase of Natural Gas Dated December 1, 2019 | $ 38,932.44 | Assume |
| 296 | GMR | Sheltex Investments, Inc. | Transportation Service Agreement and Exhibit A General Terms and Conditions between Gulf Chemical & Metallurgical (n/k/a Gladieus Metals Recycling LLC) dated as of October 5, 2010 | $ 350.50 | Assume |
| 297 | GMR | Ascentery Corporation | Base Contract for Sale and Purchase of Natural Gas dated as of September 21, 2010 | $ - | Assume |
| 298 | GMR | Bakertide Solutions, LLC | Independent Contractor Agreement dated as of August 6, 2025 | $ - | Assume |
| 26 | GMR | Austin Fire Systems, LLC | Master Services Agreement dated as of September 28, 2023 | $ 125,000.00 | Assume |
| 203 | GMR | Maverick Maintenance & Supply, LLC | Master Services Agreement dated as of May 21, 2024 | $ 10,000.00 | Assume |