United States Bankruptcy Court
Southern District of Texas

**ENTERED**

April 10, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALEON METALS, LLC *et al.*,[1] | ) Case No. 25-90305 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER APPROVING THE
DISCLOSURE STATEMENT FOR, AND CONFIRMING THE JOINT PLAN OF
<u>LIQUIDATION OF ALEON METALS, LLC, *ET AL.*</u>**

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***") and,

as applicable, the Official Committee of Unsecured Creditors (the "***Committee***"), in the above-

captioned chapter 11 cases (the "***Chapter 11 Cases***") having:

- a. commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") on August 17, 2025 (the "***Petition Date***"), in the United States Bankruptcy Court for the Southern District of Texas (the "***Court***");

- b. continued to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

- c. Filed, on the Petition Date, the *Declaration of Roy Gallagher in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 2] (the "***First Day Declaration***"), detailing the facts and circumstances of these Chapter 11 Cases;

- d. Filed, on February 10, 2026, the *Combined Disclosure Statement and Joint Plan of Liquidation for Aleon Metals, LLC, et al.*, [Docket No. 350] (as may be amended, modified, or supplemented from time to time, the "***Disclosure***

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aleon Metals, LLC (1610); Aleon Renewable Metals, LLC (9215); and Gladieux Metals Recycling, LLC (6057).  The location of the Debtors' service address is: P.O. Box 2290, 302 Midway Road, Freeport, TX 77542.

*Statement*," or the "***Plan***," or the "***Combined Disclosure Statement and Plan***," as applicable);[2]

e.  Filed, on February 10, 2026, the *Debtors' and the Official Committee of Unsecured Creditors' <u>Emergency</u> Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures; (III) Approving the Form of Ballot and Notices; (IV) Approving Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan; and (V) Scheduling a Combined Hearing on (A) Final Approval of the Disclosure Statement and (B) Confirmation of the Plan* [Docket No. 349] (the "***Disclosure Statement Motion***");

f.  caused, on or before February 27, 2026, the Solicitation Packages (as defined below), including the Combined Hearing Notice (as defined below), to be distributed in accordance with the Disclosure Statement Order (as defined below), the Solicitation and Voting Procedures (as defined below), the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "***Local Rules***"), and the Procedures for Complex Cases in the Southern District of Texas (the "***Complex Case Procedures***"), as evidenced by, among other things, the *Certificate of Service* [Docket No. 369] (together with all the exhibits thereto, the "***Solicitation Affidavit***");

g.  Filed, on March 20, 2026, the *Notice of Filing of Plan Supplement for the Joint Chapter 11 Plan of Liquidation for Aleon Metals, LLC, et al.* [Docket No. 376] (the "***Plan Supplement***");

h.  Filed, on March 31, 2026, the *Declaration of Clarissa D. Cu Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Plan of Liquidation of Aleon Metals, LLC, et al.* [Docket No. 379] (the "***Voting Report***");

i.  Filed, on April 6, 2026, the *Declaration of Roy Gallagher in Support of (I) Approval of the Disclosure Statement on a Final Basis, and (II) Confirmation of the Joint Plan of Liquidation of Aleon Metals, LLC, et al.* [Docket No. 380] (the "***Confirmation Declaration***");

j.  Filed, on April 6, 2026, *The Debtors' and the Official Committee of Unsecured Creditors' Memorandum of Law in Support of (I) Approval of the Debtors' Disclosure Statement, and (II) Confirmation of the Debtors'*

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Combined Disclosure Statement and Plan.

*Joint Plan of Liquidation for Aleon Metals, LLC, et al.* [Docket No. 383] (the "***Confirmation Brief***"); and

k. Filed, on April 7, 2026, the *Amended Declaration of Clarissa D. Cu Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Plan of Liquidation of Aleon Metals, LLC, et al.* [Docket No. 385] (the "***Amended Voting Report***" and, together with the Voting Report, the "***Voting Reports***").

The Court having:

a. entered, on October 8, 2025, the *Order (I) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving the Assumption of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 222] (the "***Sale Order***"), which, among other things, authorized the sale of substantially all of the Debtors' assets (the "***Sale***"), free and clear of all liens, claims, encumbrances, and interests on the terms set forth in that certain asset purchase agreement by and among AM BidCo Operations LLC and the Debtors, and contemplated the establishment of a trust (the "***GUC Trust***") for the benefit of unsecured creditors to oversee the administration of claims against the Debtors' Estates and investigate and, if appropriate, prosecute certain claims belonging to the Estates;

b. reviewed the procedures for: (i) soliciting, receiving, and tabulating votes to accept or reject the Plan; (ii) allowing Claims temporarily for voting purposes; and (iii) filing objections to the Combined Disclosure Statement and Plan (collectively, the "***Solicitation and Voting Procedures***");

c. entered, on February 21, 2026, the *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures; (III) Approving the Form of Ballot and Notices; (IV) Approving Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan; and (V) Scheduling a Combined Hearing on (A) Final Approval of the Disclosure Statement and (B) Confirmation of Plan* [Docket No. 364] (the "***Disclosure Statement Order***"), conditionally approving the Disclosure Statement, and approving: (i) the Solicitation and Voting Procedures; (ii) the form and manner of notice of the combined hearing to consider final approval of the adequacy of the Disclosure Statement and Confirmation of the Plan (the "***Combined Hearing Notice***"); (iii) the forms of notice of non-voting status (the "***Non-Voting Status Notices***"); (iv) the forms of ballots (the "***Ballots***"); (v) the solicitation materials and documents included in the solicitation packages (the "***Solicitation Packages***"); and (vi) other forms, notices, dates, and deadlines set forth in the Disclosure Statement Order;

3

d. set February 24, 2026, as the voting record date (the "***Voting Record Date***");

e. set March 27, 2026, as the deadline for Holders to vote on the Plan and to opt out of the third-party releases (the "***Third-Party Releases***") contained therein (the "***Voting Deadline***");

f. set March 27, 2026, as the deadline for filing and serving objections to Confirmation of the Plan and final approval of the Disclosure Statement (the "***Plan and Disclosure Statement Objection Deadline***");

g. set the later of (a) March 27, 2026, and (b) the fifth day after such Holder's claim is disputed to the extent it is a disputed claim (a "***Disputed Claim***"), as the deadline for such Holder to File and serve a motion, pursuant to Bankruptcy Rule 3018(a) (a "***Rule 3018 Motion***"), requesting that the Court temporarily allow its Claim in a different amount or with a different classification for purposes of voting to accept or reject the Plan (the "***Rule 3018 Motion Deadline***");

h. set April 8, 2026, at 1:00 p.m. (prevailing Central Time) as the date and time for the combined hearing to consider final approval of the adequacy of the Disclosure Statement and Confirmation of the Plan (the "***Combined Hearing***");

i. reviewed (i) the Plan, (ii) the Disclosure Statement, (iii) the Plan Supplement, (iv) the Confirmation Brief, (v) the Combined Hearing Notice, (vi) the Confirmation Declaration, (vii) the Solicitation Affidavit, (viii) the Voting Reports, and (ix) all Filed pleadings, exhibits, statements, responses, and comments regarding Confirmation, including all objections, joinders, statements, and reservations of rights;

j. held the Combined Hearing;

k. heard the statements, arguments, and objections, if any, made by counsel in respect of Confirmation of the Plan and approval of the Disclosure Statement; and

l. considered all oral representations, testimony, documents, filings, and other evidence regarding Confirmation of the Plan and approval of the Disclosure Statement.

**NOW**, **THEREFORE**, the Court having found that notice of the Combined Hearing and the opportunity for any party in interest to object to Confirmation of the Plan and approval of the Disclosure Statement have been adequate and appropriate as to all parties affected or to be affected

by the Plan and the transactions contemplated thereby, and that the legal and factual bases set forth in the documents Filed in support of Confirmation and all evidence proffered, admitted, or adduced by counsel at or prior to the Combined Hearing and the entire record of the Chapter 11 Cases establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following findings of fact, conclusions of law, and orders:

**IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:**

A.      **Findings of Fact and Conclusions of Law.** The findings of fact and conclusions of law set forth herein and on the record of the Combined Hearing constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following conclusions of law constitute findings of fact, or *vice versa*, they are adopted as such.

B.      **Jurisdiction, Venue, and Core Proceeding**. The Court has jurisdiction over the Chapter 11 Cases pursuant to section 1334 of title 28 of the United States Code. The Court has exclusive jurisdiction to determine whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code and should be approved on a final basis and confirmed, respectively. Venue is proper in this district pursuant to sections 1408 and 1409 of title 28 of the United States Code.  Final approval of the Disclosure Statement and Confirmation of the Plan are core proceedings within the meaning of section 157(b)(2) of title 28 of the United States Code, and the Court may enter a final order consistent with Article III of the United States Constitution.

C.      **Commencement and Joint Administration of the Chapter 11 Cases**. On the Petition Date, each of the Debtors commenced a chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On August 18, 2025, the Court entered the *Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 34], pursuant to which the Chapter 11 Cases were consolidated for procedural purposes only and are being jointly administered under Bankruptcy Rule 1015(b). On August 28, 2025, the United States Trustee for the Southern District of Texas (the "*U.S. Trustee*") appointed the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 97].   Since the Petition Date, the Debtors have operated their business and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

D.      **Bankruptcy Rule 3016**. The Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a). The Debtors and the Committee appropriately Filed the Disclosure Statement and the Plan with the Court in satisfaction of Bankruptcy Rule 3016(b).

E.      **Judicial Notice**. The Court takes judicial notice of the docket of these Chapter 11 Cases maintained by the clerk of the Court or its duly appointed agent, including all pleadings and other documents on file, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases. All parties have had a fair opportunity to litigate all issues raised, or that might have been raised, in objection to final approval of the Disclosure Statement and Confirmation of the Plan.

F.      **Final Approval of the Disclosure Statement**. On February 21, 2026, the Court entered the Disclosure Statement Order, which, among other things, conditionally approved the Disclosure Statement for solicitation of the Plan.

G.      The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including, to the extent applicable, the Securities Act, and (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code), and is approved on a final basis in all respects. The Debtors' and the Committee's use of the Disclosure Statement in solicitation of acceptances of the Plan is approved, and the Disclosure Statement is approved on a final basis pursuant to this Confirmation Order.

H.      **Solicitation and Voting; Notice**. The Debtors and the Committee provided due, adequate, and sufficient notice of the Voting Deadline, the Plan and Disclosure Statement Objection Deadline, the deadlines to opt out of, or otherwise object to, the Third-Party Releases, and the Combined Hearing, in each case in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and any other applicable rules, laws, and regulations. Pursuant to the Disclosure Statement Order, Holders of Claims had until March 27, 2026 (the "***Opt-Out Deadline***"), to opt out of the Third-Party Releases. The Debtors and the Committee provided at least thirty-five (35) days' notice of the Combined Hearing and at least twenty-eight (28) days' notice of the Plan and Disclosure Statement Objection Deadline, each of which meets or exceeds the respective minimum of twenty-eight (28) days' notice required under Bankruptcy Rule 2002(b)(1-2). *See* Solicitation Affidavit.

I.      As described in the Voting Reports and the Solicitation Affidavit, the Debtors transmitted the Solicitation Package to all Holders of Claims entitled to vote on the Plan (as of the

Voting Record Date) and the Combined Hearing Notice to all parties in interest. Transmission and service of the foregoing, and any and all other documents associated with the Debtors' and the Committee's solicitation, complied with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, the Disclosure Statement Order, the Solicitation and Voting Procedures, and any applicable nonbankruptcy law, rule, or regulation, and were timely, adequate, and sufficient, and no other or further notice is or shall be required.

J.      As set forth in the Solicitation Affidavit and the Voting Reports, the Solicitation Agent distributed, or caused to be distributed, the Solicitation Packages to Holders of Claims in Class 3 – General Unsecured Claims (the "*Voting Class*") that held a Claim as of the Voting Record Date, as set by the Disclosure Statement Order. The establishment and notice of the Voting Record Date was reasonable and sufficient.

K.      Under the circumstances of these Chapter 11 Cases, the twenty-eight-day period during which the Debtors and the Committee solicited acceptances or rejections of the Plan was a reasonable and sufficient period of time for Holders of Claims in the Voting Class to make an informed decision to accept or reject the Plan. The process for solicitation of votes to accept or reject the Plan was conducted in good faith and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and any applicable nonbankruptcy law, rule, or regulation.

L.      Holders of Class 3 General Unsecured Claims were eligible to vote on the Plan in accordance with the procedures delineated in the Solicitation Packages. The Ballots used to solicit votes to accept or reject the Plan from Holders in the Voting Class were appropriate and adequately addressed the particular needs of these Chapter 11 Cases. As evidenced by the Voting Report, the

majority (94.3% by number and 97.9% by amount of Claims) of Holders of Class 3 General Unsecured Claims voted to accept the Plan.  If the alternative tabulation in the Amended Voting Report applies, the majority (92.0% by number and 92.7% by amount of Claims) of Holders of Class 3 General Unsecured Claims voted to accept the Plan.

M.       The Debtors were not required to solicit votes from the Holders of Claims in Class 1 – Other Priority Claims and Class 2 – Other Secured Claims (collectively, the "*Unimpaired Classes*"), as each such Class is Unimpaired under the Plan and thus presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Pursuant to section 1126(g) of the Bankruptcy Code, the Debtors were also not required to solicit votes from the Holders of Claims or Interests in Class 4 – Intercompany Claims, Class 5 – Intercompany Interests, or Class 6 – Interests in Aleon Metals, because each such Class is Impaired under the Plan and deemed to have rejected the Plan (the Classes in this paragraph, collectively, the "*Non-Voting Classes*").

N.       The Debtors served the Combined Hearing Notice on the Debtors' full creditor matrix and served Non-Voting Status Notices on all Holders of Claims and Interests in Non-Voting Classes. The Combined Hearing Notice adequately informed Holders of Claims and Interests of critical information regarding voting on (if applicable) and objecting to the Plan, including deadlines and the inclusion of release, exculpation, and injunction provisions in the Plan, and adequately summarized the terms of the Third-Party Releases. Further, because the form enabling stakeholders to opt out of the Third-Party Releases (the "*Opt-Out Form*") was included in both the Ballots and the Non-Voting Status Notices, every known stakeholder, including Unimpaired creditors and equityholders, was provided with the means by which the stakeholders could opt out of the Third-Party Releases and the opportunity to do so.

O.      The solicitation of votes on the Plan complied with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, the Solicitation and Voting Procedures, and all applicable nonbankruptcy rules, laws, and regulations, and was appropriate and satisfactory and is approved in all respects.

P.      **Burden of Proof—Confirmation of the Plan**. The Debtors and the Committee, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.  In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard.

Q.      **Plan Supplement**. The Debtors and the Committee Filed the Plan Supplement consisting of, among other things, the GUC Trust Agreement, the Schedule of Assumed Contracts, and the Schedule of Retained Causes of Action. All such materials are consistent with the terms of the Plan, and the filing and notice of the Plan Supplement was proper and in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable laws, rules, and regulations, and applicable orders of the Court for all purposes, and no other or further notice is or shall be required with respect to the Plan Supplement and all of the documents included therein. All documents included in the Plan Supplement, including any amendments, modifications, and supplements thereto, and all documents and agreements related thereto (including all exhibits and attachments thereto), are integral to, part of, and incorporated by reference into the Plan and this Confirmation Order as if set forth in full therein or herein. Subject to the terms of the Plan and/or this Confirmation Order, the Debtors and the Committee reserve the right to alter, amend, update, or modify the Plan Supplement at any time prior to the Effective Date.

10

R. **Modifications of the Plan**. Pursuant to and consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors and the Committee proposed certain modifications to the Plan as reflected herein, in the Plan Supplement, and/or in the Plan Filed with the Court prior to entry of this Confirmation Order (collectively, the "***Plan Modifications***"). Consistent with Bankruptcy Rule 3019, the Plan Modifications do not: (a) constitute material modifications of the Plan under section 1127 of the Bankruptcy Code; (b) cause the Plan to fail to meet the requirements of sections 1122 or 1123 of the Bankruptcy Code; (c) materially and adversely change the treatment of any Claims or Interests; (d) require re-solicitation of any Holders of any Claims or Interests; or (e) require that Holders of Claims in the Voting Class be afforded an opportunity to change their previously cast acceptances of the Plan. Under the circumstances, the form and manner of notice of the proposed Plan Modifications are adequate, and no other or further notice of the proposed Plan Modifications is necessary or required. Consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as modified by the Plan Modifications. The Holders of Claims in the Voting Class are not permitted to change their respective acceptances to rejections as a consequence of the Plan Modifications.

S. **Compliance with Bankruptcy Code Requirements – Section 1129(a)(1)**. The Plan complies with all applicable provisions of the Bankruptcy Code, including sections 1122 and 1123, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

a. <u>Proper Classification – Sections 1122 and 1123(a)(1)</u>. The Plan satisfies the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code. Article VI of the Plan provides for the separate classification of Claims and Interests into six (6) Classes. Valid business,

factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests. The classifications were not implemented for any improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests. Each Class of Claims or Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. The Plan therefore satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

      b.      <u>Specified Unimpaired Classes – Section 1123(a)(2)</u>. Article VI of the Plan specifies that Class 1 – Other Priority Claims and Class 2 – Other Secured Claims are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

      c.      Additionally, Article V of the Plan specifies that Allowed Administrative Claims, Allowed Priority Tax Claims, U.S. Trustee Fees, Allowed Professional Fee Claims, and Allowed DIP Claims have been or will be, as of the Effective Date, paid in full or fully satisfied, as applicable, although these Claims are not separately classified under the Plan.

      d.      <u>Specified Treatment of Impaired Classes – Section 1123(a)(3)</u>. Article VI of the Plan specifies that Class 3 – General Unsecured Claims, Class 4 – Intercompany Claims, Class 5 – Intercompany Interests, and Class 6 – Interests in Aleon Metals are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code and describes the treatment of such Classes.  Accordingly, the Plan satisfies section 1123(a)(3) of the Bankruptcy Code.

      e.      <u>No Discrimination – Section 1123(a)(4)</u>. Article VI of the Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest in accordance with the Plan, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

f.      Adequate Means for Plan Implementation – Section 1123(a)(5). The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code. The Plan and the documents included in the Plan Supplement provide adequate and proper means for execution and implementation of the Plan, including, among other things: (a) the general settlement of Claims and Interests; (b) the establishment of, transfer of GUC Trust Assets to, and distributions from, the GUC Trust; (c) the issuance of GUC Trust Interests; (d) the general authority for the Debtors to take all actions necessary or appropriate to effectuate any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, as set forth more fully in Article VIII of the Plan; (e) the cancellation of certain existing agreements, obligations, instruments, and Interests; and (f) provisions governing Distributions under the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

g.      Non-Voting Equity Securities – Section 1123(a)(6). The Plan does not provide for the issuance of equity or other securities of the Debtors, including non-voting equity securities. The GUC Trust also does not qualify as a "corporation" as that term is defined in section 101(9) of the Bankruptcy Code and need not satisfy the requirements for corporations under section 1123(a)(6) of the Bankruptcy Code.  Nevertheless, the GUC Trust shall not issue non-voting equity securities nor shall it provide for separate classes of voting securities.  The Plan therefore satisfies section 1123(a)(6) of the Bankruptcy Code.

h.      Resignation of Officers and Directors – Section 1123(a)(7). As set forth in Article VIII of the Plan, the directors and/or managers and officers of the Debtors shall be deemed to have resigned on the Effective Date, without further action from the Debtors. In turn, on the Effective Date, the GUC Trustee shall be authorized and empowered to act on behalf of the Debtors and to take all such actions and measures as necessary to implement the Plan, which actions or

13

measures would otherwise be taken by an officer or a director of the Debtors. On the Effective Date, the GUC Trustee shall succeed to all privileges of the Debtors attaching to the GUC Trust Assets and shall be empowered to exercise all powers, commence all proceedings, and take all actions that may be or could have been exercised, commenced, or taken with respect to the GUC Trust Assets, by any officer, director, member, manager, shareholder, or other party acting in the name of the Debtors or their Estates with like effect as if duly authorized, exercised, and taken by action of such officers, directors, members, managers, shareholders, or other party. The process for selecting, and selection of, the GUC Trustee are consistent with the interests of Holders of Claims and Interests and public policy. The Plan therefore satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

i.      <u>Discretionary Contents of the Plan – Section 1123(b)</u>. The Plan's discretionary provisions comply with section 1123(b) of the Bankruptcy Code and are consistent with the applicable provisions of the Bankruptcy Code. Thus, the Plan satisfies section 1123(b) of the Bankruptcy Code.

j.      <u>Impairment or Unimpairment of Classes – Section 1123(b)(1)</u>. The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code. Specifically, Article VI of the Plan impairs or leaves Unimpaired each Class of Claims and Interests.

k.      <u>Assumption and Rejection of Executory Contracts – Section 1123(b)(2)</u>. The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code. As set forth in detail in Article XI of the Plan, upon the Effective Date, all executory contracts and unexpired leases not expressly assumed or assumed and assigned to the Purchaser pursuant to the APA will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except as provided in the Plan or

14

this Confirmation Order. Furthermore, executory contracts listed in the Schedule of Assumed Contracts shall not be rejected and, to the extent executory, the APA and any other documents related to the Sale shall be assumed. The Debtors' determinations regarding the assumption or rejection of executory contracts and unexpired leases are based on, and within, the sound business judgment of the Debtors and are in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other parties in interest in the Chapter 11 Cases.

l.      Settlement, Releases, Exculpation, and Injunction – Section 1123(b)(3).

i.      ***Settlements.*** The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code. In accordance with section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the Distributions, settlements, and other benefits provided under the Plan, including the global settlement among the Debtors, the Committee, the DIP Secured Parties, and the Purchaser described in Article IV.F of the Plan (the "***Global Settlement***"), and, except as stated otherwise in the Plan, the provisions of the Plan constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, subordination, and other legal rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any Distribution to be made on account of such Allowed Claim or Allowed Interest. The compromise and settlement of such Claims and Interests embodied in the Plan, including the Global Settlement, are in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable. Entry into such compromises and settlements represents a sound exercise of the Debtors' business judgment. This Confirmation Order shall constitute the Court's approval of such settlements and a finding by the Court that such settlements satisfy the requirements of applicable law for approval pursuant to Bankruptcy Rule 9019.

ii.      ***Releases.*** Article XIV.D of the Plan describes certain releases granted by the Debtors and their Estates (collectively, the "***Debtor Releases***"). The Debtor Releases are granted in exchange for the good and valuable consideration provided by the Released Parties. The Debtors have satisfied the business judgment standard with respect to the propriety of the Debtor Releases. For the reasons set forth on the record of these Chapter 11 Cases and the evidence proffered, admitted, or adduced at or prior to the Combined Hearing, such releases are a necessary and integral part of the Plan. Further, the Debtor Releases are "fair and equitable" and "in the best interests of the estate" considering: (a) the probability of success in litigating the released Claims and Causes of Action given uncertainty in fact and law with respect to the released Claims and Causes of Action; (b) the complexity and likely duration and expense of litigating the released Claims and Causes of Action; and (c) the arm's-length negotiations which produced the settlements embodied in the Plan.

iii.      The Debtor Releases appropriately offer protection to parties that participated in and contributed to the Debtors' restructuring process. Each of the Released Parties made significant concessions and/or contributions to these Chapter 11 Cases. The Debtor Releases for (i) each of the Debtors; (ii) the Released Director; (iii) the DIP Agent; (iv) each of the DIP Lenders; (v) each of the Prepetition Secured Parties; (vi) the Purchaser; (vii) the Committee and each of its members; and (viii) each of the foregoing Entities' Related Parties, are appropriate because such parties were integral to the negotiation and consummation of the Sale, the negotiation of the Plan, have actively supported the Debtors' restructuring and the Plan, and/or otherwise provided financing and made other substantial contributions to the Debtors' Estates and the Chapter 11 Cases, as applicable.

iv.        Entry of this Confirmation Order constitutes the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors and their respective Estates set forth in Article XIV.D of the Plan, which includes by reference each of the related provisions and definitions contained therein, and, further, constitutes the Court's finding that such releases are: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (c) in the best interests of the Debtors and their respective Estates; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, their Estates, or the GUC Trustee, as applicable, asserting any Claim or Cause of Action released pursuant to such releases.

v.        The scope and substance of the Debtor Releases are appropriately tailored under the facts and circumstances of these Chapter 11 Cases. The Debtor Releases are appropriate in light of, among other things, the value the Released Parties provided to the Debtors' Estates and the critical nature of the Debtor Releases to the Plan, and were necessary to incentivize the Debtors' stakeholders to support the Plan.

vi.        Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Released Parties under the Plan include Roy Gallagher, in his capacity as the Debtors' Chief Restructuring Officer.

vii.        ***Third-Party Releases***. Article XIV.E of the Plan describes the Third-Party Releases.  The Third-Party Releases, as modified herein, are a necessary and integral element of the Plan, are fair, equitable, reasonable, and are in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests. The Third-Party Releases, as modified herein: (a) are consensual; (b) represent a good faith settlement and compromise of the released Claims; (c)

are beneficial to and in the best interests of the Debtors, their Estates, and their stakeholders and are important to the overall objectives of the Plan to finally resolve certain Claims among or against certain parties in interest in these Chapter 11 Cases as set forth in the Plan; (d) are specific in language and scope; (e) are essential to the Confirmation of the Plan; (f) are given in exchange for the Released Parties' substantial contributions made and the good and valuable consideration provided in connection with these Chapter 11 Cases; (g) are a condition to the good faith settlement and compromise of the released Claims; (h) constitute a bar to any of the Releasing Parties asserting any released Claim solely to the extent released against any Released Party; (i) facilitated participation of the Released Parties in both the Plan process and the Chapter 11 Cases generally; and (j) were instrumental in developing a plan that maximized value for all of the Debtors' stakeholders.

viii.     The Third-Party Releases were a negotiated and integral term of the Plan and were critical to incentivizing parties to support the Plan. The Third-Party Releases are specific in language and a condition of the compromises and settlements embodied in the Plan. As such, the Third-Party Releases appropriately offer certain protections to parties who constructively participated in the Debtors' restructuring process, and the Debtors had a good faith basis for including the Third-Party Releases in the Plan.

ix.     The Ballots sent to all Holders of Claims entitled to vote on the Plan unambiguously stated that the Plan contains the Third-Party Releases, set forth the terms of the Third-Party Releases, and provided the option for such Holders to elect to opt out of granting the Third-Party Releases by indicating such election on the Ballot. The Non-Voting Status Notices sent to all Holders of Claims or Interests not entitled to vote on the Plan similarly and unambiguously included information regarding the Third-Party Releases and detailed the process

by which Holders of Claims and/or Interests in the Non-Voting Classes could opt out of granting the Third-Party Releases, including by providing a form by which such Holders could indicate that they wished to opt out of granting the Releases. The Combined Hearing Notice sent to Holders of Claims and Interests referenced the Third-Party Releases and an explanation of how to object to the Combined Disclosure Statement and Plan. In addition, the Combined Hearing Notice advised careful review of the release, exculpation, and injunction provisions of the Plan and emphasized in bold and capitalized typeface that any party who opposed the Plan, including the release, exculpation, or injunction provisions set forth therein, should timely File an objection to the Plan in accordance with the Combined Hearing Notice.

*x.* *Notwithstanding anything to the contrary in the Plan or herein, Holders of Claims or Interests in Class 4 – Intercompany Claims, Class 5 – Intercompany Interests, and Class 6 – Interests in Aleon Metals shall not constitute Releasing Parties and shall not be bound by the Third-Party Releases set forth in Article XIV of the Plan in their capacities as such, irrespective of whether they opted out of the Third-Party Releases.*

xi. *Exculpation.* The exculpation, described in Article XIV.F of the Plan (the "*Exculpation*"), is appropriate under applicable law, and enforceable to the maximum extent allowed by *In re Highland Capital Mgmt., L.P.*, 48 F. 4th 419 (5th Cir. 2022) and *In re Highland Capital Mgmt., L.P.*, 132 F. 4th 353 (5th Cir. 2025) (hereinafter "*Highland II*"), because it was supported by proper evidence, proposed in good faith, formulated following extensive, good faith, arm's-length negotiations with key constituents, and is appropriately limited in scope. Without limiting anything in the Exculpation, each party receiving the benefit of the Exculpation has participated in these Chapter 11 Cases in good faith and in compliance with applicable laws with regard to solicitation of votes and distribution of consideration pursuant to the Plan, and is

appropriately released and exculpated as set forth in Article XIV.F of the Plan. The Exculpation, including its carveout for actual fraud, gross negligence, or willful misconduct, is fair, reasonable, and appropriate under the circumstances of the Chapter 11 Cases and is consistent with established practice in this jurisdiction.

xii.      ***Injunction.***  The injunction provision set forth in Article XIV.G of the Plan (the "***Injunction***") is essential to the Plan, appropriate under applicable law, and enforceable to the maximum extent allowed by *Highland II*, and necessary to implement the Plan and to preserve and enforce the Debtor Releases, the Third-Party Releases, and the Exculpation. The Injunction is appropriately tailored to achieve those purposes.

a.      <u>Modification of Rights – Section 1123(b)(5)</u>. The Plan modifies the rights of Holders of Claims or Interests, as applicable, in Class 3 – General Unsecured Claims, Class 4 – Intercompany Claims, Class 5 – Intercompany Interests, and Class 6 – Interests in Aleon Metals, and leaves Unimpaired the rights of Holders of Claims in Class 1 – Other Priority Claims and Class 2 – Other Secured Claims, as permitted by section 1123(b)(5) of the Bankruptcy Code.

b.      <u>Additional Plan Provisions – Section 1123(b)(6)</u>. The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including provisions for (a) Distributions to Holders of Claims and Interests, (b) allowance of certain Claims, (c) retention of Court jurisdiction, and (d) the establishment of the GUC Trust and the transfer of the GUC Trust Assets to the GUC Trust, thereby satisfying section 1123(b)(6) of the Bankruptcy Code. The failure to address any provisions of the

Bankruptcy Code specifically in this Confirmation Order shall not diminish or impair the effectiveness of this Confirmation Order.

c.  Cure of Defaults – Section 1123(d). Article XI of the Plan provides that, on the Effective Date, except to the extent otherwise set forth therein, all executory contracts and unexpired leases not expressly assumed or assumed and assigned to the Purchaser pursuant to the APA will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.  Notwithstanding the foregoing, the Plan further provides that any executory contract or unexpired lease that the Debtors previously rejected shall be rejected as of the date set forth in the applicable notice or order rejecting such executory contract or unexpired lease.  Furthermore, executory contracts listed in the Schedule of Assumed Contracts shall not be rejected and, to the extent executory, the APA and any other documents related to the Sale shall be assumed.  There are no unpaid cure costs associated with the executory contracts listed on the Schedule of Assumed Contracts, the executory contracts and unexpired leases assumed or assumed and assigned to the Purchaser, or, to the extent executory, the APA and documents related to the Sale.  As such, the Plan provides that the Debtors have cured defaults, if any, with respect to assumed executory contracts in accordance with section 365(b)(1) of the Bankruptcy Code. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

T.  **The Debtors' Compliance with the Bankruptcy Code – Section 1129(a)(2)**. The Debtors and the Committee have complied with the applicable provisions of the Bankruptcy Code and, thus, satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code. Specifically, each Debtor: (a) is an eligible debtor under section 109 of the Bankruptcy Code and a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code; (b) has complied with

applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court; and (c) complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, any applicable nonbankruptcy law, rule or regulation, and all other applicable law in transmitting the Solicitation Materials and related documents and notices, and in soliciting and tabulating the votes on the Plan.

U.      **Plan Proposed in Good Faith – Section 1129(a)(3).** The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code. The Debtors and the Committee have proposed the Plan in good faith and not by any means forbidden by law. In so determining, the Court has examined the totality of the circumstances surrounding the filing of these Chapter 11 Cases, the Plan, the process leading to Confirmation, including the support of Holders of Claims and/or Interests for the Plan, and the transactions to be implemented pursuant thereto. The Debtors' and the Committee's good faith is evident from the facts and the record of these Chapter 11 Cases, the Plan, the Disclosure Statement, the record of the Combined Hearing and other proceedings held in these Chapter 11 Cases.

V.      These Chapter 11 Cases were Filed, and the Plan was proposed, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of the Debtors' stakeholders. The Plan was the product of extensive negotiations conducted at arm's-length among the Debtors and certain of their key stakeholders. The Plan's classification, settlement, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's-length, are consistent with sections 105, 1122, 1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and are each necessary for the Debtors to consummate a value-maximizing conclusion to these Chapter 11 Cases. Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

W.      The Debtors and each of the constituents that negotiated the Plan, and each of their respective officers, directors, managers, members, employees, advisors, and professionals: (a) acted in good faith in negotiating, formulating, and proposing, where applicable, the Plan and the agreements, compromises, settlements, transactions, transfers, and documentation the Plan contemplates, and (b) will be acting in good faith in proceeding to (i) consummate the Plan and the agreements, compromises, settlements, transactions, transfers, and documentation the Plan contemplates, and (ii) take any actions this Confirmation Order authorizes and directs or contemplates.

X.      **Payment for Services or Costs and Expenses – Section 1129(a)(4).** The procedures set forth in the Plan for the Court's review and ultimate determination of the fees and expenses the Debtors will pay in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

Y.      **Directors, Officers, and Insiders – Section 1129(a)(5).** Because the Plan provides for the dissolution of the Debtors' Estates and the resignation, without further action, of the directors and/or managers and officers of the Debtors on the Effective Date, section 1129(a)(5) of the Bankruptcy Code does not apply to the Debtors. To the extent section 1129(a)(5) applies to the GUC Trust, the Debtors have satisfied the requirements of this provision by, among other things, disclosing the identity of the GUC Trustee pursuant to the Plan Supplement.

Z.      **No Rate Changes – Section 1129(a)(6).** The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and will not require governmental regulatory approval. Section 1129(a)(6) of the Bankruptcy Code therefore does not apply to the Plan.

AA.     **Best Interest of Creditors – Section 1129(a)(7).** The Plan satisfies section 1129(a)(7) of the Bankruptcy Code. The liquidation analysis attached to the Combined Plan and Disclosure Statement as <u>Exhibit A</u> and the other evidence related thereto in support of the Plan that was proffered, admitted, or adduced at or prior to the Combined Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analyses or evidence were prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that each Holder of an Impaired Claim or Interest against a Debtor either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if such Debtors were liquidated under chapter 7 of the Bankruptcy Code as of the Effective Date.

BB.     **Acceptance by Certain Classes – Section 1129(a)(8).** The Unimpaired Classes are Unimpaired by the Plan and, accordingly, Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  As to each Debtor, the Voting Class is Impaired and has voted to accept the Plan, as established by the Voting Reports.  Nevertheless, Holders of Claims or Interests in Class 4 – Intercompany Claims, Class 5 – Intercompany Interests, and Class 6 – Interests in Aleon Metals receive no recovery under the Plan and are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code (the "***Deemed Rejecting Classes***").  Although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Deemed Rejecting Classes, the Plan is confirmable because, as set forth *infra* in paragraph HH, the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes, and thus satisfies the requirements for Confirmation under section 1129(b) of the Bankruptcy Code with respect to such Deemed Rejecting Classes.

CC.     **Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code – Section 1129(a)(9).** The treatment of Allowed Administrative Claims, Allowed Priority Tax Claims, U.S. Trustee Fees, Allowed Professional Fee Claims, and Allowed DIP Claims under Article V of the Plan, and of Allowed Other Priority Claims under Article VI of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

DD.     **Acceptance by At Least One Impaired Class – Section 1129(a)(10).** The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Reports, Class 3, which is Impaired, voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code).

EE.     **Feasibility of the Plan – Section 1129(a)(11).** The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The Debtors are liquidating pursuant to the Plan in a manner that complies with the priority scheme and other provisions of the Bankruptcy Code and other applicable law.

FF.     **Payment of Statutory Fees – Section 1129(a)(12).** The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article XV.D of the Plan provides for the payment of all U.S. Trustee Fees due and payable in accordance with section 1128 of the Bankruptcy Code.

GG.     **Non-Applicability of Certain Sections – Section 1129(a)(13)–(16).** The Debtors do not have any remaining retiree benefit obligations (as defined in section 1114 of the Bankruptcy Code) or any domestic support obligations, are not individuals, and are not nonprofit corporations.

Therefore, sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases and the Plan.

HH.     **Confirmation of the Plan Over Nonacceptance of Impaired Classes – Section 1129(b).** The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes have been deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code. *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met, as discussed above. *Second*, the Plan is fair and equitable with respect to the Deemed Rejecting Classes. The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any Claim or Interest that is junior to each Deemed Rejecting Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and (b) no Holder of a Claim or Interest in a Class senior to each Deemed Rejecting Class is receiving more than 100 percent on account of its Claim or Interest. Accordingly, the Plan is fair and equitable to all Holders of Claims and Interests in the Deemed Rejecting Classes. *Third*, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes because similarly situated Holders of Claims and Interests will receive substantially similar treatment on account of their Claims or Interests, as applicable, in such Classes. Therefore, the Plan satisfies section 1129(b) of the Bankruptcy Code and can be confirmed.

II.     **Only One Plan – Section 1129(c).** The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan Filed with respect to each Debtor in each of the Chapter 11 Cases.

JJ. **Principal Purpose of the Plan – Section 1129(d).** The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

KK. **Not Small Business Cases – Section 1129(e).** The Chapter 11 Cases are not small business cases, and accordingly section 1129(e) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

LL. **Good Faith Solicitation – Section 1125(e).** The Debtors and the Committee have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all their respective activities relating to the support and Consummation of the Plan, including the solicitation and receipt of acceptances of the Plan, and are entitled to the protections afforded pursuant to section 1125(e) of the Bankruptcy Code. The Debtors and the Committee have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders. The Plan accomplishes this goal. Accordingly, the Debtors, the Committee, the Released Parties, and the parties receiving the Exculpation have been, are, and will continue to be acting in good faith within the meaning of section 1125(e) of the Bankruptcy Code if they proceed to: (a) consummate the Plan and the agreements, settlements, transactions, transfers, and other actions contemplated thereby, regardless of whether such agreements, settlements, transactions, transfers, and other actions are expressly authorized by this Confirmation Order; and (b) take any actions authorized and directed or contemplated by this Confirmation Order.

MM. **Satisfaction of Confirmation Requirements.** Based upon the foregoing, all other pleadings, documents, exhibits, statements, declarations, and affidavits Filed in connection with

27

Confirmation of the Plan, and all testimony, evidence, and arguments made, proffered, admitted, or adduced at or prior to the Combined Hearing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

NN.     **Likelihood of Satisfaction of Conditions Precedent.** Each of the conditions precedent to the Effective Date, as set forth in Article X.A of the Plan has been or is reasonably likely to be satisfied or, as applicable, waived in accordance with Article X.B of the Plan.

OO.     **Implementation.** The provisions governing the means for implementation of the Plan in Article VIII therein shall be, and hereby are, approved in their entirety. All documents and agreements necessary to implement the Plan, including: (a) the GUC Trust Agreement; (b) the Schedule of Assumed Contracts; (c) the Schedule of Retained Causes of Action; (d) any other documents contained in the Plan Supplement; and (e) all other relevant and necessary documents, have been or will be negotiated in good faith and arm's-length, are in the best interests of the Debtors and their Estates and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements.

PP.     **Good Faith.** The Debtors, the Released Parties, and the Releasing Parties have been and will be acting in good faith if they proceed to: (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions to effectuate the Plan this Confirmation Order authorizes and directs. The Released Parties have made a substantial contribution to these Chapter 11 Cases.

**ACCORDINGLY, IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

1.      *Solicitation*.   To the extent applicable, the solicitation of votes on the Plan complied with section 1125 of the Bankruptcy Code, Bankruptcy Rule 3017, all other provisions

of the Bankruptcy Code, and all other applicable rules, laws, and regulations, and was appropriate and satisfactory and is approved in all respects.

2.　　***Approval of the Disclosure Statement***.  The Disclosure Statement is approved on a final basis.

3.　　***Confirmation of the Plan***.  The Plan, a copy of which is attached hereto as **Exhibit A**, as amended by this Confirmation Order, is approved in its entirety and confirmed pursuant to section 1129 of the Bankruptcy Code.

4.　　The terms of the Plan, including the Plan Supplement (including all documents included therein, exhibits thereto, and any supplements, amendments, or modifications thereof in accordance with this Confirmation Order and the Plan), are incorporated by reference into and are an integral part of this Confirmation Order.  The terms of the Plan, the Plan Supplement, and any other documents Filed in connection with the Plan and/or executed or to be executed in connection with the transactions the Plan contemplates, and all amendments and modifications thereof made or to be made in accordance with the Plan and this Confirmation Order, are hereby approved in all respects and shall be immediately effective, enforceable, and binding as of the Effective Date.  The Debtors and the GUC Trustee, without further order of the Court, are authorized to take all actions as may be necessary, appropriate, or required under the Plan and the Plan Supplement documents to effectuate the Plan.

5.　　***Objections***. All objections (including any statements and reservations of rights contained therein) to Confirmation of the Plan that have not been withdrawn, waived (including any objections waived pursuant to the immediately succeeding paragraph), or settled prior to entry of this Confirmation Order, are not cured by the relief granted herein, or otherwise resolved as

stated by the Debtors or the Committee on the record of the Combined Hearing, are hereby overruled on the merits with prejudice.

6.      All objections to Confirmation, if any, not Filed prior to the Objection Deadline set forth in the Combined Hearing Notice or such other applicable deadline are deemed waived.

7.      ***Classifications***.  The terms of the Plan shall govern the classification of Claims and Interests for purposes of the Distributions to be made thereunder. The classifications set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors, the Committee, or the GUC Trust except for voting purposes.

8.      ***Compromise and Settlement of Claims, Interests, and Controversies***.  To the extent provided by the Bankruptcy Code and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. To the extent provided for by the Bankruptcy Code, the Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies, and the entry of this Confirmation Order shall constitute the Court's approval of such compromise and settlement, as well as a finding by the Court that such settlement and compromise is fair, equitable,

reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

9.      ***The Debtor Releases, the Third-Party Releases, the Exculpation, and the Injunction***.  The release, exculpation, injunction, and related provisions set forth in Article XIV of the Plan shall be, and hereby are, approved in their entirety, including, but not limited to, the Debtor Releases, the Third-Party Releases (as modified below), the Exculpation, and the Injunction. For the avoidance of doubt, Professionals constitute Released Parties under the Plan.

a.      ***Notwithstanding anything to the contrary in the Plan or herein, Holders of Claims or Interests in Class 4 – Intercompany Claims, Class 5 – Intercompany Interests, and Class 6 – Interests in Aleon Metals shall not constitute Releasing Parties and be deemed to grant the Third-Party Releases set forth in Article XIV of the Plan, irrespective of whether they opted out of the Third-Party Releases.***

b.      The first paragraph of Article XIV.E is hereby replaced in its entirety to read as follows:

**As of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor and other Released Party from any and all Causes of Action, whether known or unknown, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising on or after the Petition Date from, in whole or in part, the Debtors (including the governance, management, ownership or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the GUC Trust, as applicable, and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility,**

**the Bridge Financing, the Prepetition Bond Documents, the APA, the Sale, the Bankruptcy Cases and any related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Plan, contract, instrument, release, or other agreement or document created or entered into in connection with the DIP Facility, the Bridge Financing, the Prepetition Bond Documents, the APA, the Sale, the Disclosure Statement, the Plan, or the Plan Supplement, the Debtors' restructuring efforts, the filing of the Bankruptcy Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, any action or actions taken in furtherance or consistent with administration of the Plan, the issuance or distribution of any debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or after the Petition Date through and including the Effective Date.**

10.      ***Release of Liens***.  Except as otherwise specifically provided in the Plan or in any other contract, instrument, agreement or document created pursuant to the Plan or the Plan Supplement, on the Effective Date and concurrently with the applicable Distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the GUC Trust and its successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required from the Debtors or the GUC Trustee, as applicable.

11.      ***Professional Compensation***.    The provisions governing compensation of Professionals set forth in Article V.D of the Plan are approved in their entirety.  All final requests for payment of Professional Fee Claims must be Filed and served no later than thirty (30) days after the Effective Date.  Any objections to Professional Fee Claims shall be served and Filed no

later than twenty-one (21) days after the filing of such final applications for payment of Professional Fee Claims.

12.    **_The GUC Trust_**.   On the Effective Date, the GUC Trust shall be established pursuant to the GUC Trust Agreement for the purpose of maximizing the value of the GUC Trust Assets and effectuating distributions to the GUC Trust Beneficiaries consistent with the Plan and the GUC Trust Agreement. The provisions governing the GUC Trust set forth in Article VIII.C of the Plan and the form of GUC Trust Agreement Filed in the Plan Supplement are hereby approved in their entirety.   Notwithstanding anything to the contrary in the Plan, the fiduciary duties of the GUC Trustee and the GUC Trust Oversight Committee will be guided by the GUC Trust Agreement.

13.    **_Sources of Plan Consideration_**.   The GUC Trust Assets will be used to fund the GUC Trust for the purpose of effectuating distributions to the GUC Trust Beneficiaries in accordance with the terms of the Plan and the GUC Trust Agreement.

14.    **_Tax Returns_**.   After the Effective Date, the GUC Trustee will file tax returns as a grantor trust pursuant to Treasury Regulation Article 1.671-4(a) and, as applicable, may (i) seek a determination of tax liability under section 505 of the Bankruptcy Code; (ii) file if necessary, any and all tax and information returns required with respect to the GUC Trust; (iii) make tax elections for and on behalf of the GUC Trust; and (iv) pay taxes, if any, payable for and on behalf of the GUC Trust.

15.    **_Vesting of Assets_**.   On or after the Effective Date, immediately following the formation of the GUC Trust, all GUC Trust Assets shall vest directly in, and be irrevocably transferred, including pursuant to section 1123(a)(5)(B) of the Bankruptcy Code, to the GUC Trust without further action of the Court. Upon such transfer, the GUC Trust shall hold the GUC Trust

Assets, including the GUC Trust Claims, in its own right as the legal and beneficial owner thereof and as the successor-in-interest to the Debtors with respect thereto, and not merely as an agent, representative, or nominee of the Debtors or their Estates. The Debtors shall have no further interest in or with respect to the GUC Trust Assets. The dissolution of the Debtors on the Effective Date or upon entry of a final decree, as applicable, pursuant to paragraph 16 below shall not impair, diminish, or otherwise affect the GUC Trust's ownership of or standing to enforce the GUC Trust Assets, including the GUC Trust Claims. The GUC Trustee will, in an expeditious but orderly manner, liquidate and distribute to the GUC Trust Beneficiaries or utilize as funding to pursue the GUC Trust Claims on behalf of the GUC Trust Beneficiaries, the GUC Trust Assets in accordance with the Plan and the GUC Trust Agreement. Such assets shall be held free and clear of all Liens, Claims, and interests of Holders of Claims and Interests, except as otherwise set forth in the Plan and the GUC Trust Agreement.

16. ***Corporate Existence***. On the Effective Date, Debtors Aleon Metals, LLC and Aleon Renewable Metals, LLC shall be deemed to be dissolved without any further action by such Debtors pursuant to the applicable general corporation law of the states in which the Debtors are incorporated without any requirement of action by the shareholders or directors and/or managers, as applicable, of the Debtors, except solely for the filing of a certificate of dissolution, cancellation, or other applicable notice as may be required in the jurisdiction of formation of each Debtor. Upon entry of a final decree closing its chapter 11 case, Debtor Gladieux Metals Recycling, LLC shall be deemed to be dissolved without any further action by such Debtor pursuant to Texas or applicable law without any requirement of action by the shareholders or directors and/or managers, as applicable, of such Debtor, except solely for the filing of a certificate of dissolution, cancellation, or other applicable notice as may be required in the jurisdiction of formation of such

34

Debtor.  For the avoidance of doubt, the dissolution of the Debtors shall not:  (a) impair, diminish, or terminate any rights, claims, or Causes of Action that were transferred to and vested in the GUC Trust pursuant to Paragraph 15 of this Confirmation Order and Article VIII.C of the Plan; (b) affect the standing or authority of the GUC Trustee to investigate, commence, prosecute, settle, or otherwise dispose of the GUC Trust Claims in any court of competent jurisdiction; or (c) provide any basis for any Entity to challenge the GUC Trustee's authority or the GUC Trust's ownership of any GUC Trust Asset on the grounds that the Debtors have been dissolved.

17.     ***Cancellation of Securities, Agreements, and Instruments***.  Except as otherwise provided in the Plan, the Plan Supplement, this Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date: (i) the obligations of the Debtors under each of the Prepetition Bond Documents, the FTAI Loans, the GM Note Payable, the GM Loan Agreement, and the EAF Note, and each certificate, share, note, bond, indenture, purchase right, option, warrant, intercreditor agreement, guaranty, indemnity, deed of trust, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors and the GUC Trustee, as applicable, shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, or other instruments or documents evidencing or creating any indebtedness or obligation of, or Claims against or Interests in, the Debtors shall be released and discharged; *provided*, that notwithstanding the releases set forth in Article XIV.D and Article XIV.E of the Plan, upon Confirmation or the occurrence of the Effective Date (1) any such agreement that governs the

35

rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive Distributions under the Plan as provided therein; and (2) the Prepetition Bond Documents shall continue in effect (other than, for the avoidance of doubt, any Liens or security interest terminated pursuant to Article XIV.C of the Plan) after the Effective Date solely with respect to any rights of the applicable Prepetition Trustee to (A) maintain, exercise, and enforce any of their respective rights to indemnification, reimbursement, or similar obligations, (B) exercise its Prepetition Charging Lien against Distributions to the applicable Prepetition Bondholders in accordance with the applicable Prepetition Bond Documents, and (C) perform any functions that are necessary to effectuate the foregoing, including appearing and raising issues in the Chapter 11 Cases, in any proceeding in the Court, or in any other court.

18.     ***Distributions***.  All Distributions pursuant to the Plan shall be made in accordance with Article IX of the Plan, and such methods of distribution are hereby approved in their entirety.

19.     ***Effectiveness of All Actions***.  All actions authorized to be taken pursuant to the Plan and the Plan Supplement shall be effective on, prior to, or after the Effective Date pursuant to this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, managers, members, or equityholders of the Debtors and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or equityholders.

20.     ***Governmental Approvals Not Required***.  Except as otherwise specifically provided herein, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Plan and the Disclosure Statement, any documents,

36

instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

21.     ***Directors and Officers***.  In accordance with Article VIII.H of the Plan, upon the Effective Date, the directors and/or managers and officers of the Debtors shall be deemed to have resigned, without further action.  Upon the Effective Date, the GUC Trustee shall be empowered and authorized to act in the place and stead of the Debtors, in the GUC Trustee's capacity as successor-in-interest to the Debtors with respect to the GUC Trust Assets, and to take all such actions and measures as necessary to implement the Plan, which actions or measures would otherwise be taken by an officer or a director of the Debtors. Without limiting the foregoing, the GUC Trustee shall have independent standing and authority to investigate, commence, prosecute, settle, or otherwise dispose of any and all GUC Trust Claims in any court of competent jurisdiction, including in the GUC Trustee's own name or in the name of the GUC Trust, without regard to the dissolution of the Debtors and without the need to seek any further order or approval from this Court (except as expressly required by the Plan or the GUC Trust Agreement).

22.     ***Dissolution of the Committee***.  On the Effective Date, the Committee shall automatically dissolve and the members of the Committee (solely in their capacities as such) and the Committee's Professionals (solely in their capacity as such) shall be released from all their duties relating to the Chapter 11 Cases, except with respect to:  (i) any applications for Professional Fee Claims or expense reimbursements for members of the Committee, including preparing same, objecting to same, defending same and attending any hearing with respect to same; and (ii) any motions or other actions seeking enforcement or implementation of (a) the Plan or (b) this Confirmation Order.

23. ***Payment of Statutory Fees***.  Notwithstanding any other provision of the Plan to the contrary, all U.S. Trustee Fees, as determined by the Court at the Confirmation Hearing, shall be paid in full in Cash on or before the Effective Date. On and after the Effective Date, the GUC Trustee shall File with the Court quarterly reports in a form reasonably acceptable to the U.S. Trustee for each Debtor until its case is closed, dismissed, or converted. All U.S. Trustee Fees that arise after the Effective Date shall be paid in full in Cash by the GUC Trustee when due. The GUC Trustee shall have the obligation to pay U.S. Trustee Fees pursuant to section 1930 of title 28 of the United States Code for each Debtor until its case is closed, dismissed, or converted. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of Claim with respect to U.S. Trustee Fees.

24. ***Certain Filings and Reporting Requirements***.  After the Confirmation Date, the Debtors, unless otherwise specified herein or in the Plan, shall have no obligation to (i) provide any reports to any parties otherwise required under any orders entered in the Chapter 11 Cases or, (ii) File with the Court or serve on any party reports that the Debtors were obligated to File under the Bankruptcy Code or a Court order; *provided*, that the GUC Trust will seek authority to close the Chapter 11 Cases in accordance with the Plan, the Bankruptcy Code, and the Bankruptcy Rules; *provided*, *further*, that, notwithstanding the foregoing, the Debtors or the GUC Trust, as applicable, shall timely File all required monthly operating reports and post-confirmation quarterly reports in a form prescribed by the U.S. Trustee until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

25. ***Notice of Confirmation and Effective Date***.  The Debtors or the GUC Trust, as applicable, shall serve notice of entry of this Confirmation Order and the occurrence of the Effective Date, substantially in the form attached hereto as **Exhibit B** (as may be revised, the

"*Confirmation Order and Effective Date Notice*"), in accordance with Bankruptcy Rules 2002 and 3020(c) on all holders of Claims and Interests within ten (10) Business Days after the Effective Date. Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed the Combined Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. The Combined Hearing Notice and the Confirmation Order and Effective Date Notice are adequate under the particular circumstances of these Chapter 11 Cases and no other or further notice is necessary.

26.    *Plan Modifications*.  This Confirmation Order and the Plan attached hereto as **Exhibit A** include certain modifications to the Plan to address formal and informal objections raised by various parties. The Plan Modifications do not materially and adversely affect the treatment of any Claim against or Interest in any of the Debtors under the Plan and are hereby approved pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019. After giving effect to the Plan Modifications, the Plan continues to meet the requirements of sections 1122 and 1123 of the Bankruptcy Code. Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or re-solicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

27.    *Reservation of Rights*.  Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court enters this Confirmation Order, and this Confirmation

Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

28. ***Successors and Assigns***. The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity (for the avoidance of doubt, nothing in this paragraph shall expand the scope of any release, exculpation, or injunction provided under the Plan or this Confirmation Order).

29. ***Nonseverability***. Each term and provision of the Plan is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the GUC Trustee, as applicable; and (c) nonseverable and mutually dependent.

30. ***Continued Effect of Stays and Injunctions***. Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, any order of the Court, or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

31. ***Exhibits; Plan Supplement***.  All exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, are hereby incorporated herein by this reference and shall be fully enforceable as if stated in full herein.

32. ***GUC Trustee***.  The GUC Trustee shall have the standing, right and authority to investigate, commence, prosecute, or settle, as appropriate, any and all such claims and Causes of Action that constitute GUC Trust Assets transferred to the GUC Trust pursuant to the Plan, the GUC Trust Agreement, and this Confirmation Order, in the Court or in any other federal or state court of competent jurisdiction, without regard to the dissolution of any of the Debtors and without the need to reopen any of the Chapter 11 Cases. The GUC Trustee's standing and authority under this paragraph shall not be impaired by the entry of a final decree closing any or all of the Chapter 11 Cases. In pursuing any GUC Trust Claims, the GUC Trustee shall be entitled to the tolling provisions provided under sections 108 and 546 of the Bankruptcy Code, and such tolling provisions shall continue to apply notwithstanding the dissolution of any of the Debtors, the entry of a final decree, or the closing of any or all of the Chapter 11 Cases. No applicable statute of limitations, statute of repose, or other time-based defense shall be deemed to have been triggered, restarted, or shortened by reason of the transfer of the GUC Trust Claims to the GUC Trust, the dissolution of any of the Debtors, or the closing of any of the Chapter 11 Cases.

33. ***United States***.  Notwithstanding anything to the contrary contained in the Plan and any other related Plan document, nothing shall limit or be intended to or be construed as a release that would, in effect, act as a bar to the United States Government or any of its agencies, or any state and local authority, from pursuing any police or regulatory action or any criminal action.

34.     ***Texas Commission on Environmental Quality***.   Nothing in this Confirmation Order, the Plan, any amendments thereto, or related Plan documents, discharges, releases, precludes, or enjoins: (i) any police or regulatory liability to any Governmental Unit that is not a "claim" as defined in 101(5) of the Bankruptcy Code; (ii) any claim of a Governmental Unit arising on or after the Confirmation Date; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any Entity would be subject to as the owner or operator of property after the Confirmation Date; (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors; or (v) any enforcement actions currently pending before the Texas Commission on Environmental Quality ("***TCEQ***"), including, but not limited to, Docket No. 2025-0595-IWD-E. Nor shall anything in this Confirmation Order enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.  For the avoidance of doubt, the Debtors and, after the Effective Date, the GUC Trustee, expressly preserve all related rights and defenses, including the right to argue that any alleged liability of the Debtors does not fall within the enumerated categories (i) through (v) above.

35.     Further, nothing in this Confirmation Order, the Plan, any amendments thereto, or related Plan documents, authorizes the transfer or assignment of any TCEQ (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.[3] Nothing in this Confirmation Order shall relieve any Entity from any obligation to address or comply with information requests or inquiries from any Governmental Unit.  Nothing in this Confirmation Order shall affect any setoff or recoupment rights of any Governmental Unit

---

[3]     The Sale Order [Docket No. 222] and *Stipulation and Agreed Order Regarding the Purchaser and TCEQ* [Docket No. 262] are not superseded by this provision.

against the Debtors or the GUC Trustee; *provided*, *however*, that the rights and defenses of the Debtors and the GUC Trustee, as applicable, with respect to any such rights of setoff or recoupment are fully preserved.  Nothing in this Confirmation Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Confirmation Order or to adjudicate any defense asserted under this Confirmation Order. For the avoidance of doubt, the State of Texas and its agencies opt out of any and all releases provided in the Plan.

36.     ***Governing Law***.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided*, that corporate, limited liability company, or partnership governance matters relating to the Debtors or the GUC Trust, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or the GUC Trust, as applicable.

37.     ***Substantial Consummation***.  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

38.     ***Effect of Non-Occurrence of Conditions to the Effective Date***.  If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (iii) constitute an admission,

acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.  For the avoidance of doubt, the non-Consummation of the Plan shall not require or result in the voiding, rescission, reversal, or unwinding of the Sale or the revocation of the Debtors' authority under the Sale Order to consummate such Sale.

39.     ***Binding Nature of the Plan***.  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and upon the occurrence of the Effective Date, the provisions of the Plan, the final versions of the documents contained in the Plan Supplement, and this Confirmation Order, shall be immediately effective and enforceable and bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan, all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan or this Confirmation Order, and any and all non-Debtor parties to executory contracts and unexpired leases.

40.     ***Retention of Jurisdiction***.  The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan or this Confirmation Order, retain jurisdiction over all matters arising out of, or related to, these Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code.

41.     ***Headings***.  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

42.     ***References to and Omissions of Plan Provisions***.  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to specifically include or to refer

to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

43.      ***Controlling Document***.  In the event of any inconsistency between the Plan and any document, schedule, or exhibit contained in the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such document, schedule, or exhibit, or in this Confirmation Order). In the event of any inconsistency between this Confirmation Order and the Plan, this Confirmation Order shall control.

44.      ***Waiver of Stay***.  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Court.

45.      ***Final Order***.  This Confirmation Order is a final order that shall be effective and enforceable immediately upon entry, its provisions shall be self-executing, and the period in which an appeal must be filed shall commence upon the entry hereof.  In the absence of any party obtaining a stay pending appeal, the Debtors are authorized to consummate the Plan.

Signed:  April 10, 2026

_____

Christopher Lopez
United States Bankruptcy Judge

45

**EXHIBIT A**

**Plan**

*Solicitation Version*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ALEON METALS, LLC *et al.*,[1] | ) | Case No. 25-90305 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**COMBINED DISCLOSURE STATEMENT AND
<u>JOINT PLAN OF LIQUIDATION FOR ALEON METALS, LLC, *ET AL.*</u>**

**THIS COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION FOR ALEON METALS, LLC, *ET AL.* HAS BEEN SET FOR A HEARING FOR FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND A HEARING ON CONFIRMATION OF THE PLAN OF LIQUIDATION ON APRIL 3, 2026 AT 10:00 A.M. (CENTRAL TIME), IN COURTROOM 402, UNITED STATES COURTHOUSE, 515 RUSK STREET, HOUSTON, TEXAS, 77002.**

**THE DEBTORS AND THE COMMITTEE URGE ALL HOLDERS OF CLAIMS IN THE IMPAIRED CLASS RECEIVING BALLOTS TO VOTE TO <u>ACCEPT</u> THE PLAN AS CONTAINED HEREIN.**

| **NORTON ROSE FULBRIGHT US LLP** | **MORRISON & FOERSTER LLP** | **GRAY REED** |
|---|---|---|
| Jason L. Boland (SBT 24040542) | Jennifer L. Marines | Jason S. Brookner |
| Bob B. Bruner (SBT 08390450) | (admitted *pro hac vice*) | (SBT 24033684) |
| Julie Harrison (SBT 24092434) | Benjamin Butterfield | Lydia R. Webb |
| Maria Mokrzycka (SBT 24119994) | (admitted *pro hac vice*) | (SBT 24083758) |
| 1550 Lamar, Suite 2000 | Andrew Kissner | Emily F. Shanks |
| Houston, Texas 77010 | (admitted *pro hac vice*) | (SBT 24110350) |
| Telephone: (713) 651-5151 | 250 West 55th Street | 1300 Post Oak Blvd., Ste. 2000 |
| Facsimile: (713) 651-5246 | New York, New York 10019 | Houston, Texas 77056 |
| jason.boland@nortonrosefulbright.com | Telephone: (212) 468-8000 | Telephone: (713) 986-7000 |
| bob.bruner@nortonrosefulbright.com | Facsimile: (212) 468-7900 | Facsimile: (713) 986-7100 |
| julie.harrison@nortonrosefulbright.com | jmarines@mofo.com | jbrookner@grayreed.com |
| maria.mokrzycka@nortonrosefulbright.com | bbutterfield@mofo.com | lwebb@grayreed.com |
| | akissner@mofo.com | eshanks@grayreed.com |

*Co-Counsel to the Debtors and Debtors in Possession*
**February 20, 2026.**

*Co-Counsel to the Debtors and Debtors in Possession*

*Counsel to the Official Committee of Unsecured Creditors*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aleon Metals, LLC (1610); Aleon Renewable Metals, LLC (9215); and Gladieux Metals Recycling, LLC (6057). The location of the Debtors' service address is: P.O. Box 2290, 302 Midway Road, Freeport, TX 77542.

**TABLE OF CONTENTS**

**Page**

EXHIBITS ................................................................................................................ 6

I.      INTRODUCTION ........................................................................................ 10

II.     DEFINITIONS AND RULES OF INTERPRETATION .............................. 10

        A.      DEFINITIONS .................................................................................... 10

        B.      RULES OF INTERPRETATION ....................................................... 22

        C.      INCORPORATION OF DOCUMENTS BY REFERENCE .............. 23

        D.      COMPUTATION OF TIME ............................................................... 23

        E.      CONTROLLING DOCUMENT ......................................................... 23

III.    DEBTORS' HISTORY, ASSETS, LIABILITIES, AND MAJOR EVENTS ................. 24

        A.      OWNERSHIP STRUCTURE ............................................................. 24

        B.      MANAGEMENT ................................................................................ 24

        C.      DEBTORS' BUSINESS ...................................................................... 24

        D.      PREPETITION CAPITAL STRUCTURE ......................................... 25

                1.      Municipal Bond Debt – Senior Secured ARM Bonds, Senior Secured GMR Bonds, and Subordinate Secured GMR Bonds. ................. 26

                2.      Bridge Financing. ................................................................... 27

                3.      FTAI Loans. ............................................................................ 27

                4.      GM Loans. .............................................................................. 27

                5.      EAF Note. ............................................................................... 27

                6.      Mason Metals Repo Loan. ...................................................... 28

                7.      Unsecured Debt ...................................................................... 28

        E.      EVENTS LEADING TO THE DEBTORS' BANKRUPTCY FILING .............. 28

IV.     MAIN EVENTS IN THE BANKRUPTCY CASES .................................... 29

        A.      BAR DATE .......................................................................................... 29

        B.      MEETING OF CREDITORS ............................................................. 29

        C.      OFFICIAL COMMITTEE OF UNSECURED CREDITORS ............ 29

        D.      RETENTION OF PROFESSIONALS ............................................... 29

        E.      CERTAIN ORDERS AND EVENTS IN THE BANKRUPTCY CASE ............ 30

        F.      SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND ASSUMPTION OF CERTAIN CLAIMS AND LIABILITIES .......................... 31

V.      ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ....................... 32

**TABLE OF CONTENTS**
(continued)

**Page**

A.    ADMINISTRATIVE CLAIMS ............................................................................... 32

B.    PRIORITY TAX CLAIMS.................................................................................... 32

C.    U.S. TRUSTEE FEES........................................................................................... 33

D.    PROFESSIONAL FEE CLAIMS ......................................................................... 33

E.    DIP CLAIMS ....................................................................................................... 33

VII.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................ 33

A.    CLASS 1 - OTHER PRIORITY CLAIMS............................................................ 34

B.    CLASS 2 - OTHER SECURED CLAIMS ............................................................ 34

C.    CLASS 3 – GENERAL UNSECURED CLAIMS ................................................. 35

        1.    Holders of All Allowed General Unsecured Claims................................ 35

        2.    Holders of Allowed General Unsecured Claims Excluding Deficiency Claims...................................................................................... 35

D.    CLASS 4 – INTERCOMPANY CLAIMS ............................................................ 35

E.    CLASS 5 – INTERCOMPANY INTERESTS ...................................................... 35

F.    CLASS 6 – INTERESTS IN ALEON METALS .................................................. 36

VII.    ACCEPTANCE OR REJECTION OF THE PLAN ...................................................... 36

A.    CLASS ENTITLED TO VOTE............................................................................. 36

B.    ACCEPTANCE BY IMPAIRED CLASSES OF CLAIMS OR INTERESTS .................................................................................................... 36

C.    PRESUMED ACCEPTANCE BY UNIMPAIRED CLASSES ............................ 36

D.    PRESUMED REJECTIONS BY IMPAIRED CLASSES.................................... 36

E.    CONFIRMATION PURSUANT TO SECTION 1129(B) OF THE BANKRUPTCY CODE....................................................................................... 36

F.    CONTROVERSY CONCERNING IMPAIRMENT ......................................... 37

G.    ELIMINATION OF VACANT CLASSES ........................................................... 37

VIII.    MEANS FOR EXECUTION OF THE PLAN............................................................... 37

A.    FUNDING THE PLAN ....................................................................................... 37

B.    LIMITED SUBSTANTIVE CONSOLIDATION OF THE DEBTORS............. 37

C.    GUC TRUST ...................................................................................................... 37

        1.    Issuance of GUC Trust Interests. ............................................................. 39

        2.    Appointment of the GUC Trustee............................................................. 39

**TABLE OF CONTENTS**
(continued)

**Page**

| | | | |
|---|---|---|---|
| | 3. | Powers and Duties of the GUC Trustee. | 39 |
| | 4. | Compensation of the GUC Trustee and Retention of Professionals. | 41 |
| | 5. | Resignation/Removal of the GUC Trustee. | 41 |
| | 6. | GUC Trust Oversight Committee. | 42 |
| | 7. | Termination. | 42 |
| D. | | LIABILITIES ASSUMED PURSUANT TO THE APA | 42 |
| E. | | DISSOLUTION OF COMMITTEE; DISCHARGE OF PROFESSIONALS | 43 |
| F. | | CANCELLATION OF SECURITIES, AGREEMENTS, AND INSTRUMENTS | 43 |
| G. | | CORPORATE ACTION | 43 |
| H. | | RESIGNATION OF OFFICERS AND DIRECTORS | 44 |
| IX. | | DISTRIBUTIONS | 44 |
| A. | | PROVISIONS GOVERNING DISTRIBUTIONS | 44 |
| | 1. | Distributions. | 44 |
| | 2. | Delivery of Distributions. | 44 |
| | 3. | Undeliverable Distributions. | 44 |
| | 4. | Time Bar to Cash Payments By Check. | 45 |
| | 5. | Setoffs and Recoupment. | 45 |
| B. | | PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND CONTINGENT CLAIMS AGAINST THE DEBTORS | 45 |
| | 1. | Objection Deadline. | 45 |
| | 2. | Responsibility for Objecting to Claims. | 45 |
| | 3. | No Distribution Pending Resolution of Claims. | 45 |
| X. | | CONFIRMATION AND CONSUMMATION OF THE PLAN | 46 |
| A. | | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE | 46 |
| B. | | WAIVER OF CONDITIONS TO THE EFFECTIVE DATE | 46 |
| C. | | SUBSTANTIAL CONSUMMATION | 46 |
| D. | | NOTICE OF OCCURRENCE OF EFFECTIVE DATE | 46 |
| E. | | EFFECT OF NON-OCCURRENCE OF THE EFFECTIVE DATE | 46 |
| XI. | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 47 |

**TABLE OF CONTENTS**
(continued)

**Page**

| XII. | MODIFICATIONS AND AMENDMENTS | 47 |
|------|------------------------------|-----|
| XIII. | RETENTION OF JURISDICTION | 47 |
| XIV. | SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS | 50 |
| | A. | COMPROMISE AND SETTLEMENT OF CLAIMS, INTERESTS, AND CONTROVERSIES | 50 |
| | B. | LIMITED DISCHARGE OF DEBTORS AND INJUNCTION | 50 |
| | C. | RELEASE OF LIENS | 50 |
| | D. | RELEASES BY THE DEBTORS | 51 |
| | E. | RELEASES BY THE RELEASING PARTIES | 52 |
| | F. | EXCULPATION AND LIMITATION OF LIABILITY | 53 |
| | G. | INJUNCTION | 53 |
| XV. | MISCELLANEOUS PROVISIONS | 53 |
| | A. | BINDING EFFECT | 53 |
| | B. | SEVERABILITY OF PLAN PROVISIONS | 54 |
| | C. | REVOCATION, WITHDRAWAL, OR NON-CONFIRMATION OF THE PLAN | 54 |
| | D. | PAYMENT OF STATUTORY FEES; FILING OF QUARTERLY REPORTS | 54 |
| | E. | SUCCESSORS AND ASSIGNS | 55 |
| | F. | FILING OF ADDITIONAL DOCUMENTS | 55 |
| | G. | ENTIRE AGREEMENT | 55 |
| | H. | FURTHER ASSURANCES | 55 |
| | I. | SUBORDINATION RIGHTS | 55 |
| | J. | GOVERNING LAW | 56 |
| XVI. | CONFIRMATION OF THE PLAN | 56 |
| | A. | VOTING PROCEDURES AND REQUIREMENTS | 56 |
| | | 1. | Confirmation Procedure | 56 |
| | | 2. | Procedure for Objections | 56 |
| | | 3. | Requirements for Confirmation | 57 |
| | | 4. | Classification of Claims and Interests | 57 |
| | | 5. | Impaired Claims or Interests | 58 |

**TABLE OF CONTENTS**
(continued)

**Page**

6.     Confirmation without Necessary Acceptances; Cramdown. ................... 58

7.     Opt-Out of Releases Under the Plan. ....................................................... 59

B.     THE BEST INTERESTS TEST & LIQUIDATION ANALYSIS ...................... 60

C.     FEASIBILITY ............................................................................................... 61

D.     ACCEPTANCE OF THE PLAN ................................................................... 61

XVII.   CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING.................... 62

A.     CERTAIN BANKRUPTCY LAW CONSIDERATIONS ................................. 62

1.     Parties in Interests May Object to the Plan's Classification of
       Claims and Interests. .................................................................................. 62

2.     The Conditions Precedent to the Effective Date of the Plan May
       Not Occur. ................................................................................................... 63

3.     The Plan May Not be Accepted. ................................................................. 63

4.     The Plan May Not Be Confirmed. .............................................................. 63

5.     Contingencies Could Affect Votes of the Impaired Class to Accept
       or Reject the Plan. ...................................................................................... 63

6.     Releases, Injunctions, and Exculpation Provisions May Not be
       Approved...................................................................................................... 64

B.     FAILURE TO CONFIRM OR CONSUMMATE THE PLAN .......................... 64

XVIII.  TAX CONSEQUENCES................................................................................................ 64

A.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES....................... 64

B.     TAX CONSEQUENCES FOR U.S. HOLDERS OF CERTAIN CLAIMS........ 65

C.     INFORMATION REPORTING AND WITHHOLDING.................................. 66

XIX.    CONCLUSION AND RECOMMENDATION................................................................ 66

**EXHIBITS**

EXHIBIT A            Liquidation Analysis

EXHIBIT B            Disclosure Statement Order

**DISCLAIMER**

THE DEBTORS AND THE COMMITTEE ARE PROVIDING THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE CHAPTER 11 PLAN OF LIQUIDATION OF ALEON METALS, LLC AND ITS AFFILIATED DEBTORS.  NOTHING IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XVII HEREIN.

THE DEBTORS AND THE COMMITTEE URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND ALL OF THE ACTIONS NECESSARY TO EFFECTUATE THE PLAN.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

FACTUAL INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS AND THE COMMITTEE DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN OR UPON THE MERITS OF THE PLAN.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***").  SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTORS' EXPECTATIONS WITH RESPECT TO FUTURE EVENTS.  FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.  MAKING INVESTMENT DECISIONS BASED ON THE

INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND/OR THE PLAN IS, THEREFORE, SPECULATIVE.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE GUC TRUSTEE MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS COMBINED DISCLOSURE STATEMENT AND PLAN IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS AND THE COMMITTEE ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS AND THE COMMITTEE MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, THE DEBTORS AND THE COMMITTEE HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.  THE DEBTORS AND THE COMMITTEE RESERVE THE RIGHT TO FILE AN AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN FROM TIME TO TIME.

CONFIRMATION AND CONSUMMATION OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE X OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN. THERE IS NO ASSURANCE THAT THIS COMBINED DISCLOSURE STATEMENT AND PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED.  YOU ARE ENCOURAGED TO READ THIS COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, INCLUDING, BUT NOT LIMITED TO, ARTICLE XVII OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THIS COMBINED DISCLOSURE STATEMENT AND PLAN.

THE DEBTORS AND THE COMMITTEE HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. THE DEBTORS AND THE COMMITTEE HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.

IF THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THIS COMBINED DISCLOSURE STATEMENT AND PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THIS COMBINED DISCLOSURE STATEMENT AND

8

Case 25-90305   Document 390   Filed in TXSB on 04/10/26   Page 56 of 124

Case 25-90305   Document 360   Filed in TXSB on 02/20/26   Page 10 of 73

PLAN) WILL BE BOUND BY THE TERMS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND ANY TRANSACTIONS CONTEMPLATED THEREBY.

THE DEBTORS AND THE COMMITTEE SUPPORT CONFIRMATION OF THE PLAN AND, AS FURTHER SET FORTH HEREIN, URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THIS COMBINED DISCLOSURE STATEMENT AND PLAN.

## I.      INTRODUCTION[2]

Aleon Metals, LLC, Aleon Renewable Metals, LLC, and Gladieux Metals Recycling, LLC (collectively, the "***Debtors***"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases pending before the Bankruptcy Court, and the Official Committee of Unsecured Creditors (the "***Committee***") hereby jointly propose this Combined Disclosure Statement and Joint Plan of Liquidation (together with any amendments, supplements, and exhibits thereto, the "***Disclosure Statement***," the "***Plan***," or the "***Combined Disclosure Statement and Plan***," as applicable) for the liquidation of the Debtors' remaining assets and resolution of the outstanding Claims against and Interests in the Debtors. Other agreements and documents supplementing this Plan have been, or will be, filed with the Bankruptcy Court and will be available for review prior to the Voting Deadline.

This Combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, businesses, properties, operations, the Bankruptcy Cases, risk factors, summary and analysis of the Plan, and certain other related matters.

The Debtors have requested that the Bankruptcy Court schedule the Confirmation Hearing for **April 3, 2026 at 10:00 a.m. (prevailing Central Time)**. At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan has been accepted by the requisite number of Holders of Claims, and whether the other standards for Confirmation of the Plan have been satisfied. Once commenced, the Confirmation Hearing may be adjourned or continued by announcement in open court without any other further notice.

**ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THIS COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTORS AND THE COMMITTEE RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## II.      DEFINITIONS AND RULES OF INTERPRETATION

### A.      DEFINITIONS

"***Administrative Claim***" means a Claim for costs and expenses of administration of the Bankruptcy Cases arising on or prior to the Effective Date and allowed pursuant to section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates; (ii) Allowed Professional Fee Claims; and (iii) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

"***Administrative Claims Bar Date***" means the deadline by which all requests for payment of Administrative Claims (excluding Professional Fee Claims and Section 503(b)(9) Claims) must be filed and served on the Debtors and the Committee, which shall be March 27, 2026.

"***Affiliate***" has the meaning set forth in section 101(2) of the Bankruptcy Code.

---

[2]   Capitalized terms used but not defined in this Introduction shall have the meanings ascribed to such terms below.

"*Aleon Metals*" means Aleon Metals, LLC, a chapter 11 debtor in the Bankruptcy Cases.

"*Allowed*" means, with respect to any Claim, all or that portion, as applicable, of any Claim against any Debtor that (i) has been listed in the Schedules (as such Schedules may be amended by the Debtors from time to time) as liquidated in amount and not "disputed" or "contingent," and for which no contrary or superseding Proof of Claim has been timely Filed or that the Debtors, the Committee, or the GUC Trustee does not timely object to in accordance with the terms of the Plan, (ii) has been expressly allowed by Final Order or under the Plan, (iii) has been compromised, settled or otherwise resolved pursuant to the terms of the Plan, the Bankruptcy Rules, the Local Rules, or another Final Order of the Bankruptcy Court, or (iv) is evidenced by a Proof of Claim Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, the Bar Date Order, or another Final Order of the Bankruptcy Court states that a Proof of Claim or request for payment is not and shall not be required to be Filed) that the Debtors, the Committee, the GUC Trustee, or any other party in interest do not timely object to in accordance with the terms of the Plan; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan shall not be considered "Allowed" for any other purpose under the Plan or otherwise, except if and to the extent otherwise determined to be Allowed as provided herein.  Unless otherwise specified under the Plan, under the Bankruptcy Code, by order of the Bankruptcy Court or as otherwise agreed by the Debtors, the Committee, or the GUC Trustee, Allowed Claims shall not, for any purpose under the Plan, include any interest, costs, fees, or charges on such Claims from and after the Petition Date, and no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or the GUC Trust, as applicable.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors, the Committee, or the GUC Trustee and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt, (i) a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim, and (ii) a Claim that is disputed shall not become an Allowed Claim unless as otherwise provided for in the Plan.  "*Allow*" and "*Allowing*" shall have correlative meanings.

"*Ankura*" means Ankura Consulting Group, LLC, the Debtors' restructuring advisor in these Bankruptcy Cases.

"*APA*" means that certain Asset Purchase Agreement (together with all schedules and exhibits thereto), dated as of October 21, 2025 (as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time), by and among AM BidCo Operations LLC, as purchaser, and the Debtors, as sellers [Docket No. 269].

"*ARM*" means Aleon Renewable Metals, LLC, a chapter 11 debtor in these Bankruptcy Cases.

"*ARM Facility*" means the electric arc furnace, real property located at 302 Midway Road, Freeport, Texas 77541, and related assets owned by ARM.

"*Arnold & Porter*" means Arnold & Porter Kaye Scholer LLP.

"*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 105(a), 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code, or any similar federal, state, or common law causes of action, including, without limitation, any Causes of Action arising under section 547 of the Bankruptcy Code or similar preference-related actions arising under the Bankruptcy Code or applicable non-bankruptcy law.

"*Ballot*" means the ballot form distributed to each Holder of a Claim entitled to vote to accept or reject the Plan.

"*Bankruptcy Cases*" means (i) when used in reference to a particular Debtor, the chapter 11 case Filed for such Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (ii) when used in reference to all the Debtors, the jointly administered chapter 11 cases for all of the Debtors in the Bankruptcy Court and currently styled *In re Aleon Metals, LLC, et al.*, Case No. 25-90305 (CML) (Jointly Administered).

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Bankruptcy Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"*Bankruptcy Rules*" mean, collectively, the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Bankruptcy Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Bankruptcy Cases or proceedings therein, as the case may be.

"*Bar Date*" means the deadline to file Proofs of Claim (including Administrative Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code), which shall be (i) October 21, 2025 for all non-governmental parties, and (ii) February 13, 2026 for Governmental Units.

"*Bar Date Order*" means the *Order (I) Establishing Deadlines for the Filing of Proofs of Claim, (II) Approving the Form and Manner of Notice Thereof, (III) Approving the Form and Manner for Filing Proofs of Claim, and (IV) Granting Related Relief* [Docket No. 154].

"*Bidding Procedures*" means those Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order, as amended or modified from time to time.

"*Bidding Procedures Motion*" means the *Debtors' Emergency Motion for Entry of (I) an Order (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing Entry into the Stalking Horse Agreement, (C) Approving Procedures for the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling an Auction and Sale Hearing, (E) Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief, and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 12].

"*Bidding Procedures Order*" means the *Order (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing Entry into the Stalking Horse Agreement, (C) Approving Procedures for the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling an Auction and Sale Hearing, (E) Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief* [Docket No. 79, as corrected at Docket No. 88].

"*Bondholder Group*" means the ad hoc group of Prepetition Bondholders represented by Arnold & Porter.

"*Bridge Financing*" means the term loans extended by the Prepetition Superpriority Lenders to the Debtors prior to the Petition Date pursuant to that certain *Superpriority Secured Credit Agreement*, dated as of May

12

7, 2025 (as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time).

"*Business Day*" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close.

"*Cash*" means the legal tender of the United States of America or the equivalent thereof.

"*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever belonging to the Debtors, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes: (i) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims; (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (iv) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any claims under any state or foreign law, including Avoidance Actions.

"*Claim*" means any "claim" against any Debtor, as such term is defined in section 101(5) of the Bankruptcy Code.

"*Claim Objection*" means any objection to a Claim filed by the Debtors, the Committee, or the GUC Trustee, as applicable.

"*Class*" means a category of Holders of Claims or Interests, as described below in Article VI.

"*Closing Date*" means October 21, 2025.

"*Combined Disclosure Statement and Plan*" has the meaning ascribed to such term in the Introduction.

"*Committee*" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases pursuant to section 1102(a) of the Bankruptcy Code on August 28, 2025 [Docket No. 97].

"*Confirmation*" means entry by the Bankruptcy Court of the Confirmation Order confirming this Plan.

"*Confirmation Date*" means the date of entry by the Bankruptcy Court of the Confirmation Order.

"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan and final approval of the Disclosure Statement, as such hearing may be adjourned or continued from time to time.

"*Confirmation Order*" means the order entered by the Bankruptcy Court confirming the Plan pursuant to, among others, section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby.

"*Consenting Creditor*" means, collectively, the following, in each case in its capacity as such with each being a "*Consenting Creditor*": (a) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan and who do not check the box on the applicable Ballot to affirmatively opt out of the releases

13

set forth in the Plan; and (b) all Holders of Claims or Interests that abstain from voting on the Plan, vote to reject the Plan, or are deemed to reject the Plan and who do not either (i) timely check the box on the applicable Ballot or notice of non-voting status to affirmatively opt out of the releases set forth in the Plan, or (ii) timely object to the Plan in respect of the releases contained therein that is not withdrawn or otherwise resolved before Confirmation; *provided*, *further*, that in no event shall any Non-Released Party be a Consenting Creditor.

"*Consummation*" means the occurrence of the Effective Date.

"*Debtor*" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Bankruptcy Cases.

"*Debtors*" has the meaning ascribed to such term in the Introduction.

"*Deficiency Claims*" means any portion of the Prepetition Bond Claims constituting a general unsecured claim under section 506(a) of the Bankruptcy Code.

"*DIP Agent*" means UMB Bank, National Association, solely in its capacities as administrative agent and collateral agent under the DIP Facility.

"*DIP Claims*" means any and all Claims of the DIP Lenders arising from, under or in connection with the DIP Documents or the DIP Facility.

"*DIP Documents*" means that certain *Superpriority Secured Debtor-In-Possession Credit Agreement*, dated as of August 21, 2025, between the Debtors, the DIP Lenders, and the DIP Agent, and all other related agreements, documents, security agreements, pledge agreements, or other collateral documents in connection with the DIP Facility, as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time.

"*DIP Facility*" means that certain superpriority senior secured priming debtor-in-possession term loan facility made available to the Debtors by the DIP Lenders pursuant to the DIP Documents and the Final DIP Order.

"*DIP Motion*" means the *Debtors' Emergency Motion For Entry Of Interim And Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims, and (B) Adequate Protection to the Prepetition Secured Parties; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 9].

"*DIP Lenders*" means the lenders under the DIP Facility.

"*Disclosure Statement*" means the disclosure statement, including all exhibits and schedules thereto and references therein (as amended, supplemented, or modified from time to time), that is embodied within this Combined Disclosure Statement and Plan and prepared and distributed in accordance with, among others, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

"*Distribution*" means any distribution of property to a holder of an Allowed Claim on account of such Claim in accordance with the terms of the Plan.

14

"*EAF Note*" means that certain Promissory Note, dated June 16, 2022, by Debtor ARM in favor of Debtor GMR, as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time.

"*Effective Date*" means the first Business Day after the later of the date on which (i) all the conditions to the occurrence of the Effective Date set forth in Article X of this Combined Disclosure Statement and Plan have been satisfied or waived in accordance with such Article; and (ii) no stay of the Confirmation Order is in effect.

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Estate*" means, as to each Debtor, the estate created for such Debtor in its Bankruptcy Case pursuant to sections 301 and 541 of the Bankruptcy Code upon the filing of the Bankruptcy Cases.

"*Excluded Related Party*" means any financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors to any Person or Entity, including ARM and GMR, related to the negotiation, documentation, or execution of the Prepetition Bond Documents at the time of issuance of each series of Prepetition Bonds.

"*Facilities*" means the GMR Facility and the ARM Facility.

"*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims, and (B) Adequate Protection to the Prepetition Secured Parties; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 132].

"*Final Order*" means an order, ruling, or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated, or stayed, and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument, or rehearing shall be pending, or (ii) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Bankruptcy Rule 8002; *provided*, that no order shall fail to be a Final Order solely due to the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rules 59 or 60 of the Federal Rules of Civil Procedure, or Rule 9024 of the Bankruptcy Rules may be filed with respect to such order.

"*File*," "*Filed*," or "*Filing*" mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in the Bankruptcy Cases.

"*First Rejection Notice*" means the *First Notice of Rejection of Certain Executory Contracts and Unexpired Leases (and the Abandonment of Property)* [Docket No. 167].

"*FTAI*" means non-Debtor ARM Investment LLC.

"*FTAI Credit Agreement*" means that certain Loan Agreement, dated June 15, 2022, between Debtor Aleon Metals and FTAI, as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time.

"*General Unsecured Claim*" means an Unsecured Claim against a Debtor, including Deficiency Claims, but excluding any Administrative Claims (including Professional Fee Claims), DIP Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, Intercompany Claims, Intercompany Interests, or Interests in Aleon Metals.

"*Gladieux Metals*" means non-Debtor Gladieux Metals, LLC.

"*GM Loan Agreement*" means that certain Loan Agreement, dated as of February 1, 2021, between Gladieux Metals and GMR (as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time).

"*GM Note Payable*" means that certain note payable dated May 21, 2018, provided by GMR to Gladieux Metals (as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time).

"*GMR*" means Gladieux Metals Recycling, LLC, a chapter 11 debtor in these Bankruptcy Cases.

"*GMR Facility*" means the catalyst recycling facility located at 302 Midway Road, Freeport, Texas 77541 and related assets owned by GMR.

"*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"*GUC Trust*" means the trust established pursuant to the GUC Trust Agreement.

"*GUC Trust Agreement*" means that certain agreement made by and among the Debtors and the GUC Trustee, establishing and delineating the terms and conditions of the GUC Trust, substantially in the form to be filed as part of the Plan Supplement.

"*GUC Trust Assets*" means all assets held from time to time by the GUC Trust, the proceeds of which shall be distributed to the GUC Trust Beneficiaries in accordance with the GUC Trust Agreement, and which shall initially consist of any Cash remaining in the Debtors' Estates that is an Excluded Asset (as defined in the APA) (which, for the avoidance of doubt, does not include amounts remaining in the Carve-Out Account or any Cash and Cash Equivalents (as defined in the APA) or Purchased Assets (as defined in the APA) that constitute property of the Purchaser under the APA), which Cash shall not be less than $757,500, plus the Debtors' commercial tort claims, Avoidance Actions not acquired by the Purchaser, and current and prior directors' and officers' insurance policies and any rights thereto (such commercial tort claims, Avoidance Actions not acquired by the Purchaser, and current and prior directors' and officers' insurance policies and any rights thereto, collectively, the "*GUC Trust Claims*"). For the avoidance of doubt, $757,500 in Cash transferred to the GUC Trust shall be earmarked as follows in accordance with the Sale Order: (i) $440,000 for GUC Trust Beneficiaries, excluding the Holders of Deficiency Claims; (ii) $250,000 for all GUC Trust Beneficiaries, including the Holders of Deficiency Claims; and (iii) $67,500 for Allowed Professional Fees for the Committee Professionals (each as defined in the Final DIP Order) incurred post-Closing (as defined in the APA).

"*GUC Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims (including Deficiency Claims).

16

"*GUC Trust Distributable Assets*" means, $250,000 in Cash (or any portion of the $250,000 not utilized to pursue the GUC Trust Claims), plus any proceeds from pursuing the GUC Trust Claims.

"*GUC Trust Interests*" means the interests to be issued to GUC Trust Beneficiaries evidencing their interests in the GUC Trust and the right to receive distributions therefrom as set forth in the GUC Trust Agreement and this Plan.

"*GUC Trustee*" means Patricia Missal or any other successor GUC Trustee appointed in accordance with the GUC Trust Agreement.

"*GUC Trust Oversight Committee*" means the committee formed pursuant to Article VIII.C.5 of the Plan and the GUC Trust Agreement to, among other things, oversee the GUC Trust.  The members of the GUC Trust Oversight Committee as of the Effective Date shall be UMB Bank, National Association; Hoover Ferguson/Hoover Circular Solutions; and Dacon Corporation.

"*Holder*" means an Entity holding a Claim against, or Interest in, any of the Debtors.

"*Impaired*" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Intercompany Claim*" means a Claim of a Debtor against another Debtor.

"*Intercompany Interest*" means an Interest held by a Debtor in another Debtor.

"*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership or profits interests of the Debtors, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any of the Debtors, whether or not arising under or in connection with any employment agreement, and whether or not certificated, transferable, preferred, common, voting, or denominated "stock," or similar security, that existed immediately before the Effective Date.

"*Interim DIP Order*" means the *Interim Order (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims, and (B) Adequate Protection to the Prepetition Secured Parties; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 55].

"*Issuer*" means the Brazoria County Industrial Development Corporation.

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Local Rules*" means the Bankruptcy Local Rules for the Southern District of Texas.

"*Mason Metals*" means Mason Metals, LLC.

17

"*Mason Metals Repo Agreement*" means that certain Master Sale and Repurchase Agreement, dated as of April 19, 2023, between GMR and Mason Metals (as amended, restated, amended and restated, waived, supplemented or otherwise modified from time to time).

"*Non-Released Party*" means any Excluded Related Party or any current or former director, manager, or officer of the Debtors other than the Released Director.

"*Other Priority Claim*" means a Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"*Other Secured Claim*" means any Secured Claim against the Debtors other than a DIP Claim and the Prepetition Bond Claims.

"*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"*Petition Date*" means August 17, 2025, the date when the Debtors filed their respective voluntary chapter 11 petitions.

"*Plan*" has the meaning ascribed to such term in the Introduction.

"*Plan Supplement*" means the compilation of certain documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms of the Plan and in accordance with the Bankruptcy Code and the Bankruptcy Rules), including the GUC Trust Agreement, that are necessary to the implementation and effectuation of the Plan and will be filed, in one or more filings, by the Debtors.

"*Prepetition Bond Claims*" means, collectively, the Senior Secured ARM Bond Claims, the Senior Secured GMR Bond Claims, and the Subordinate Secured GMR Bond Claims.

"*Prepetition Bond Documents*" means, collectively, "Bond Documents" as defined in each of the Senior Secured ARM Indenture, the Senior Secured GMR Indenture, and the Subordinate Secured GMR Indenture.

"*Prepetition Bondholders*" means the Senior Secured ARM Bondholders, the Senior Secured GMR Bondholders, and the Subordinate Secured GMR Bondholders.

"*Prepetition Bonds*" means the Senior Secured ARM Bonds, the Senior Secured GMR Bonds, and the Subordinate Secured GMR Bonds.

"*Prepetition Charging Lien*" means any Lien or other priority in payment arising prior to the Effective Date, pursuant to the Prepetition Bond Documents, to which any Prepetition Trustee is entitled for payment of any compensation, fees, expenses, or disbursements, including, without limitation, fees and expenses of counsel, payable or reimbursable to the applicable Prepetition Trustee under the applicable Prepetition Bond Documents, against Distributions to be made to the applicable Prepetition Bondholders, but solely to the extent such compensation, fees, expenses, or disbursements have not been paid by another party (including the Debtors and the GUC Trustee).

"*Prepetition Secured Parties*" means the Prepetition Bondholders, the Prepetition Superpriority Lenders, the Prepetition Superpriority Agent, and the Prepetition Trustee.

"*Prepetition Superpriority Agent*" means UMB Bank, National Association, solely in its capacities as administrative agent and collateral agent under the Bridge Financing.

"*Prepetition Superpriority Lenders*" means those members of the Bondholder Group who provided the Debtors' with Bridge Financing prior to the Petition Date.

"*Prepetition Trustee*" means UMB Bank, N.A., solely in its respective capacities as trustee for the Senior Secured ARM Bonds, the Senior Secured GMR Bonds, and the Subordinate Secured GMR Bonds, as applicable.

"*Priority Tax Claim*" means a Claim or a portion of a Claim of a Governmental Unit for which priority is asserted under section 507(a)(8) of the Bankruptcy Code.

"*Professional*" means a Person or Entity (i) employed in these Bankruptcy Cases pursuant to a Final Order in accordance with sections 327, 328, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date pursuant to section 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (ii) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"*Professional Fee Claim*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including, but not limited to, transaction fees and success fees) for compensation for services rendered or reimbursement of expenses incurred by a Professional in connection with the Bankruptcy Cases from the Petition Date through the Effective Date, to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

"*Professional Fee Claims Bar Date*" means the deadline for filing all applications for Professional Fee Claims on a final basis, which shall be thirty (30) days after the Effective Date.

"*Professional Fee Reserve*" means an account held by the Debtors (or their counsel or other designee) for the payment of Professional Fee Claims of the Debtor Professionals (as defined in the Final DIP Order).

"*Professional Fee Reserve Amount*" means $342,500 for the Debtor Professionals (as defined in the Final DIP Order) for Allowed Professional Fees incurred post-Closing in accordance with the Sale Order; *provided*, that such amounts shall be reduced for any Allowed Professionals Fees for the Debtor Professionals incurred post-Closing that are paid prior to the Effective Date.

"*Proof of Claim*" shall mean a written proof of Claim Filed against any of the Debtors in the Bankruptcy Cases.

"*Purchaser*" means AM BidCo Operations LLC, as designee of the Stalking Horse Bidder, in its capacity as purchaser of substantially all of the Debtors' assets pursuant to the APA.

"*Rejection Procedures Motion*" means the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases, (II) Authorizing the Abandonment of Certain Personal Property, if Any, (III) Approving and Establishing Procedures to Reject Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 8].

"*Rejection Procedures Order*" means the *Order (I) Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases, (II) Authorizing the Abandonment of Certain Personal Property, if Any, (III) Approving and Establishing Procedures to Reject Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 165].

19

"***Related Parties***" means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees; *provided*, *however*, that in no event shall any Excluded Related Party be a Related Party.

"***Released Director***" means Timothy Pohl, in his capacity as an independent manager of the Debtors.

"***Released Party***" means, collectively, and in each case only in its capacity as such:  (i) each of the Debtors; (ii) the Released Director; (iii) the DIP Agent; (iv) each of the DIP Lenders; (v) each of the Prepetition Secured Parties; (vi) the Purchaser; (vii) the Committee and each of its members; and (viii) with respect to each of the foregoing Entities identified in subsections (i) through (vii) herein, each of such Entities' Related Parties; *provided, however*, that in no event shall any Non-Released Party be a Released Party.

"***Releasing Party***" means, collectively, and in each case only in its capacity as such: (i) each of the Debtors; (ii) the Released Director; (iii) the DIP Agent; (iv) each of the DIP Lenders; (v) each of the Prepetition Secured Parties; (vi) the Purchaser; (vii) the Committee and each of its members; (viii) each Consenting Creditor; and (ix) with respect to each of the foregoing Entities identified in subsections (i) through (viii) herein, each of such Entities' Related Parties; *provided, however,* that in no event shall any Non-Released Party be a Releasing Party.

"***Sale***" means the sale of all or substantially all of the Debtors' assets to the Purchaser approved by the Bankruptcy Court pursuant to the Sale Order.

"***Sale Order***" means the *Order (I) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 222].

"***Secured Claim***" shall mean, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is (i) secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the Debtors in and to property of the Estates, to the extent of the value of the Holder's interest in such property as of the relevant determination date, or (ii) Allowed as such pursuant to the terms of the Plan (subject to the Confirmation Order becoming a Final Order).  The defined term Secured Claim includes any Claim that is (1) subject to an offset right under applicable law as of the Petition Date, and (2) a secured claim against the Debtors pursuant to sections 506(a) and 553 of the Bankruptcy Code.

"***Schedule of Assumed Contracts***" means that list of executory contracts to be assumed by the Debtors on the Effective Date as set forth in the Plan Supplement.

"***Schedules***" means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs Filed by the Debtors in the Bankruptcy Cases pursuant to section 521 of the Bankruptcy Code, as each may be amended and supplemented from time to time.

"*Section 503(b)(9) Claim*" means a Claim entitled to administrative expense status arising under section 503(b)(9) of the Bankruptcy Code.

"*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

"*Senior Secured ARM Bondholders*" means the holders of the Senior Secured ARM Bonds.

"*Senior Secured ARM Bond Claims*" means any Claim held by the Senior Secured ARM Bondholders that is derived from or based upon the Senior Secured ARM Indenture, the Senior Secured ARM Loan Agreement, and any other agreements, documents, and instruments relating to the foregoing (including, but not limited to, any security agreements and any guarantees with respect thereto).

"*Senior Secured ARM Bonds*" means the Solid Waste Disposal Facilities Revenue Bonds (Aleon Renewable Metals, LLC Project) issued in the amount of $75,000,000 (Series 2022) and $100,000,000 (Additional Series 2023).

"*Senior Secured ARM Loan Agreement*" means that certain Loan Agreement, dated as of June 1, 2022 (as amended, restated, supplemented, or otherwise modified by that certain Amendment to Loan Agreement, dated as of June 1, 2023, and as may have been further amended, restated, supplemented or otherwise modified from time to time), pursuant to which the Issuer loaned the proceeds of the Senior Secured ARM Bonds to Debtor ARM.

"*Senior Secured ARM Indenture*" means that certain Indenture of Trust, dated as of June 1, 2022 (as amended, restated, supplemented, or otherwise modified by that certain First Supplemental Indenture of Trust, dated as of June 1, 2023, and as may have been further amended, restated, supplemented or otherwise modified from time to time), between the Issuer and the Prepetition Trustee.

"*Senior Secured GMR Bondholders*" means the holders of the Senior Secured GMR Bonds.

"*Senior Secured GMR Bond Claims*" means any Claim held by the Senior Secured GMR Bondholders that is derived from or based upon the Senior Secured GMR Indenture, the Senior Secured GMR Loan Agreement, and any other agreements, documents, and instruments relating to the foregoing (including, but not limited to, any security agreements and any guarantees with respect thereto).

"*Senior Secured GMR Bonds*" means the Solid Waste Disposal Facilities Revenue Bonds (Gladieux Metals Recycling, LLC Project) issued in the amount of $25,000,000 (Series 2019), $25,000,000 (Additional Series 2019A), and $50,000,000 (Additional Series 2019B).

"*Senior Secured GMR Loan Agreement*" means that certain Loan Agreement, dated as of March 1, 2019 (as amended, restated, supplemented, or otherwise modified by that certain Amendment to Loan Agreement, dated as of July 1, 2019, and that certain Second Amendment to Loan Agreement, dated as of November 1, 2019, and as may have been further amended, restated, supplemented or otherwise modified from time to time), pursuant to which the Issuer loaned the proceeds of the Senior Secured GMR Bonds to Debtor GMR.

"*Senior Secured GMR Indenture*" means that certain Indenture of Trust, dated as of March 1, 2019 (as amended, restated, supplemented, or otherwise modified by that certain First Supplemental Indenture of Trust, dated as of July 1, 2019, and that certain Second Supplemental Indenture of Trust, dated as of November 1, 2019, and as may have been further amended, restated, supplemented or otherwise modified from time to time), between the Issuer and the Prepetition Trustee.

"*Solicitation Agent*" means Stretto, Inc., in its capacity as claims, noticing, and solicitation agent appointed in these Bankruptcy Cases.

"*Solicitation Procedures Order*" shall mean that certain order conditionally approving the Disclosure Statement, scheduling the Confirmation Hearing, and establishing procedures for solicitation and tabulation of votes on the Plan.

"*Stalking Horse Bidder*" means AM BidCo Holdings, LLC.

"*Subordinate Secured GMR Bondholders*" means the holders of the Subordinate Secured GMR Bonds.

"*Subordinate Secured GMR Bond Claims*" means any Claim held by the Subordinate Secured GMR Bondholders that is derived from or based upon the Subordinate Secured GMR Indenture, the Subordinate Secured GMR Loan Agreement, and any other agreements, documents, and instruments relating to the foregoing (including, but not limited to, any security agreements and any guarantees with respect thereto).

"*Subordinate Secured GMR Bonds*" means the Solid Waste Disposal Facilities Subordinate Revenue Bonds (Gladieux Metals Recycling, LLC Project) issued in the amount of $38,500,000 (Series 2020).

"*Subordinate Secured GMR Loan Agreement*" means that certain Loan Agreement, dated as of May 1, 2020 (as amended, restated, supplemented, or otherwise modified from time to time), pursuant to which the Issuer loaned the proceeds of the Subordinate Secured GMR Bonds to Debtor GMR.

"*Subordinate Secured GMR Indenture*" means that certain Indenture of Trust, dated as of May 1, 2020 (as amended, restated, supplemented, or otherwise modified from time to time), between the Issuer and the Prepetition Trustee.

"*Unimpaired*" means, with respect to a Claim, Interest, or a Class of Claims or Interests, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"*Unsecured Claim*" means a Claim that is not a Secured Claim and that is not entitled to priority under section 507(a)(1)-(9) of the Bankruptcy Code.

"*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

"*U.S. Trustee Fees*" means all fees payable pursuant to 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717.

"*Voting Deadline*" means **March 27, 2026**, the deadline by which Ballots to accept or reject the Plan must be actually received by the Solicitation Agent to be counted, as set forth in the Solicitation Procedures Order.

## B.      RULES OF INTERPRETATION

For purposes of this Combined Disclosure Statement and Plan, except as expressly provided or unless the context otherwise requires: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (iii) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document,

22

schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (iv) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (v) all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, of this Combined Disclosure Statement and Plan; (vi) all references herein to exhibits are references to exhibits in the Plan Supplement; (vii) the words "herein," "hereof," and "hereto" refer to this Combined Disclosure Statement and Plan in its entirety rather than to a particular portion of this Combined Disclosure Statement and Plan; (viii) any effectuating provisions may be interpreted by the GUC Trustee in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; (ix) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules; (x) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (xi) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (xii) references to docket numbers are references to the docket numbers of documents Filed in the Bankruptcy Cases under the Bankruptcy Court's CM/ECF system; (xiii) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Bankruptcy Cases, unless otherwise stated; (xiv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (xv) the words "include," "includes," and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (xvi) references to "shareholders," "directors," and/or "officers" shall also include "members," "partners," and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xvii) references to "Proofs of Claim," "Holders of Claims," "disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "disputed Interests," and the like, as applicable; (xviii) unless otherwise specified herein, references from or through any date mean from and including or through and including; and (xix) except as otherwise provided in the Plan, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

## C.   INCORPORATION OF DOCUMENTS BY REFERENCE

This Combined Disclosure Statement and Plan incorporates by reference certain documents relating to the Debtors that are not presented herein or delivered herewith.  The documents that have been or will be filed in the Debtors' Bankruptcy Cases are incorporated by reference herein in their entirety, including all amendments thereto filed prior to the date set for confirmation, including, but not limited to, all exhibits and documents included in the Plan Supplement.  Documents and pleadings filed in these Bankruptcy Cases are available at the following website: https://cases.stretto.com/aleonmetals/.

## D.   COMPUTATION OF TIME

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## E.   CONTROLLING DOCUMENT

In the event of any inconsistency between the Plan and any document, schedule, or exhibit contained in the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated

otherwise in such document, schedule, or exhibit, or in the Confirmation Order).  In the event of any inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

### III.    DEBTORS' HISTORY, ASSETS, LIABILITIES, AND MAJOR EVENTS

#### A.    OWNERSHIP STRUCTURE

Aleon Metals is a wholly owned subsidiary of non-Debtor GM-FTAI HoldCo LLC, a joint venture between FTAI and Gladieux Metals.

Aleon Metals is a Texas limited liability company which owns 100% of ARM and GMR.  Other than Aleon Metals' ownership interest in ARM and GMR, Aleon Metals owns no other assets and has no employees.

ARM is a Delaware limited liability company which, as of the Petition Date, owned, among other assets, the ARM Facility, and as of the Petition Date, had no employees.

GMR is a Texas limited liability company which, as of the Petition Date, owned, among other assets, the GMR Facility.  All of the Debtors' employees were employed by GMR.  The Debtors purchased the GMR Facility in 2017, after its prior owner, Gulf Chemical & Metallurgical Corporation, filed for protection under chapter 11 of the Bankruptcy Code.

#### B.    MANAGEMENT

The following table sets forth the Debtors' management as of the Petition Date:

| | |
|---|---|
| Tarun Bhatt | Mr. Bhatt was the CEO of the Debtors.  Mr. Bhatt also serves on the board of managers of the Debtors. |
| Greg Gyomlai | Mr. Gyomlai is the Director of Finance of the Debtors. |
| Frank Carfora | Mr. Carfora serves on the board of managers of ARM. |
| Ken Nicholson | Mr. Nicholson serves on the board of managers of Aleon Metals and ARM. |
| Robert Thayer | Mr. Thayer serves on the board of managers of GMR. |
| Timothy Pohl | Mr. Pohl was appointed as the independent manager on each of the Debtor's boards, effective as of April 28, 2025. |
| Roy Gallagher | Mr. Gallagher was appointed Chief Restructuring Officer of the Debtors, effective as of April 28, 2025. |

#### C.    DEBTORS' BUSINESS

The following is a brief description of the primary components of the Debtors' business, the GMR Facility, and the ARM Facility, each as of the Petition Date:

1.    **GMR Facility**.  The GMR Facility consists of multiple hearth furnaces, hydrometallurgical circuits, and other equipment which are used to recycle spent catalyst and extract vanadium, molybdenum, and other valuable metals.  These metals are then sold into specialty markets,

24

including battery manufacturing and steelmaking, and the Debtors credit a portion of the proceeds from such sales back to the original refiners.

2. **ARM Facility**. The ARM Facility is located adjacent to the GMR Facility on a largely unoccupied parcel of real estate. The ARM Facility owns the electric arc furnace, which is located on the GMR Facility. The ARM Facility, though not operational, was established to develop a process for converting end-of-life lithium-ion battery and alumina tailings (a byproduct of the Debtors' catalyst processing at the GMR Facility) into battery-grade nickel and cobalt. ARM owns the intellectual property relating to such process.

## D. PREPETITION CAPITAL STRUCTURE

As of the Petition Date, the Debtors had approximately $403.2 million in the aggregate of funded debt, as shown in the chart below, as well as approximately $10.7 million of other unsecured debt.

| Debt Facility | Approx. Outstanding Principal Amount ($ millions) | Interest Rate | Maturity |
|---|---|---|---|
| May 2025 Bridge Financing | $15.0 | 15.00% | May '26 |
| July 2025 Bridge Financing | 2.8 | 15.00% | May '26 |
| Series 2022 Revenue Bonds | 70.3 | 10.00% | Jun. '42 |
| Series 2023 Revenue Bonds | 93.7 | 12.00% | Jun. '43 |
| EAF Note | 21.5 | 6.00% | Jun. '25 |
| *Total ARM Debt* | *$203.3* | | |
| May 2025 Bridge Financing | $15.0 | 15.00% | May '26 |
| July 2025 Bridge Financing | 2.8 | 15.00% | May '26 |
| Series 2019 Revenue Bonds | 23.0 | 9.00% | Mar. '39 |
| Series 2019A Revenue Bonds | 23.0 | 9.00% | Mar. '39 |
| Series 2019B Revenue Bonds | 48.2 | 7.00% | Mar. '39 |
| Series 2020 Subordinated Revenue Bonds | 35.4 | 8.50% | Mar. '39 |
| Gladieux Metals Note Payable | 7.5 | 10.00% | Dec. '25 |
| Gladieux Metals Subordinated Loan | 9.8 | 8.00% | Dec. '26 |
| Mason Metals Repo Loan | 10.9 | 15.00% | -- |
| *Total GMR Debt[3]* | *$157.8* | | |
| May 2025 Bridge Financing | $15.0 | 15.00% | May '26 |
| July 2025 Bridge Financing | 2.8 | 15.0% | May '26 |
| FTAI Loan | 42.1 | 8.00% | Jan. '26 |
| *Total Aleon Metals Debt[4]* | *$42.1* | | |
| **Total Funded Debt** | **$403.2** | | |

1. **Municipal Bond Debt – Senior Secured ARM Bonds, Senior Secured GMR Bonds, and Subordinate Secured GMR Bonds**.

Both GMR and ARM have from time to time issued tax-exempt revenue bonds to municipal bond markets to fund capital expenditures and finance operations.  Each series of revenue bonds was issued by the Issuer, which lent the bond proceeds to GMR or ARM, as applicable.  The bonds are in turn backed by

---

[3]   To avoid double-counting, the GMR subtotal does not include amounts owed on the Bridge Financings included in the ARM subtotal.

[4]   Aleon Metals also guaranteed the Bridge Financing. To avoid double-counting, the Aleon Metals subtotal does not include amounts owed on the Bridge Financings included in the ARM subtotal.

26

the Issuer's rights under the respective loan agreements with GMR or ARM, as well as a direct pledge of assets by GMR or ARM. The Prepetition Trustee serves as indenture trustee for each series of revenue bonds.

### 2. Bridge Financing.

As described further below, the Prepetition Superpriority Lenders agreed to provide Bridge Financing in the months leading up to the Petition Date. On May 7, 2025, GMR and ARM, as borrowers, Aleon Metals as guarantor, the Prepetition Superpriority Agent, as agent, and the Prepetition Superpriority Lenders entered into that certain Superpriority Secured Credit Agreement pursuant to which the Prepetition Superpriority Lenders agreed to make term loans to GMR and ARM in the aggregate amount of $15,000,000. On July 25, 2025, the Prepetition Superpriority Lenders agreed to provide additional term loans to GMR and ARM in the amount of $2,812,500. The Bridge Financing was repaid in full upon the second draw of the DIP Facility.

### 3. FTAI Loans.

Pursuant to the FTAI Credit Agreement, an affiliate of FTAI agreed to make up to $20 million of term loans to Aleon Metals, which has been increased from time to time. The FTAI Credit Agreement was secured by a lien on certain assets of Aleon Metals. As of the Petition Date, the aggregate amount outstanding under the FTAI Credit Agreement was approximately $42.7 million, including accrued and unpaid interest. Any amounts that remain due and owing to FTAI under the FTAI Credit Agreement are classified as General Unsecured Claims under the Plan.

### 4. GM Loans.

On May 21, 2018, GMR issued the GM Note Payable in the amount of $7.5 million. As of the Petition Date, the aggregate amount outstanding under the GM Note Payable was approximately $12.9 million, including accrued and unpaid interest.

Pursuant to the GM Loan Agreement, Gladieux Metals agreed to provide GMR with up to $100 million of term loans. The GM Loan Agreement was secured by a subordinated deed of trust on certain real and personal property of GMR that is subordinate to the lien securing the Subordinate Secured GMR Bonds. As of the Petition Date, the aggregate amount outstanding under the GM Loan Agreement was approximately $14 million, including accrued and unpaid interest.

Any amounts that remain due and owing to Gladieux Metals under the GM Note Payable or the GM Loan Agreement are classified as General Unsecured Claims under the Plan.

### 5. EAF Note.

ARM purchased the electric arc furnace from GMR using a combination of cash and the EAF Note issued in favor of GMR in the principal amount of approximately $21.5 million. The EAF Note was secured by a subordinated deed of trust on certain real and personal property of ARM that is subordinate to the lien securing the Senior Secured ARM Bonds. As of the Petition Date, the aggregate amount outstanding under the EAF Note was approximately $21.5 million, including accrued and unpaid interest. The EAF Note is classified as an Intercompany Claim under the Plan.

**6. Mason Metals Repo Loan**.

Pursuant to the Mason Metals Repo Agreement, Mason Metals provided GMR with short-term financing secured by calcine, an intermediate metal product generated at the GMR Facility. The loans were structured as sales by GMR to Mason Metals of calcine in exchange for cash, and GMR was required to repurchase such calcine at a later date. As of the Petition Date, the aggregate amount outstanding under the Mason Metals Repo Agreement was approximately $12.8 million, including accrued and unpaid interest. On September 22, 2025, the Bankruptcy Court entered the Rejection Procedures Order which rejected the Mason Metals Repo Agreement and authorized GMR to abandon the calcine securing the loans issued under the Mason Metals Repo Agreement to Mason Metals as of the Petition Date. Any amounts that remain due and owing to Mason Metals under the Mason Metals Repo Loan are classified as General Unsecured Claims under the Plan.

**7. Unsecured Debt**.

As set forth the Debtors' Schedule F, as of the Petition Date, the total unsecured debt was: (a) for Aleon Metals, $159,720,704.69, (b) for ARM, $13,492,455.67, and (c) for GMR, $194,298,467.68.

**E.     EVENTS LEADING TO THE DEBTORS' BANKRUPTCY FILING**

The Debtors' decision to commence these chapter 11 cases was the culmination of a series of operational, financial, and market-driven challenges that emerged over the past several years. The Debtors' business, while strategically located and technologically advanced, has been subject to significant volatility in commodity prices, particularly for vanadium and molybdenum, which are the primary metals recovered from spent catalyst. Despite the partial hedge against metals prices inherent to the Debtors' business model, this volatility nonetheless has resulted in unpredictable revenue streams and periods of negative cash flow.

In recent years, the Debtors also have faced persistent operational disruptions. In late 2024 and early 2025, the Facilities experienced significant downtime due to various equipment failures. The most notable of the issues faced by the Debtors was the malfunctioning of their $SO_2$ scrubber, a device used to remove sulfur dioxide—a leading cause of acid rain—from exhaust gases generated at the Facilities. The federal Clean Air Act and analogous local legislation have long required industrial emitters such as the Debtors to implement systems to mitigate sulfur dioxide pollution. As such, a properly functioning $SO_2$ scrubber is critical to maintaining environmental compliance and plant throughput.

The Debtors' issues with their $SO_2$ scrubber led to a material reduction in production volumes, with the Debtors unable to process any material amount of catalyst between February and July 2025. On average, throughput at the GMR Facility dropped to approximately 178 tons per month of processed catalyst (or 2,131 tons in total) over the twelve (12) months preceding the Petition Date, well below the GMR Facility's permitted capacity of 55,000 tons per year. Even during periods of relatively higher production, the GMR Facility struggled to achieve consistent uptime, and annualized production volumes lagged the targets established in the Debtors' business plan.

The Debtors also faced challenges in securing reliable supply of HDS (hydrodesulfurization) and RDS (residue desulfurization) catalyst, which are essential feedstocks for their recycling operations. Relationships with key suppliers became strained because of past due payables and market uncertainty, further complicating efforts to maintain consistent plant utilization.

Beginning in Spring 2025, the Debtors' management and advisors undertook a comprehensive review of strategic alternatives, including a potential recapitalization, refinancing, or asset sale. However, the complexity of the Debtors' capital structure, the need for substantial new investment, and the ongoing

28

operational challenges made an out-of-court solution impracticable.  Moreover, while the Debtors' equity holders had historically committed substantial capital to the Debtors' operations in the form of equity investments and subordinated loans, the Debtors learned that their equity holders were no longer willing to support the business with additional capital investment.

Accordingly, the Debtors and their advisors began negotiating with a group of Prepetition Bondholders holding a supermajority of their outstanding municipal bond indebtedness regarding a bridge financing facility to stabilize the Debtors' operations and provide adequate liquidity to allow the Debtors to explore value-maximizing alternatives.  As a result of those discussions, the Prepetition Superpriority Lenders provided the Debtors with $15 million of initial bridge financing in May 2025.  This liquidity allowed the Debtors to continue operating while they assessed their long-term capital needs and explored restructuring alternatives.  Once the Debtors' ongoing capital needs had been quantified, it became clear that the quantum of new capital required, the Debtors' continuing operational challenges, and deteriorating relationships with their vendors together made it challenging to restructure outside of bankruptcy.  The Prepetition Superpriority Lenders then agreed to provide additional bridge financing to fund a marketing process for the Debtors' assets and prepare for a chapter 11 filing.

On August 17, 2025, the Debtors each filed voluntary petitions for bankruptcy relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

## IV.      MAIN EVENTS IN THE BANKRUPTCY CASES

### A.      BAR DATE

Pursuant to the Bar Date Order, the deadline for non-governmental parties to file proofs of claim or interests was set for October 21, 2025, and the deadline for Governmental Units to file proofs of claim is set for February 13, 2026.

### B.      MEETING OF CREDITORS

The meeting of creditors required under section 341 of the Bankruptcy Code occurred on October 16, 2025.

### C.      OFFICIAL COMMITTEE OF UNSECURED CREDITORS

On August 28, 2025, the U.S. Trustee appointed the Committee [Docket No. 97].  The Committee is currently comprised of the following five members: (i) Hoover Ferguson/Hoover Circular Solutions; (ii) CCKX, LLC d/b/a Flo-Bin Rentals; (iii) Cenovus Energy Inc.; (iv) Reagent Chemical and Research LLC; and (v) Dacon Corporation.

### D.      RETENTION OF PROFESSIONALS

The Debtors filed applications for the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Bankruptcy Cases.  On the Petition Date, the Debtors filed an application to employ Stretto, Inc. as claims, noticing, and solicitation agent, which was approved by the Bankruptcy Court [Docket No. 36].

The Debtors also filed additional employment applications, including: (a) Morrison & Foerster LLP, as counsel [Docket No. 135]; (b) Norton Rose Fulbright US LLP, as co-counsel [Docket No. 136]; (c) Ankura, as restructuring advisor [Docket No. 137]; and (d) Jefferies LLC ("*Jefferies*"), as investment

banker [Docket No. 138].  The Bankruptcy Court approved such employment applications on October 14, 2025.

### E.     CERTAIN ORDERS AND EVENTS IN THE BANKRUPTCY CASE

#### 1.   **First Day Motions**.

On the Petition Date, the Debtors filed several motions designed to facilitate a smooth transition into chapter 11 as well as the administration of the Bankruptcy Cases in a timely and efficient manner. Pursuant to those motions, the Bankruptcy Court entered orders that, among other things, authorized the Debtors to:

(a)  jointly administer these Bankruptcy Cases [Docket No. 34];

(b)  designate these Bankruptcy Cases as complex chapter 11 cases [Docket No. 35];

(c)  employ Stretto, Inc. as their claims, noticing, and solicitation agent [Docket No. 36];

(d)  File a consolidated list of the thirty largest unsecured creditors that are not insiders and redact certain personal identification information [Docket No. 53];

(e)  extend the deadline by which the Debtors were required to file their Schedules [Docket No. 54];

(f)  maintain existing corporate bank accounts and continue using their existing cash management system in the ordinary course of business on an interim basis [Docket No. 56] and a final basis [Docket No. 121];

(g)  continue the Debtors' insurance programs and premium financing agreements [Docket No. 57];

(h)  establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 59];

(i)  pay certain prepetition obligations for critical vendors, holders of section 503(b)(9) claims, and lien claimants, on an interim basis [Docket No. 61] and a final basis [Docket No. 120];

(j)  pay certain prepetition taxes [Docket No. 63]; and

(k)  pay prepetition wages, salaries, and other compensation and benefits and continue their compensation and benefits programs in the ordinary course [Docket No. 64].

#### 2.   **DIP Motion**.

On the Petition Date, the Debtors filed the DIP Motion whereby the Debtors sought authority to (i) enter into the DIP Facility consisting of up to $62,502,000 of new money loans and $125,004,000 of roll-up loans, and (ii) consensually use the Prepetition Secured Parties' cash collateral.  On August 19, 2025, the Bankruptcy Court entered the Interim DIP Order approving the DIP Motion on an interim basis [Docket No. 55].  On September 16, 2025, the Bankruptcy Court entered the Final DIP Order approving the DIP Motion on a final basis including certain modifications agreed to by the DIP Agent, the Debtors, and the Committee [Docket No. 132].  The proceeds of the DIP Facility and the consensual use of cash collateral have been used to fund these Bankruptcy Cases including, among other things, the postpetition sale process.

### 3.   **Bidding Procedures Motion.**

On the Petition Date, the Debtors filed the Bidding Procedures Motion seeking approval of the Bidding Procedures.  On August 26, 2025, the Court entered the Bidding Procedures Order granting the Bidding Procedures Motion [Docket No. 78, as corrected at Docket No. 88].  On September 15, 2025, the Debtors, the DIP Agent, and the Committee agreed to extend certain sale-related deadlines as evidenced by the *Notice of Extension of Certain Sale-Related Dates and Sale Hearing* [Docket No. 129].  As discussed below, on September 29, 2025, the Bid Deadline (as defined in the Bidding Procedures Order) passed and no Qualified Bids (as defined in the Bidding Procedures Order), other than the Stalking Horse Bid (as defined in the Bidding Procedures Order), were received.

### 4.   **Rejection Procedures Motion.**

On the Petition Date, the Debtors filed the Rejection Procedures Motion, seeking to establish procedures to reject executory contracts and unexpired leases.  The Rejection Procedures Motion also sought to reject certain contracts and leases *nunc pro tunc* to the Petition Date.  On September 22, 2025, the Court entered the Rejection Procedures Order [Docket No. 165], approving the rejection of certain leases for office space and bin rentals, rejection of an internet service contract, and abandonment of related personal property, including the storage bins and their contents, each as of the Petition Date.  On that same day, the Debtors filed the First Rejection Notice through which it rejected additional contracts *nunc pro tunc* to the Petition Date [Docket No. 167].

### F.   **SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND ASSUMPTION OF CERTAIN CLAIMS AND LIABILITIES**

After the Petition Date and pursuant to the Bidding Procedures Order, Jefferies assisted the Debtors in marketing their assets for a sale.  Since June 2025, Jefferies contacted over 107 parties, including approximately 58 financial buyer and approximately 49 strategic buyers.  This outreach included parties that were suggested to Jefferies by the Committee's professionals.

Throughout the process, and particularly in the weeks before the deadline to submit bids under the Bidding Procedures Order, Jefferies and the Debtors' management spent time corresponding and meeting with potential bidders and other interested parties in an effort to solicit additional qualified bids.  During this time, Jefferies continued to receive diligence requests from interested parties and uploaded responsive diligence materials to the virtual data room, and otherwise worked diligently to enable parties to address areas of interest and concern in connection with their evaluation of a potential sale transaction.

The bid deadline was September 29, 2025, nearly three (3) months since the Debtors and Jefferies initially began soliciting third party interest to determine the highest and best offer for the sale of all or substantially all of the Debtors' assets.  Despite the Debtors' and Jefferies' best efforts to solicit qualified bids, the Debtors received no additional qualified bids prior to the bid deadline, other than the Stalking Horse Bid.  On October 1, 2025, the Debtors cancelled the auction and declared the Purchaser, as designee of the Stalking Horse Bidder, as the successful bidder [Docket No. 185].  The Debtors sought approval of the Sale to the Purchaser at a hearing on October 8, 2025.  The Bankruptcy Court entered the Sale Order that same day.

Pursuant to the APA, the Purchaser acquired substantially all of the Debtors' assets, including, among other things, all of the Debtors' cash, accounts receivable, fixtures and equipment, inventory, and certain Avoidance Actions.  The Purchaser also agreed to assume the Assumed Contracts and various liabilities of the Debtors, including certain Cure Costs (each as defined in the APA).

Additionally, the APA and the Sale Order incorporated the terms of a global settlement reached by and among the Debtors, the Committee, the DIP Secured Parties, and the Purchaser, pursuant to which such parties agreed that the APA shall provide that Cash Consideration (as defined in the APA) would include (i) agreed and allowed administrative expense claims under section 503(b) of the Bankruptcy Code incurred through the Closing Date; (ii) Allowed Professional Fees through the Closing Date; (iii) 2025 pro-rated property taxes; (iv) outstanding U.S. Trustee Fees; and (v) an amount equal to $1,100,000 (the "***Wind-Down Amount***"). The Wind-Down Amount consists of (a) $440,000 to be earmarked for distribution to general unsecured creditors, excluding Deficiency Claims; (b) $250,000 to fund the GUC Trust for the benefit of all Allowed general unsecured claims, including, but not limited to, the Deficiency Claims; (c) $67,500 for Allowed Professional Fees of Committee Professionals incurred after the Closing Date; and (d) $342,500 for Allowed Professional Fees for Debtor Professionals incurred after the Closing Date.

## V. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

### A. ADMINISTRATIVE CLAIMS

Except with respect to Professional Fee Claims and Section 503(b)(9) Claims, and except to the extent that an Administrative Claim (i) has been assumed by the Purchaser under the APA, (ii) has already been paid during the Bankruptcy Cases, or (iii) a Holder of an Allowed Administrative Claim and the applicable Debtor agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the Effective Date.

Except as otherwise provided in the Plan or the Bar Date Order, and except with respect to Professional Fee Claims or Section 503(b)(9) Claims, requests for payment of Administrative Claims must be filed and served on the Debtors or the GUC Trustee, as applicable, no later than the Administrative Claims Bar Date. Objections to requests for payment of Administrative Claims (other than with respect to Professional Fee Claims and Section 503(b)(9) Claims), must be filed with the Bankruptcy Court and served on the Debtors or the GUC Trustee, as applicable, and the requesting party no later than twenty-one (21) days after the service of the respective request.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE GUC TRUSTEE, THE ESTATES, OR THE PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

### B. PRIORITY TAX CLAIMS

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash in an amount equal to the amount of such Allowed Priority Tax Claim. Priority Tax Claims that are Allowed and due and payable as of the Effective Date shall be paid by the Debtors on the Effective Date. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Allowed Priority Tax Claim shall be paid in accordance with the terms of any agreement between the Debtors or the GUC Trustee, as applicable, and the Holder of such Claim, or as may be due and payable under applicable nonbankruptcy law, or in the ordinary course of business.

C.      **U.S. TRUSTEE FEES**

All U.S. Trustee Fees payable on or before the Effective Date shall be paid in full on the Effective Date by the Debtors. U.S. Trustee Fees payable after the Effective Date, if any, shall be paid by the GUC Trustee until such time as the Bankruptcy Court enters a final decree closing these Bankruptcy Cases or an order either converting these Bankruptcy Cases to cases under chapter 7 or dismissing these Bankruptcy Cases. After Confirmation, the GUC Trustee shall file with the Bankruptcy Court and shall transmit to the U.S. Trustee a statement of all disbursements made by the GUC Trustee for each quarter, or portion thereof that these Bankruptcy Cases remain open in a format prescribed by the U.S. Trustee. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to File a request for Administrative Claims.

D.      **PROFESSIONAL FEE CLAIMS**

All final requests for payment of Professional Fee Claims must be Filed and served no later than the Professional Fee Claims Bar Date. The Bankruptcy Court shall determine the Allowed amounts of all Professional Fee Claims. Any objections to any Professional Fee Claims must be filed and served on counsel to the Debtors or the GUC Trustee, as applicable, the Prepetition Trustee, the Committee, and the U.S. Trustee and the requesting party no later than twenty-one (21) days after Filing of the final applications for payment of such Professional Fee Claims.

Except to the extent that the applicable Holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Debtors or, after the Effective Date, the GUC Trustee, each Holder of an Allowed Professional Fee Claim shall be paid in full in Cash from the Professional Fee Reserve or the GUC Trust, as applicable. Professional Fee Claims that are Allowed Claims and due and payable as of the Effective Date shall be paid by the Debtors on the Effective Date.

On or prior to the Effective Date, the Debtor shall fund the Professional Fee Reserve in an amount equal to the Professional Fee Reserve Amount. The Professional Fee Reserve shall be held in trust by the Debtors (or their counsel or other designee) for the Debtor Professionals until all Allowed Professional Fee Claims for the Debtor Professionals have been paid in full.

E.      **DIP CLAIMS**

The Debtors sold substantially all of their assets to the Purchaser through a credit bid in the amount of $187,506,000 in full and final satisfaction of the DIP Claims. Therefore, the DIP Claims are fully satisfied, settled, released, and discharged, and no Distribution on account of the DIP Claims shall be required under the Plan.

## VI.      CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of voting on the Plan and receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled.

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, in no event shall any Holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Claim.

The following table (i) designates the Classes of Claims and Interests for the purposes of voting on the Plan and receiving Distributions hereunder, and (ii) specifies which Classes are (a) Impaired or Unimpaired by the Plan, and (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

| Class | Designation | Treatment | Estimated Amount of Claims | Voting Status | Projected Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | $0 | Deemed to Accept | N/A |
| 2 | Other Secured Claims | Unimpaired | $0 | Deemed to Accept | N/A |
| 3 | General Unsecured Claims | Impaired | $280.7 million | Entitled to Vote | 0.22% |
| 4 | Intercompany Claims | Impaired | $0 | Deemed to Reject | N/A |
| 5 | Intercompany Interests | Impaired | $0 | Deemed to Reject | N/A |
| 6 | Interests in Aleon Metals | Impaired | $54.8 million | Deemed to Reject | 0.00% |

**A.     CLASS 1 - OTHER PRIORITY CLAIMS**

**Description**.  Class 1 consists of the Other Priority Claims.

**Treatment**.  The Debtors believe that all Allowed Other Priority Claims have been satisfied in full via the Court's "first day" orders or were assumed by the Purchaser under the terms of the APA.  To the extent that there is an Allowed Other Priority Claim that has not already been satisfied, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for its Allowed Other Priority Claim, either: (i) Cash equal to the amount of such Allowed Other Priority Claim; or (ii) such other treatment that the Debtors or the GUC Trustee, as applicable, and the Holder of such Allowed Other Priority Claim have agreed upon in writing.

**Voting**.  Class 1 is Unimpaired.  Holders of Class 1 Other Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

**B.     CLASS 2 - OTHER SECURED CLAIMS**

**Description**.  Class 2 consists of the Other Secured Claims.

**Treatment**.  Upon the Closing of the Sale, any collateral securing the Other Secured Claims as of the Petition Date shall have been sold to the Purchaser.  To the extent that there is an Allowed Other Secured

Claim that has not already been satisfied, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of, and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments: (i) payment in full in Cash; (ii) delivery of the collateral securing such Allowed Other Secured Claim; or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired.

**Voting**.  Class 2 is Unimpaired.  Holders of Class 2 Other Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

C.      **CLASS 3 – GENERAL UNSECURED CLAIMS**

**Description**.  Class 3 consists of the General Unsecured Claims.

**Treatment**.  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment, such Holder shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, a GUC Trust Interest.  Holders of Allowed General Unsecured Claims who receive a GUC Trust Interest shall be entitled to a *pro rata* distribution of the following, as set forth more fully in the GUC Trust Agreement:

1.  **Holders of All Allowed General Unsecured Claims**.  The GUC Trust Distributable Assets.

2.  **Holders of Allowed General Unsecured Claims Excluding Deficiency Claims**. On the Effective Date, $440,000.  For the avoidance of doubt, Holders of Allowed Deficiency Claims agree to not receive their *pro rata* share of the $440,000.

**Voting**.  Class 3 is Impaired.  Holders of Class 3 General Unsecured Claims are entitled to vote on the Plan.

D.      **CLASS 4 – INTERCOMPANY CLAIMS**

**Description**.  Class 4 consists of the Intercompany Claims of the Debtors.

**Treatment**.  On the Effective Date, all Intercompany Claims shall either be settled, discharged, cancelled, or released without any Distribution on account of such Intercompany Claims and be of no further force or effect.

**Voting**.  Class 4 is Impaired.  Holders of Class 4 Intercompany Claims are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote on the Plan.

E.      **CLASS 5 – INTERCOMPANY INTERESTS**

**Description**.  Class 5 consists of the Intercompany Interests of the Debtors.

**Treatment**.  On the Effective Date, all Intercompany Interests shall be extinguished without any Distribution on account of such Intercompany Interests and shall be of no further force or effect.

**Voting**.  Class 5 is Impaired.  Holders of Class 5 Intercompany Interests are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote on the Plan.

35

F.      CLASS 6 – INTERESTS IN ALEON METALS

**Description**.  Class 6 consists of the Allowed Interests in Aleon Metals.

**Treatment**.  On the Effective Date, all Interests in Aleon Metals shall be automatically cancelled, released, extinguished, and of no further force or effect.  Holders of Interests in Aleon Metals shall neither retain nor receive any property under the Plan on account of such Interests and shall receive no Distribution.

**Voting**.  Class 6 is Impaired.  Holders of Class 6 Interests in Aleon Metals are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote on the Plan.

## VII.      ACCEPTANCE OR REJECTION OF THE PLAN

A.      CLASS ENTITLED TO VOTE

Because Claims in Class 3 are Impaired and Holders thereof will receive or retain property or an interest in property under the Plan, only Holders of Claims in Class 3 shall be entitled to vote to accept or reject the Plan.

B.      ACCEPTANCE BY IMPAIRED CLASSES OF CLAIMS OR INTERESTS

In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.  In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if such Plan is accepted by Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have timely and properly voted to accept or reject the Plan.

C.      PRESUMED ACCEPTANCE BY UNIMPAIRED CLASSES

Because Claims in Classes 1 and 2 are Unimpaired pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in Classes 1 and 2 are deemed to have accepted the Plan and, therefore, such Holders of Claims are not entitled to vote to accept or reject the Plan.

D.      PRESUMED REJECTIONS BY IMPAIRED CLASSES

Because Holders of Claims or Interests in Classes 4, 5, and 6 are not entitled to receive or retain any property under the Plan, pursuant to section 1126(g) of the Bankruptcy Code, such Holders of Claims or Interests are presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

E.      CONFIRMATION PURSUANT TO SECTION 1129(B) OF THE BANKRUPTCY CODE

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the documents submitted

in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

### F.      CONTROVERSY CONCERNING IMPAIRMENT

If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### G.      ELIMINATION OF VACANT CLASSES

Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Allowed Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be considered vacant and deemed eliminated from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## VIII.   MEANS FOR EXECUTION OF THE PLAN

### A.      FUNDING THE PLAN

The Plan will be funded by Cash held by the Debtors and the GUC Trust Assets.

### B.      LIMITED SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

The Plan constitutes a motion for the limited consolidation of the Debtors and their respective Estates solely for purposes of voting on the Plan, confirming the Plan, and making Distributions pursuant to the Plan.  Voting on the Plan shall be counted on a consolidated basis.  On the Effective Date, solely for purposes of voting on the Plan, objecting to the allowance of Claims provided for under the Plan, and making Distributions under the Plan: (a) the assets of the Debtors will be pooled for the purpose of paying Allowed Claims against the Debtors; (b) any Claim filed or asserted against any of the Debtors will be deemed a Claim against all of the Debtors; (c) all Claims of each Debtor against any other Debtor will be eliminated; and (d) any obligation of any of the Debtors and all guarantees thereof executed by any of the Debtors will be deemed to be an obligation of each of the Debtors.  Additionally, Holders of Allowed Claims who assert identical Claims against multiple Debtors shall be entitled to only a single satisfaction of such Claims, and any such duplicate Claims shall be deemed disallowed, expunged, and void as against the Debtors without need for the filing of a Claim Objection or further order of the Bankruptcy Court and such duplicate Claims shall receive no Distribution under the Plan.

For the avoidance of doubt, the limited consolidation described in this section shall not affect the legal and corporate structures of the Debtors.  In addition, such consolidation shall not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code.

### C.      GUC TRUST

On the Effective Date, the GUC Trust shall be established pursuant to the GUC Trust Agreement for the purpose of maximizing the value of the GUC Trust Assets and effectuating distributions to the GUC Trust Beneficiaries consistent with the Plan.  The GUC Trust is intended to qualify as a liquidating trust pursuant to Treasury Regulation (as defined below) Article 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidation purpose of the GUC Trust.

On the Effective Date, the GUC Trust Assets shall vest automatically in the GUC Trust. The transfer of the GUC Trust Assets to the GUC Trust shall be made for the benefit and on behalf of the GUC Trust Beneficiaries. The assets comprising the GUC Trust Assets will be treated for tax purposes as being transferred by the Debtors to the GUC Trust Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the GUC Trust Beneficiaries to the GUC Trust in exchange for the GUC Trust Interests in the GUC Trust. The GUC Trust Beneficiaries shall be treated as the grantors and owners of the GUC Trust. Upon the transfer of the GUC Trust Assets, the GUC Trust shall succeed to all of the Debtors' rights, title and interest in the GUC Trust Assets, and the Debtors will have no further interest in or with respect to the GUC Trust Assets.

In pursuing any GUC Trust Claims, the GUC Trustee shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the periods in which any of the GUC Trust Claims may be brought under section 546 of the Bankruptcy Code. The GUC Trust Agreement will require consistent valuation of the GUC Trust Assets by the GUC Trustee and the GUC Trust Beneficiaries for all U.S. federal and other income tax and reporting purposes. The GUC Trust will not be permitted to receive or retain Cash in excess of a reasonable amount to meet claims and contingent liabilities or to maintain the value of the GUC Trust Assets.

In connection with the prosecution of the GUC Trust Claims, any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity attaching to any prepetition documents or communications relating to the GUC Trust Claims shall be transferred to and shall vest in the GUC Trust. The GUC Trust's receipt of such privileges associated with the GUC Trust Claims shall not operate as a waiver of those privileges possessed or retained by the Debtors, nor shall it operate to eliminate the rights of any co-defendant to any applicable joint privilege. The GUC Trust shall also be vested with the Debtors' rights, as such rights existed prior to the Effective Date, to conduct discovery and oral examinations of any party under Bankruptcy Rule 2004. The GUC Trust, however, shall not be considered a successor of any Debtor and shall not assume any obligations of the Debtors other than as expressly provided for by the Plan and the GUC Trust Agreement.

Any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity held by the Committee shall be transferred to and shall vest in the GUC Trust. The GUC Trust shall have access to all discovery obtained by the Committee in these Bankruptcy Cases, including discovery obtained pursuant to Bankruptcy Rule 2004.

The GUC Trust shall file annual reports regarding the liquidation or other administration of property comprising the GUC Trust Assets, the distributions made by it and other matters required to be included in such report in accordance with the GUC Trust Agreement. In addition, the GUC Trust will file tax returns as a grantor trust pursuant to Treasury Regulation Article 1.671-4(a).

The GUC Trust Interests are not intended to constitute "securities." To the extent the GUC Trust Interests are deemed to be "securities," the issuance of such interests shall be exempt from registration under the Securities Act and any applicable state and local laws requiring registration of securities pursuant to section 1145 of the Bankruptcy Code or another available exemption from registration under the Securities Act. If the GUC Trustee determines, with the advice of counsel, that the GUC Trust is required to comply with registration or reporting requirements under the Securities Act, the Securities Exchange Act of 1934 or other applicable law, then the GUC Trustee shall take any and all actions to comply with such registration and reporting requirements, if any, and to file reports with the Securities and Exchange Commission to the extent required by applicable law.

To the extent that the terms of the Plan with respect to the GUC Trust are inconsistent with the terms set forth in the GUC Trust Agreement, then the terms of the GUC Trust Agreement shall govern.

1. **Issuance of GUC Trust Interests.**

All of the GUC Trust Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  On the Effective Date, the GUC Trust shall issue the GUC Trust Interests for distribution pursuant to the provisions hereof and the GUC Trust Agreement.  All GUC Trust Interests to be issued shall be deemed issued as of the Effective Date regardless of the date on which they are actually distributed.  For the avoidance of doubt, ownership of a GUC Trust Interest will not be evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except the book entry system.

The GUC Trust Interests shall be non-transferable and non-assignable during the term of the GUC Trust except by operation of law.  An assignment by operation of law shall not be effective until appropriate notification and proof thereof is submitted to the GUC Trustee, and the GUC Trustee may continue to pay all amounts to or for the benefit of the assigning GUC Trust Beneficiaries until receipt of proper notification and proof of assignment by operation of law.  The GUC Trustee may rely upon such proof without the requirement of any further investigation.

2. **Appointment of the GUC Trustee**.

As of the Effective Date, Patricia Missal shall serve as the GUC Trustee.

3. **Powers and Duties of the GUC Trustee**.

As of the Effective Date, the GUC Trustee on behalf of the GUC Trust may control and exercise authority over the GUC Trust Assets, over the acquisition management, and disposition of the GUC Trust Assets, and over the management and conduct of the affairs of the GUC Trust including the potential pursuit of the GUC Trust Claims for the benefit of the GUC Trust and the GUC Trust Beneficiaries.  In connection therewith, the GUC Trustee shall have standing before the Bankruptcy Court to pursue or not to pursue any and all Causes of Action that constitute GUC Trust Assets, as she determines are in the best interests of the GUC Trust Beneficiaries and consistent with the purposes of the GUC Trust, the Sale Order, and the Confirmation Order. In administering the GUC Trust Assets, the GUC Trustee shall endeavor not to unduly prolong the GUC Trust's duration, with due regard that undue haste in the administration of the GUC Trust Assets may fail to maximize value for the GUC Trust Beneficiaries and otherwise be imprudent and not in the best interests of the GUC Trust Beneficiaries.  Without limiting the generality of the foregoing, but subject to the Sale Order and the Confirmation Order, and the provisions of the GUC Trust Agreement, the GUC Trustee shall be expressly authorized to, with respect to the GUC Trust and the GUC Trust Assets:

(a) exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced, and take all actions that may be or could have been taken with respect to the GUC Trust Assets, by any officer, director, member, manager, shareholder, or other party acting in the name of the Debtors or their Estates with like effect as if duly authorized, exercised, and taken by action of such officers, directors, members, managers, shareholders, or other party.

(b) open and maintain bank accounts on behalf of or in the name of the GUC Trust and designate additional authorized signers on bank accounts as may be necessary, calculate and make distributions, and take other actions consistent with the Sale Order, the Confirmation Order, and the implementation thereof, including the establishment, re-evaluation, adjustment, and maintenance of appropriate reserves, in the name of the GUC Trust.

(c) receive, manage, invest, supervise, and protect the GUC Trust Assets.

(d)  hold legal title to any and all GUC Trust Assets.

(e)  collect and liquidate all GUC Trust Assets and make distributions consistent with the GUC Trust Agreement and the Plan.

(f)  review and, where appropriate, object to Claims payable out of the GUC Trust Assets pursuant to the Plan or the Bankruptcy Code, and, subject to the terms thereof, supervise and administer the resolution, settlement and payment of claims payable out of the GUC Trust Assets pursuant to the Plan or the Bankruptcy Code, and the distribution to the GUC Trust Beneficiaries, in accordance with the GUC Trust Agreement and the Plan.

(g)  act in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions of the GUC Trust Agreement and the Plan.

(h)  as applicable, (i) seek a determination of tax liability under Bankruptcy Code section 505; (ii) file if necessary, any and all tax and information returns required with respect to the GUC Trust; (iii) make tax elections for and on behalf of the GUC Trust; and (iv) pay taxes, if any, payable for and on behalf of the GUC Trust.

(i)  pay all lawful expenses, debts, charges, taxes, and liabilities of the GUC Trust.

(j)  make distributions to the GUC Trust Beneficiaries as provided for, or contemplated by the GUC Trust Agreement and the Plan.

(k)  withhold from the amount distributable to any person such amount as may be sufficient to pay any tax or other charge which the GUC Trustee has determined, in her sole discretion, may be required to be withheld therefrom under the income tax laws of the United States, any foreign country, or of any state, local, or political subdivision of any of the foregoing.

(l)  enter into any agreement or execute any document or instrument required by or consistent with the GUC Trust Agreement and perform all obligations thereunder.

(m) if any of the GUC Trust Assets are situated in any state or other jurisdiction in which the GUC Trustee is not qualified to act as trustee, nominate and appoint a person duly qualified to act as trustee in such state or jurisdiction and require from each such trustee such security as may be designated by the GUC Trustee in her discretion; confer on such trustee all the rights, powers, privileges, and duties of the GUC Trustee under the GUC Trust Agreement, subject to the conditions and limitations of the GUC Trust Agreement, except as modified or limited by the GUC Trustee and except where the conditions and limitations may be modified by the laws of such state or other jurisdiction (in which case, the laws of the state or other jurisdiction in which such trustee is acting shall prevail to the extent necessary); require such trustee to be answerable to the GUC Trustee for all monies, assets, and other property that may be received in connection with the administration of all property; and, remove such trustee, with or without cause, and appoint a successor trustee at any time by the execution by the GUC Trustee of a written instrument declaring such trustee removed from office, and specifying the effective date and time of removal.

(n)  purchase and carry all insurance policies and pay all insurance premiums and costs she deems reasonably necessary or advisable.

(o) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution and distribution of the GUC Trust Assets, to be paid solely from the funds held in trust for the GUC Trust Beneficiaries for which such costs, expenses, and obligations were incurred; *provided,* that for the avoidance of doubt and sake of efficiency, the GUC Trust may retain the same professionals and/or consultants as previously retained by the Debtors or the Committee, unless any actual conflicts arise that may not be waived with the consent of the GUC Trust and GUC Trustee.

(p) implement, enforce, or discharge all of the terms, conditions and all other provisions of, and all duties and obligations under, the GUC Trust Agreement relating to the GUC Trust, the GUC Trust Assets, or the GUC Trustee.

(q) invest in demand and time deposits in banks or savings institutions, or temporary investments such as short term certificates of deposit or Treasury bills or other investments that a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations or any modification in the Internal Revenue Service ("***IRS***") guidelines, whether set forth in IRS rulings, revenue procedures, other IRS pronouncements or otherwise.

(r) investigate and prosecute any and all GUC Trust Claims and compromise or settle such GUC Trust Claims.

a) take all other actions that the GUC Trustee deems reasonably necessary or desirable to administer the GUC Trust in accordance with the GUC Trust Agreement.

### 4. <u>Compensation of the GUC Trustee and Retention of Professionals</u>.

The initial GUC Trustee shall receive fair and reasonable compensation for her services at her standard hourly rate ($500 per hour), which compensation shall be a charge against and paid out of the GUC Trust Assets.  The reimbursement of actual, reasonable, and documented out of pocket expenses shall be paid in arrears on or before the last Business Day of each month.  Any compensation to be paid to the GUC Trustee shall be subject to the review and approval of the GUC Trust Oversight Committee. Any successor to the GUC Trustee shall also be entitled to reasonable compensation in connection with the performance of its duties, which compensation may be different from the terms provided in the GUC Trust Agreement and shall be subject to the review of and approval of the GUC Trust Oversight Committee.

The GUC Trustee shall be entitled to pay from the GUC Trust Assets actual, reasonable, and documented compensation, plus the reimbursement of actual, reasonable, and documented out-of-pocket expenses, to each of its professionals on such terms and conditions as may be agreed to upon by the parties, but solely from the funds held in trust for the GUC Trust Beneficiaries for which such costs, expenses, and obligations were incurred.  In the event that a dispute arises between the parties regarding payment of any such compensation or expense reimbursement, the professionals may seek payment of such fees and costs by filing a motion with the Bankruptcy Court and providing notice to the GUC Trustee.

### 5. <u>Resignation/Removal of the GUC Trustee.</u>

The GUC Trustee may resign at any time upon thirty days' written notice delivered to the Bankruptcy Court and the GUC Trust Oversight Committee; *provided*, that such resignation shall only become effective upon the appointment of a permanent or interim successor GUC Trustee, unless the GUC Trustee determines in his or her reasonable judgment that the GUC Trust lacks sufficient assets and financial

resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Sale Order, the Confirmation Order, and the GUC Trust Agreement, in which case such resignation may become effective without appointment of a successor GUC Trustee.  The GUC Trustee may be removed by the Bankruptcy Court upon motion and after notice and a hearing, which motion may be brought by any party in interest.  In the event of the resignation, death, disability, dissolution, or removal of the GUC Trustee, the GUC Trust Oversight Committee may appoint a replacement.

### 6.   <u>GUC Trust Oversight Committee</u>.

The GUC Trust Oversight Committee shall be comprised of three members as follows: (i) UMB Bank, National Association;(ii) Hoover Ferguson/Hoover Circular Solutions; and (iii) Dacon Corporation. The GUC Trust Oversight Committee shall have all the rights and powers of a duly elected board of directors of a Texas corporation and shall supervise the GUC Trustee in accordance with the GUC Trust Agreement and the Confirmation Order.  Except as otherwise set forth in the GUC Trust Agreement, approval by a simple majority of the votes of such GUC Trust Oversight Committee shall be required for the GUC Trust Oversight Committee to act on any matter.  Any member of the GUC Trust Oversight Committee shall have the ability and standing to bring any dispute involving the GUC Trust, the GUC Trust Agreement, and the Confirmation Order before the Bankruptcy Court.  In the event that the GUC Trust Oversight Committee shall not continue to exist under the GUC Trust Agreement, the GUC Trustee shall have all the rights and powers of a duly elected board of directors of a Texas corporation and all references in the GUC Trust Agreement to required approval or other action of such GUC Trust Oversight Committee shall be of no force or effect.  On or promptly following the Effective Date, the GUC Trust Oversight Committee shall adopt by-laws that are consistent with the terms and conditions of the GUC Trust Agreement.

### 7.   <u>Termination</u>.

The GUC Trustee shall be discharged and the GUC Trust shall be terminated, at such time as: (i) (A) all of the GUC Trust Assets have been liquidated or the Allowed Claims of the GUC Trust Beneficiaries have been satisfied, (B) all duties and obligations of the GUC Trustee under the GUC Trust Agreement have been fulfilled, and (C) all Distributions required to be made by the GUC Trustee under the Sale Order, the GUC Trust Agreement, and the Plan have been made; or (ii) the GUC Trustee determines in his or her reasonable judgment that the GUC Trust lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the GUC Trust Agreement and/or the Plan.

### D.   LIABILITIES ASSUMED PURSUANT TO THE APA

Upon the Confirmation Date, all liabilities specifically assumed pursuant to Section 2.3 of the APA (and only up to the aggregate amounts set forth therein) shall be deemed disallowed, expunged, discharged, and void as against the Debtors without need for the filing of a Claim Objection or further order of the Court.  All liabilities specifically assumed pursuant to Section 2.3 of the APA (and only up to the aggregate amounts set forth therein) either were paid by the Purchaser, or will be paid by the Purchaser in the manner and to the extent set forth in the APA, and shall not be Claims against the Debtors or their Estates.

All amounts in the Carve-Out Account (as defined in the APA) after all Allowed Professional Fees through the Closing have been irrevocably paid in full shall be returned to the Purchaser; *provided*, *however*, that the Debtors may use such remaining amounts to pay (i) the Solicitation Agent's fees and expenses for solicitation of the Plan up to $20,000; and (ii) U.S. Trustee Fees, to the extent not already provided for pursuant to the Sale Order.

### E.    DISSOLUTION OF COMMITTEE; DISCHARGE OF PROFESSIONALS

The Committee shall be dissolved automatically on the Effective Date and the members of the Committee (solely in their capacities as such) and the Committee's Professionals (solely in their capacity as such) shall be released from all their duties relating to the Chapter 11 Cases, except with respect to (a) any applications for Professional Fee Claims or expense reimbursements for members of the Committee, including preparing same, objecting to same, defending same and attending any hearing with respect to same; and (b) any motions or other actions seeking enforcement or implementation of (i) the Plan or (ii) the Confirmation Order.

On the Effective Date, the Debtors' Professionals (solely in their capacity as such) shall be discharged and released from all their duties relating to the Chapter 11 Cases, except with respect to (a) any applications for Professional Fee Claims, including preparing same, objecting to same, defending same and attending any hearing with respect to same; and (b) any motions or other actions seeking enforcement or implementation of (i) the Plan or (ii) the Confirmation Order.

### F.    CANCELLATION OF SECURITIES, AGREEMENTS, AND INSTRUMENTS

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date: (i) the obligations of the Debtors under each of the Prepetition Bond Documents, the FTAI Loans, the GM Note Payable, the GM Loan Agreement, and the EAF Note, and each certificate, share, note, bond, indenture, purchase right, option, warrant, intercreditor agreement, guaranty, indemnity, deed of trust, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors and the GUC Trustee, as applicable, shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, or other instruments or documents evidencing or creating any indebtedness or obligation of, or Claims against or Interests in, the Debtors shall be released and discharged; *provided*, that notwithstanding the releases set forth in Article XIV.F of the Plan, upon Confirmation or the occurrence of the Effective Date (1) any such agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; and (2) the Prepetition Bond Documents shall continue in effect (other than, for the avoidance of doubt, any Liens or security interest terminated pursuant to Article XIV.C) after the Effective Date solely with respect to any rights of the applicable Prepetition Trustee to (A) maintain, exercise, and enforce any of their respective rights to indemnification, reimbursement, or similar obligations, (B) exercise its Prepetition Charging Lien against Distributions to the applicable Prepetition Bondholders in accordance with the applicable Prepetition Bond Documents, and (C) perform any functions that are necessary to effectuate the foregoing, including appearing and raising issues in the Bankruptcy Cases in any proceeding in the Bankruptcy Court or any other court.

### G.    CORPORATE ACTION

On the Effective Date, all matters expressly provided for under the Plan that would otherwise require approval of the shareholders or directors and/or managers, as applicable, of one or more of the Debtors, including, but not limited to, the dissolution or merger of any of the Debtors, shall be deemed to have occurred and shall be in effect upon the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors are incorporated without any requirement of action by the shareholders or directors and/or managers, as applicable, of the Debtors.

43

## H.      RESIGNATION OF OFFICERS AND DIRECTORS

Upon the Effective Date, the directors and/or manager and officers of the Debtors shall be deemed to have resigned, without further action.  Upon the Effective Date, the GUC Trustee shall be empowered and authorized to act on behalf of the Debtors and to take all such actions and measures as necessary to implement the Plan, which actions or measures would otherwise be taken by an officer or a director of the Debtors.

## IX.      DISTRIBUTIONS

## A.      PROVISIONS GOVERNING DISTRIBUTIONS

### 1.   **Distributions**.

The GUC Trustee will serve without bond and shall make all Distributions under the Plan.  Any Distributions to be made by the GUC Trustee pursuant to the Plan shall be made to the Holders of Allowed Claims in accordance with the terms and provisions of Articles V and VI of this Combined Disclosure Statement and Plan.  To the extent required by applicable law, the GUC Trustee shall comply with all tax withholding and reporting requirements imposed on her by any Governmental Unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  The GUC Trustee may require any Holder of an Allowed Claim entitled to a Distribution under the Plan to furnish its, his, or her employer or taxpayer identification number (the "*TIN*") assigned by the Internal Revenue Service.  Any Distribution under the Plan may be conditioned on the receipt of such TIN.  If any such Holder of an Allowed Claim entitled to a Distribution hereunder fails to provide a requested TIN within thirty days after the request hereof, then such failure shall be deemed to be a waiver of such Holder's interest in such Distribution, including the right to receive any future Distributions.  The GUC Trustee may but shall not be required to make any Distribution of less than $100.00.

### 2.   **Delivery of Distributions**.

Distributions and deliveries to Holders of Allowed Claims shall be made at the addresses set forth on the Debtors' Schedules and/or Proofs of Claim Filed by such Holders (if such Proofs of Claim have been Filed), or at the last known addresses of such Holders if no Proof of Claim is Filed; or if the GUC Trustee has been notified of a change of address, at the address set forth in such notice.

### 3.   **Undeliverable Distributions**.

If any Distribution is returned as undeliverable, the GUC Trustee may, in her sole discretion, make such efforts to determine the current address of the Holder of the Allowed Claim with respect to which the Distribution was made as the GUC Trustee deems appropriate, but no Distribution to any Holder shall be made unless and until the GUC Trustee has determined the then-current address of the Holder, at which time the Distribution to such Holder shall be made to the Holder without interest.  Amounts in respect of any undeliverable Distributions made by the GUC Trust shall be returned to, and held in trust by, the GUC Trust until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety days from the date the Distribution is made ("*Unclaimed Property*").  In the event that any Distribution to a Holder of an Allowed Claim becomes Unclaimed Property, such Distributions will revert to the GUC Trust as an asset of the GUC Trust.

4.   **Time Bar to Cash Payments By Check**.

Checks issued by the GUC Trust to Holders of Allowed Claims shall be null and void if not negotiated within 120 days after the date of issuance thereof.  Requests for the reissuance of any check that becomes null and void pursuant to this provision shall be made directly to the GUC Trustee by the Holder of such Allowed Claim to whom the check was originally issued.  Any Allowed Claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Effective Date or the first anniversary of the date on which the Claim at issue became an Allowed Claim.  After that date, all Allowed Claims in respect of voided checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become property of the GUC Trust as Unclaimed Property.

5.   **Setoffs and Recoupment**.

The GUC Trustee may, but shall not be required to, setoff against, recoup from, any Claim (and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim) of any nature whatsoever that the Debtors may have had against the Holder of such Claim; *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Estates, or the GUC Trust of any such Claim that the Debtors, the Estates, or the GUC Trust has or may have against such Holder.

B.   **PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND CONTINGENT CLAIMS AGAINST THE DEBTORS**

1.   **Objection Deadline**.

Unless a different date is set by order of the Bankruptcy Court, all Claim Objections shall be served and Filed no later than ninety days after the Effective Date or twenty (20) days after a particular Proof of Claim is Filed, whichever is later; *provided, however*, that such deadline may be extended pursuant to a motion filed with the Court by the GUC Trustee.  Any proof of Claim filed after the Bar Date shall be of no force and effect, shall be deemed disallowed and expunged, and will not require objection.

2.   **Responsibility for Objecting to Claims**.

Prior to the Effective Date, all parties identified by the Bankruptcy Rules may file objections to Claims.  From and after the Effective Date, the GUC Trustee shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims, including without limitation, any objections to Claims filed by the Debtors prior to the Effective Date.

3.   **No Distribution Pending Resolution of Claims**.

Notwithstanding any other provision of the Plan, no payment or Distribution shall be made with respect to any Claim until all such Claim becomes an Allowed Claim.  To the extent that the GUC Trustee makes a Distribution while a Claim is subject to a Claim Objection Filed with the Bankruptcy Court, the GUC Trustee shall hold in reserve such Holder's *pro rata* portion of the Distribution (the "***Reserve Amount***").  If such Holder's Claim is allowed by the Bankruptcy Court or agreement between the GUC Trustee and the Holder, the GUC Trustee shall distribute the Reserve Amount to such Holder.  If such Holder's Claim is disallowed by the Bankruptcy Court, the GUC Trustee shall distribute the Reserve Amount *pro rata* to all other applicable Holders of Allowed Claims.

### X.      CONFIRMATION AND CONSUMMATION OF THE PLAN

#### A.      CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Each of the following is a condition precedent to the occurrence of the Effective Date:

1.  the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, including the GUC Trust Agreement, shall have been filed;

2.  the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall be a Final Order in full force and effect with no stay or vacation thereof then in effect;

3.  all U.S. Trustee Fees shall have been paid in full; and

4.  all other actions, documents, and agreements necessary to implement and consummate the Plan, including, without limitation, all actions, documents, and agreements necessary to implement any transactions contemplated under the Plan, shall have been effectuated or executed.

#### B.      WAIVER OF CONDITIONS TO THE EFFECTIVE DATE

Any of the conditions to consummation of the Plan set forth in Article X.A may be waived in whole or in part with the prior written consent of the Debtors, the Prepetition Trustee, and the Committee without any notice to or approval of other parties in interest or the Bankruptcy Court.

#### C.      SUBSTANTIAL CONSUMMATION

"Substantial consummation" of the Plan, as such term is defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

#### D.      NOTICE OF OCCURRENCE OF EFFECTIVE DATE

Within five (5) Business Days after the occurrence of the Effective Date, the GUC Trustee shall file with the Bankruptcy Court and serve a *Notice of Occurrence of Effective Date* that informs all Holders of Claims and Interests of (i) the Confirmation of the Plan and occurrence of the Effective Date; (ii) notice of the Professional Fee Claims Bar Date; and (iii) such other matters as the GUC Trustee deems appropriate or as may be ordered by the Bankruptcy Court.

#### E.      EFFECT OF NON-OCCURRENCE OF THE EFFECTIVE DATE

If each of the conditions specified in this Article have not been satisfied or waived in the manner provided herein within ninety days after the Confirmation Date, then: (i) the Confirmation Order shall be vacated and of no further force or effect; (ii) no Distributions under the Plan shall be made; (iii) the Debtors and all Holders of Claims against or Interests in the Debtors shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to Claims and Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and the Plan shall be deemed withdrawn.  Upon such occurrence,

46

the Debtors shall File a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.

## XI.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, except to the extent otherwise set forth herein, all executory contracts and unexpired leases not expressly assumed or assumed and assigned to the Purchaser pursuant to the APA will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code; *provided*, that any executory contract or unexpired lease that the Debtors previously rejected shall be rejected as of the date set forth in the applicable notice or order rejecting such executory contract or unexpired lease; *provided*, *further*, that the executory contracts listed in the Schedule of Assumed Contracts shall not be rejected.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of executory contracts and unexpired leases pursuant to this Article and sections 365(a) and 1123 of the Bankruptcy Code.

All such previously rejected executory contracts and unexpired leases shall be treated as if such contracts/leases had been breached on the date immediately preceding the Petition Date, and such Claim— to the extent asserted in a timely filed Proof of Claim—shall be classified as a Class 3 General Unsecured Claim for damages incurred as a result of the rejection.  To the extent that such rejection damage Claim was not asserted in a timely filed Proof of Claim, such Claim will be forever barred and unenforceable against the Debtors' Estates.

To the extent executory, the APA, and any other documents related to the Sale, shall be assumed.

Pursuant to the Bar Date Order, all Entities holding claims arising from the Debtors' rejection of executory contracts and unexpired leases under the Plan are required to file Proofs of Claim by 4:00 p.m., prevailing Central Time, on the date that is thirty days following entry of the Confirmation Order.

## XII.      MODIFICATIONS AND AMENDMENTS

The Debtors may alter, amend, or modify the Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy Code at any time prior to or after the Confirmation Date but prior to substantial Consummation of the Plan; *provided*, *however*, that any such alteration, amendment, or modification does not materially and adversely affect the treatment of Holders of Claims or Interests under the Plan.  Any Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

## XIII.   RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Bankruptcy Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

1. allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether Filed before or after the

47

Effective Date and whether or not contingent, disputed, or unliquidated or for contribution, indemnification, or reimbursement), including the compromise, settlement, and resolution of any request for payment of any Claims or Interests, the resolution of any objections to the allowance or priority of Claims or Interests, and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any objection to such Claim or Interest to the extent permitted under applicable law;

2. grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3. determine and resolve any matters related to (i) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom; and (ii) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that all Distributions to Holders of Allowed Claims under the Plan and the performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

5. construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and Consummation of the Plan and all contracts, instruments, releases, other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan in accordance with sections 524 and 1141 of the Bankruptcy Code following the occurrence of the Effective Date;

6. determine and resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation, implementation or enforcement of the Plan (and all exhibits and schedules to the Plan) or the Confirmation Order, including the releases and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

7. modify this Plan or the Confirmation Order before or after the Effective Date, pursuant to section 1127 of the Bankruptcy Code, as well as any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

8. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation, implementation, or enforcement of the Plan or the Confirmation Order;

48

9.  enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

10.  determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order;

11.  hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all GUC Trust Claims, and consider and act upon the compromise and settlement of any Claim, Interest, or Cause of Action;

12.  enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Bankruptcy Cases;

13.  hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

14.  determine and resolve controversies related to the Estates, the Debtors, or the GUC Trust from and after the Effective Date;

15.  determine such other matters and for such other purposes as may be provided in the Confirmation Order;

16.  hear and determine any other matter relating to this Plan;

17.  hear any other matter not inconsistent with the Bankruptcy Code; and

18.  enter a final decree closing any or all of the Bankruptcy Cases.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, or the Plan Supplement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Bankruptcy Cases, including the matters set forth in this Article XIII, the provisions of this Article XIII shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## XIV.  SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A.  COMPROMISE AND SETTLEMENT OF CLAIMS, INTERESTS, AND CONTROVERSIES

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions, releases, and other benefits provided pursuant to the Plan, which Distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the Distributions, releases, and other benefits provided hereunder, shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and are fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the GUC Trustee, may compromise and settle Claims against, and Interests in, the Debtors and their Estates and GUC Trust Claims against other Entities.

### B.  LIMITED DISCHARGE OF DEBTORS AND INJUNCTION

This is a liquidating Plan, and the Debtors do not intend to engage in operations after Confirmation. Notwithstanding the foregoing, the entry of the Confirmation Order will operate as a general resolution with prejudice, as of the Effective Date, of all pending legal proceedings, if any, against the Debtors and their assets and properties and any proceedings not yet instituted against the Debtors or their assets and properties, except as otherwise provided in the Plan or the Confirmation Order. Except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims against the Debtors are permanently enjoined on and after the Effective Date from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or their Estates, or the GUC Trustee, with respect to any such Claim, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any such Claim against the Debtors, their Estates, or the GUC Trustee, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, their Estates, or the GUC Trustee, with respect to such Claim, (iv) asserting any right of subrogation of any kind against any obligation due to the Debtors, their Estates, or the GUC Trustee, with respect to any such Claim, and (v) asserting any right of setoff or recoupment against the Debtors, their Estates, or the GUC Trustee except as specifically permitted by section 553 of the Bankruptcy Code. Unless otherwise provided in the Plan or the Confirmation Order, or by order of the Bankruptcy Court, all injunctions or automatic stays provided for in these Bankruptcy Cases pursuant to section 105, if any, or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date will remain in full force and effect until the Effective Date.

### C.  RELEASE OF LIENS

**Except as otherwise specifically provided in the Plan or in any other contract, instrument, agreement or document created pursuant to the Plan or the Plan Supplement, on the Effective Date and concurrently with the applicable Distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of**

**such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the GUC Trust and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required from the Debtors or the GUC Trustee, as applicable.**

### D.        RELEASES BY THE DEBTORS

**Pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, including the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Released Party will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the GUC Trust, and their respective Estates, as applicable, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the GUC Trust, or their respective Estates or Affiliates, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, ownership, or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the GUC Trust, as applicable, and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility, the Bridge Financing, the Prepetition Bond Documents, the APA, the Sale, the Bankruptcy Cases and any related adversary proceedings and related prepetition activities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the DIP Facility, the Bridge Financing, the Prepetition Bond Documents, the APA, the Sale, the Disclosure Statement, the Plan, or the Plan Supplement, the Debtors' restructuring efforts, the filing of the Bankruptcy Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, any action or actions taken in furtherance or consistent with administration of the Plan, the issuance or distribution of any debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations of any Entity arising on or after the Effective Date under the Plan, the Confirmation Order, the APA, any restructuring transaction, any assumed executory contract or unexpired lease, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; and (b) any Claim or Cause of Action against any Non-Released Party.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors and their respective Estates set forth in this Article XIV.D, which includes by reference each of the related provisions and definitions contained**

51

herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their respective Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, their Estates, or the GUC Trustee, as applicable, asserting any Claim or Cause of Action released pursuant to such releases.

E.        RELEASES BY THE RELEASING PARTIES

As of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor and other Released Party from any and all Causes of Action, whether known or unknown, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, ownership or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the GUC Trust, as applicable, and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility, the Bridge Financing, the Prepetition Bond Documents, the APA, the Sale, the Bankruptcy Cases and any related adversary proceedings and related prepetition activities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Plan, contract, instrument, release, or other agreement or document created or entered into in connection with the DIP Facility, the Bridge Financing, the Prepetition Bond Documents, the APA, the Sale, the Disclosure Statement, the Plan, or the Plan Supplement, the Debtors' restructuring efforts, the filing of the Bankruptcy Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, any action or actions taken in furtherance or consistent with administration of the Plan, the issuance or distribution of any debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations of any Entity arising on or after the Effective Date under the Plan, the Confirmation Order, the APA, any restructuring transaction, any assumed executory contract or unexpired lease, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Claim or Cause of Action against any Non-Released Party, or (c) any of the Debtors' commercial tort claims and Avoidance Actions transferred to the GUC Trust or the Purchaser, as applicable.

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article XIV.E, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.**

## F.      EXCULPATION AND LIMITATION OF LIABILITY

Except as otherwise specifically provided in the Plan, and to the fullest extent permissible under applicable law, neither the Debtors' Estates, the Debtors, nor the Committee will have or incur any liability to any Holder of a Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the solicitation of votes to accept the Plan, the Bankruptcy Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration of the Plan or the property to be distributed under the Plan, except for their actual fraud, gross negligence, or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

No Holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, will have any right of action against the Debtors' Estates, the Debtors, or the Committee, for any act or omission in connection with, relating to, or arising out of the solicitation of votes to accept the Plan, or the pursuit of Confirmation, the pursuit of Consummation, or the administration of the Plan or the property to be distributed under the Plan, except as provided by the Plan or by law.

## G.      INJUNCTION

**Except as otherwise provided in the Plan, from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, or creating, perfecting or enforcing any Lien of any kind, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, Interest, or remedy released or to be released, exculpated or to be exculpated, pursuant to the Plan or the Confirmation Order.  By accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the injunction in the Plan.  All injunctions or stays provided for in these Bankruptcy Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.**

## XV.      MISCELLANEOUS PROVISIONS

## A.      BINDING EFFECT

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and upon the occurrence of the Effective Date, the provisions of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order, shall be immediately effective and enforceable and bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan, all Entities that are parties

to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. **To opt-out of the release in Section XIV.E above, Holders of Claims must (i) timely submit a Ballot or notice of non-voting status indicating you have opted-out out of the release or (ii) timely file an objection with the Bankruptcy Court specifically stating your intention to opt-out by the deadline set by the Bankruptcy Court for filing and serving objections to approval of the Combined Disclosure Statement and Plan.**

## B.      SEVERABILITY OF PLAN PROVISIONS

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of a party in interest, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the GUC Trustee, as applicable; and (iii) non-severable and mutually dependent.

## C.      REVOCATION, WITHDRAWAL, OR NON-CONFIRMATION OF THE PLAN

The Debtors and the Committee reserve the right to revoke or withdraw the Plan prior to the Confirmation Hearing. If the Plan is revoked or withdrawn prior to the Confirmation Hearing, or if the Plan is not confirmed by the Bankruptcy Court, then (i) the Plan shall be null and void in all respects; and (ii) nothing contained in this Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Entity, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## D.      PAYMENT OF STATUTORY FEES; FILING OF QUARTERLY REPORTS

Notwithstanding any other provision of the Plan to the contrary, all U.S. Trustee Fees, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in full in Cash on or before the Effective Date. On and after the Effective Date, the GUC Trustee shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee for each Debtor until its case is closed, dismissed, or converted. All U.S. Trustee Fees that arise after the Effective Date shall be paid in full in Cash by the GUC Trustee when due. The GUC Trustee shall have the obligation to pay U.S. Trustee Fees pursuant to United States Code title 28 section 1930 for each and every Debtor until its particular case is closed, dismissed, or converted. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to File any proofs of Claim with respect to U.S. Trustee Fees.

E.      SUCCESSORS AND ASSIGNS

The rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

F.      FILING OF ADDITIONAL DOCUMENTS

On or before the Effective Date, the Debtors may issue, execute, deliver, and File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

G.      ENTIRE AGREEMENT

Except with respect to consummation of the Sale, including, but not limited to the APA, or as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, claims, and defenses, and such parties expressly reserve any and all of their respective rights, remedies, claims and, defenses.  The Plan and the documents comprising the Plan Supplement, including any drafts thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any claim or fault or liability or damages whatsoever.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to the Plan and the documents comprising the Plan Supplement are part of a proposed settlement of matters that could otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

H.      FURTHER ASSURANCES

The Debtors, the GUC Trustee, all Holders of Allowed Claims receiving Distributions pursuant to the Plan, and all other parties in interest may and shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

I.      SUBORDINATION RIGHTS

The classification and manner of satisfying all Claims and the respective Distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with the contractual, legal and equitable subordination rights relating thereto, whether arising under contract, general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  All subordination rights that a Holder of a Claim may have with respect to any Distribution to be made under the Plan shall be implemented through the Plan, and all actions by such Holder of a Claim related to the enforcement of such subordination rights shall be enjoined permanently. The provisions of any contractual or structural subordination of Claims shall remain enforceable by the GUC Trustee on behalf of the Estates after the occurrence of the Effective Date.  Without limitation hereunder, the GUC Trustee, on behalf of the Estates, may likewise enforce any right of the Debtors or the Estates to equitably or otherwise subordinate Claims under section 510 of the Bankruptcy Code, which

55

rights are deemed transferred to, remain and are preserved in the GUC Trust, except as otherwise expressly set forth herein or as expressly provided in a Final Order of the Bankruptcy Court in the Bankruptcy Cases.

## J.    GOVERNING LAW

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided*, that corporate, limited liability company, or partnership governance matters relating to the Debtors or the GUC Trust, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or the GUC Trust, as applicable.

## XVI.    CONFIRMATION OF THE PLAN

## A.    VOTING PROCEDURES AND REQUIREMENTS

### 1.  Confirmation Procedure.

The Solicitation Procedures Order, among other things, conditionally approves this Combined Disclosure Statement and Plan for solicitation purposes only and authorizes the Debtors to solicit votes to accept or reject the Plan.  The Confirmation Hearing has been scheduled virtually for **April 3, 2026 at 10:00 a.m. (prevailing Central Time)** in Courtroom 402, United States Courthouse, 515 Rusk Street, Houston, Texas 77002 to consider (i) final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code, and (ii) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice with the Bankruptcy Court.

### 2.  Procedure for Objections.

Any objection to final approval of this Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code or Confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (iii) state with particularity the basis and nature of any objection to this Combined Disclosure Statement and Plan and, if practicable, a proposed modification to this Combined Disclosure Statement and Plan that would resolve such objection; and (iv) be Filed with the Bankruptcy Court (contemporaneously with a proof of service) and served upon:  (a) counsel to the Debtors, Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Jennifer Marines (jmarines@mofo.com), Benjamin Butterfield (bbutterfield@mofo.com), and Andrew Kissner (akissner@mofo.com), and (b) Norton Rose Fulbright US LLP, 1550 Lamar Street, Suite 2000, Houston, TX 77010, Attn: Jason Boland (jason.boland@nortonrosefulbright.com), Julie Goodrich Harrison (julie.harrison@nortonrosefulbright.com), and Maria Mokrzycka (maria.mokrzycka@nortonrosefulbright.com); (b) the U.S. Trustee, Southern District of Texas, Region 7, 515 Rusk Street, Suite 3516, Houston, TX 77002, Attn: Ha Nguyen (ha.nguyen@usdoj.gov) and Jana Whitworth (jana.whitworth@usdoj.gov); (c) counsel to the Committee, Gray Reed, Attn: Lydia Webb (lwebb@grayreed.com) and Jason S. Brookner (jbrookner@grayreed.com); and (d) counsel to the Prepetition Trustee, Arnold & Porter Kaye Scholer LLP, 70 West Madison Street, Suite 4200, Chicago, IL 60602-4321, Attn: Michael Messersmith (michael.messersmith@arnoldporter.com) and Sarah Gryll

56

(sarah.gryll@arnoldporter.com) so as to be **actually received** no later than March 27, 2026.  **Unless an objection to this Combined Disclosure Statement and Plan is timely Filed and served, it may not be considered by the Bankruptcy Court**.

### 3. Requirements for Confirmation.

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among other requirements, the Plan (i) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (ii) must be feasible.  The Bankruptcy Court must also find that: (a) the Plan has classified Claims and Interests in a permissible manner; (b) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.

### 4. Classification of Claims and Interests.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).  The Debtors and the Committee also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors and the Committee believe that the Plan complies with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors and the Committee believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtors and the Committee intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

**EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM**

**REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by Holders of Allowed Claims. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtors and the Committee believe that the consideration, if any, provided under the Plan to Holders of Allowed Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

5.    **Impaired Claims or Interests**.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Class 3 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims or Interests in Classes 4, 5, and 6 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan. Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3.**

6.    **Confirmation without Necessary Acceptances; Cramdown**.

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly," and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims and Interests in Classes 4, 5, and 6 are deemed to reject the Plan, the Debtors and the

58

Committee will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  The Debtors and the Committee believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those in Classes 4, 5, and 6 is entitled to receive any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtors and the Committee believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable."  To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

(a)      **Secured Creditors**.  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b)      **Unsecured Creditors**.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)      **Interests**.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest, or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors and the Committee believe that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

### 7.   **Opt-Out of Releases Under the Plan**.

The Plan contains certain third-party releases by Releasing Parties, which are set forth in Article XIV.E herein.  Releasing Parties include, among others, Consenting Creditors, who represent (a) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan and who do not check the box on the applicable Ballot to affirmatively opt out of the releases set forth in the Plan; and (b) all Holders of Claims or Interests that abstain from voting on the Plan, vote to reject the Plan, or are deemed to reject the Plan and who do not either (i) timely check the box on the applicable Ballot or notice of non-voting status to affirmatively opt out of the releases set forth in the Plan, or (ii) timely object to the Plan in respect of the releases contained therein that is not withdrawn or otherwise resolved before Confirmation of the Plan.

Ballots include an option for any Holders of Claims to check a box to opt-out of the releases contained in the Plan. Holders of Claims and Interests that are not entitled to vote will receive a notice of non-voting status that includes, among other things, an optional form to opt-out of the releases under the Plan. Additionally, an Entity will not be a Releasing Party if it timely files an objection with the Bankruptcy Court to the releases contained in the Plan and such objection is not resolved before the confirmation of the Plan.

## B. THE BEST INTERESTS TEST & LIQUIDATION ANALYSIS

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

As described in more detail in the liquidation analysis attached hereto as **Exhibit A**, because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors and the Committee believe that in a chapter 7 liquidation, there would be substantial additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors and the Committee believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimate Distribution to the Holders of Allowed Claims. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Bankruptcy Cases (such as compensation for professionals) that are allowed in the chapter 7 cases.

It is also anticipated that a chapter 7 liquidation would result in delay in the distributions to Holders of Allowed Claims. Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than ninety days following conversion of the case to chapter 7. Thus, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the Bankruptcy Cases.

Accordingly, the Debtors and the Committee believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Bankruptcy Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

**IMPORTANTLY, THE DEBTORS AND THE COMMITTEE URGE ALL HOLDERS OF CLAIMS IN THE IMPAIRED CLASS RECEIVING BALLOTS TO VOTE TO ACCEPT THE PLAN AS CONTAINED HEREIN.**

Based on the foregoing, the Plan provides an opportunity to bring the greatest return to Holders of Allowed Claims.

## C.      FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).  Because the Combined Disclosure Statement and Plan proposes a liquidation of all of the Debtors' remaining assets, for purposes of this test, the Debtors and their advisors have analyzed the ability of the Debtors and the GUC Trustee, as applicable, to meet their respective obligations under the Combined Disclosure Statement and Plan. Specifically, the GUC Trustee will have access to the GUC Trust Assets, which the Debtors project will be sufficient for the Debtors and the GUC Trustee, as applicable, to fulfill their respective obligations under the Plan.  Therefore, the Debtors and the Committee believe that the liquidation pursuant to the Combined Disclosure Statement and Plan will meet the feasibility requirements of the Bankruptcy Code.

## D.      ACCEPTANCE OF THE PLAN

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of Ballots are set forth in the Solicitation Procedures Order.

For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan.  At least one voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

Holders of Claims entitled to vote on the Plan will receive instructions for submitting a Ballot to vote to accept or reject the Plan.  After carefully reviewing the Disclosure Statement, including all exhibits, each Holder of a Claim (or its authorized representative) entitled to vote should follow the instructions to indicate its vote on the Ballot.  All Holders of Claims (or their authorized representatives) entitled to vote must (i) carefully review the Ballot and the instructions for completing it, (ii) complete all parts of the Ballot, and (iii) submit the Ballot by **March 27, 2026** (the "*Voting Deadline*") for the Ballot to be considered.  Holders of Claims (or their authorized representatives) entitled to vote must by the Voting Deadline either:  (i) submit an electronic ballot via the Solicitation Agent's website at https://cases.stretto.com/aleonmetals/; or (ii) deliver the Ballot(s) to the Solicitation Agent by mail or hand delivery at the following address:

| **If by First-Class Mail:** |
| Aleon Metals, LLC, *et al.* |
| Ballot Processing c/o Stretto |
| 410 Exchange, Suite 100 |
| Irvine, CA 92602 |

> **If by Hand Delivery or Overnight Mail:**
> Aleon Metals, LLC, *et al.*
> Ballot Processing c/o Stretto
> 410 Exchange, Suite 100
> Irvine, CA 92602

> **By Electronic, Online Submission:**
>
> Please visit https://cases.stretto.com/aleonmetals/.  Click on the link and follow the prompts and directions.  To access and submit your E-Ballot, you will need to enter your unique E-Ballot ID#.  Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your Ballot.  **Holders who cast a Ballot using the Solicitation Agent's E-Ballot platform portal should NOT also submit a paper Ballot.**

**BALLOTS MUST BE SUBMITTED SO AS TO BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT NO LATER THAN THE VOTING DEADLINE.  ANY BALLOTS SUBMITTED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.**

**HOLDERS OF CLAIMS IN CLASS 3 WHO DO NOT WISH TO PROVIDE THE RELEASES SET FORTH IN ARTICLE XIV.E HEREIN MUST AFFIRMATIVELY INDICATE SO BY CHECKING THE "OPT-OUT" BOX ON THEIR BALLOT.**

**PLEASE BE ADVISED THAT ALL HOLDERS OF CLAIMS IN CLASS 3 THAT (I) VOTE TO ACCEPT THE PLAN; OR (II) VOTE TO REJECT THE PLAN, OR DO NOT VOTE, BUT DO NOT AFFIRMATIVELY MAKE THE OPT-OUT ELECTION ON THEIR BALLOT SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN ARTICLE XIV.E HEREIN.**

### XVII.   CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW.  HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.      **CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

1.      **Parties in Interests May Object to the Plan's Classification of Claims and Interests**.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors and the Committee believe that the classification of the Claims and

Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors and the Committee created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur**.

As more fully set forth in Article X, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not satisfied or waived, the Effective Date will not take place.

**3.    The Plan May Not be Accepted**.

The Debtors and the Committee can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors and the Committee may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

**4.    The Plan May Not Be Confirmed**.

Even if the Debtors and the Committee receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that this Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation had not been met.  Moreover, there can be no assurance that modifications to this Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a chapter 11 reorganization or liquidation of the Debtors' assets could be implemented and what Distribution the Holders of Allowed Claims would receive.  If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that the Holders of Allowed Claims would receive less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

**5.    Contingencies Could Affect Votes of the Impaired Class to Accept or Reject the Plan**.

The Distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies could affect Distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Class to accept or reject the Plan or require any sort of revote by the Impaired Class.

The estimated Claims and creditor recoveries set forth in this Combined Disclosure Statement and Plan are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Combined Disclosure Statement and Plan.  Moreover, the Debtors and the Committee cannot determine with any

certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**6.** **Releases, Injunctions, and Exculpation Provisions May Not be Approved**.

Article XIV of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors or Released Parties, as applicable.  The Bankruptcy Court's approval of the releases, injunctions, and exculpations provided in the Plan may be subject to objection by parties in interest and may not be approved.

**B.**      **FAILURE TO CONFIRM OR CONSUMMATE THE PLAN**

If the Plan is not confirmed and consummated, it is possible that an alternative plan can be negotiated and presented to the Bankruptcy Court for approval; however, there is no assurance that the alternative plan, if any, will be confirmed, that the Bankruptcy Cases will not be converted to a chapter 7 liquidation, or that any alternative chapter 11 plan could or would be formulated on terms as favorable to creditors as the terms of the Plan.  Holders of Interests will receive no recovery under the Plan or in a chapter 7 liquidation.  If a chapter 7 liquidation were to occur, there is a risk that there would be little, if any, value available for distribution to the Holders of Allowed Claims.

**XVIII.  TAX CONSEQUENCES**

**A.**      **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES**

The following discussion is a summary of certain material U.S. federal income tax consequences of the Combined Disclosure Statement and Plan to U.S. Holders (as defined below) (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims. The following summary does not address the U.S. federal income tax consequences to U.S. Holders of Claims or Interests not entitled to vote on the Combined Disclosure Statement and Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "***Internal Revenue Code***"), U.S. Department of the Treasury regulations promulgated and proposed thereunder (the "***Treasury Regulations***"), judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Combined Disclosure Statement and Plan and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below.  The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to U.S. Holders of Claims or Interests in light of their individual circumstances, nor does the discussion deal with tax issues with respect to U.S. Holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies; banks or other financial institutions; brokers, dealers, or traders in securities; real estate investment trusts; governmental authorities or agencies; tax-exempt organizations; retirement plans; individual retirement or other tax-deferred accounts; certain expatriates or former long-term residents of the United States; small business investment companies; regulated investment companies; S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners; persons whose functional currency is not the U.S. dollar; persons who use a mark-to-market method of accounting; persons required to report income on an applicable financial statement; persons holding Claims or Interests as part of a

64

straddle, hedge, constructive sale, conversion transaction, or other integrated transaction; and persons who are not U.S. Holders (as defined below)).  Furthermore, this discussion assumes that a U.S. Holder of a Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the Internal Revenue Code (generally property held for investment).  This discussion does not address any U.S. federal non-income (including estate or gift), state, local, or foreign taxation, alternative minimum tax, or the Medicare tax on certain net investment income.

If a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a U.S. Holder of Claims or Interests, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.  A U.S. Holder of a Claim or Interest that is a partnership and the partners in such partnership should consult their tax advisors with regard to the U.S. federal income tax consequences of the Combined Disclosure Statement and Plan.

"U.S. Holder" is a Holder of a Claim that is: (1) an individual who is a citizen or resident of the U.S. for U.S. federal income tax purposes; (2) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S. or any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (4) a trust (A) if a court within the U.S. is able to exercise primary supervision over its administration and one or more "U.S. persons" as defined in the Internal Revenue Code have authority to control all substantial decisions of the trust or (B) that was in existence on August 20, 1996 and has a valid election in effect under the Treasury Regulations to be treated as a U.S. trust.  Non-U.S. Holders should consult their own advisors concerning the tax consequences of the Plan to them.

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A U.S. HOLDER OF A CLAIM OR INTEREST.  EACH U.S. HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH U.S. HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.**

**B.      TAX CONSEQUENCES FOR U.S. HOLDERS OF CERTAIN CLAIMS**

Generally, a U.S. Holder of a Claim will be treated as disposing of its Claim in a taxable exchange governed by Section 1001 of the Internal Revenue Code.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest (as discussed further below), a U.S. Holder of a Claim generally will recognize gain or loss equal to the difference between the "amount realized" (if any) by such U.S. Holder in exchange for its Claim and such U.S. Holder's "adjusted tax basis" in the Claim.  The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under the Plan in respect of a U.S. Holder's Claim.  The "adjusted tax basis" of a U.S. Holder in a Claim will generally be equal to the U.S. Holder's cost therefor.  To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the U.S. Holder, the nature of the Claim in the U.S. Holder's hands, the purpose and circumstances of its acquisition, the U.S. Holder's holding period of the Claim, and the extent to which the U.S. Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. If the Claim is a capital asset in the U.S. Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the U.S. Holder has held such Claim for more than one year.  Long-term capital gains of non-corporate taxpayers may be taxed at lower rates than items of ordinary income. The deductibility of capital losses is subject to limitations.

A portion of the consideration received by a U.S. Holder may be attributable to accrued but untaxed interest on its Claim.  A U.S. Holder who did not previously include accrued but unpaid interest attributable to its Claim in its gross income for U.S. federal income tax purposes, and who receives a distribution on account of its Claim pursuant to the Plan, will recognize ordinary income to the extent such amounts were not taken into income by the U.S. Holder, regardless of whether such U.S. Holder realizes an overall gain or loss as a result of surrendering its Claim.  A U.S. Holder who previously included accrued but unpaid interest attributable to its Claim in its gross income for U.S. federal income tax purposes should recognize a deductible loss to the extent that such accrued but unpaid interest is not satisfied in full. Such loss may be ordinary, but the tax law is unclear on this point.

## C.   INFORMATION REPORTING AND WITHHOLDING

In connection with the Combined Disclosure Statement and Plan, the Debtors will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all Distributions under the Combined Disclosure Statement and Plan will be subject to those withholding and information reporting requirements.  U.S. Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Combined Disclosure Statement and Plan.

In general, information reporting requirements may apply to Distributions pursuant to the Combined Disclosure Statement and Plan.  Additionally, under the backup withholding rules, a U.S. Holder may be subject to backup withholding with respect to Distributions made pursuant to the Combined Disclosure Statement and Plan, unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establishes an exemption from backup withholding.  Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund, provided the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  U.S. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Combined Disclosure Statement and Plan would be subject to these regulations and require disclosure on the U.S. Holder's tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR U.S. HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH U.S. HOLDER'S CIRCUMSTANCES.  EACH U.S. HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH U.S. HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.**

## XIX.   CONCLUSION AND RECOMMENDATION

The Debtors and the Committee believe that Confirmation of the Plan is desirable and in the best interests of all Holders of Claims and Interests.  The Debtors and the Committee therefore urge you to vote

to accept the Plan and to evidence such acceptance by returning the Ballot(s) so that they will be received by the Voting Deadline.

Dated: February 20, 2026                    */s/ Roy Gallagher*
                                            Roy Gallagher
                                            Chief Restructuring Officer of the Debtors


                                            */s/ Jason S. Brookner*
                                            **GRAY REED**
                                            Jason S. Brookner (TX Bar No. 24033684
                                            Lydia R. Webb (TX Bar No. 24083758)
                                            Emily F. Shanks (TX Bar No. 24110350)
                                            1300 Post Oak Blvd., Suite 2000
                                            Houston, TX 77056
                                            Telephone: (713) 986-7000
                                            Facsimile: (713) 986-7100
                                            Email: jbrookner@grayreed.com
                                            Email: lwebb@grayreed.com
                                            Email: eshanks@grayreed.com

                                            *Counsel to the Official*
                                            *Committee of Unsecured Creditors*

68

**EXHIBIT A**

**Liquidation Analysis**

Liquidation Analysis - Estimated Proceeds
*($ in 000s)*

Confidential

| # | Detail | Ref | Ch. 11 Plan Aleon, et al | Hypothetical Ch. 7 Liquidation GMR | ARM | AM |
|---|---|---|---|---|---|---|
| 1. | **Total Available Assets** | (1) | **1,063** | **857** | **204** | **2** |
| | | | | | | |
| 2. | Professional Fees | (2) | (237) | (352) | (15) | - |
| 3. | Chapter 7 Trustee Fees | (3) | n.a. | (46) | (13) | (0) |
| 4. | U.S. Trustee Fees - Ch. 11 Quarterly Fees | (4) | (12) | (11) | (1) | (0) |
| 5. | Subtotal, Wind Down Costs | | (249) | (409) | (29) | (1) |
| | | | | | | |
| 6. | **Gross Proceeds Available for Distribution to Creditors** | | **814** | **448** | **175** | **1** |
| | | | | | | |
| 7. | Administrative Claims | (5) | (119) | (119) | - | - |
| 8. | Priority Tax Claims | (6) | (72) | (72) | - | - |
| 9. | Subtotal, Admin & Priority Tax Claims | | (191) | (191) | - | - |
| | | | | | | |
| 10. | **Net Proceeds Available for Distribution to Creditors** | | **623** | **258** | **175** | **1** |

**Notes:**

(1) Represents cash available for distribution as of 2/5/2025. For purposes of the liquidation analysis, $200,000 has been allocated to ARM for land and equipment contributed to the sale. This amount was determined using prior value indications for ARM received from 3rd parties during the sale process.

(2) Includes $124,497 for debtor professionals and $67,500 for UCC professionals. The Hypothetical Ch. 7 Liquidation includes an additional $175,000 of estimated fees incurred by the Ch. 7 Trustee, Trustee advisors, and Debtors professionals to effectively convert and effectuate the liquidation. The Ch. 11 Plan fees includes $45,000 for claims agent costs.

(3) Ch. 7 Trustee Fees are dictated by the fee guidelines of section 326(a) of the Bankruptcy Code, calculated as: 25% of first $5,000 or less, 10.0% of amounts between $5,000 and $1,000,000, and 3.0% on amounts over $1,000,000.

(4) Includes estimated payments for Q1 2026 U.S. Trustee Fees.

(5) Represents 503(b)(9) claims.

(6) Represents accrued sales & use tax assumed to be treated as a priority tax 507(a)(8) claim. Unreported sales & use tax may include potential lates fees and/or penalties which have not been assessed.

Liquidation Analysis - Recoveries Comparison
*($ in 000s)*

Confidential

| # | Detail | Ref | | Proposed Ch. 11 Plan – Aleon, et al | | | | Hypothetical Ch. 7 Liquidation – GMR | | | | Hypothetical Ch. 7 Liquidation – ARM | | | | Hypothetical Ch. 7 Liquidation – AM | | |
|---|--------|-----|---|------|-----------|---|---|------|-----------|---|---|------|-----------|---|---|------|-----------|---|
| | | | | Claim | Recovery $ | Recovery % | | Claim | Recovery $ | Recovery % | | Claim | Recovery $ | Recovery % | | Claim | Recovery $ | Recovery % |
| 1. | **Net Proceeds Available for Distribution to Creditors** | | | $ 623 | | | | $ 258 | | | | $ 175 | | | | $ 1 | | |
| 2. | Class 1: Other Priority Claims | Pass | | - | - | n.a. | | - | - | n.a. | | - | - | n.a. | | - | - | n.a. |
| 3. | Proceeds Available to Other Secured Claims | | | $ 623 | | | | $ 258 | | | | $ 175 | | | | $ 1 | | |
| 4. | Class 2: Other Secured Claims | Pass | | - | - | n.a. | | - | - | n.a. | | - | - | n.a. | | - | - | n.a. |
| 5. | Proceeds Available to General Unsecured Claims | | | $ 623 | | | | $ 258 | | | | $ 175 | | | | $ 1 | | |
| 6. | General Unsecured Claims | (1) | | (92,671) | (456) | 0.49% | | (49,249) | (95) | 0.19% | | (737) | (1) | 0.17% | | (42,685) | (1) | 0.0% |
| 7. | General Unsecured Claims (Deficiency Claims) | (2) | | (188,026) | (167) | 0.09% | | (84,466) | (163) | 0.19% | | (103,560) | (173) | 0.17% | | - | - | n.a. |
| 8. | Class 3: All General Unsecured Claims | Pass | | (280,697) | (623) | 0.22% | | (133,715) | (258) | 0.19% | | (104,297) | (175) | 0.17% | | (42,685) | (1) | 0.0% |
| 9. | Proceeds Available to Intercompany Claims | | | $ - | | | | $ - | | | | $ - | | | | $ - | | |
| 10. | Class 4: Intercompany Claims | (3) Pass | | n.a. | - | n.a. | | (148,414) | - | 0.0% | | (38,266) | - | 0.0% | | (116,570) | - | 0.0% |
| 11. | Proceeds Available to Intercompany Interests | | | $ - | | | | $ - | | | | $ - | | | | $ - | | |
| 12. | Class 5: Intercompany Interests | (3) Pass | | n.a. | - | n.a. | | - | - | n.a. | | - | - | n.a. | | (54,803) | - | 0.0% |
| 13. | Proceeds Available to Interests in Aleon Metals | | | $ - | | | | $ - | | | | $ - | | | | $ - | | |
| 14. | Class 6: GM-FTAI HoldCo Interests in Aleon Metals | Pass | | (54,803) | - | 0.0% | | - | - | n.a. | | - | - | n.a. | | (54,803) | - | 0.0% |

**Notes:**

(1)  Recoveries under the Plan represent pro rata distribution of $373,006 ($440,000 net of priority tax claims of $71,952 and additional cash of $4,958) for GUC Trust Beneficiaries, excluding the Holders of Deficiency Claims, and pro rata distribution of $250,000 of GUC Trust claims.

(2)  Recoveries under the Plan represent pro rata distribution of $250,000 of GUC Trust claims for the benefit of all allowed general unsecured claims, including the Deficiency Claims.

(3)  Intercompany claims and interest not applicable on consolidated basis.

**EXHIBIT B**

**Disclosure Statement Order**

**EXHIBIT B**

**Confirmation Order and Effective Date Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALEON METALS, LLC *et al.*,[1] | ) Case No. 25-90305 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF (I) ENTRY OF ORDER CONFIRMING THE
JOINT PLAN OF LIQUIDATION FOR ALEON METALS, LLC, *ET AL.* AND
(II) OCCURRENCE OF THE EFFECTIVE DATE**

**PLEASE TAKE NOTICE** that on [●], 2026, the United States Bankruptcy Court for the Southern District of Texas (the "***Court***") entered the *Findings of Fact, Conclusions of Law, and Order Approving the Disclosure Statement for, and Confirming the Joint Plan of Liquidation of Aleon Metals, LLC, et al.* [Docket No. [●]] (the "***Confirmation Order***") confirming the *Combined Disclosure Statement and Joint Plan of Liquidation for Aleon Metals, LLC, et al.* [Docket No. 360] (the "***Plan***").[2]

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on [●], 2026.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan and the Confirmation Order may be obtained by visiting the Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein or on the website of the Debtors' Solicitation Agent at https://cases.stretto.com/AleonMetals.

**PLEASE TAKE FURTHER NOTICE** that the Court has approved certain discharge, release, exculpation, injunction, and related provisions in Article XIV of the Plan. The Plan and the Confirmation Order, and the provisions thereof, are binding on the Debtors, the GUC Trustee, and any Holder of a Claim against or an Interest in the Debtors, and such Holder's respective successors, assigns, and designees, whether or not the Claim or the Interest of such Holder is Impaired under the Plan and whether or not such Holder voted to accept the Plan.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aleon Metals, LLC (1610); Aleon Renewable Metals, LLC (9215); and Gladieux Metals Recycling, LLC (6057).  The location of the Debtors' service address is: P.O. Box 2290, 302 Midway Road, Freeport, TX 77542.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan or Confirmation Order, as applicable.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Plan and the Confirmation Order, the deadline for filing requests for payment of Professional Fee Claims shall be thirty (30) days after the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that from and after this date, if you wish to receive notice of filings in these Chapter 11 Cases you must request such notice with the clerk of the Court and serve a copy of such request for notice on counsel to the GUC Trustee. You must do so even if you filed such a notice prior to the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that the Plan and the Confirmation Order contain other provisions that may affect your rights. You are encouraged to review the Plan and the Confirmation Order in their entirety.

[*Remainder of page intentionally left blank.*]

Houston, Texas
Dated:[●], 2026

*/s/ DRAFT*

| **NORTON ROSE FULBRIGHT US LLP** | **MORRISON & FOERSTER LLP** |
|---|---|

Jason L. Boland (SBT 24040542)

Bob B. Bruner (SBT 08390450)

Julie Harrison (SBT 24092434)

Maria Mokrzycka (SBT 24119994)

1550 Lamar, Suite 2000

Houston, Texas 77010

Telephone: (713) 651-5151

Facsimile: (713) 651-5246

Email: jason.boland@nortonrosefulbright.com

Email: bob.bruner@nortonrosefulbright.com

Email: julie.harrison@nortonrosefulbright.com

Email: maria.mokrzycka@nortonrosefulbright.com

Jennifer L. Marines (admitted *pro hac vice*)

Benjamin Butterfield (admitted *pro hac vice*)

Andrew Kissner (admitted *pro hac vice*)

250 West 55th Street

New York, New York 10019

Telephone: (212) 468-8000

Facsimile: (212) 468-7900

Email: jmarines@mofo.com

Email: bbutterfield@mofo.com

Email: akissner@mofo.com

*Co-Counsel to the Debtors and Debtors in Possession*

*Co-Counsel to the Debtors and Debtors in Possession*

*/s/ DRAFT*

**GRAY REED**

Jason S. Brookner (TX Bar No. 24033684

Lydia R. Webb (TX Bar No. 24083758)

Emily F. Shanks (TX Bar No. 24110350)

1300 Post Oak Blvd., Suite 2000

Houston, TX 77056

Telephone: (713) 986-7000

Facsimile: (713) 986-7100

Email:  jbrookner@grayreed.com

Email: lwebb@grayreed.com

Email: eshanks@grayreed.com

*Counsel to the Official*
*Committee of Unsecured Creditors*

3

## CERTIFICATE OF SERVICE

I certify that on [●], 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ DRAFT*

[●]

4